UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF COMMISSIONS
IMPORT-EXPORT S.A. FOR JUDICIAL
ASSISTANCE PURSUANT TO
28 U.S.C. § 1782

CASE NO. _

**DECLARATION OF NATHALIE MAKOWSKI IN SUPPORT OF
APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

1. I, Nathalie Makowski, under penalties of perjury pursuant to 28 U.S.C. § 1746, hereby declare:

2. I am over the age of 18 and make this Declaration upon my personal knowledge, my review of relevant documents, and information supplied by the Applicants (defined below).

3. I am a lawyer in France and am a partner at the law firm OPLUS, located in France. I have been practicing law for 18 years and specialize in international arbitration and commercial litigation relating to the enforcement of arbitral decisions in French Courts.

4. I am fluent in English and make this Declaration without the aid of a translator.

5. I currently represent Commissions Import-Export S.A. (the "Applicant" OR "Commisimpex") in litigation in France against TotalEnergies SE, TotalEnergies Holdings SAS, and TotalEnergies EP Congo in the Commercial Court of Nanterre, France in case RG n°2016F02380 (the "French Proceeding").

6. I make this Declaration in support of Commisimpex's Application for Judicial Assistance pursuant to 28 U.S.C. § 1782.

7. Commisimpex is a company that is organized under the laws of the Republic of

Congo (the "ROC") but is managed from Beirut, Lebanon.

8. Commisimpex seeks assistance from the United States District Court for the Southern District of New York to obtain documentary evidence from the New York Stock Exchange, BOFA Securities Inc., MUFG Securities America, Morgan Stanley & Co. LLC, Natixis Securities Americas LLC, SMBC Nikko Securities America, and Deutsche Bank Securities (collectively, "Respondents") to support the civil proceeding pending in the Commercial Court of Nanterre, France in case RG n°2016F02380 against TotalEnergies SE, TotalEnergies Holdings SAS, and TotalEnergies EP Congo, due to a debt of approximately $2.1 billion guaranteed owed by the Republic of Congo and guaranteed by payments owed by TotalEnergies SE, TotalEnergies Holdings SAS, and TotalEnergies EP Congo relating to their operations in Congolese oil and gas fields.

## Background

9. From 1984 to 1986, Commisimpex contracted with the Republic of Congo (the "ROC") for infrastructure and public works construction projects (the "Contracts").

10. The Contracts were initially funded by supplier credits granted by Commisimpex to the ROC, which were formalized into promissory notes issued by a Congolese public institution known as the *Caisse Congolaise d'Amortissement* ("CCA"), to be guaranteed by the ROC. The first payments on the promissory notes were due in January 1992.

11. On December 22, 1986, the ROC, represented by its Ministry of Finance and the CCA, issued a payment Guaranty (the "Guaranty") to Commisimpex. A true and correct copy of the Guaranty is attached as Exhibit 1 and an accurate translation of the Guaranty is attached as Exhibit 2. It includes a clause stating that it is to be governed by Swiss law. Ex. 2 at p.7.

12. The Guaranty specifically stated that its purpose was "to enable COMMISIMPEX *to provide the necessary financing for the completion and execution of the contracts and amendments to the works and supplies awarded to it*" and included a list of eleven contracts and the amounts owed under the contracts, which it acknowledged were "financed exclusively with the loans granted by Commisimpex." *Id*. at § 3, ¶ A, B.

13. The Guaranty identifies eleven contracts, entered into from 1984 to 1986, of which five were payable in French Francs, five in Pounds Sterling, and one in USD. The $66 million USD sum represents the estimated aggregate value of the contracts in USD value under the then-prevailing exchange rates.

14. The only obligation for Commisimpex in the Guaranty was to satisfy its obligations under the Contracts. *Id*. at § 3, ¶ F.

