# Exhibit 4

Prof. Dr. PASCAL PICHONNAZ
University of Fribourg

Mobile: +41 79 323 5309
office: +41 26 300 8029
home office: +41 26 401 0756
pascal.pichonnaz@unifr.ch www.unifr.ch/ius/pichonnaz

# Legal opinion

## on the validity of the warranty
### under Swiss law

## Prof. Dr. Pascal PICHONNAZ

Full Professor, University of Fribourg (Switzerland) LL.M.
(UC Berkeley), lawyer

## IMPORT EXPORT COMMISSIONS
## ("Commisimpex")

### v.

## TOTAL E&P Congo, ELF AQUITAINE, TOTAL S.A.

Commercial Court of Nanterre (France)

Issued on August 20, 2020

# SUMMARY

**§ 1 INTRODUCTION** .................................................................................................3

**§ 2 A BRIEF SUMMARY OF THE FACTS** .............................................................4

**§ 3 ISSUES TO BE RESOLVED** ...............................................................................4

**§ 4 LEGAL ANALYSIS** .............................................................................................5

  **I.   INTRODUCTION** ............................................................................................5

  **II.  CONDITIONS FOR THE VALIDITY AND IMPLEMENTATION OF "PLEDGE" OF RECEIVABLES** ..........................................................................6

      1.  The material conditions for the creation ...........................................................7

         *1° The specificity of the guarantee in relation to the secured claim* ............7

         *2° Determination of the object of the pledge*..............................................8

      2.  TERMS AND CONDITIONS OF CREATION ..................................................9

  **III. EFFECTS AND REALIZATION OF THE PLEDGE** ...................................9

      1.  EFFECTS PRIOR TO ENFORCEMENT ........................................................9

      2.  EFFECTS ON THE DEBTOR OF THE PLEDGED RIGHT FROM THE NOTICE OF PLEDGE ........................................................................................10

      3.  REALIZATION OF THE PLEDGED RIGHT ................................................11

  **IV. ANALYSIS IN THE SPECIFIC CASE** .....................................................11

      1.  THE CLASSIFICATION OF "Pledge on Claims"..........................................11

      2.  CONDITIONS OF VALIDITY AND TERMS OF CONSTITUTION................12

      3.  CONDITIONS FOR REALIZATION OF THE GUARANTEE ...........................14

         *1° Unilateral private enforcement* ............................................................15

         *2° Increased strengthening of the pledgee's position* .................................16

         *3° A summary of the system established by the notice and enforcement* ...................17

**§ 5 CONCLUSIONS** ...............................................................................................**19**

**APPENDIX – LEGAL PROVISIONS REFERRED TO** ..........................................**21**

  **I.   Swiss Civil Code** .........................................................................................**21**

  **II.  Code of Obligations**.....................................................................................**23**

  **III. Law on Private International Law** .............................................................**24**

# § 1 INTRODUCTION

**1** The undersigned is a full professor of private law and Roman law at the University of Fribourg and former Dean of the Faculty of Law. He teaches contract law and the law of obligations in particular. A *curriculum vitae* and list of publications by the author of the opinion can be downloaded from www.unifr.ch/ius/pichonnaz .

**2** The undersigned declares that he has no conflict of interest in relation to the parties to these proceedings.

**3** This opinion has been prepared at the request of Commisimpex.

**4** In preparing this opinion, I had access to the following documents:

- The Guarantee of December 22, 1986

- The Minutes of the Interministerial Commission (Exhibit 3)

- The Memorandum of Understanding dated October 14, 1992 (Exhibit 6)

- The Memorandum of Understanding of August 23, 2003 (Exhibit 8)

- The Arbitration Award of December 3, 2000 (Exhibit 9)

- The Arbitration Award of January 21, 2013 (Exhibit 10)

- The partial arbitration award of August 20, 2010

- The appeal for annulment of the Partial Award (Exhibit 88)

- The meanings of the Guarantee (Exhibits 39 to 44)

- The contracts and amendments referred to in the Guarantee (Exhibits 1-10), as well as the list of contracts and certificates

- Commisimpex's summary conclusions of February 18, 2020

- Total E&P Congo's summary conclusions of September 3, 2019

- The summary conclusions of TOTAL SA AND TOTAL Holdings

- The Establishment Agreements and amendments between the Total Group and Congo (exhibits 22 to 26; Amendments 12, 13, 18, 19)

- The attestations of Messrs. Miokono, Lekoundzou, and Poungui (exhibits 27-29)

- The consultations of Professor Carbonnier (Exhibit 37) and Professor Delebecque (Exhibit 89)

- The opinion of the President of the Supreme Court of Congo (Exhibit 60)

- The Mazars report dated March 28, 2019

## § 2 A BRIEF SUMMARY OF THE FACTS

**5**   Commisimpex is a Congolese company specializing in public works. From 1984 to 1986, Commisimpex and Congo entered into contracts for public works and the supply of equipment.

**6**   On December 22, 1986, the Congolese State, represented by the Ministry of Finance and Budget and the Caisse Congolaise d'Amortissement (the "**CCA**"), issued **a guarantee** to Commisimpex **for payment of the price of the works contracts**, subject to their proper performance (hereinafter, the "**Guarantee**").

**7**   In relation to Total SA, Total E&P Congo, and ELF Aquitaine (hereinafter: "**the TOTAL Group companies**"), the Guarantee establishes, in particular, a lien in favor of Commisimpex on the receivables defined by the Guarantee.

**8**   Following an arbitration award dated December 3, 2000, now enforceable, a decision dated November 9, 2001 before the Commercial Court of Brazzaville, now enforceable, and an arbitration award dated January 21, 2013, also enforceable, the principle of Commisimpex's claim has been definitively recognized. The *amount has*, of course, changed over the course of the proceedings. The Mazars report of October 23, 2017, and its update on March 28, 2019, established the current amount owed by Congo.

**9**   On October 11 and 12, 2011, October 7 and 10, 2016, and December 26, 2017, Commisimpex served the Guarantee on each of these debtors, namely the companies of the TOTAL Group (*Exhibits Nos. 39 to 44).*

**10**   Despite these notices/notifications ("**notices**"), the secured debtors refused to release the amounts owed by the Congolese State to Commisimpex and, adopting the position of Congo, opposed the enforcement of the Guarantee.