15. The ROC determined that Commisimpex did so and issued certificates of completion.

16. As security for full payment under the Guaranty, the ROC pledged "all revenues, and in particular all receivables, royalties, taxes, duties, and other rights" from certain defined oil and gas fields in the ROC, specifically referencing the payments owed under a convention entered in October 1968, between the ROC and several energy companies. *Id*. at 2 and § 3, ¶ F.

17. The 1986 Guaranty issued by the ROC "is enforceable at the demand of COMMISIMPEX" and is a "permanent instruction" to ELF to make payments to Commisimpex rather than to the ROC of "up to the amount of the sums of the contracts, amendments and work mentioned above, including principal and interest, costs, accessories, and compensation for all prejudices of delay." *Id.* at Article 1. Through the 1986 Guaranty, the ROC assigned incoming

payments from its oil and gas fields to Commisimpex as surety for the Contracts. *Id*. at ¶ F, I.

18. The Guaranty is subject to and legal under Swiss law, as set forth in the expert opinion of Professor Pascal Pichonnaz (the "Pichonnaz Opinion"), a true and correct copy of which is attached as Exhibit 3, and an accurate translation of which is attached as Exhibit 4. Professor Pichonnaz is a former judge, and currently the president of the European Law Institute and the chair of private and roman law at the University of Fribourg in Switzerland, where he teaches contract law. According to the Pichonnaz Opinion, Swiss law permits parties to pledge incoming payments as debt securities, and does not require the consent of the parties from whom the pledged payments are due; the Guaranty functions as a "pledge on receivables" under Article 899 *et seq*. of the Swiss Civil Code. Professor Pichonnaz further opined that the Guaranty is a legitimate contract under Swiss law that remains valid until the full obligation of the underlying debt is satisfied. *Id*.

19. Attached as Exhibit 5 is a true and correct copy of an April 3, 1987 Certification from the Justice of the Supreme Court of Congo, who confirmed that the Guaranty complied with Congolese law and legal policy. An accurate copy of a translation of the 1987 Certification is attached as Exhibit 6.

**Arbitration against the ROC**

20. The ROC did not meet its payment obligations under the Contracts when the promissory notes came due in 1992, at which point the debt had grown to approximately $194 million.

21. The ROC and Commisimpex compromised and entered into an agreement on October 14, 1992 (the "1992 Agreement"), which was the subject of a December 7, 2000 arbitral

award in Commisimpex's favor (the "2000 Award"). A true and correct certified translation of the 2000 Award is attached as Exhibit 7.

22. The 1992 Agreement would allow the ROC to pay a portion (then valued at $86,832,448.52) of the existing debt according to a ten-year payment plan, in 120 equal and successive monthly installments. The first payment was scheduled to begin on January 30, 1998, effectively delaying the repayment by an additional six years. *Id*. at 27.

23. The ROC also waived sovereign immunity in the 1992 Agreement, and agreed to resolve all disputes through binding arbitration. *Id*. at 4.

24. The ROC failed to make the January 30, 1998 payment.

25. Commisimpex initiated arbitration under the auspices of the International Chamber of Commerce (ICC) in 1998, which the ROC unsuccessfully opposed. *Id*.

26. The Tribunal issued a partial award on August 7, 1998, and a final arbitral award on December 7, 2000 recognizing that Commisimpex had satisfied its obligations under the Contracts and ordered the Republic of the Congo and CCA to pay the amounts set forth in the 1992 Agreement, as well as interest, penalty interest on the various promissory notes, and costs. *Id*. at 67-70.

27. Rather than simply pay any portion of the 2000 Award – which recognized damages of approximately $107 million with interest and costs – the ROC unsuccessfully tried to annul the 2000 Award, but it was upheld by the Tribunal de Grande Instance of Paris and the Paris Court of Appeals on May 23, 2002. It has also been upheld in courts in Belgium, Sweden, the UK and the United States.

28. On August 23, 2003, Commisimpex, the ROC, and the CCA entered into a new

agreement confirming the entirety of the debt and adopting a new repayment plan (the "2003 Agreement"). A true and correct copy of the 2003 Agreement is attached as Exhibit 8, and an accurate translation is attached as Exhibit 9.