**11**   It was under these circumstances that Commisimpex brought proceedings against the Total Group companies before the Commercial Court of Nanterre.

## § 3 ISSUES TO BE RESOLVED BY

**12**   My mission consists of:

**13**     - Determine the validity of the deed (form and substance) and its classification under the heading "guarantee of payment of the price of works contracts" (hereinafter: the **Guarantee**) under Swiss law;

**14**     - Determine the conditions for implementing the pledge;

**15**     Determine the enforceability of the pledge against the pledged debtors.

# § 4 LEGAL ANALYSIS

## I. INTRODUCTION

**16** On December 22, 1986, the State of Congo, represented by the Ministry of Finance and Budget, and the Caisse Congolaise d'Amortissement (the "**CCA**"), hereinafter also referred to as "the **Guarantors**," granted Commisimpex the benefit of a "**Guarantee**" whose validity is subject to **Swiss law** (*see Guarantee, Paragraph I 2(ᵉ)paragraph).*

**17** This commitment is worded as follows:

> (B) *The Guarantors hereby undertake, unconditionally and irrevocably, to guarantee to COMMISIMPEX the payment of the full amounts of the contracts and amendments for works and supplies awarded to COMMISIMPEX, details of which are set out above.*

**18** This is an **irrevocable and unconditional commitment** by the Guarantors to guarantee payment of the sums specified in Articles 2 and 3 of the Guarantee. This commitment is qualified by paragraph C of the Guarantee as follows:

> *(C) This guarantee constitutes an **irrevocable, unconditional, independent, and permanent** commitment binding on each Guarantor and **enforceable** against them, **regardless of any irregularity** or unenforceability of payment, and each Guarantor shall only be released upon payment of all sums due to COMMISIMPEX under the contracts for works, addenda, and supplies, including interest, late payment interest, costs, and incidental expenses related to the contracts detailed above. (*emphasis added)

**19** **At the same time**, paragraph F of the Guarantee emphasizes that the People's Republic of Congo **pledges and guarantees all revenues**, including all receivables, etc., from the exploitation in any form whatsoever of the hydrocarbon deposits detailed below:

> *(F) As security for the full, irrevocable, and unconditional payment of the amounts of the contracts and amendments for works and supplies detailed above, the R.P.C. pledges and guarantees **all revenues**, including all receivables, royalties, taxes, duties, etc., whether **present, future or contingent,** arising or to arise, directly or indirectly, from the exploitation in any form whatsoever of the hydrocarbon deposits detailed below: Likouala, Loango, Tchibouela, Emeraude, Yanga, Sendji and Sendji Compl. located in the territory of the People's Republic of Congo.* (emphasis added)

**20**     This pledge on receivables and other rights may thus be invoked directly against the companies of the Total Group.

**21**     Before examining the validity of the "guarantee," it is important to recall the nature of the relationship between the parties:

**22**     - **The original creditor** is the State of Congo, which acted through the Ministry of Finance and Budget and the CCA. Again through the Ministry and the CCA, it pledged the claims designated by the Guarantee in favor of Commisimpex; the State of Congo is therefore also **the pledgor**. As there is no distinction between the parties, I will use the terms grantor and original creditor interchangeably to refer to the State of Congo; the term Guarantors may also refer directly to the Ministry and the CCA, which acted on behalf of the State of Congo.

**23**     -     **The pledgee** is Commisimpex. It has an irrevocable right to obtain payment of the claims designated by the Guarantee from the debtors of those claims, namely the Total Group. The payment mechanism will be presented below (see *infra* ¶ 62 ff.).

**24**     **The pledged debtors** are the companies of the Total Group. As such, they must comply with a number of rules as soon as they are notified of the existence of the Guarantee (see *below* ¶ 45). They must then pay the debts owed to the State of Congo directly to the pledgee, under the conditions set out in this notice.

**25**     I will therefore examine the conditions for the validity of the "pledge" of claims under Swiss law (II.), the effects and enforcement of the pledge (III.), before analyzing their implementation in the specific case (IV.).

## II.     CONDITIONS FOR THE VALIDITY AND IMPLEMENTATION OF THE "PLEDGE" OF RECEIVABLES

**26**     In order to determine the conditions of validity and implementation of the "pledge" provided for in **paragraph F** of the Guarantee, it is necessary, under Swiss law, to first classify the act in question. Swiss law refers to this type of "pledge" as a
"pledge on receivables" within the meaning of Art. 899 et seq. of the Swiss Civil Code (hereinafter: "**CC**").

**27**     **Article 899(1) CC** provides that *"[r]equests and other transferable rights may be pledged.*" In order to establish the conditions for the validity of such a pledge on claims, it is important to first determine the material conditions for its creation (1.), then the terms and conditions for its creation (2.).

# 1. MATERIAL CONDITIONS FOR THE CREATION OF A LIEN

**28**  It should be noted that the creation of the pledge is dependent on the special nature of the security in relation to the secured claim (1), before analyzing the object of the pledge (2).

## 1° The specificity of the guarantee in relation to the secured claim

**29**  The specialty of the security provided for in Article 899 CC is of the same nature as that which generally prevails in matters of pledging, which is why the reference in Article 899(2) CC applies[1]. Thus, as with any right of pledge, the right of pledge on claims and other rights is an **accessory right,** which depends on the principal right, which is the secured claim[2]. It therefore only exists insofar as the secured claim exists (Article 889(1) CC and Article 114(1) CO). The secured claim(s) must therefore be determined by the contract.

**30**  **a) The nature of the secured claim**. The rules on pledges, and therefore those on liens on claims, *do not* contain *any restrictions on the type of claims that may benefit from the security*[3]; the cause of the secured claim is also irrelevant[4]. It is therefore *not necessary* for the amount of the claim to be determined in the form of a *fixed sum or a maximum guaranteed sum* when the pledge is created[5].

**31**  The claim or right to be encumbered *must be "transferable,"* i.e., capable of being assigned or transferred[6]. A limitation on transferability does not render the right "inalienable" within the meaning of Art. 899 CC, nor does the fact that the claim or right is protected by secrecy (e.g., professional or banking secrecy)[7]. A claim or right may be inalienable by law, by agreement between the parties, or by the nature of the claim; under Swiss law, the assessment is made in accordance with Article 164 CO relating to the assignment of claims. In addition to the existence of an express rule in the law or an agreement between the parties to the contract giving rise to obligations, claims that are non-assignable by their nature may also be considered[8].