29. The 2003 Agreement covered the entirety of the ROC's debt to Commisimpex under the Contracts and it referenced the 1986 Guaranty as remaining active and not novated by the 2003 Agreement. The 2003 Agreement specifically preserved all of Commisimpex's legal rights against the debt "until full settlement of the commitments made by the State of CONGO." *Id*. Article 7.

30. The Republic of Congo failed to make payments under the 2003 Agreement, and Commisimpex initiated arbitration on April 17, 2008.

31. The Tribunal issued a partial award on August 20, 2010, which confirmed its jurisdiction, and a final award on January 21, 2013, ordering the ROC to pay €956,971,876 euros in principal, interest, penalty interest, costs, and incidental expenses. A true and correct copy of the 2013 final arbitral award ("2013 Award") is attached as Exhibit 10, and an accurate translation is attached as Exhibit 11.

32. The 2010 partial award was upheld by the Paris Court of Appeal on June 12, 2012.

33. The 2013 Award was rendered enforceable in France on February 13, 2013. The annulment appeal was dismissed by the Paris Court of Appeal on October 14, 2014, and that dismissal was confirmed by the French Court of Cassation on May 25, 2016.

34. The Awards have continued to accumulate interest, and the total debt currently stands at approximately €1.8 billion, or $2.1 billion USD.

35. The ROC attempted to neutralize the Awards in 2012 by causing a sham judgment

to be issued by its courts against Commisimpex followed by a very short liquidation proceeding, concluding on October 30, 2012. The Tribunal de Grande Instance de Paris, as upheld by the Paris Court of Appeals on September 12, 2017 and the French Court of Cassation on January 16, 2019 found that the Congolese liquidation proceedings so "violated the principle of good faith" so as to be "without effect" as to the existing debt." A true and correct copy of the decision by the Paris Court of Appeals is attached as Exhibit 12, and an accurate translation is attached as Exhibit 13.

### TotalEnergies' Involvement

36. TotalEnergies SE (then Total SA) acquired ELF pursuant to a merger initiated in 1999. ELF Aquitaine ultimately became TotalEnergies Holdings SAS, and ELF Congo became TotalEnergies EP Congo. Both TotalEnergies Holdings SAS and TotalEnergies EP Congo are subsidiaries of TotalEnergies SE.

37. The 1968 Convention has been amended several times, including a 2004 amendment that recognized TotalEnergies SE's acquisition of ELF, through which TotalEnergies acquired ELF's obligations and rights under the 1968 Convention. The 1968 Convention was abrogated in 2020, but that abrogation does not affect Commsimpex's rights under the Guaranty, which predate that abrogation.

38. None of the Amendments to the 1968 Convention released TotalEnergies or ELF from their obligations under the Guaranty or the 1968 Convention.

39. In October 2011, Commisimpex served copies of the Guaranty and the 2000 Award on TotalEnergies SE to formally notify TotalEnergies SE of the outstanding debt and the payment obligation it had inherited from ELF. TotalEnergies SE did not respond to this notice.

40. Neither TotalEnergies nor ELF have ever made payments to Commisimpex under

the Guaranty.

41. In October 2016, following the confirmation of the 2013 arbitral award, Commisimpex re-served the Guaranty on TotalEnergies EP Congo, and re-served TotalEnergies SE in December 2017. These service efforts included demands for the amount due under the 2013 Award.

### Litigation in France

42. To enforce the Guaranty, Commisimpex initiated proceedings against TotalEnergies EP Congo and ELF Aquitaine (now TotalEnergies Holdings SAS) in the Commercial Court of Nanterre, under Case No. 2016F02380, demanding that TotalEnergies EP Congo, ELF Aquitaine and TotalEnergies SE pay the amount owed under the 2000 Award and the 2013 Award.

43. The lawsuit sought the principal debt, interest, late interest penalties, all of which are covered by the Guaranty. Commisimpex, relying on the Guaranty, specifically requested that payments be made through the sums owed to the ROC by TotalEnergies EP Congo and ELF Aquitaine (now TotalEnergies Holdings SAS).