---

[1]  P.-H. STEINAUER, Les droits réels, Volume III, 4th edition, Bern 2012, n. 3207; DE GOTTRAU/B. FOËX, in: Pichonnaz/Foëx/Piotet (eds.), Commentaire romand du Code civil, vol. II, Art. 457-977 CC, Art. 1-61 Tit.fin. CC, Basel 2016 (CR CC II-DE GOTTRAU/FOËX), Art. 899 CC n. 21.

[2]  STEINAUER, Property Rights III (n. 1), n. 3130; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 12.

[3]  STEINAUER, Property Rights III (n. 1), n. 3131; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 15.

[4]  B. FOËX, Le contrat de gage mobilier, Basel/Frankfurt am Main 1997, p. 215 ff.

[5]  STEINAUER, Property Rights III (n. 1), n. 3131a; FOËX, The Contract (n. 4), p. 222 ff.; already ATF *47/1921* III 97, JdT 1922 I 79.

[6]  BSK-ZGB II-BAUER (5th ed.), Art. 899 CC n. 21; cf. ZK-OFTINGER/BÄR, Art. 899 CC n. 71; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 14; BK-ZOBL, Art. 899 CC n. 32, 61 ff.

[7]  CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 14-

[8]  ZK-SPIRIG, Art. 164 CO, n. 160 ff.; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 14; BK-ZOBL, Art. 899 CC n. 62 ff.

**32**  However, according to legal doctrine, **even an inalienable claim may be validly pledged** if the conditions of Art. 164 para. 2 CO are met[9]. Art. 164 para. 2 CO states: "*The debtor may not invoke the fact that the claim was stipulated as non-transferable if the third party became a creditor on the basis of a written acknowledgment that did not mention non-transferability.*" Thus, the pledgee is protected even if a *pactum non cedendo* was concluded between the creditor and the assigned (or, in this case, pledged) debtor if the pledge agreement[10]  does not mention non-assignability and the pledgee relied on it in good faith at the time the pledge was created (or the claim assigned)[11].

**33**  The right of pledge may secure a *debt of the pledgor* or the *debt of a third party;* however, this debt must be valid, even if it may be *current* (due or not), *conditional, future, or simply contingent*[12]. Moreover, a time-barred claim does not prevent the pledge from being enforced[13].

**34**  **b) Determination of the secured claim.** The secured claim must be *sufficiently determined*[14]. Where the content of the claim is not immediately fixed, the cause of the claim or the service that is the subject of the claim must at least be described with sufficient precision to enable the subject of the security *to be determined*[15]. In particular, it may be specified that a pledge covering all claims arising from business relations between a bank and one of its customers has been deemed lawful and sufficiently determinable([16]) .

## 2° Determining the subject matter of the pledge

**35**  The object of the pledge within the meaning of Art. 899 para. 1 CC may be any claim or other right, provided that it is transferable (see *above* ¶ 31 ff.). It may also be claims

---

[9]  CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 14; STEINAUER, Droits réels III (n. 1), n. 3207.

[10]  ZK-SPIRIG, Art. 164 CO, n. 199;

[11]  CR CO I-PROBST, Art. 164 CO n. 71; ZK-SPIRIG, Art. 164 CO, n. 195.

[12]  STEINAUER, Property Rights III (n. 1), n. 3132; FOËX, The Contract (n. 4), p. 219 ff. and 226 ff.; already ATF *71/1945* II 262, JdT 1946 I 370.

[13]  STEINAUER, Property Rights III (n. 1), n. 3132a.

[14]STEINAUER, Property Rights III (n. 1), n. 3133; FOËX, The Contract (n. 4), p. 226 ff.; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 13; H. KUHN, Schweizerisches Kreditsicherungsrecht, Bern 2011, § 23 n. 21.

[15]  STEINAUER, Property Rights III (n. 1), n. 3133; KUHN (n. 14) § 23 n. 19; ATF *51/1925* II 278.

[16]  ATF *106/1980* II 257, JdT 1982 II 106; STEINAUER, Property Rights III (n. 1), n. 3134a.

[17]  See, for example, ATF *118/1992* II 142, JdT 1993 I 300; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 22.

[18]  STEINAUER, Droits réels III (n. 1), n. 3207; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 14.

future or conditional[19]. It matters little whether the debtor of the right or claim is the grantor, the pledgee or a third party[20].

## 2. TERMS AND CONDITIONS OF THE CREATION OF THE SECURITY INTEREST

36 The pledge is created by contract, namely a **contract creating a right of pledge**, which is governed by the rules on pledges (Art. 899 para. 2 CC)[33]. Even if only one party undertakes the obligation, the constitutive act is not a unilateral act, but rather a unilateral contract[34], namely a contract in which only one party, the original creditor, commits by pledging its claims. The acceptance of the pledgee creditor takes place in principle by conclusive act, namely tacitly (by silence) or by behavior that demonstrates its acceptance.

37 The contract must be in **writing**. When only the original creditor/pledgor commits to the guarantee (as in this case), it is sufficient for only the original creditor/pledgor to sign the constitutive contract; in accordance with Art. 13 para. 1 CO, the form requirement will already be met ("*A contract for which the law requires written form must be signed by all persons to whom it imposes obligations*").

38 The validity of the constitutive contract is **not** subject **to the consent of the third-party debtor, nor even to notice given to the latter**[21]. Of course, "the creditor and the grantor may give notice of the commitment to the third-party debtor" (Art. 900 para. 2 CC), but this is not a condition for the validity of the constitution of the security[22]. In fact, the notice only has an impact on the discharging effect of the payment by the pledged debtor, in accordance with Art. 906 CC (see *below* ¶ 45).

## III. THE EFFECTS AND REALIZATION OF THE PLEDGE

39 **Pursuant to Art. 899 para. 2 CC**, the effects of a lien on a right are the same as those of a pledge on movable property.

## 1. EFFECTS PRIOR TO FORCED REALIZATION OF THE LIEN

40 Prior to forced enforcement, most of the effects are determined by Art. 899 para. 2 CC. This is particularly the case for the following elements: the creditor may not create a pledge

---

[19] STEINAUER, Property Rights III (n. 1), n. 3207a; ATF *113/1987* II 163; BSK-ZGB II-BAUER (5th ed.), Art. 899 CC n. 19; cf. ZK-OFTINGER/BÄR, Art. 899 CC n. 71; KUHN, (n. 14), § 23 n. 19.