44. On February 16, 2018, faced with TotalEnergies SE and TotalEnergies EP Congo's ongoing refusal to respond or satisfy their obligations, Commisimpex forcibly joined TotalEnergies SE (then Total SA) to the lawsuit.

45. The Commercial Court of Nanterre is the initial court of review for such matters. Appeals from the Commercial Court of Nanterre are decided by the Versailles Court of Appeals, and appeals from the Versailles Court of Appeals are decided by the Court of Cassation.

46. The TotalEnergies defendants asserted that the Commercial Court of Nanterre

lacked jurisdiction over TotalEnergies EP Congo. They also challenged the validity and authenticity of the Guaranty, and the quantum of debt owed under the Guaranty – the amount TotalEnergies would owe.

47. TotalEnergies "quantum" argument included allegations of non-performance or partial performance, and relied on a December 24, 2020 report by PricewaterhouseCoopers France ("PWC-FR"), acting as a consultant to TotalEnergies. The PWC-FR Report concluded that only €234 million of the 2000 Award could be attributed to the contracts covered by the Guaranty. A true and correct copy of the PWC-FR Report is attached as Exhibit 14, and an accurate translation is attached as Exhibit 15.

48. TotalEnergies also argued that the 2013 Award was based on obligations unrelated to the Guaranty, relying on assertions made in the ("PWC-FR") Report.

49. Problems with the ("PWC-FR") Report are set forth in the Rebuttal Report of Didier Kling, an expert accredited by the Court of Cassation. A true and correct copy of the Kling Rebuttal Report is attached as Exhibit 16, and an accurate translation is attached as Exhibit 17. As set forth in the Kling Rebuttal Report:

    a. PWC-FR issued the report despite an undisclosed conflict of interest that violates accounting ethics principles in France: while the report was pending, TotalEnergies' board of directors nominated PWC-FR for a six-year engagement as its auditor, compromising its independence and providing an incentive to issue a report favorable to TotalEnergies. Ex. 18 at p. 27-28.

    b. The PWC-FR report incorrectly concludes that performance was completed for only seven of the eleven contracts covered by the Guaranty, which

contradicts the determinations made in the 2000 Award. *Id.* at 21-22.

   c. The PWC-FR report incorrectly limits the debt for the amounts denominated in French Francs, Great Britain Pounds, and United States Dollars, and ignores the Contracts denominated in CFA Francs. *Id.* at 23.

   d. The PWC-FR report incorrectly asserts that the amounts awarded by the 2013 Award are unrelated to the Contracts covered by the Guaranty. *Id.* at 25-26.

50. PWC-Fr was hired as external statutory auditor (*commissaire aux comptes*) for a six year contract after the report was issued and did not disclose the Commisimpex liability in its subsequent reports to annual shareholders.

51. On March 31, 2022, the Commercial Court of Nanterre dismissed Commisimpex's lawsuit against TotalEnergies SE, TotalEnergies SAS and TotalEnergies EP Congo on jurisdictional grounds. A true and correct copy of the Commercial Court of Nanterre's order is attached as Exhibit 18, and an accurate translation is attached as Exhibit 19.

52. Commisimpex appealed, and on October 10, 2024, the Versailles Court of Appeals held that the Commercial Court of Nanterre had jurisdiction over TotalEnergies SE, TotalEnergies Holdings SAS, and TotalEnergies EP Congo, reversing the Commercial Court of Nanterre's decision. A true and correct copy of the Versailles Court of Appeals' decision is attached as Exhibit 20, and an accurate translation is attached as Exhibit 21.