[20] STEINAUER, Property Rights III (n. 1), n. 3207a; ATF *113/1987* II 163; BSK-ZGB II-BAUER (5th ed.), Art. 899 CC n. 19; cf. ZK-OFTINGER/BÄR, Art. 899 CC n. 71; KUHN, (n. 14), § 23 n. 19.

[21] STEINAUER, Property Rights III (n. 1), n. 3208e; BK-ZOBL, Art. 900 n. 51 ff.; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 900 CC n. 26 ff.

[22] SJ 2010 473; ATF *47/1917* II 474.

on pledged claims only with the consent of the pledgor (Art. 887 CC); the pledge encumbers the claim and its accessories (Art. 892 para. 1 CC)[23].

**41**    Similarly, the right of pledge guarantees the creditor *the principal, contractual interest, collection costs, and default interest* (Art. 891 para. 2 CC).

**42**    Articles 905 and 906(1) CC regulate matters relating to the management of claims and rights that need not be discussed here.

## 2.    EFFECTS ON THE DEBTOR OF THE PLEDGED RIGHT UPON NOTIFICATION OF THE PLEDGE

**43**    **Once the pledge has been notified ("served")**, the debtor may only settle the debt with the holder of the right or the pledgee with the consent of the other party, otherwise they will be required to make the payment a second time[24]. **Article 906 para. 2 CC** provides as follows:

> *The debtor, having been notified of the pledge, may only make payment to the owner or pledgee with the consent of the other interested party.*

**44**    The Federal Court has already indicated at an early stage that **the notice must refer to the pledge**[25]. The notice may even be given by conclusive acts, in the sense that it is sufficient if, in view of the circumstances, the pledged debtor can infer the existence of the pledge[26]. There is *no need to indicate the amount of the claims or provide other information,* e.g., regarding the consequences of the pledge[(27)]; it is sufficient for the notice to refer to the fact that the claim has been pledged (and this can be communicated by conclusive acts[(28)] ·i.e., even without a word or only implicitly)[(29)] ·If the debtor has become aware of the pledge not through a formal notice but in some other way, this knowledge is treated as equivalent to a formal notice, provided that there is no doubt and that the knowledge is based on a reliable source·

**45**    Once the notice has been received by the pledged debtor, he may no longer pay the original creditor directly without the consent of the pledgee (CC 906 II)[31]; therefore, if the debtor pays the

---

[23]  STEINAUER, Droits réels III (n. 1), n. 3210; BSK-ZGB II-BAUER (5th ed.), CC 892 n. 7; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 892 CC n. 5.

[24]  ATF *128/2002* III 366, JdT 2002 I 554; BK-ZOBL, Art. 906 CC n. 36; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 906 CC n. 12.

[25]  BK-ZOBL, Art. 900 CC n. 48; ATF *27/1901* II 197; ATF *23/1897* I 702.

[26]  BK-ZOBL, Art. 900 CC n. 48; ATF *27/1901* II 197.

[27]  BK-ZOBL, Art. 900 CC n. 48.

[28]  BK-ZOBL, Art. 900 CC n. 47; ATF *27/1901* II 197.

[29]  BK-ZOBL, Art. 900 CC n. 48.

[30]  BK-ZOBL, Art. 906 CC n. 35.

[31]  BK-ZOBL, Art. 906 CC n. 34.

claim to its original creditor after being notified of the pledge and without the pledgee's consent, **the payment does not have the effect of discharging the debt** and the debtor may have to pay a second time[32]. According to a ruling by the Federal Court[33] once notice has been given, the debtor owes the debt jointly to both parties, and it is their internal agreement that determines to whom the payment should ultimately be made. Therefore, when the notice has already been sent to the debtor and the *creditor* continues to demand payment, the debtor may require the creditor to present a document containing the consent of the pledgee, and vice versa. This authorization may, of course, be found directly in the pledge agreement[34].

## 3. ENFORCEMENT OF THE RIGHT PLEDGED

46   If the pledgee is not satisfied, they may request the forced enforcement of the pledged right and pay themselves from the price obtained (Art. 891 para. 1 CC by reference to Art. 899 para. 2 CC)[35]. For a pledged claim, this amounts to demanding payment of the pledged sums.

## IV.   ANALYSIS IN THE SPECIFIC CASE

47   After examining whether the classification as a "pledge on receivables" is correct (1.), I will examine whether the conditions of validity and the terms and conditions of constitution are fulfilled (2.), and then discuss the conditions for realizing the Guarantee (3.).

## 1.   THE CLASSIFICATION AS A "Pledge on Receivables "

48   **Paragraph F** of the Guarantee contains the following wording: "*the PRC pledges and guarantees all income...*". In Swiss law, this expression refers to the issue of "lien on receivables and other rights" within the meaning of Articles 899 to 906 of the Swiss Civil Code, since this institution is, in a way, parallel to the pledging of movable property. Moreover, Article 899(2) CC provides that "*unless otherwise provided, the rules on pledges shall apply.*"

49   **A textual analysis** of paragraph F confirms that this is indeed a "pledge on receivables," as it states that "*the PRC pledges and guarantees all revenues.*" Furthermore, paragraph H also mentions the terms "pledges" and "guarantees."
"guarantees."

---

[32]   ATF *45/1919* III 1 cons. 2 (p. 6); BK-ZOBL, Art. 906 CC n. 36; ZK-OFTINGER/BÄR, Art. 906 CC, n. 24.

[33]   ATF *45/1919* II 250 cons. 2.

[34]   BK-ZOBL, Art. 906 CC n. 34; ZK-OFTINGER/BÄR, Art. 906 CC, n. 25; ATF *45/1919* II 250 cons. 2.

[35]   STEINAUER, Property Rights III (n. 10), n. 3211.

**50** **Other factors** reinforce the analysis that the second part of the Guarantee does indeed constitute a pledge on claims within the meaning of Art. 899 CC:

**64** **a) The negative pledge clause**. Paragraph H states that "*the PRC undertakes not to assign or pledge to third parties, in any manner whatsoever, the Revenues and other rights referred to above (paragraph F)*". This commitment not to assign or pledge the receivables a second time makes perfect sense when the principal debtor has pledged the specified receivables it has against the Total Group Companies (defendants in these proceedings). The principal debtor must not jeopardize the possibility of realizing the pledged receivables.