53. The Versailles Court of Appeals found that Commisimpex's claims against TotalEnergies were of "a real and serious character," citing the 1968 Convention, its amendments, and the 1986 Guaranty. In doing so, the Versailles Court of Appeals was skeptical of

TotalEnergies' challenge to the authenticity of the Guaranty and the assertion that the Guaranty would have been overridden by the 1992 Agreement; it noted that the Republic of the Congo had repeatedly invoked and relied upon the Guaranty in arbitral and judicial proceedings well after 1992, and that the Guaranty itself had been noticed to TotalEnergies in 2011, 2016, and 2017 in accordance with French law. *Id*.

54. The case went back to the Commercial Court of Nanterre on the merits. TotalEnergies has appealed the Versailles Court of Appeals decision before the Court of Cassation.

55. TotalEnergies applied for a suspension of the case on the merits pending the outcome of the procedure before the Court of Cassation. A hearing took place on October 17, 2025, to decide whether the case may otherwise proceed while the appeal to the Court of Cassation is pending. The decision on whether the merits will be suspended pending appeal is expected to be issued by the Court on January 27, 2026.

56. The Applicant is seeking representations made by TotalEnergies relating to potential litigation-related liability generally and Commisimpex specifically. Applicant is also seeking internal documents and communications from Respondents relating to the Commisimpex liability.

57. The Applicant will be able to use the anticipated discovery materials to challenge TotalEnergies' defenses to both to the validity of the debt and to the total "quantum" of the debt – specifically challenging TotalEnergies' arguments based on the PWC-FR Report, which TotalEnergies used to argue that the debt is a tenth of its asserted size. Thus far, TotalEnergies has previewed that it will assert these defenses in its arguments, including in pleadings submitted by TotalEnergies for a March 19, 2025 procedural hearing before the Commercial Court of Nanterre.

58.	In support of its pleadings before the Versailles Court of Appeals, TotalEnergies submitted a copy of a May 17, 2024 email from counsel for TotalEnergies to US counsel for Commisimpex. A true and correct copy of TotalEnergies' submission, which includes a French translation of the email and the original English, is attached as Exhibit 22.

## The Evidence is Not Obtainable in France

59.	French courts would not have extraterritorial jurisdiction as all of the Respondents are located outside of France.

*60.*	Nor does France have a system that permits robust third-party discovery. French law sets out only limited processes by which parties may attempt to gain access to documents. In France, the party seeking evidence must identify the precise document or narrow category of documents that it seeks produced; only if the actual document itself is identified with precision to a French court will the French court consider ordering its production. *See* Code Civil arts. 138-142 (Fr.).

61.	Applicant seeks Respondents' internal communications and documents regarding TotalEnergies' representations to Respondents. Respondents are not expected to be parties to the French Proceeding, which has been ongoing for approximately seven years. Respondents are not located in France, and Respondents are also not part of the TotalEnergies corporate family. This means that French courts would not be able to order production of any evidence from Respondents, especially Respondents' internal communications and documents.

62.	Applicant also seeks communications between Respondents and TotalEnergies entities or their agents, including the applications and submissions to the NYSE and the Underwriters. Although Applicant knows that there were communications between some

TotalEnergies entities or agents and the Respondents, as well as the probable content of those communications, it is unable to identify the precise communications in question. It does not know when those applications were made, or which TotalEnergies entities made or would have a copy of the communications. As a result, Applicant is unable to obtain the communications between TotalEnergies and Respondents in the French proceedings.

**French Courts Would be Receptive to the Discovery Sought**

63. French courts would not reject evidence obtained via a § 1782 proceeding. There is no provision in French law that would prohibit collecting evidence through the § 1782 proceeding, and French Courts have been receptive to the type of documentary evidence sought through this application in other proceedings.

64. The § 1782 Application does not circumvent any proof-gathering restriction under French law. None of the Respondents are French. There is no discovery order in the French Proceeding against disclosing or collecting the evidence sought in this proceeding. It is impracticable to obtain the discovery sought in the French proceeding, but there is no prohibition against obtaining or utilizing it. The evidence sought would be admissible or otherwise useable in French courts and in the French Proceeding specifically subject to any violation of French public policy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this October _21_, 2025, in Paris, France.

By: _____

Nathalie Makowski