*65* **b) Term of validity**. Paragraph K emphasizes that the Guarantee is valid until "*full payment of all obligations arising from contracts and amendments for works and supplies, including interest, late payment interest, costs, and incidental expenses related to the above-mentioned contracts.*" Paragraph L states that "*it is agreed that only the full and complete payment of all sums, principal and interest in particular, owed to COMMISIMPEX and covered by this guarantee, relating to contracts and amendments for works and supplies, could discharge the Guarantors, without any possibility of cancellation of this guarantee by any means other than the full payment indicated*." These two paragraphs emphasize that the lien on the receivables **only** expires **after full payment of the pledged receivables;** this link with the underlying receivable is typical of the accessory nature of the lien on receivables (see *supra* ¶ 29).

**51** Finally, several documents emphasize **the validity of this Guarantee** under Swiss law.

**52** **1°** Article 7 of the Memorandum of Understanding dated August 23, 2003 (*Exhibit 8*) confirms that there are pre-existing guarantees in favor of COMMISIMPEX; this therefore constitutes recognition of the validity of the Guarantee. However, the Arbitral Award of January 21, 2013 (*Exhibit 10, para. 253 and point 7 of the operative part*) validated Article 7 of this Memorandum of Understanding, an award which now has the force of res judicata.

**53** **2°** The appeal for annulment of the Partial Award The partial arbitration award of August 20, 2010 (*Exhibit 88, para. 125*) established the DRC's recognition of the terms of the Guarantee, as well as the absence of any objection to its validity.

**54** Thus, the Guarantee does indeed constitute a **pledge on claims** within the meaning of Articles 899 et seq. of the Civil Code, and its validity has been recognized by the parties.

## 2. CONDITIONS OF VALIDITY AND TERMS OF CONSTITUTION

**55** I will now examine four conditions of validity and terms of establishment of the pledge:

56 **1° The principle of specificity of the guarantee in relation to the secured claim** is established (see *above* ¶ 29). The secured claims exist and their *amount* has been confirmed cumulatively by the Arbitral Award of December 3, 2000, and by the Arbitral Award of January 21, 2013 (*Exhibit 10, operative part, points 8 and 10*). The Guarantee is therefore also sufficiently specific (see *above* ¶ 34). The Guarantee also takes care to specify the secured claims (p. *1).* As it is not necessary to indicate a fixed amount or a maximum secured amount, the Guarantee analyzed here is *perfectly valid* in this respect.

57 **2° Determination of the object of the pledge.** The fact that not all of the Congolese government's claims against the Total Group companies existed at the time of the pledge is also not a problem in terms of the validity of the deed, since these may even be future or conditional claims (see *above* ¶ 33).. On the question of whether the claims pledged by the pledgor are transferable (see *supra*
¶ 31), the President of the Supreme Court of the People's Republic of Congo stated that
"*the obligations of the Guarantor arising from the signing of the Guarantee and the aforementioned contracts and amendments constitute commercial obligations subject to private law and shall remain valid in all their provisions, shall be binding on the Congolese State and shall be recognized as valid in the People's Republic of Congo*" (point 10 of the opinion of the President of the Supreme Court). Furthermore, if these claims were to be considered inalienable, whereas the document constituting the Guarantee emphasizes in Paragraphs O and P that all authorizations have been given and that the grantor waives immunity from jurisdiction and any immunity from enforcement, it should be noted **that, pursuant to Art. 164 para. 2 CO,** it is not possible to oppose the inalienability to the pledgee creditor on the grounds that the latter could in good faith rely on the alienability of these rights at the time of conclusion of the contract (see *supra* ¶ 32).

58 The only exception would be if the inalienability were based on a mandatory rule of foreign law (in this case, the law of the Republic of Congo) that pursued legitimate and clearly overriding interests in relation to the Swiss conception of law (Art. 19 of the Federal Act of December 18, 1987, on Private International Law, LDIP[36]). It is not my role to make such an analysis; however, I can point out that the President of the Supreme Court of Congo found that the claims were alienable and that Swiss law requires action to be taken against contradictory behavior (*venire contra factum proprium;* Art. 2 para. 2 CC). However, by supporting the application of a possible mandatory rule that would prevent the pledging of the claims in question, one would be supporting contradictory behavior on the part of the State of Congo, which, on the one hand, assures in the Guarantee that everything has been done to ensure its validity and enforceability, but which, on the other hand, could invoke a rule that would prevent the pledge. The function of Article 19 LDIP is not to support contradictory behavior by a State. In this case,

---

[36] Systematic Compilation (RS) 291.

It appears that the claims are perfectly capable of being pledged in accordance with the opinion of the President of the Supreme Court of Congo.

**59** Furthermore, it is irrelevant which law applies to the pledged receivables, since the pledging of receivables is subject to Swiss law, which allows any receivable to be used as collateral (see *above* ¶ 30), including, of course, receivables not subject to Swiss law.

**60** **3° Form.** The deed of pledge of the claims was drawn up in writing. The Guarantee examined contains in a single document the contract constituting the pledge and the contract for the disposal of the claims, creating the limited real right. As the creditor and pledgor signed it, the written form requirement of Article 12 et seq. CO was fully complied with, since only the party entering into the commitment must sign the contract (Art. 13(1) CO). In fact, the signature of the pledgee is not necessary[37] Furthermore, the consent of the third-party debtor or even notification thereof is not a constituent element of its validity (see *supra* ¶ 52).

**61** **4° The pledge does not constitute an excessive commitment (Art. 27 para. 2 CC).** No Federal Court ruling indicates a case of excessive pledging of claims. The only similar case is that of a global assignment of claims for security purposes, in which the Federal Supreme Court has set a limit whereby the global assignment of future claims must be delimited so that it can be determined whether the assignment is limited, for example, to a specific activity or to several delimited activities[38] Admittedly, the case law has been developed in relation to the assignment of claims, but some authors recommend that it also be applied to the pledging of claims[39] In the present case, however, not only is this not an assignment of claims (which already casts doubt on the application of the case law), but above all, the Guarantee specifies the contracts concerned (see paragraph F *at the end*), so that the delimitation is in any case sufficient under Article 27(2) CC for the commitment not to be considered excessive.

## 3. CONDITIONS FOR THE REALIZATION OF THE GUARANTEE

**62** I will examine the various clauses of the Guarantee that relate to the guarantee on claims.

---

[37] Federal Supreme Court ruling, 4A_586/2009, SJ 2010 I 473; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 900 CC n. 10; BSK-ZGB II-BAUER (5th ed.), Art. 900 CC n. 2; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 22.

[38] ATF *112/1986* II 433 cons. 3, JdT 1987 I 162; cf. also TERCIER/PICHONNAZ, Le droit des obligations,[6th]ed., Zurich 2019, n. 1846.

[39] CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 899 CC n. 22.

## 1° Unilateral private realization

**63** The parties may derogate from the enforcement regime of Art. 906 para. 2 CC and provide for a so-called private enforcement clause[40]. This allows the pledgee to demand payment of the claims directly from the pledgor and to take legal action directly in his own name[41]. This enables them to obtain simplified enforcement, since it is sufficient to initiate enforcement proceedings for a monetary claim. This is the procedure currently taking place before the Commercial Court of Nanterre.

**64** **Paragraph I of the Guarantee** provides for such a clause, which states:

> *This Guarantee is enforceable at the request of COMMISIMPEX and shall constitute a permanent, irrevocable, and unconditional payment instruction to AGIP, AGIP Congo, Elf, and ELF Congo for the amounts of the contracts, amendments, and works mentioned above, including principal and interest, costs, incidental expenses, and compensation for any damage caused by delay. In this case, this guarantee shall be enforceable against AGIP, AGIP Congo, ELF, and ELF Congo or any guarantor, and COMMISIMPEX may enforce it as of right against all assets, shares, interests, or other rights, including the agreements and royalties mentioned in Articles 2 and 3 above, belonging to R.P.C. with respect to AGIP, AGIP Congo, ELF, and ELF Congo and any Guarantor without recourse or prior authorization. The signature of R.P.C. on this document constitutes unreserved acceptance and definitive consent to the above-mentioned enforcement by COMMISIMPEX against AGIP, AGIP Congo, ELF and ELF Congo and any other company wholly or partially owned by the Guarantor(s).*

**65** The statement that the Guarantee is enforceable at the request of Commisimpex and constitutes a "*permanent, irrevocable, and unconditional payment instruction*" to Total Group companies is the **embodiment of the right of private enforcement**. Not only do the parties agree that Commisimpex may, *at its sole request*, obtain payment into its own hands, but they also give an irrevocable, unconditional, and permanent instruction to the secured debtors to pay the secured creditor, Commisimpex.

**66** As a result, **the debtor can no longer pay directly to its creditor without the consent of the pledgee** when the latter notifies the debtor of the pledge (CC 906 II). Therefore, if the debtor pays the debt to its original creditor when it has been

---

[40] ZK-OFTINGER/BÄR, Art. 906 CC, n. 4; STEINAUER, Property Rights III (n. 1), n. 3210c; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 906 CC n. 4, 16.

[41] CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 906 CC n. 17; BK-ZOBL, Art. 906 CC n. 16; ZK-OFTINGER/BÄR, Art. 906 CC, n. 37.

informed of the pledge, his payment does not constitute discharge. Thus, he may be compelled to pay a second time into the hands of the pledgee (see *supra* ¶64)[42].

**67**    In this case, the secured debtors were notified on several occasions (see *above* ¶ 9), including, to my knowledge, for the first time on October 11 and 12, 2011. From that moment on, any payment made to the original creditor was no longer valid without the consent of the pledgee. This also means that the lack of validity and the right to payment of the sums in question existed as of the notice of October 11 and 12, 2011. If they had had any doubts about the right of the principal creditor or the pledge to receive the amounts, the pledged debtors could have requested a document, in this case the extract from the Guarantee, which clearly states in Paragraph I the right, at the simple request of the pledgee, to receive payment from the debtor ("...shall constitute a permanent, irrevocable and unconditional payment instruction"). However, the notices already expressly contained this indication, so that there was no doubt for the secured debtors as soon as the notice was communicated to them (see *infra* ¶ 75).

## 2° Further strengthening of the position of the pledgee creditor

**68**    The grantors or the original creditor not only strengthened the position of the pledgee by giving him a right of private enforcement through this unilateral enforcement clause in favor of the pledgee. They also strengthened his position through **three additional clauses**.

**69**    **a) The negative pledge clause.** Paragraph H of the Guarantee (see *above* ¶ 64) states that "the PRC undertakes not to assign or pledge to third parties, in any manner whatsoever, the Revenues and other rights mentioned above (paragraph F)." The purpose of this typical clause is to render null and void any subsequent commitment that the pledgor may make. Indeed, in accordance with Art. 893 para. 2 CC (which applies by reference to Art. 899 para. 2 CC), the ranking between several pledgees "is determined by the date on which the pledges were created." However, this can be a sensitive issue in the case of future claims, where the commitment could be considered to take effect on the date the claim arises (even if the pledge was created earlier). To avoid any risk in this regard, and thus to ensure that the pledgee creditor will have full security for the claims covered by the pledge, the guarantors have undertaken not to pledge the same claims a second time. This therefore strengthens the position of the pledgee creditor.

**70**    **b) The clause prohibiting modification of the basic contract.** Paragraph H specifies the following:

> *The PRC undertakes* [...] *not to revoke the aforementioned mandate, not to terminate or modify the instructions or commitments given in relation to the payment of Revenues, and not to terminate the Agreements.*

---

[42] ZK-OFTINGER/BÄR, Art. 906 CC, n. 24; CR CC II-DE GOTTRAU/FOËX (n. 1), Art. 906 CC n. 12; STEINAUER, Property Rights III (n. 1), n. 3210e.

*or to modify them in such a way as to directly or indirectly reduce the above-mentioned pledges and guarantees.*

**71** The clause prohibits the Congolese government from modifying in any way the contracts between the Congolese government and Total Group companies if this would have a negative impact on the rights and security arising from the pledge of receivables. This clause goes hand in hand with paragraph P, which emphasizes that all authorizations have been obtained in order to assure the pledgee that it has a claim that it can effectively realize. **The aim of the parties** to the pledge agreement is thus to create an irrevocable right for which the underlying claims are maintained.

**72** **c) Waiver of immunity from jurisdiction and enforcement.** This clause, set out in Paragraph O, is particularly important in relation to the first demand guarantee stipulated in the first paragraphs of the Guarantee. However, it also highlights the parties' desire to leave nothing to chance, ensuring that no exceptions or objections can prevent payment on first demand of the amounts claimed.

## 3° A summary of the system established by the notice and enforcement of the forced

**73** The arrangement between the creditor of the pledged receivables and the pledgee is **subject to Swiss law** in accordance with Paragraph P, 2ᵉ paragraph "*This security shall be governed by Swiss law, subject to any other rights or remedies available to COMMISIMPEX under the law of any jurisdiction where the assets of any Guarantor may be located*."

**74** This means that the "unilateral private enforcement" clause is subject to Swiss law. It thus validly derogates from Art. 906 para. 2 CC. Its effect is that, upon the sole request ("notice") of the pledgee, the pledged debtor is irrevocably obliged to pay the pledgee. Already on the basis of Art. 906 para. 2 CC, these notices do not need to comply with any specific form (see *supra* ¶ 44); however, the Guarantee itself does not impose any particular form requirements for this notice. There is no need to indicate the amount of the claims or provide any other specific information, provided that the pledged debtors can deduce from the notice the existence of the pledge of the debts they owe (see *above* ¶ 44).

**75** In this case, the notices dated October 11 and 12, 2011, October 7 and 10, 2016, and December 26, 2017, meet these minimum requirements. Commisimpex did indeed serve the Guarantee on each of these debtors, namely the companies of the TOTAL Group (*see exhibits nos. 39 to 44).* On the one hand, these notices expressly refer to the Guarantee of December 22, 1986, and to the secured claims. On the other hand, the notification also contains the content of Paragraph I of the Guarantee (see *above* ¶ 64), so that there was no longer any doubt that the original creditor had given its prior consent to payment to the pledgee. The Federal Court's case law allowing the pledged debtor to demand a document legitimizing the pledgee (see *above* ¶ 67) was thus fulfilled in advance.

76   Therefore, **as soon as the notice** ("service") **was given**, the secured debtors could no longer validly discharge their obligations to the principal creditor and were required to pay the amounts owed to the pledgee. At the latest at the time of this notice, the pledgee could bring an action to obtain payment in his own name.

77   In the absence of voluntary payment, the pledgee may, upon notification, obtain enforcement of this claim against the pledged debtors, which it is doing before the Commercial Court of Nanterre.

# § 5 CONCLUSIONS

**78**   **1°** The fact that the State of Congo "*pledges and guarantees all revenues, and in particular all receivables, royalties, taxes, duties, etc., whether present, future or contingent, arising or to arise, directly or indirectly, from the exploitation in any form whatsoever of the hydrocarbon deposits detailed below* " (Paragraph F) must be classified as **a "pledge on receivables" within the meaning of Art. 899 et seq. CC (**see supra ¶ 48 et seq.).

**79**   **2°** The pledge on receivables **was validly constituted**. Indeed, the specificity of the guarantee in relation to the secured receivables is given (see *above* ¶ 56); the object of the pledge is sufficiently determined (see *above* ¶ 57); the receivables were transferable (see *supra* 57) and if they were not, it would have to be considered, pursuant to Art. 164 para. 2 CO, that it is not possible to oppose the inalienability to the pledgee (see *supra* ¶ 57). Even recourse to Art. 19 PDCA would be of no use, given the contradictory behavior of the Congo (*see supra* ¶ 58). Finally, the written form is also respected (see *supra* ¶ 60).

**80**   **3° Private enforcement of the guarantee** is effected by unilateral enforcement of the pledge in derogation from Art. 906 para. 2 CC, from which the parties may validly derogate (dispositive right, see *supra* ¶ 63). Under this clause, the pledgee may also take direct legal action against the pledged debtors. This is what the drafters provided for in Paragraph I (see *above* ¶ 64), stipulating an irrevocable and unconditional right for Commisimpex to obtain payment directly from the pledged debtors, without going through any formalities (see *above* ¶ 65). Thus, Commisimpex can enforce the private enforcement clause based on Swiss law before a French court, since this clause allows the pledgee to enforce the claim in ordinary proceedings (see *above* ¶ 75).

**81**   **4° The additional clauses** (negative pledge clause [see *supra* ¶ 69], clause prohibiting modification of the underlying relationship [see *supra* ¶ 70], immunity from jurisdiction and enforcement clause [see *above* ¶ 72]) reinforce the idea that the pledgor has taken all steps to ensure that payment should be made to the pledgee upon first demand, in other words, that the Guarantee is "enforceable and at the request of COMMISIMPEX" (Paragraph I *in initio)*. This is also why the grantor provided that the Guarantee constitutes "a permanent, irrevocable and unconditional payment instruction" (Paragraph I) to the Total Group companies and that the Guarantee "would be enforceable" (Paragraph I) against the Total Group companies (see *supra* ¶ 64).

**82**   **The payment is therefore enforceable**, given that the pledgee has requested it and that the permanent, irrevocable, and unconditional instruction to the debtors to pay emphasizes that the pledged debtors have waived any exceptions in advance or at least at the time of the notice of the Guarantee. The procedure thus leads to

enforcement proceedings against the mortgaged debtors of the pledged claims in accordance with the French procedure currently in progress.

Fribourg, August 20, 2020

Prof. Pascal Pichonnaz

# APPENDIX – THE LEGAL PROVISIONS REFERRED TO IN THE SWISS CIVIL CODE

## I.    SWISS CIVIL CODE

### Art. 2 B. Scope of civil rights / I. General duties

[1] Everyone is required to exercise their rights and fulfill their obligations in accordance with the rules of good faith.

[2] Manifest abuse of a right is not protected by law.

### Art. 27 B. Protection of personality / I. Against excessive commitments

[1] Noone may, even partially, renounce the enjoyment or exercise of civil rights.

[2]Noone may alienate their freedom or prohibit its use in a manner contrary to the law or public morals.

### Art. 887 A. Pledge / I. Constitution / 4. Commitment by the creditor

The creditor may only pledge the item pledged to him with the consent of the person from whom he holds it.

### Art. 891 A. Pledge / III. Effects / 1. Rights of the creditor

[1] A creditor who is not disinterested has the right to pay himself from the proceeds of the sale of the pledge.

[2] The pledge guarantees the creditor the principal, the agreed interest, the costs of enforcement, and default interest.

### Art. 892 A. Pledge / III. Effects / 2. Scope of the pledge

[1] The pledge encumbers the item and its accessories.

[2] Unless otherwise agreed, the creditor shall return the natural fruits of the thing to the debtor as soon as they cease to form an integral part of it.

[3] The pledge extends to the fruits which, at the time of realization, form an integral part of the thing.

### Art. 894 A. Pledge / III. Effects / 4. Forfeiture clause

Any clause authorizing the creditor to appropriate the pledge in the event of non-payment shall be null and void.

### Chapter II: Pledge on claims and other rights Art. 899 A.

### In general

[1] Claims and other transferable rights may be pledged.

[2] Unless otherwise provided, the rules governing pledges shall apply.

### Art. 900 B. Creation / I. Ordinary claims

[1] The pledge of claims that are not evidenced by a title or result only from an acknowledgment of debt shall be made in writing and, in the latter case, by the surrender of the title.

[2] The creditor and the grantor may give notice of the assignment to the third-party debtor.

[3] The pledge of other rights shall be made in writing, in accordance with the formalities established for their transfer.

### Art. 901 B. Creation / II. Securities

[1] The pledge of bearer securities shall be effected by their mere delivery to the pledgee.

[2] Other securities may only be pledged by delivery of the security bearing an endorsement or assignment.

[3] The commitment of intermediated securities is governed exclusively by the Act of October 3, 2008, on intermediated securities[1]. [2] – –

### Art. 902 B. Constitution / III. Securities representing goods and warrants

[1] The pledging of securities representing goods confers a lien on those goods.

[2] Where a special pledge certificate (warrant) has been created independently of the certificate representing the goods, the pledge of the warrant is equivalent to the pledging of the goods, provided that this is mentioned on the main certificate with an indication of the amount secured and the maturity date.

### Art. 903 B. Creation / IV. Subsequent pledge of the claim

The subsequent pledge of a claim already encumbered by a lien is valid only if the owner of the claim or the new pledgee notifies the previous pledgee in writing.

### Art. 904 C. Effects / I. Scope of the creditor's right

[1] Unless otherwise agreed, a pledge on claims generating interest or other periodic income, such as dividends, shall extend only to current payments, excluding those that have already fallen due.

[2] Where such ancillary payments are represented by specific securities, they shall, unless otherwise stipulated, be included in the pledge only if they have themselves been pledged in accordance with the law.

### Art. 905 C. Effects / II. Representation of shares and partnership interests in a limited liability company given as collateral

[1] Shares pledged shall be represented at the company's general meeting by the shareholder himself and not by the pledgee.

[2] Limited liability company shares pledged as collateral shall be represented at the shareholders' meeting by the shareholder himself and not by the pledgee.

### Art. 906 C. Effects / III. Administration and repayment

[1] The owner of the pledged claim may terminate it or enforce its recovery, and the pledgee has the right to compel him to do so if such measures are required in the interests of sound management.

[2] The debtor, having been notified of the pledge, may only make payment to the owner or pledgee with the consent of the other interested party.

[3] In the absence of such consent, he must deposit the payment.

## II.     ' CODE OBLIGATIONS

### Art. 13 B. Form of contracts / II. Written form / 1. Form required by law / b. Its elements

[1] A contract for which the law requires written form must be signed by all persons to whom it imposes obligations.

### Art. 18 D. Interpretation of contracts; simulation

[1] In order to assess the form and clauses of a contract, it is necessary to ascertain the real and common intention of the parties, without dwelling on any inaccurate expressions or terms that they may have used, either by mistake or to disguise the true nature of the agreement.

[2] The debtor may not raise the defense of simulation against a third party who has become a creditor on the basis of a written acknowledgment of the debt.

### Art. 82 C. Time of performance / VI. In bilateral contracts / 1. Manner of performance

A party seeking performance of a bilateral contract must have performed or offer to perform its own obligation, unless it is entitled to a term under the terms or nature of the contract.

### Art. 114 A. Extinction of ancillary obligations

[1] When the principal obligation is extinguished by payment or otherwise, sureties, pledges, and other ancillary rights are also extinguished.

[2] Interest accrued previously may no longer be claimed unless this right has been stipulated or results from the circumstances.

[3]Special provisions on real estate liens, securities, and composition agreements remain reserved.

### Art. 120 F. Set-off / I. Conditions / 1. In general

[1] Where two persons owe each other sums of money or other benefits of the same kind, each party may set off its debt against its claim, provided that both debts are due.

[2] The debtor may assert the set-off even if his claim is disputed.

[3] The set-off of a time-barred claim may be invoked if the claim was not extinguished by the statute of limitations at the time it could be set off.

### Art. 127 G. Limitation period / I. Time limits / 1. Ten years

All actions are subject to a ten-year statute of limitations, unless otherwise provided for in federal civil law.

### Art. 164 A. Assignment of claims / I. Conditions / 1. Voluntary assignment / a. Admissibility

[1] The creditor may assign his right to a third party without the consent of the debtor, unless the assignment is prohibited by law, agreement, or the nature of the case.

[2] The debtor may not invoke the fact that the claim was stipulated as non-assignable if the third party became a creditor on the basis of a written acknowledgment that did not mention non-assignability.

**Art. 169 A. Assignment of claims / II. Effects of assignment / 1. Situation of the assigned debtor / c. Exceptions of the assigned debtor**

[1] The debtor may raise against the assignee, as he could have raised against the assignor, any defenses available to him at the time he became aware of the assignment.

[2] If the debtor had a claim against the assignor that was not yet due at that time, the debtor may invoke set-off, provided that the claim did not become due after the assigned claim.

# III.   LAW ON INTERNATIONAL PRIVATE LAW

**Art. 19 VII. Consideration of mandatory provisions of foreign law**

[1]Where legitimate and manifestly overriding interests under Swiss law so require, a mandatory provision of a law other than that designated by this Act may be taken into consideration if the situation in question has a close connection with that law.

[2] In determining whether such a provision should be taken into account, consideration shall be given to its purpose and the consequences of its application in order to reach a decision that is appropriate from the perspective of Swiss law.