Exhibit 10





**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration  •  Cour internationale d'arbitrage**

# SENTENCE

**ICC International Court of Arbitration  •  Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org   E-mail arb@iccwbo.org

# COUR INTERNATIONALE D'ARBITRAGE DE LA CCI

## AFFAIRE No. 16257/EC/ND/MCP

COMMISSIONS IMPORT EXPORT S.A., AYANT POUR DENOMINATION
COMMERCIALE COMMISIMPEX

(Rép. du Congo)

c/

LA REPUBLIQUE DU CONGO

(BRAZZAVILLE) (Rép. du Congo)

Ce document est un original de la Sentence Finale rendue conformément au Règlement d'arbitrage de la Cour internationale d'arbitrage de la CCI.

**CHAMBRE DE COMMERCE INTERNATIONALE**

**SENTENCE FINALE**

**Affaire CCI n° 16 257/EC/ND/MCP**

**ENTRE:**

**COMMISSIONS IMPORT EXPORT S.A.,** ayant pour dénomination commerciale « Commisimpex » et son siège social 86, avenue Foch, Quartier Cathédrale, BP 1244 BRAZZAVILLE, **REPUBLIQUE DU CONGO ;**

Représentée par M. Michael Polkinghorne, M. Charles Nairac, M. Christophe Seraglini et Mme Elizabeth Lefebvre-Gross, WHITE & CASE, 19 place Vendôme, 75001 Paris, **FRANCE**

Demanderesse,

Ci-après « Commisimpex » ou « la Demanderesse »

**ET :**

**LA REPUBLIQUE DU CONGO,** Président de la République, Palais Présidentiel, Quartier Plateau, BRAZZAVILLE, **REPUBLIQUE DU CONGO ;**

Représentée par M. Jean-Pierre Vignaud, M. Jean-Yves Garaud et M. Charles de Taffin, CLEARY, GOTTLIEB, STEEN & HAMILTON LLP, 12 rue de Tilsitt, 75008 Paris, **FRANCE**

Défenderesse,

Ci-après « le Congo » ou « la République du Congo » ou « la Défenderesse »

**TABLE DES MATIERES**

I.   FAITS .................................................................................................................... 3
II.  PROCÉDURE......................................................................................................... 4
III. POSITION DES PARTIES .................................................................................... 32
     A.   Position de la Demanderesse..................................................................... 32
     B.   Position de la Défenderesse....................................................................... 38
IV.  DISCUSSION ........................................................................................................ 45
     ●   QUESTIONS PRELIMINAIRES SOULEVEES PAR LA MISE EN LIQUIDATION
         JUDICIAIRE DE COMMISIMPEX ........................................................................ 45
     ●   LE LITIGE ENTRE LES PARTIES ...................................................................... 52
     A.   Sur l'autorité dc chose jugée de la Sentence CCI no. 9899 du 3 décembre 2000 ..... 52
     B.   Sur la validité du Protocole de 2003 et son caractère contraignant ....................... 54
          a.   Sur l'absence de pouvoirs alléguée des signataires du Protocole de 2003 ............ 54
          b.   Sur l'absence alléguée de caractère contraignant du Protocole de 2003 ............. 59
          c.   Sur l'ignorance du montant de la créance tel que présenté dans lc Protocole dc
               2003 ................................................................................................... 64
          d.   Sur l'absence alléguée dc cause du Protocole de 2003 .................................. 65
     C.   Sur les montants dus par la République du Congo à Commisimpex ..................... 73
          a.   La dette de 440.000.000 FRF (Article 1er du Protocole de 2003)...................... 74
          b.   La dette de 520.000.000 FRF (Articles 3 et 4 du Protocolc de 2003)............... 76
     D.   La répartition de la charge des frais de l'arbitrage ................................................ 78

# I.   FAITS

**1.** De 1984 à 1986, Commisimpex et la République du Congo ont conclu divers marchés de travaux publics et de fournitures de matériels et avenants à ces contrats[1], financés au moyen de crédits consentis par Commisimpex au profit de l'État, matérialisés par des billets à ordre émis par la Caisse Congolaise d'Amortissement (ci-après la « CCA ») et devant être avalisés par l'État. Ces travaux ont tous fait l'objet d'attestations de bonne fin des travaux.

**2.** Le 22 décembre 1986, la République du Congo, représentée par le Ministère des Finances et du Budget et la Caisse Congolaise d'Amortissement, a émis au profit de Commisimpex une garantie de paiement de certains des marchés et avenants conclus avec celle-ci, sous réserve de leur parfaite exécution (ci-après la « Garantie de 1986 »).

**3.** La société Commisimpex et la République du Congo ont conclu le 14 octobre 1992 le Protocole n°566 (ci-après « le Protocole de 1992 », Pièce C-5). Le Protocole de 1992 visait à établir les modalités de règlement des « *dettes restant dues* » pour rembourser les crédits fournisseurs consentis par Commisimpex pour les « *marchés et avenants joints en annexe au présent protocole* »[2]. Les « *dettes restant dues* » étaient libellées en Francs français, Livres sterling, dollars US et FCFA et représentaient environ 22 milliards de FCFA.

**4.** Par requête d'arbitrage à la Cour internationale d'arbitrage de la CCI (ci-après « la Cour Internationale d'Arbitrage ») en date du 13 mars 1998 (Pièce R-2), dans l'affaire n°9899, Commisimpex a sollicité la condamnation de la République du Congo et de la CCA au paiement de montants non honorés en exécution du Protocole de 1992. Aux termes d'une sentence finale rendue le 3 décembre 2000 (Pièce C14), ce tribunal arbitral condamnait solidairement la République du Congo et la CCA au paiement de 107 millions de dollars US, limitant la condamnation au montant correspondant aux anciens billets à ordre restitués par Commisimpex.

La sentence a été revêtue de l'exequatur par le Tribunal de grande instance de Paris le 12 décembre 2000. Le Congo et la CCA ont formé un recours en annulation devant la Cour d'appel de Paris le 2 janvier 2001 qui a été rejeté le 23 mai 2002.

**5.** Le 23 août 2003, la société Commisimpex, d'une part, et Monsieur Gabriel Longobé, Ministre délégué, Secrétaire Général de la Présidence de la République, et Monsieur Jean-Dominique Okemba, Secrétaire d'État, Secrétaire Général du Conseil de Sécurité, d'autre part, ont signé le Protocole d'accord n°706 (ci-après « le Protocole de 2003 ») (Pièce C27). Le Protocole de 2003 fixait les modalités de remboursement de la dette de la République du Congo, considérablement augmentée par rapport au Protocole de 1992 et évaluée à 48 milliards de FCFA au 30 septembre 1992. Le Protocole de 2003 décrivait « *la dette de l'État*

---

[1]   Le marché 353/83 a été conclu entre le Congo et la société APV Hall International Limited le 10 novembre 1983 (Pièce C-40). Commisimpex et l'État ont ensuite conclu les avenants n°1, 3, 4 et 5 au marché 353/83 (Pièces R-23, R-24, R-21 et R-22) ; ainsi que le marché 185/84 du 25 juin 1984 (Pièce R-6) ; le marché 83/85 du 24 juin 1985 et son avenant n°1 (Pièces R-25 et R-26) ; le marché 009/86/G du 12 février 1986 (Pièce R-19) ; le marché 015/86 du 26 mars 1986 et son avenant n°1 (Pièces R-4 et R-20) et le marché 53/86 du 1er juillet 1986 (Pièce R-5).

[2]   L'annexe au Protocole de 1992 n'a cependant pas été communiquée dans la présente procédure.

*du Congo* » comme étant composée d'une « *première partie* » de 22 milliards de FCFA, « *objet du Protocole [de 1992]* », et d'une « *deuxième partie* » de 26 milliards de FCFA. Le Protocole de 2003 prévoyait que l'État s'engageait « *à conclure avec la société Commisimpex un Protocole d'Accord Définitif en remplacement du présent Protocole, pour clore les négociations en cours* » (article 6).

**6.** Le présent litige porte sur les effets du Protocole de 2003 dont Commisimpex demande l'exécution en arguant qu'il vaut reconnaissance de la dette totale de la République du Congo à son égard tandis que celle-ci soutient qu'il est nul et de nul effet. Pour le Congo, la question de sa dette vis-à-vis de Commisimpex a été réglée définitivement par le Protocole de 1992 et le tribunal arbitral constitué dans la procédure CCI no. 9899 dont la sentence a autorité de chose jugée.

## II. PROCÉDURE

**7.** Le 21 avril 2009, le Secrétariat de la Cour internationale d'arbitrage de la CCI (ci-après « le Secrétariat de la CCI ») a accusé réception de la requête d'arbitrage soumise par Commisimpex le 17 avril 2009. La Demanderesse a indiqué souhaiter que le litige soit soumis à un collège de trois arbitres et a nommé comme arbitre M. le Professeur Bernard Hanotiau.

**8.** Le 22 avril 2009, le Secrétariat de la CCI a transmis cette requête d'arbitrage à la République du Congo.

**9.** Les 4 et 5 mai 2009, la Demanderesse a adressé au Secrétariat de la CCI une lettre accompagnée de deux pages modifiant sa requête d'arbitrage, dont le Secrétariat a accusé réception le 6 mai 2009.

**10.** Le 26 mai 2009, le cabinet Cleary Gottlieb a informé le Secrétariat de la CCI qu'il représentait la Défenderesse dans ce litige et a indiqué que celle-ci, ayant accepté que le litige soit soumis à un collège de trois arbitres, nommait Me Carole Malinvaud en qualité d'arbitre.

**11.** Le 3 juin 2009, le Secrétariat de la CCI a adressé aux parties copie de la déclaration d'acceptation et d'indépendance de Me Carole Malinvaud.

**12.** Le 4 juin 2009, le Secrétariat de la CCI a adressé aux parties copie de la déclaration d'acceptation et d'indépendance de M. Le Professeur Bernard Hanotiau.

**13.** Le 8 juin 2009, la Défenderesse a indiqué au Secrétariat de la CCI qu'elle entendait contester l'existence, la portée et la validité de la clause compromissoire invoquée par la Demanderesse dans sa requête. Elle a ajouté qu'elle consentait à ce que le lieu de l'arbitrage soit Paris et que l'arbitrage soit conduit en langue française.

**14.** Le même jour, la Demanderesse a accepté la proposition de la Défenderesse quant à la désignation conjointe du Président du Tribunal Arbitral par les co-arbitres et a suggéré le 30 juin 2009 comme date limite pour cette désignation.

**15.** Le 11 juin 2009, le Secrétariat de la CCI a demandé aux parties si, dans l'hypothèse où l'arbitrage avait lieu, elles s'accorderaient sur un délai exprès à accorder aux co-arbitres à compter de la date à laquelle ils recevraient notification de leur confirmation pour tenter de désigner conjointement le Président du Tribunal Arbitral.

**16.** Le 18 juin 2009, les parties ont indiqué par lettres respectives au Secrétariat de la CCI que les co-arbitres disposaient, pour nommer conjointement le Président du Tribunal Arbitral, d'un délai de trois semaines à compter de la date à laquelle ils avaient reçu notification de leur confirmation. Le Secrétariat de la CCI a accusé réception de ces lettres le 19 juin 2009.

**17.** Le 25 juin 2009, la Défenderesse a sollicité un délai supplémentaire de quinze jours, soit jusqu'au 10 juillet 2009, pour soumettre sa réponse à la requête d'arbitrage.

**18.** Le 26 juin 2009, la Demanderesse a indiqué espérer que la Défenderesse soumette sa réponse à la requête d'arbitrage dans les meilleurs délais.

**19.** Le 29 juin 2009, le Secrétariat de la CCI a étendu au 6 juillet 2009 le délai accordé à la Défenderesse pour soumettre sa réponse à la requête d'arbitrage.

**20.** Le 8 juillet 2009, le Secrétariat de la CCI a accusé réception de la réponse à la requête d'arbitrage de la Défenderesse datée du 6 juillet 2009.

**21.** Le 17 juillet 2009, la Demanderesse a adressé ses commentaires sur les objections à la compétence du Tribunal soulevées par la Défenderesse. Le Secrétariat de la CCI a accusé réception de cette lettre le 20 juillet 2009.

**22.** Le 30 juillet 2009, le Secrétariat de la CCI a informé les parties que la Cour internationale d'arbitrage de la CCI avait décidé que l'arbitrage aurait lieu conformément à l'article 6 (2) du Règlement et avait confirmé le Professeur Bernard Hanotiau et Me Carole Malinvaud en qualité de co-arbitres.

**23.** Le même jour, le Secrétariat de la CCI a indiqué aux co-arbitres qu'ils disposaient de 21 jours pour désigner conjointement le Président du Tribunal Arbitral.

**24.** Le 7 août 2009, Me Carole Malinvaud a indiqué au Secrétariat de la CCI que le Professeur Hanotiau et elle-même proposaient conjointement Me Yves Derains comme Président du Tribunal Arbitral.

**25.** Le 10 août 2009, le Professeur Bernard Hanotiau a confirmé au Secrétariat de la CCI que Me Carole Malinvaud et lui-même proposaient conjointement Me Yves Derains comme Président du Tribunal Arbitral.

**26.** Le 14 août 2009, le Secrétariat de la CCI a adressé aux parties une copie de la déclaration d'acceptation et d'indépendance de Me Yves Derains.

**27.** Le 28 août 2009, le Secrétaire Général de la Cour internationale d'arbitrage de la CCI a confirmé Me Yves Derains en qualité de Président du Tribunal Arbitral, le Tribunal étant donc constitué comme suit :

Monsieur le Professeur Bernard HANOTIAU
HANOTIAU & VAN DEN BERG
IT Tower, 9th Floor
480 Avenue Louise- Box 9
1050 Bruxelles
Belgique
Tel: +32 2 290 39 00
Fax: +32 2 290 39 39
E-mail: bernard.hanotiau@hvdb.com
(Co-arbitre)

Maître Carole MALINVAUD
GIDE LOYRETTE NOUEL
26, Cours Albert 1er
75008 Paris
France
Tel : + 33 (0) 1 40 75 36 66
Fax : + 33 (0) 1 40 75 69 36
E-mail : malinvaud@gide.com
(Co-arbitre)

Maître Yves DERAINS
DERAINS & GHARAVI
25 rue Balzac
75008 Paris
France
Tel : +33 (0) 1 40 55 51 00
Fax : +33 (0) 1 40 55 51 05
E-mail : yvesderains@derainsgharavi.com
(Président du Tribunal Arbitral)

**28.** Le même jour, le dossier de l'affaire a été transmis aux arbitres.

**29.** Le 11 septembre 2009, le Tribunal Arbitral a adressé aux parties des projets d'Acte de Mission et d'Ordonnance de Procédure n°1 afin d'obtenir leurs commentaires ainsi que le résumé de leurs positions.

**30.** Le 21 septembre 2009, les parties ont adressé au Tribunal Arbitral leurs commentaires sur l'Acte de Mission ainsi que le résumé de leurs positions.

**31.** Le 24 septembre 2009, le Tribunal Arbitral a adressé aux parties un nouveau projet d'Acte de Mission intégrant les positions des parties ainsi que leurs commentaires.

**32.** Le 30 septembre 2009, la Demanderesse a formulé une nouvelle demande de réparation de son préjudice moral.

**33.** Le 1er Octobre 2009, une réunion s'est tenue à Paris entre le Tribunal Arbitral et les parties.

**34.** Le même jour, le Tribunal Arbitral a communiqué à la Cour Internationale d'Arbitrage l'Acte de Mission signé par les parties et le Tribunal.

**35.** Le même jour, le Tribunal Arbitral a également adressé aux parties l'Ordonnance de Procédure n° 1 dont la teneur est la suivante:

*« Attendu que le 1er octobre, une réunion s'est tenue à Paris en présence du Tribunal Arbitral, des parties et de leurs conseils;*

*Attendu qu'à la même date, les parties ont signé l'Acte de Mission ;*

*Attendu que Me. Catherine Schroeder a été désignée comme Secrétaire du Tribunal Arbitral ;*

*Attendu que par lettre du 30 octobre 2009, la partie demanderesse a indiqué qu'elle n'était pas en état de discuter dès à présent du calendrier prévisionnel ;*

**Le Tribunal Arbitral décide ce qui suit :**

*1.* **Calendrier Prévisionnel**

*1.1.1* *Les Parties tenteront d'établir conjointement un calendrier prévisionnel et indiqueront, pour le 16 octobre 2009, au Tribunal Arbitral l'état de leur discussion.*

*1.1.2* *Une conférence téléphonique entre les Parties et le Tribunal Arbitral aura lieu le 20 octobre afin de finaliser le calendrier prévisionnel.*

*2.* **Echange d'écritures**

*2.1* *Les Parties pourront présenter leurs arguments de fait et de droit dans deux échanges successifs de mémoires, selon le calendrier établi.*

*2.2* *Les mémoires devront être soumis sous format A4 et A5 et en version électronique (word et pdf).*

*2.3* *Les mémoires des parties doivent comprendre tous les arguments de fait et tous les arguments de droit justifiant les conclusions prises, sous la forme de paragraphes numérotés. Les parties présenteront séparément, en les numérotant spécialement, chacun de leurs arguments.*

*2.4* *Dans leurs mémoires, les parties indiqueront la nature des moyens de preuve qu'elles entendent soumettre à l'appui de leurs arguments de fait (pièces, témoignages, expertises, etc.) ou de droit (extraits de doctrine ou de jurisprudence, avec références complètes). Les mémoires seront accompagnés d'une table des matières.*

*2.5* *Les pièces soumises par les parties au Tribunal Arbitral seront numérotées de façon continue (pour la Demanderesse « C- ... » ; pour la Défenderesse « R-... ») et annexées aux mémoires auxquels elles se réfèrent. Elles seront de plus accompagnées d'une liste indiquant la date et l'auteur de chacune d'elles; cette liste sera mise à jour par les parties chaque fois qu'une nouvelle pièce sera soumise. Les annexes reproduisant des passages de doctrine ou de jurisprudence seront numérotées de façon continue (pour la Demanderesse « CL-... » ; pour la Défenderesse « RL-... »).*

2.6   *Les pièces soumises au Tribunal Arbitral doivent l'être dans leur intégralité et les passages visés devront être identifiés. Les photocopies seront suffisantes, à moins que la partie adverse conteste l'authenticité du document, auquel cas le Tribunal Arbitral pourra demander la production du document original ou d'une copie certifiée conforme de l'original.*

2.7   *Une partie pourra demander à la partie adverse de soumettre tout document dont elle ne dispose pas si celui-ci en a la possession ou, sous le contrôle de la partie adverse, si le document est suffisamment identifié et pertinent pour la résolution du litige.*

*Si la partie à qui une telle requête a été soumise refuse de s'exécuter, le Tribunal Arbitral pourra ordonner la production du (des) document(s) en question, sur requête de la partie concernée. Les parties devront former leurs éventuelles requêtes au Tribunal Arbitral de manière conjointe, à la date indiquée dans le calendrier prévisionnel ci-dessus. Cette requête conjointe devra identifier le(s) document(s) avec suffisamment de précision et devra indiquer en quoi le(s) document(s) est (sont) pertinent(s) (« Redfern Schedule »). Le Tribunal Arbitral aura tout pouvoir de statuer et tiendra en particulier compte des intérêts légitimes de la partie à qui la requête de production a été adressée. Si un document était considéré comme confidentiel par la partie à qui la requête est adressée, elle devra en informer le Tribunal Arbitral et la partie adverse. Le Tribunal Arbitral prendra alors toutes les mesures nécessaires pour assurer la protection de ce document tout en s'efforçant, dans la mesure du possible, à en autoriser la production.*

*Le Tribunal Arbitral appréciera librement et tirera toutes conséquences du refus d'une partie d'obtempérer à son ordre de production.*

2.8   *Le Tribunal Arbitral pourra également à tout moment demander à l'une des parties de soumettre un document qu'il considère pertinent pour la résolution du litige.*

2.9   *Les parties ne seront pas autorisées à présenter des pièces nouvelles après l'échange d'écritures, sous réserve d'une autorisation expresse du Tribunal Arbitral.*

**3.   Auditions des témoins et experts**

3.1   *Toute personne peut être entendue, y compris les parties et leurs dirigeants.*

3.2   *Les parties soumettront en annexe à leurs écritures les déclarations écrites des témoins indiqués dans leurs écritures, sauf pour les témoins qui sont sous contrôle de la partie adverse ou refusent de témoigner.*

3.3   *Seuls seront entendus les témoins dont une partie requiert le contre-examen. Les autres seront dispensés de comparaître, sauf si le Tribunal Arbitral souhaite les entendre. Dans l'hypothèse où une partie ne requiert pas le contre-examen d'un témoin, elle n'est pas pour autant réputée avoir accepté le contenu de son attestation. Dans ce cas, le Tribunal Arbitral juge de la valeur à accorder à l'attestation dans son entière discrétion.*

3.4   *Les témoins/experts seront en principe cités par la partie pour laquelle ils ont fourni une déclaration écrite ou un rapport.*

3.5   *Lorsqu'un témoin cité est sous le contrôle de la partie adverse, celle-ci engagera tous ses efforts pour que ce témoin paraisse.*

*3.6 Si un témoin dûment cité ne devait pas comparaître pour une raison valable, sa déclaration écrite pourra néanmoins être prise en compte par le Tribunal Arbitral, selon les circonstances et pour autant qu'elle ne soit pas contestée.*

*3.7 Les auditions de témoins et experts se dérouleront en principe selon la procédure suivante :*

*a. Les témoins et les experts seront d'abord invités par le Tribunal Arbitral à confirmer leur déclaration écrite. Celle-ci tiendra lieu d'examen direct sous réserve d'une éventuelle brève présentation.*

*b. Sauf ordre contraire du Tribunal Arbitral, les témoins et les experts dont le témoignage a été consigné dans une déclaration écrite seront interrogés uniquement par le conseil de la partie adverse (« contre-examen »).*

*c. Le conseil de l'autre partie aura s'il le souhaite l'occasion de poser des questions en relation avec les réponses données (« ré-examen ») ; l'occasion sera ensuite également offerte au conseil de l'autre partie de poser des questions complémentaires.*

*d. Le Tribunal Arbitral peut interroger les témoins et les experts en tout temps et autoriser des interrogatoires complémentaires.*

*3.8 S'ils le jugent nécessaire, les experts peuvent commencer par une introduction, qui devra toutefois être brève.*

*3.9 Le Tribunal Arbitral se réserve le droit de faire entendre plusieurs témoins ou experts simultanément afin de pouvoir confronter leurs points de vue.*

*3.10 Les représentants des parties peuvent assister à toutes les audiences ; les témoins et les experts ne peuvent y assister qu'après leur audition.*

*3.11 Les coûts liés à l'audition d'un témoin ou d'un expert seront supportés par la partie qui l'a cité, sous réserve de la décision finale du Tribunal Arbitral sur la répartition de tels frais. Si un témoin est cité par les deux parties, la partie sous le contrôle de laquelle se trouve ce témoin supportera les coûts liés à son audition. Si un témoin ne se trouve pas sous le contrôle de l'une ou l'autre partie, les coûts liés à son audition seront partagés par moitié entre les parties.*

*3.12 Les audiences d'audition feront l'objet d'un procès-verbal en français, établi par un(e) sténotypiste dont les coûts seront avancés par parts égales par les parties. »*

**36.** Le 16 octobre 2009, la Demanderesse a fait connaître au Tribunal Arbitral l'état des discussions des parties quant au calendrier prévisionnel, indiquant qu'elle souhaiterait que le Tribunal Arbitral se prononce, par une sentence partielle, sur la question de sa compétence, et ce avant tout examen au fond des demandes des parties. Elle adressait un calendrier prévisionnel établi par les parties dans l'hypothèse où le Tribunal ferait droit à cette demande.

**37.** Le même jour, la Défenderesse a indiqué que, pour sa part, la question de la compétence se mélangeait au fond mais qu'elle s'en remettait à la sagesse du Tribunal. Elle a ajouté que dans l'hypothèse où le Tribunal Arbitral accepterait la bifurcation de la procédure, celle-ci devrait porter sur toutes les exceptions de procédure et que c'est dans ce cas seulement qu'elle

accepterait le calendrier fixé par Commisimpex. Dans le cas inverse, elle a confirmé qu'elle était d'accord pour fixer avec la Demanderesse un calendrier prévisionnel.

**38.** Le 19 octobre 2009, le Tribunal Arbitral a accusé réception des lettres respectives des parties et a confirmé la conférence téléphonique devant avoir lieu entre les parties et le Tribunal le 20 octobre 2009 afin que celles-ci puissent développer leurs positions respectives. Le 20 octobre 2009, une conférence téléphonique a eu lieu entre les parties et le Tribunal Arbitral.

**39.** Le même jour, le conseil de la Défenderesse a adressé au Tribunal Arbitral son pouvoir pour représenter la République du Congo, signé par M. l'Ambassadeur Lopès.

**40.** Le même jour, le Tribunal Arbitral a adressé aux parties l'Ordonnance de procédure n°2 qui dispose que :

> *« Attendu que conformément à l'Ordonnance de Procédure no.1, les parties ont, par lettres du 16 octobre 2009, fait part au Tribunal Arbitral de l'état de leurs discussions quant à l'établissement d'un calendrier de procédure ;*
>
> *Attendu que les parties ont fait part de leurs positions respectives quant à la bifurcation de la procédure lors d'une conférence téléphonique entre elles et le Tribunal Arbitral le 20 octobre 2009 ;*
>
> ***Le Tribunal Arbitral décide ce qui suit :***
>
> *1.1.    Le Tribunal Arbitral accepte le calendrier prévisionnel établi par les parties, dans l'hypothèse d'une bifurcation, comme suit :*
>
> > *- Mémoire de la Défenderesse sur la compétence et ses exceptions de procédure : 11 décembre 2009 ;*
> >
> > *- Mémoire en réponse de la Demanderesse : 29 janvier 2010 ;*
> >
> > *- Mémoire en réplique de la Défenderesse : 26 février 2010 ;*
> >
> > *- Mémoire en duplique de la Demanderesse : 26 mars 2010.*
> >
> > *- Une audience est prévue le 26 avril 2010.*
>
> *1.1.1.    Le Tribunal Arbitral se réserve le droit, à l'issue de ces deux échanges de mémoires, ou à l'issue de l'audience prévue de renvoyer les exceptions de compétence et/ou de procédure au fond s'il s'estimait insuffisamment informé pour trancher ces questions. »*

**41.** Le 29 octobre 2009, la Demanderesse a demandé que la Défenderesse fournisse un pouvoir signé devant notaire ainsi qu'une copie des documents attestant des pouvoirs de l'Ambassadeur Lopès pour engager le Congo.

**42.** Le même jour, le Tribunal Arbitral a invité la Défenderesse à soumettre ses commentaires sur la lettre de la Demanderesse pour le 3 novembre 2009.

**43.** Le 3 novembre 2009, la Défenderesse s'est opposée à la fourniture d'un pouvoir de représentation devant être signé par notaire, le droit français ne l'exigeant pas et posant, au contraire, une présomption de mandat *ad litem* au profit des avocats.

**44.** Le 5 novembre 2009, la Demanderesse a indiqué qu'elle était satisfaite des assurances données par la Défenderesse quant à sa qualité de représentant de la République du Congo.

**45.** A la même date, la Défenderesse a indiqué au Secrétariat de la CCI qu'elle considérait cette procédure comme abusive et a fait état de difficultés financières importantes.

**46.** Le 6 novembre 2009, le Tribunal Arbitral a accusé réception des lettres respectives des parties et a noté que la question de la représentation de la Défenderesse était maintenant réglée.

**47.** Le 12 décembre 2009, la Défenderesse a adressé au Tribunal Arbitral et à la Demanderesse son Mémoire sur la Compétence.

**48.** Le 29 janvier 2010, la Demanderesse a adressé au Tribunal Arbitral et à la Défenderesse son Mémoire en Réponse sur la Compétence.

**49.** Le 26 février 2010, la Défenderesse a adressé au Tribunal Arbitral et à la Demanderesse son Mémoire en Réplique sur la Compétence.

**50.** La Cour Internationale d'Arbitrage, lors de sa session du 11 mars 2010, conformément à l'Article 24 (2) du Règlement, a prolongé le délai pour rendre la Sentence Finale jusqu'au 30 juin 2010.

**51.** Le 26 mars 2010, la Demanderesse a adressé au Tribunal Arbitral et à la Défenderesse son Mémoire en Duplique sur la Compétence.

**52.** Le 08 avril 2010, le Tribunal Arbitral a confirmé aux parties qu'une audience se tiendrait le 26 avril 2010.

**53.** Le 14 avril 2010, le Tribunal Arbitral a reçu une lettre de la Demanderesse faisant part de l'accord des parties sur les modalités d'organisation de l'audience, sous réserve de son propre accord.

**54.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a donné son accord sur les modalités d'organisation de l'audience.

**55.** Par lettre du 22 avril 2010, le Tribunal Arbitral a adressé aux parties un courriel rédigé dans les termes suivants :

> « *Le Tribunal Arbitral serait reconnaissant si les parties voulaient bien s'exprimer lors de l'audience de lundi sur la notion et les conséquences juridiques de « l'inscription par la CCA de la créance de Commisimpex au titre de la dette de l'Etat » qui apparait dans le par ces motifs des deux décisions congolaises de première instance :*
> - *« ordonne à la caisse congolaise d'amortissement d'inscrire la totalité de ces sommes au titre de la dette de l'Etat etc... » (C 20 p.34 et 35)*

- *« ordonne à la Caisse Congolaise d'amortissement (CCA) d'inscrire la totalité des créances confirmées par la société Commisimpex, reconnues et arrêtées sur la fiche d'audition du 27 mars 2002 etc.. » (C24 p 47- 49) ».*

**56.** L'audience s'est tenue le 26 avril comme prévu. À l'occasion de cette audience, il a été décidé que les parties indiqueraient au Tribunal Arbitral si, et dans quel délai, elles seraient en mesure de lui remettre des éléments de droit congolais précisant la nature de l'inscription de créance au titre de la dette de l'État.

**57.** En date du 3 mai 2010, le Tribunal Arbitral fixa aux parties un délai expirant au 7 mai 2010 pour fournir ces informations.

**58.** À la demande de la Défenderesse, ce délai fut prorogé jusqu'au 19 mai 2010 par lettre du Tribunal Arbitral du 10 mai 2010. Par le même courrier, le Tribunal Arbitral prononçait la clôture des débats, conformément à l'article 22 (1) du règlement d'arbitrage de la CCI.

**59.** Par communication du 11 mai 2010, le Tribunal Arbitral précisait que, dans l'hypothèse où la Demanderesse formulerait une demande après examen des documents éventuellement remis par la Défenderesse, il prendrait les mesures appropriées.

**60.** Par courrier du 19 mai 2010, la Défenderesse communiqua les textes de droit congolais suivants :

- Loi n°1.2000 du 1$^{er}$ février 2000, portant loi organique relative au régime financier de l'État ;
- Décret n°2000-187 du 10 août 2000, portant règlement général sur la comptabilité publique.

**61.** La Demanderesse n'a pas formulé de demande quelconque après la communication de ces textes.

**62.** Le 09 juin 2010, le Tribunal Arbitral a accusé réception, pour la bonne règle, des textes de droit congolais soumis par la Défenderesse le 19 mai 2010.

**63.** La Cour Internationale d'Arbitrage, lors de sa session du 10 juin 2010, conformément à l'Article 24 (2) du Règlement, a prolongé le délai pour rendre la Sentence Finale jusqu'au 31 août 2010.

**64.** Le 20 août 2010, le Tribunal Arbitral a rendu sa Sentence Partielle, notifiée aux parties par le Secrétariat de la Cour le 24 août 2010. Dans cette sentence le Tribunal Arbitral décidait que

*« 1) Le Tribunal Arbitral se déclare compétent pour trancher le présent litige ;*

*2) Le Tribunal Arbitral renvoie au fond la question de l'autorité de la chose jugée de la sentence arbitrale du 3 décembre 2000 rendue dans l'affaire CCI n°9899 ;*

*3) L'allocation des coûts de l'arbitrage propres à cette phase de la procédure sera décidée dans la sentence finale ;*

*4) Toutes autres demandes des parties sont renvoyées au fond. »*

Pour rendre cette sentence, le Tribunal Arbitral s'était fondé sur la clause d'arbitrage suivante :

> *« En cas de différend portant sur l'interprétation, l'exécution ou toutes autres difficultés entre les parties relativement au présent protocole d'accord, les parties conviennent de se concerter pour aboutir à un règlement amiable ; à défaut, le différend sera résolu par un ou plusieurs arbitres désignés conformément au règlement d'arbitrage de la Chambre de Commerce International (Paris) statuant en premier et dernier ressort. »*

figurant à l'article 10 du Protocole du 14 octobre 1992, dont les signataires sont la République du Congo et la société Commisimpex, et applicable en l'espèce comme déclaré par la Sentence Partielle du 20 août 2010. Cette clause étant silencieuse sur le droit applicable, il a été décidé, par accord des parties, que le droit applicable était le droit français (VIII de l'Acte de Mission).

**65.** Le 2 septembre 2010, le Tribunal Arbitral a informé les parties que la Cour Internationale d'Arbitrage, lors de sa session du 12 août 2010, a prolongé le délai pour rendre la Sentence Finale jusqu'au 30 novembre 2010.

**66.** Le 7 septembre 2010, le Tribunal Arbitral a demandé aux parties de lui adresser pour le 17 septembre 2010 leurs propositions sur la procédure au fond, ajoutant qu'à l'issue de cet échange une conférence téléphonique avec le Tribunal Arbitral aurait lieu.

**67.** Le 17 septembre 2010, la Demanderesse a indiqué que les parties étaient en train d'élaborer un calendrier commun et qu'elles reviendraient vers le Tribunal Arbitral dans les prochains jours avec une proposition commune de calendrier. Elles demandaient en outre de reporter la conférence téléphonique à une date ultérieure.

**68.** Le 20 septembre 2010, le Tribunal Arbitral a accusé réception du courriel de la Demanderesse du 20 septembre 2010 et a indiqué que la conférence téléphonique prévue n'aurait pas lieu. Le même jour, le Tribunal Arbitral a proposé aux parties d'autres dates pour la tenue de cette conférence téléphonique.

**69.** Après échange avec les parties, le Tribunal Arbitral a indiqué le 23 septembre 2010 que la conférence téléphonique aurait lieu le 30 septembre 2010.

**70.** Le 27 septembre 2010, la Demanderesse a fait part au Tribunal Arbitral de l'accord des parties sur le calendrier de procédure. Le même jour, le Tribunal Arbitral a accusé réception de ce mail.

**71.** Le 30 septembre 2010, une conférence téléphonique a eu lieu entre le Tribunal Arbitral et les parties.

**72.** Le 4 octobre 2010, le Tribunal Arbitral a transmis aux parties l'Ordonnance de Procédure no. 3 dont les termes étaient les suivants:

> *« Attendu qu'une conférence téléphonique s'est tenue entre le Tribunal Arbitral et les parties le 30 septembre 2010 aux fins d'organisation de la procédure au fond;*

*Attendu que les parties ont indiqué s'être entendues sur les dates de remise de leurs mémoires respectifs comme suit:*
- *Mémoire en Demande le 10 janvier 2011,*
- *Mémoire en Défense le 10 mai 2011,*
- *Mémoire en Réplique le 10 août 2011 ;*
- *Mémoire en Duplique le 10 novembre 2011.*

*Attendu qu'il a été prévu que les parties indiqueraient au Tribunal Arbitral le 18 novembre 2011 le nom des témoins qu'elles souhaitent faire entendre à l'audience ;*
*Attendu qu'une conférence téléphonique, pour préparer l'audience, a été prévue entre le Tribunal Arbitral, qui pourra être représenté par son Président, et les parties le 23 novembre 2011 à 18h ;*
*Attendu que les dates des 19 décembre au 23 décembre 2011 ont été retenues pour tenir à Paris l'audience au fond, étant entendu qu'il est possible qu'elles ne soient pas toutes utilisées.*

## *LE TRIBUNAL ARBITRAL DECIDE :*

*1.    Le calendrier suivant est adopté :*

| Acte de Procédure | Date | Parties |
|---|---|---|
| Mémoire en Demande | 10 janvier 2011 | Demanderesse |
| Mémoire en Défense | 10 mai 2011 | Défenderesse |
| Mémoire en Réplique | 10 août 2011 | Demanderesse |
| Mémoire en Duplique | 10 novembre 2011 | Défenderesse |
| Nom des témoins qui seront entendus à l'audience | 18 novembre 2011 | Demanderesse/Défenderesse |
| Conférence téléphonique | 23 novembre 2011 | Tribunal Arbitral (Président)/ Parties |
| Audience | 19 au 23 décembre 2011 | Tribunal Arbitral/Parties |

*2.    Les dispositions de l'Ordonnance de Procédure no. 1 demeurent applicables. »*

**73.** Le 17 novembre 2010, le Tribunal Arbitral a informé les parties que la Cour Internationale d'Arbitrage avait, lors de sa session du 10 novembre 2010, et conformément à l'article 24 (2) du Règlement de la CCI, prolongé le délai pour la remise de la Sentence Finale jusqu'au 31 mai 2011.

**74.** Le 10 janvier 2011, la Demanderesse a remis son Mémoire en Demande.

**75.** Le 9 mai 2011, la Défenderesse a informé le Tribunal Arbitral qu'elle n'était pas en mesure de rendre son Mémoire en Défense pour le 10 mai et sollicitait, en accord avec la Demanderesse, un report jusqu'au 15 mai 2011. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et a accepté l'extension de délai jusqu'au 15 mai 2011.

**76.** Le 10 mai 2011, la Demanderesse a pris acte du report, pour lequel elle avait donné son accord, soulignant que la suite du calendrier procédural demeurait inchangée. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse.

**77.** Le 16 mai 2011, la Défenderesse a adressé au Tribunal Arbitral son Mémoire en Défense sur le fond.

**78.** Le 17 mai 2011, le Secrétariat de la CCI a informé le Tribunal Arbitral et les parties que, lors de la session du 12 mai 2011, et conformément à l'article 24 (2) du Règlement, la Cour Internationale d'Arbitrage avait prolongé le délai pour rendre la Sentence Finale jusqu'au 31 mars 2012.

**79.** Le 19 mai 2011, le Tribunal Arbitral a demandé aux parties si elles avaient pris les dispositions nécessaires relatives à la réservation d'une salle pour l'audience.

**80.** Le 20 juillet 2011, la Demanderesse a indiqué, au nom des parties, qu'elles s'étaient entendues pour que l'audience se déroule sur une période de 4 jours- du 19 au 22 décembre 2011- et pour que l'audience ait lieu dans les locaux du cabinet White and Case. Le même jour, le Tribunal Arbitral a accusé réception de la lettre commune des parties.

**81.** Le 11 août 2011, la Demanderesse a adressé au Tribunal Arbitral son Mémoire en Réplique sur le fond.

**82.** Le 26 octobre 2011, le Tribunal Arbitral a proposé de modifier l'heure de la conférence téléphonique prévue le 23 novembre 2011 et a demandé aux parties de lui communiquer pour le 15 novembre au plus tard les points qu'elles souhaitaient aborder lors de cette conférence téléphonique.

**83.** Le 4 novembre 2011, le Tribunal Arbitral, en l'absence de contestation par l'une des parties, a confirmé le changement d'heure de la conférence téléphonique.

**84.** Le 9 novembre 2011, la Défenderesse a indiqué ne pas être en mesure de déposer son Mémoire en Duplique pour le 10 novembre 2011 et a sollicité un report jusqu'au 20 novembre 2011. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et a invité la Demanderesse à faire part de ses commentaires pour le 10 novembre 2011. Le même jour, la Demanderesse s'est opposée à ce report et a demandé au

Tribunal Arbitral d'ordonner à la Défenderesse de remettre son mémoire au plus tard le 13 novembre 2011. Le 10 novembre 2011, le Tribunal Arbitral a indiqué avoir pris connaissance de la demande de report de la Défenderesse ainsi que des objections de la Défenderesse et a reporté au 15 novembre 2011 la date de soumission du Mémoire en Duplique, jugeant la demande de délai sollicité par la Défenderesse excessive.

**85.** Le 15 novembre 2011, la Demanderesse a communiqué au Tribunal Arbitral les points qu'elle souhaitait aborder lors de la conférence téléphonique prévue le 23 novembre 2011. Le même jour, la Défenderesse a également fait part des sujets qu'elle jugeait utile d'aborder.

**86.** Le 16 novembre 2011, la Défenderesse a adressé au Tribunal Arbitral son Mémoire en Duplique.

**87.** Le même jour, le Tribunal Arbitral a accusé réception des lettres des parties du 15 novembre 2011 relatives à l'organisation de l'audience et a indiqué l'ordre du jour pour la conférence téléphonique du 23 novembre 2011.

**88.** Le 18 novembre 2011, les parties ont indiqué au Tribunal Arbitral la liste des témoins et experts qu'elles souhaitaient entendre à l'audience.

**89.** Le 23 novembre 2011, la Demanderesse a demandé au Tribunal Arbitral de bien vouloir accepter le versement aux débats d'une nouvelle attestation de M. Mbéri, témoin, qu'elle joignait à son courriel. Le même jour, la Défenderesse a fait part de ses commentaires sur la production d'une telle attestation, précisant que si le Tribunal Arbitral venait à accepter cette production, un délai devrait être octroyé à la Défenderesse pour qu'elle puisse produire une réponse.

**90.** Le même jour, une conférence téléphonique a eu lieu entre le Tribunal Arbitral et les parties.

**91.** Le même jour, la Défenderesse a indiqué avoir omis de mentionner lors de la conférence téléphonique que le Président de la République, Monsieur Sassou N'Guesso, témoin, n'était pas en mesure de venir témoigner aux audiences compte tenu de son emploi du temps. Par ailleurs, la Défenderesse a communiqué une copie complète de l'attestation de Monsieur Ikemo, témoin, d'octobre 2011, dont une annexe manquait.

**92.** Le 24 novembre 2011, le Tribunal Arbitral a communiqué l'Ordonnance de Procédure no. 4 qui dispose que :

> « *Attendu qu'une conférence téléphonique s'est tenue entre le Tribunal Arbitral et les parties le 23 novembre 2011 aux fins d'organisation de l'audience d'audition de témoins prévue entre le 19 et le 22 décembre 2011;*
> *Attendu que par lettre du 23 Novembre 2011, la Demanderesse a adressé au Tribunal Arbitral ainsi qu'à la Défenderesse une attestation supplémentaire de M. Mberi, en sollicitant son admission au dossier ;*
> *Attendu que par lettre du même jour, la Défenderesse s'y est opposée tout en indiquant qu'elle sollicitait subsidiairement le droit de présenter des documents et/ou une attestation en réponse ;*
>
> *Attendu que les parties ont eu l'opportunité de clarifier leur position à cet égard lors de la conférence téléphonique ;*

### LE TRIBUNAL ARBITRAL DECIDE :

*1)* *Organisation de l'audience*

- *L'audience débutera tous les jours à 9h30 et se terminera à 17h30 (tout en réservant la possibilité de la prolonger en cas de besoin);*

- *Il y aura deux brèves pauses dans la journée et une pause déjeuner d'une durée de 1h30 pendant laquelle chacun est libre de s'organiser comme il l'entend (le Tribunal Arbitral acceptant cependant la proposition des parties relative aux plateaux repas pour le 1er jour de l'audience );*

- *L'audition des plaidoiries introductives de la Demanderesse puis de la Défenderesse durera une heure chacune ;*

- *Les témoins et experts seront ensuite entendus, dans un ordre sur lequel les parties sont invitées à se mettre d'accord, sachant qu'en tout état de cause, les témoins de la Demanderesse seront interrogés en premier, suivis par les témoins et experts de la Défenderesse ;*

- *Les auditions de témoins de la Demanderesse auront lieu jusqu'au 20 décembre au soir et seront suivis par ceux de la Défenderesse jusqu'au 22 au soir ;*

- *Les parties pourront interroger directement leurs témoins/experts pendant une période de 10 minutes avant qu'ils soumis [sic] au contre-interrogatoire de la partie adverse ;*

- *Il sera décidé à la fin de l'audience si le Tribunal Arbitral souhaite entendre des plaidoiries conclusives des parties à une date ultérieure ou s'il préfère recevoir des conclusions récapitulatives écrites ;*

- *Les parties devront remettre au témoin/expert interrogé, à la partie adverse et à chaque membre du Tribunal Arbitral une copie des documents qu'elles souhaitent utiliser lors de l'examen dudit témoin, et ce, sous la forme jugée la plus adéquate par chacune des parties ;*

- *Les parties devront en outre mettre à la disposition du Tribunal Arbitral un classeur complet de toutes les pièces du dossier ainsi qu'un classeur chronologique contenant les références initiales des pièces, la Demanderesse se chargeant de la constitution de ce dernier.*

*2)* *L'attestation de M. Mberi est admise au dossier ;*

*3)* *Il est accordé à la Défenderesse jusqu'au 12 décembre 2011 la possibilité de commenter cette attestation et/ou d'en remettre une nouvelle en réponse, accompagné ou non de documents ;*

*4)* *Les parties sont invitées à communiquer au Tribunal Arbitral l'ordre d'audition des témoins et experts convenu entre elles, au plus tard le 12 décembre 2011. »*

93. Le 25 novembre 2011, la Demanderesse a commenté la lettre de la Défenderesse relative à l'impossibilité pour Monsieur le Président Sassou N'Guesso de venir témoigner à l'audience

indiquant qu'elle inviterait le Tribunal Arbitral à tirer toutes les conclusions qui s'imposent du refus de Monsieur le Président Sassou N' Guesso de témoigner.

**94.** Le 12 décembre 2011, la Défenderesse a indiqué qu'elle ne remettrait pas de nouvelle attestation en réponse à celle de Monsieur Mbéri, communiquée par Commisimpex le 23 novembre 2011. A la même date, la Demanderesse a communiqué l'ordre dans lequel elle souhaitait interroger les témoins présentés par la Défenderesse et a demandé à verser aux débats quatre nouveaux documents.

**95.** Le 15 décembre 2011, la Défenderesse a demandé au Tribunal Arbitral de l'autoriser à soumettre une nouvelle attestation de Monsieur Boukamany, témoin, et a indiqué l'ordre de passage dans lequel elle souhaitait interroger les témoins présentés par Commisimpex. Le même jour, le Tribunal Arbitral a écrit aux parties au sujet de l'ordre de passage des témoins et leur a rappelé de mettre à la disposition du Tribunal Arbitral un classeur complet de toutes les pièces du dossier ainsi qu'un classeur chronologique.

**96.** Le même jour, la Demanderesse a indiqué au Tribunal Arbitral que M. Mbéri n'était toujours pas arrivé à Paris alors qu'il devait arriver le 11 décembre, précisant qu'il avait été physiquement empêché, et lui a demandé de bien vouloir ordonner à la République du Congo de prendre toutes les mesures nécessaires pour assurer la sécurité de M. Mbéri et lui permettre de quitter Brazzaville pour participer à l'audience.

**97.** Le 16 décembre 2011, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse du 15 décembre par laquelle celle-ci indiquait vouloir verser aux débats une nouvelle attestation de M. Boukamany et a invité la Demanderesse à se prononcer pour le 17 décembre 2011. Le même jour, la Demanderesse a indiqué ne pas avoir d'objection à ce que l'attestation de M. Boukamany soit versée aux débats si les pièces C200 à C203 étaient également acceptées par le Tribunal Arbitral. Elle a demandé en outre que l'ordre d'audition des témoins du Congo par Commisimpex demeure inchangé.

**98.** Le même jour, la Défenderesse a demandé à ce que la Demanderesse lui indique où se trouvait M. Mbéri et de préciser les mesures qu'elle attendait de la République du Congo pour lui permettre de quitter le territoire.

**99.** Le même jour, le Tribunal Arbitral a accusé réception des correspondances respectives des parties des 15 et 16 décembre 2011 relatives à M. Mbéri. Il a indiqué ne pas douter de ce que la République du Congo prendrait toutes les mesures nécessaires pour faciliter le déplacement à Paris d'un témoin qu'elle souhaitait contre-interroger, tout en précisant que si M. Mbéri ou tout autre témoin n'avait pu être présent à l'audience du fait d'actions ou d'omissions d'une des parties, il en tirerait toutes les conséquences à l'égard de la partie en cause.

**100.** Le 17 décembre 2011, la Demanderesse a indiqué où se trouvait M. Mbéri et précisé qu'il était toujours empêché de sortir. Elle a alors réitéré sa demande que la Défenderesse fasse tout le nécessaire pour rendre immédiatement sa liberté de mouvement à M. Mbéri.

**101.** Le même jour, la Défenderesse a confirmé que les témoins pourraient être entendus dans l'ordre souhaité par la Demanderesse à l'exception de M. Andély. Par ailleurs, elle a sollicité l'autorisation de communiquer en pièce R100 une attestation de M. Mouamba.

**102.** Par un autre courrier du même jour, la Défenderesse a également indiqué qu'elle n'entravait en rien la liberté de mouvement de M. Mbéri et que celui-ci avait déclaré avoir choisi de rester à Brazzaville pour des raisons personnelles et avait prévu de venir à Paris par le vol du lundi ou mercredi soir suivant.

**103.** Le même jour, le Tribunal Arbitral a accusé réception des correspondances des parties relatives à la situation de M. Mbéri et a invité la Demanderesse à commenter les précisions données par la Défenderesse. Dans la soirée, le Tribunal Arbitral a à nouveau écrit aux parties s'étonnant que son mail soit resté sans réponse. La Demanderesse a alors indiqué ne pas être parvenu à clarifier la situation et a indiqué qu'elle reviendrait vers le Tribunal Arbitral le lendemain.

Par ailleurs, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse du même jour relative à l'ordre d'audition des témoins et à la demande d'admission d'une nouvelle attestation, précisant que les éventuels problèmes procéduraux en résultant seraient débattus à l'audience.

**104.** Le 18 décembre, la Demanderesse a informé le Tribunal Arbitral qu'un proche de M. Mbéri l'avait informé que ce dernier avait fait l'objet de pressions de la part du gouvernement congolais qui avait indiqué que son témoignage ne serait pas le bienvenu. Il a ajouté que si une conférence téléphonique était organisée, la parole de M. Mbéri ne serait pas libre. Elle s'est également opposée aux procédés du Congo.

Le même jour, la Demanderesse a demandé au Tribunal Arbitral s'il souhaitait qu'elle exprime sa position par écrit concernant la demande d'admission par la Défenderesse d'une attestation de M. Mouamba.

Le Tribunal Arbitral a répondu qu'il n'avait pas d'objection à ce que la Demanderesse exprime par écrit sa position avant l'audience sur la demande d'admission d'une nouvelle attestation mais ne l'estimait pas indispensable. Par ailleurs, il a noté que la Demanderesse n'attendait aucune action particulière, à ce stade, concernant l'audition de M. Mbéri mais a précisé qu'il souhaitait vivement que M. Mbéri puisse être entendu à l'audience et qu'il était certain que la Défenderesse ferait tout ce qui était en son pouvoir pour faciliter son déplacement. Enfin, le Tribunal Arbitral a indiqué être disponible pour participer à une conférence téléphonique avec un représentant de chacune des parties et M. Mbéri afin de clarifier la situation.

La Défenderesse a donné son accord pour participer à une telle conférence téléphonique, précisant que la Demanderesse avait indiqué être en mesure de l'organiser. Le Président du Tribunal Arbitral a précisé qu'il ferait cette conférence téléphonique seul, en accord avec ses co-arbitres. La Demanderesse a par la suite précisé qu'elle n'était pas en mesure d'organiser cette conférence téléphonique, contrairement à ce que prétendait la Défenderesse, n'étant pas parvenue à parler à M. Mbéri directement. Elle a alors invité le Président du Tribunal Arbitral à le contacter directement, tout en disant qu'elle était disponible pour une conférence téléphonique après que le Président ait pu parler à M. Mbéri ou son entourage. La Défenderesse a réaffirmé que M. Mbéri n'avait jamais fait l'objet d'une interdiction de sortir du Congo et que celui-ci avait indiqué au Ministre d'Etat, Coordonnateur du pôle de la souveraineté, Ministre de la Justice et des droits humains, qu'il n'avait pas quitté le Congo pour raisons personnelles et qu'il avait l'intention de prendre un vol le 19 décembre. Le

Tribunal Arbitral a alors conclu qu'il n'était plus nécessaire, au vu de ces informations, d'avoir un entretien avec M. Mbéri avant l'audience. La Demanderesse a exprimé son accord et remercié la Défenderesse pour ces informations.

**105.** Une audience a eu lieu à Paris du 19 au 22 décembre 2011. Le 19 décembre 2011, la Demanderesse a remis par écrit au Tribunal Arbitral la pièce R101 (décret no. 92-978 du 25 décembre 1992 portant nomination des membres du gouvernement) soumise par la Défenderesse à la fin de l'audience.

**106.** Le 26 décembre 2011, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 5 dont les termes sont les suivants :

> « *Attendu qu'une audience sur le fond a eu lieu à Paris entre le 19 et le 22 décembre 2011 ;*
> *Attendu qu'ont été entendus en qualité de témoins : Messrs Hajaij, Wehbe, Longobé, Lenga, Andély, Ikounga, Boueno, Ikémo, Gossaki et Mouamba;*
> *Attendu que les parties ont eu l'opportunité de présenter pleinement leurs positions respectives ;*
> *Attendu que le Tribunal Arbitral souhaite recevoir des mémoires après audience ;*
> *Attendu que le Tribunal Arbitral a précisé qu'il souhaiterait que ces mémoires soient limités en taille (environ une cinquantaine de pages) ;*
> *Attendu que ces mémoires ne devront pas être accompagnées de nouvelles pièces sauf après autorisation préalable du Tribunal Arbitral;*
> *Attendu que ces mémoires devraient avoir pour but principal d'exploiter les témoignages entendus lors de l'audience;*
>
> *Attendu que le Tribunal Arbitral souhaite plus particulièrement que les parties précisent les deux questions suivantes : la portée du Protocole de 2003 et le contenu de la créance de Commisimpex, sur lesquelles les deux parties sont invitées à se prononcer ;*
>
> *Attendu cependant que les mémoires après audience ne devront pas être strictement limités à ces questions ;*
> ### *LE TRIBUNAL ARBITRAL DÉCIDE :*
>
> *1. Les parties remettront simultanément leurs mémoires après audience le 17 février 2012.*
>
> *2. Les parties disposeront jusqu'au 23 mars 2012 pour remettre simultanément leurs mémoires en réponse. »*

**107.** Le 27 janvier 2012, Mme. Carole Malinvaud a déclaré aux parties qu'un des associés de son cabinet avait signé un contrat de services avec la société Quantic Finance Ltd quant à la réalisation d'une étude générale de la réglementation congolaise en vue de la mise en place d'un cadre réglementaire relatif à la création de zones économiques spéciales et a confirmé son indépendance vis-à-vis des parties.

**108.** Le 14 février 2012, la Demanderesse a indiqué n'avoir aucune observation quant aux informations données par Mme. Carole Malinvaud.

**109.** Le 16 février 2012, le Président du Tribunal Arbitral a reçu une lettre de M. Mbéri par laquelle il s'excusait de son absence à l'audience et confirmait la validité des termes de ses attestations. Le Président du Tribunal Arbitral a transmis cette lettre aux parties le 17 février 2012 en les invitant à communiquer leurs commentaires pour le 24 février 2012.

**110.** Le 17 février 2012, Mme. Carole Malinvaud a accusé réception de la lettre de la Demanderesse du 14 février 2012 et précisé qu'elle ne manquerait pas d'informer les parties si la mission de son cabinet venait à évoluer.

**111.** Le même jour, les parties ont adressé au Tribunal Arbitral leur premier mémoire après-audience.

**112.** Le 18 février 2012, le Tribunal Arbitral a accusé réception des mémoires après audience des parties.

**113.** Le 20 février 2012, la Défenderesse a adressé au Tribunal Arbitral ses commentaires sur la lettre envoyée par M. Mbéri, proposant une audience pour l'entendre en suggérant son éventuelle présence à Paris. Le jour même, le Tribunal Arbitral a accusé réception de cette lettre.

**114.** Le 24 février 2012, la Demanderesse a sollicité du Tribunal Arbitral un délai jusqu'au 27 février 2012 pour remettre ses commentaires sur la lettre de M. Mbéri, qui lui a été accordé par le Tribunal Arbitral le même jour.

**115.** Le 27 février 2012, la Demanderesse a informé le Tribunal Arbitral que M. Mbéri était de retour au Congo mais a précisé que si celui-ci pouvait se rendre à Paris, elle répondrait favorablement à l'organisation d'une audience. Elle a ajouté que dans une telle hypothèse, il serait opportun d'en profiter pour entendre M. le Président Sassou N'Guesso et a en outre proposé d'opposer à cette occasion les points de vue de MM. Mbéri, Mouamba, Boueno et du Président Sassou N'Guesso, ayant tous versé des attestations relatives aux réunions de septembre et octobre 1992.

**116.** Le 1er mars 2012, le Tribunal Arbitral a indiqué aux parties avoir pris connaissance de leurs correspondances des 20 et 27 février 2012 et a proposé que son Président tienne une conférence téléphonique seul avec les parties.

**117.** Le 8 mars 2012, une conférence téléphonique a donc eu lieu entre le Président du Tribunal Arbitral et les parties.

**118.** Le 9 mars 2012, la Demanderesse a communiqué la lettre de M. Mbéri du 14 février 2012 en tant que pièce C204 comme convenu lors de la conférence téléphonique.

**119.** Le même jour, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no.6 qui dispose :

> *« Attendu que M. Mbéri a adressé au Président du Tribunal Arbitral uniquement une lettre en date du 14 février 2011 (sic) par laquelle il a indiqué ne pas avoir pu être présent à l'audience en qualité de témoin pour des raisons indépendantes de sa volonté et a confirmé la validité des termes de ses attestations ;*

> *Attendu que par courriel du 17 février 2012, le Président du Tribunal Arbitral a transmis copie de la lettre de M. Mbéri aux parties ainsi qu'à ses co-arbitres en invitant les parties à communiquer leurs commentaires relatifs à cette lettre pour le 24 février 2012 ;*

*Attendu que par lettre du 20 février 2012, la Défenderesse a indiqué que l'absence de crédit des attestations de M. Mbéri avait été établi à l'audience ajoutant qu'en cas de doute du Tribunal Arbitral à ce sujet, une audience pourrait être organisée pour entendre M. Mbéri, qui se trouvait peut être encore en France à cette date ;*

*Attendu que par courriel du 24 février 2012, la Demanderesse a demandé une extension de délai jusqu'au 27 février 2012 pour communiquer ses commentaires ;*

*Attendu que par courriel du même jour, le Tribunal Arbitral a accusé réception du courriel de la Demanderesse et lui a accordé l'extension de délai demandée ;*

*Attendu que le 27 février 2012, la Demanderesse a indiqué que M. Mbéri ne se trouvait plus en France et que si les circonstances avaient évolué quant à la possibilité de M. Mbéri de se rendre en France pour témoigner, elle ne s'opposerait pas à la tenue d'une telle audience. Elle a également ajouté que dans une telle hypothèse, elle considérait opportun d'entendre également le Président Sassou N'Guesso et a proposé, si le Tribunal Arbitral l'estimait utile, de confronter les points de vue de M. Mbéri, Hajaij, Mouamba, Boueno et du Président Sassou N'Guesso ;*

*Attendu que par courriel du 1 mars 2012, le Tribunal Arbitral a indiqué avoir pris connaissance des correspondances des parties. M. Yves Derains, en accord avec ses co-arbitres, a proposé de tenir une conférence téléphonique seul avec les parties ;*

*Attendu qu'une conférence téléphonique a eu lieu entre le Président du Tribunal Arbitral et les parties le 8 mars 2012 ;*

*Attendu qu'au cours de cette conférence téléphonique, les parties ont manifesté leur accord pour que la lettre du 14 février 2012 de M. Mbéri soit versée aux actes de la procédure ;*

*Attendu que la Défenderesse a réitéré sa demande d'entendre M. Mbéri en qualité de témoin, la Demanderesse confirmant sa demande d'entendre le Président Sassou N'Guesso dans le cas où M. Mbéri viendrait à être entendu ;*

*Attendu que le Président du Tribunal Arbitral a rapporté le contenu de cette conférence téléphonique à ses co-arbitres ;*

*Attendu que le Tribunal Arbitral considère qu'il n'est pas utile à ce stade d'entendre M. Mbéri dans la mesure où les parties doivent encore échanger des réponses aux mémoires après audience le 23 mars 2012 ;*

*Attendu que le Tribunal Arbitral estime qu'il sera donc mieux à même de décider si l'audition de M. Mbéri est nécessaire après cet échange ;*

### LE TRIBUNAL ARBITRAL DECIDE :

1. *Aucune décision sur l'organisation d'une nouvelle audience pour entendre M. Mbéri n'est prise à ce stade.*

2. *Le Tribunal Arbitral se réserve le droit de revenir vers les parties à ce sujet après avoir pris connaissance du dernier échange de mémoires des parties. »*

**120.** Le 13 mars 2012, le Secrétariat de la CCI a informé le Tribunal Arbitral et les parties que lors de session du 8 mars 2012, et conformément à l'article 24(2) du Règlement, la Cour

Internationale d'Arbitrage a prolongé le délai pour rendre la Sentence Finale jusqu'au 30 juin 2012.

**121.** Le 23 mars 2012, les parties ont adressé au Tribunal Arbitral leurs seconds mémoires après-audience.

**122.** Le 30 mars 2012, la Demanderesse a communiqué ses remarques quant au mode de calcul effectué par la Défenderesse dans son second mémoire après-audience pour actualiser de fin 1986 à 1997 les montants figurant dans la Fiche de calcul détaillée. Le 2 avril 2012, la Défenderesse a indiqué qu'une erreur matérielle s'était introduite dans son second mémoire après-audience et a communiqué de nouvelles pages 38 et 39 corrigées en ce sens. Elle a précisé que cela n'affectait pas son raisonnement quant au caractère incohérent et artificiel des calculs de la Demanderesse. Le 4 avril 2012, la Demanderesse a pris note de la correction effectuée par la Défenderesse et a souligné que ce changement, au contraire, affectait le raisonnement du Congo. Le 5 avril 2012, la Défenderesse a soumis de brèves observations complémentaires en réponse à la lettre de la Demanderesse du 4 avril. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et a déclaré le débat clos sur ce sujet.

**123.** Le 14 juin 2012, le Secrétariat de la Cour a informé le Tribunal Arbitral et les parties que lors de sa session du 14 juin 2012, et conformément à l'article 24(2) du Règlement, la Cour a prolongé le délai pour rendre la Sentence Finale jusqu'au 28 septembre 2012.

**124.** Le 17 juillet 2012, la Défenderesse a communiqué au Tribunal Arbitral un arrêt de la Cour d'appel de Paris du 12 juin 2012 qui a rejeté le recours en annulation formé par elle à l'encontre de la sentence partielle en date du 20 août 2011.

**125.** Le 14 septembre 2012, le Secrétariat de la Cour a informé le Tribunal Arbitral et les parties que lors de sa session du 13 septembre 2012, et conformément à l'article 24(2) du Règlement, la Cour a prolongé le délai pour rendre la Sentence Finale jusqu'au 31 octobre 2012. Le Secrétariat de la Cour a également indiqué que Madame Marie-Camille Pitton était désormais la conseillère en charge du dossier.

**126.** Le 1er octobre 2012, la Demanderesse a présenté au Tribunal Arbitral une demande de mesure d'urgence relative à une requête déposée par la Caisse Nationale de Sécurité Sociale du Congo visant à ce que Commisimpex soit déclarée en cessation de paiements et mise en liquidation lors d'une audience du Tribunal de commerce de Brazzaville du 2 octobre 2012.

**127.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a ordonné à la Défenderesse de prendre toutes dispositions pour maintenir le status quo entre les parties et de l'informer des dispositions prises par elle avant le lendemain matin 10h.

**128.** Le 2 octobre 2012, la Défenderesse a fourni ses commentaires au Tribunal Arbitral indiquant que l'audience prévue n'était qu'une première audience de procédure.

**129.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse.

**130.** Le 4 octobre 2012, la Demanderesse a adressé au Tribunal Arbitral une demande de mesure provisoire.

**131.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a invitée la Défenderesse à lui adresser ses commentaires pour le 8 octobre à 10h au plus tard.

**132.** Le 8 octobre 2012, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 7 qui dispose :

« *Attendu que par courriel en date du 1er octobre 2012, la Demanderesse a présenté au Tribunal Arbitral une demande de mesure d'urgence;*

*Attendu que la Demanderesse a indiqué que par requête auprès du Tribunal de Commerce de Brazzaville du 26 septembre 2012, la Caisse Nationale de Sécurité Sociale du Congo a demandé que « Commisimpex soit déclarée en cessation de paiements, que ses biens soient liquidés et que le tribunal nomme les organes de liquidation » alléguant que celle-ci était débitrice de cotisations sociales depuis 1981 ;*

*Attendu que la Demanderesse a encore expliqué que le Président du Tribunal de Commerce de Brazzaville avait, après avoir invoqué une vaine tentative de conciliation des parties, par ordonnance du 28 septembre 2012, fixé une audience le 2 octobre 2012 à 8h00 « aux fins de statuer sur les mérites de ladite requête » demandant à Commisimpex de « produire [ses] défenses huit jours au plus tard avant l'audience » ;*

*Attendu que la Demanderesse a indiqué au Tribunal Arbitral qu'aucune tentative de conciliation n'avait été entreprise, que les délais fixés par le tribunal étaient en violation totale des droits de la défense et que cette procédure était destinée « à permettre aux autorités congolaises de prendre frauduleusement le contrôle de Commisimpex via le liquidateur qui sera nommé par le Tribunal de Commerce de Brazzaville, de manière à court-circuiter votre sentence à intervenir (...) » ;*

*Attendu que la Demanderesse a demandé au Tribunal Arbitral « d'ordonner au Congo de donner les instructions nécessaires à sa Caisse Nationale de Sécurité Sociale, organisme public, d'accepter un renvoi de l'audience du 2 octobre 2012 à une audience ultérieure, le temps que Commisimpex puisse présenter sa défense et/ou demander d'autres mesures provisoires à votre Tribunal » ;*

*Attendu que par courriel du 1 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a ordonné à la Défenderesse « de prendre immédiatement toutes dispositions pour qu'aucune mesure qui **pourrait modifier le status quo entre les parties** et éventuellement affecter le prononcé et les **effets de la sentence arbitrale** à venir n'**intervienne** avant que le Tribunal Arbitral ait pu instruire, dans le respect du contradictoire, la **demande** de mesure d'urgence qui lui est soumise [ce soir] et prendre une décision à son égard » ;*

*Attendu que le Tribunal Arbitral a également demandé à la Défenderesse de l'informer des dispositions prises par elle avant 10h le lendemain matin ;*

*Attendu que le 2 octobre 2012, la Défenderesse a indiqué que l'audience prévue ce jour là n'était qu'une première audience de procédure et qu'en aucun cas une décision ne serait prise à cette audience sur la demande de la Caisse Nationale de Sécurité Sociale, précisant que cette affaire allait faire l'objet d'une instruction contradictoire et que Commisimpex aurait l'occasion de présenter sa défense ;*

*Attendu que le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et l'a remercié de sa réactivité ;*

*Attendu que le 4 octobre 2012, la Demanderesse a soumis au Tribunal Arbitral une demande de mesure provisoire, expliquant que la procédure intentée contre Commisimpex par la Caisse Nationale de Sécurité Sociale se fonde sur des prétendus arriérés de paiement de cotisations sociales de salariés de Commisimpex pour la période de 1981 à 2011 et que la Caisse avait demandé non pas le paiement de sa prétendue créance mais la liquidation de Commisimpex et la faillite personnelle de M. Hajaij ;*

*Attendu que la Demanderesse a précisé qu'au delà du fait que cette action était soudaine, les délais imposés dans cette procédure étaient surprenants et en violation du principe du contradictoire ;*

*Attendu que la Demanderesse a également souligné que les faits reprochés étaient dénués de fondement dans la mesure où Commisimpex a été mise en sommeil par résolution de son Assemblée Générale du 28 juin 1991, ainsi que le prouve également un certificat de non-imposition du Service des Contributions directes du Congo, qu'elle n'était débitrice d'aucune cotisation envers la Caisse Nationale de Sécurité Sociale du Congo et qu'aucune mise en demeure ne lui avait d'ailleurs été adressée ;*

*Attendu que la Demanderesse a demandé au Tribunal Arbitral « d'ordonner au Congo de donner les instructions nécessaires à sa Caisse Nationale de Sécurité Sociale, organisme public, de se désister de son action en constat de cessation de paiement et liquidation, sans préjudice de toute action au fond que la Caisse jugerait nécessaire d'intenter pour qu'il soit statué, dans le plein respect des droits de la défense, sur ses prétendues créances à l'égard de Commisimpex » et « [e]n toute hypothèse (…) de lui donner acte, dans le cadre de la sentence à intervenir, de ses protestations quant à la régularité et au bien fondé de la procédure intentée par la Caisse Nationale de Sécurité Sociale devant les juridictions congolaises » ;*

*Attendu que par courriel du 4 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et invitée la Défenderesse à commenter cette lettre pour le 8 octobre 2012 à 10h au plus tard ;*

*Attendu que la Défenderesse n'a pas fourni de commentaires dans les délais fixés par le Tribunal Arbitral ;*

*Attendu que la République du Congo ne peut invoquer aucun intérêt légitime à ce que la mise en liquidation de Commisimpex intervienne à bref délai et, en tout cas, avant la fin du présent arbitrage ;*

### *LE TRIBUNAL ARBITRAL DÉCIDE :*

*1. Les parties doivent prendre toutes mesures destinées à éviter que le status quo entre elles ne soit modifié jusqu'au prononcé de la sentence finale.*

*2. A cet égard, il est ordonné à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage ».*

**133.** Le même jour, après le prononcé de cette Ordonnance, la Défenderesse a fourni au Tribunal Arbitral ses commentaires sur la lettre de la Demanderesse du 4 octobre 2012. Le Tribunal Arbitral a accusé réception de cette lettre et a indiqué que son contenu n'était pas de nature à remettre en cause les décisions prises dans l'Ordonnance de Procédure no. 7.

**134.** Le 10 octobre 2012, le Tribunal Arbitral a informé les parties de la clôture des débats conformément à l'article 22 (2) du Règlement CCI, n'ayant pas estimé utile d'organiser une nouvelle audience pour entendre M. Mbéri après réception des Mémoires Après-Audience, comme envisagé dans l'Ordonnance de Procédure no. 6 du 9 mars 2012.

**135.** Le 11 octobre 2012, et conformément à l'article 24(2) du Règlement, la Cour Internationale d'Arbitrage a prolongé le délai pour rendre la Sentence Finale jusqu'au 31 décembre 2012.

**136.** Les parties ont remis au Tribunal Arbitral des lettres en date des 18, 19 et 25 octobre 2012 sur la procédure relative à la liquidation de Commisimpex.

**137.** Le 29 octobre 2012, Madame Carole Malinvaud a informé les parties que l'un de ses associés envisageait de répondre favorablement à la sollicitation de la République du Congo pour l'assister dans la finalisation des projets de nouveau code pétrolier et de modèle de contrat de partage de production préparés par l'administration congolaise et a précisé que cela n'avait pas de lien avec la présente affaire.

**138.** Le 30 octobre 2012, le Tribunal Arbitral a accusé réception des lettres des parties des 18, 19 et 25 octobre 2012 sur la procédure relative à la liquidation de Commisimpex et informé les parties que ces lettres n'étaient pas admises à la procédure, les débats ayant été déclarés clos par lettre du 10 octobre 2012.

Le même jour, la Demanderesse a informé le Tribunal Arbitral de la décision du Tribunal de Commerce de Brazzaville prononçant la liquidation et la dissolution de Commisimpex ainsi que la faillite personnelle de M. Hajaij, responsable de Commisimpex. A ce titre, elle demandait, entre autres, au Tribunal Arbitral de bien vouloir ré-ouvrir les débats.

**139.** Le 31 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse du 30 octobre 2012 et a invité la Défenderesse à commenter cette lettre pour le 2 novembre à 19h au plus tard.

**140.** Le 2 novembre 2012, les parties ont remis au Tribunal Arbitral leurs demandes relatives aux frais de l'arbitrage. A la même date, la Défenderesse a indiqué que n'arrivant pas à joindre sa cliente, elle confirmait le contenu de ses lettres des 8 et 19 octobre 2012.

**141.** Le 7 novembre 2012, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 8 qui dispose :

> *« Attendu que par lettre du 8 octobre 2012, la Défenderesse a adressé ses observations relatives à la lettre de Commisimpex en date du 4 octobre 2012 ;*
>
> *Attendu que le Tribunal Arbitral a accusé réception de ces observations, notant qu'elles avaient été communiquées après l'envoi de l'Ordonnance de Procédure no. 7, et a indiqué que le contenu de cette lettre n'était pas de nature à remettre en cause les décisions prises dans cette ordonnance ;*
>
> *Attendu que par lettre du 18 octobre 2012, dont une copie était adressée au Tribunal Arbitral, le conseil de la Demanderesse a demandé au conseil de la Défenderesse de bien vouloir*

*s'assurer que sa cliente respecte l'Ordonnance de Procédure no. 7 du Tribunal Arbitral, expliquant qu'au cours de l'audience de procédure du 16 octobre 2012 devant le Tribunal de Commerce de Brazzaville, celui-ci avait, sur demande de l'avocat de la Caisse Nationale de Sécurité Sociale (« CNSS ») et sans même que les disponibilités des avocats soit vérifiées, fixé une audience de plaidoirie au 23 octobre 2012 et qu'un délibéré devrait, dans ces circonstances, intervenir à bref délai;*

*Attendu que par lettre du 19 octobre 2012, dont une copie était également adressée au Tribunal Arbitral, le conseil de la Défenderesse a accusé réception de la lettre du conseil de la Demanderesse et a joint une lettre adressée le 11 octobre 2012 par le Directeur de Cabinet du Ministre d'Etat, Garde des Sceaux, Ministre de la Justice et des Droits Humains à Monsieur le Procureur de la République près le Tribunal de Grande Instance de Brazzaville par laquelle le Directeur du Cabinet du Ministre a transmis au Procureur « (…) pour qu'il soit accompli par vous ce qu'il appartiendra devant le Tribunal de Grande Instance de Brazzaville, l'ordonnance de procédure n°7 rendue le 8 octobre 2012 par le Tribunal arbitral de Paris dans l'affaire opposant la société Commisimpex à l'Etat Congolais mise en délibéré pour décision être rendue au plus tard le mois prochain. » Il était précisé que « Dans cette ordonnance le Tribunal arbitral fait injonction à l'Etat Congolais et à ses démembrements de ne pas court-circuiter la sentence attendue par une décision de mise en faillite de commisimpex, allusion faite à l'action intentée à cet effet par la CNSS devant le Tribunal du Commerce de Brazzaville. » Par ailleurs, le conseil de la Défenderesse a également joint le « Soit-Transmis du Procureur de la République du 17 octobre 2012 » où il a recommandé « d'éviter de prendre une décision de mise en faillite de Commisimpex (Affaire CNSS c/Commisimpex) avant le prononcé de la sentence arbitrale. »*

*Attendu que le 25 octobre 2012, le conseil de la Demanderesse a informé le Tribunal Arbitral que la CNSS n'avait pas renoncé à sa procédure contrairement aux dispositions de l'Ordonnance de Procédure no.7 et qu'une audience de plaidoirie s'était donc tenue le 23 octobre 2012 au cours de laquelle Commisimpex, d'une part, avait demandé « qu'il soit sursis au jugement, notamment en raison de la plainte avec constitution de partie civile pour faux, usage de faux et escroquerie déposée la veille par Commisimpex auprès du doyen des juges d'instruction près le Tribunal de grande instance de Brazzaville » ainsi que l'absence au fond de créance de la CNSS, et, le Procureur de la République du Congo, d'autre part, demandé qu'il soit sursis à la procédure de liquidation du fait de la plainte déposée par Commisimpex. Le conseil de la Demanderesse a précisé que la décision du Président devait être rendue le 30 octobre 2012 ;*

*Attendu que le 30 octobre 2012, le Tribunal Arbitral a accusé réception des lettres des parties des 18, 19 et 25 octobre 2012 sur la procédure relative à la liquidation de Commisimpex et informé les parties que ces lettres n'étaient pas admises à la procédure, les débats ayant été déclarés clos par lettre du 10 octobre 2012 ;*

*Attendu que le même jour, le conseil de la Demanderesse a informé le Tribunal Arbitral que le Tribunal de Commerce de Brazzaville avait prononcé la liquidation et la dissolution de Commisimpex, nommé les organes de liquidation et prononcé la faillite personnelle de M. Hajaij, l'interdisant également d'exercer une activité commerciale ou de diriger une société commerciale pendant dix ans. Le conseil de la Demanderesse a précisé que celle-ci et M. Hajaij avaient interjeté appel mais qu'en droit congolais, celui-ci n'était pas suspensif. Par conséquent, le conseil de la Demanderesse a prié le Tribunal :*

> *« -d'autoriser la réouverture des débats conformément à l'Article 22(1) in fine du Règlement CCI, afin de pouvoir considérer la présente demande ;*

*-de prendre acte de la violation par le Congo de l'Ordonnance ;*

*-de prendre acte du caractère intentionnel et abusif de cette violation ;*

*-de rendre une sentence (1) réitérant son Ordonnance, (2) ordonnant au Congo de prendre les mesures nécessaires pour sa CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance, (3) ordonnant au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à une demande de sursis à exécution de la décision du Tribunal de commerce dans l'attente de l'arrêt d'appel à intervenir et (4) ordonnant en tout état de cause au Congo de renoncer à faire exécuter la décision du Tribunal de Commerce de Brazzaville de ce jour devant toute juridiction, judiciaire ou arbitrale ; et d'en tirer toute autre conséquence qu'il estimera nécessaire ».*

*Attendu que le 31 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse du 30 octobre 2012 et a invité la Défenderesse à commenter celle-ci pour le 2 novembre 2012 ;*

*Attendu que par lettre du 2 novembre 2012, le conseil de la Défenderesse a indiqué qu'il ne parvenait pas à contacter sa cliente pour obtenir des informations et prendre des instructions et n'avait donc pas d'éléments à ajouter à ceux figurant dans ses lettres des 8 et 19 octobre derniers ;*

*Attendu que le Tribunal Arbitral confirme son Ordonnance de Procédure no. 7 qui dispose que :*

*1. Les parties doivent prendre toutes mesures destinées à éviter que le status quo entre elles ne soit modifié jusqu'au prononcé de la sentence finale.*

*2. A cet égard, il est ordonné à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage.*

*Attendu que le Tribunal Arbitral considère qu'en l'état la réouverture des débats est nécessaire, comme le prévoit l'article 22 (1) du Règlement d'arbitrage, afin de pouvoir examiner la demande de Commisimpex ;*

**LE TRIBUNAL ARBITRAL DECIDE :**

*1. Les débats sont ré-ouverts comme le permet l'article 22 (1) du Règlement d'arbitrage de la CCI.*

*2. La Demanderesse précisera ses demandes pour le 14 novembre 2012.*

*3. La Défenderesse adressera ses commentaires pour le 21 novembre 2012.*

*4. Une conférence téléphonique entre les parties et le Tribunal Arbitral aura lieu fin novembre ou début décembre 2012 pour débattre de ces questions. »*

**142.** Le 12 Novembre 2012, le Tribunal Arbitral a indiqué aux parties que la conférence téléphonique prévue dans l'Ordonnance de Procédure no. 8 était fixée au 28 novembre à

17h30. Le même jour, les parties ont confirmé leurs disponibilités pour cette date. Le Tribunal Arbitral a alors confirmé la tenue de la conférence téléphonique le 28 novembre 2012.

**143.** Le 14 novembre 2012, la Demanderesse a précisé ses demandes conformément à l'Ordonnance de Procédure no.8, par une lettre accompagnée de pièces factuelles C-205 à C-217 et de pièces juridiques C-RJ142 à C-RJ 149.

**144.** Le 15 novembre 2012, le Secrétariat de la CCI a informé les parties qu'il avait reçu la visite de Monsieur Gaston Mossa qui se présentait comme liquidateur judiciaire de Commisimpex et demandait les coordonnées du conseil de celle-ci. Le Secrétariat a invité Commisimpex à indiquer pour le 16 novembre 2012 si elle autorisait le Secrétariat à communiquer ses informations à Monsieur Mossa.

**145.** Le 16 novembre 2012, le conseil Commisimpex a indiqué au Secrétariat qu'il ne s'opposait pas à ce que ces coordonnées soient transmises mais a précisé qu'aucune autre information ne devrait être communiquée. Commisimpex a également indiqué qu'elle pensait que Monsieur Mossa n'était pas le véritable liquidateur.

**146.** Le 19 novembre 2012, le Secrétariat a indiqué avoir pris note des indications de Commisimpex et a confirmé qu'il allait transmettre ses coordonnées à Monsieur Gaston Mossa, ce qu'il a fait même jour.

**147.** Le 21 novembre 2012, la Défenderesse a sollicité une prorogation de délai jusqu'au 22 novembre, 14 heures, pour remettre ses observations en réponse, conformément à l'Ordonnance de Procédure no.8. Le même jour, le Tribunal Arbitral a accordé la prorogation demandée.

**148.** Le 22 novembre 2012, la Défenderesse a remis ses observations en réponse, par une lettre accompagnée de la pièce factuelle R-102 et de pièce juridique R-RJ 79.

**149.** Le 27 novembre 2012, le Secrétariat a transmis au Tribunal Arbitral une lettre de M. Gaston Mossa du 19 novembre 2012 adressée à son Président et signifiée par Huissier de Justice à la Cour Internationale d'Arbitrage le 26 novembre 2012. Cette lettre a été soumise aux parties le même jour pour discussion lors de la conférence téléphonique prévue le 28 novembre 2012.

**150.** Le 27 novembre 2012, la Demanderesse a communiqué au Tribunal Arbitral en vue de la conférence téléphonique prévue le 28 novembre 2012 les pièces C218, C219 et C220.

**151.** Le 28 novembre 2012, une conférence téléphonique a été tenue entre les parties et le Tribunal Arbitral.

**152.** Le 30 novembre 2012, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 9 qui dispose :

> « *Attendu que par Ordonnance de Procédure no. 8 du 7 novembre 2012, les débats ont été réouverts sur demande de Commisimpex, à la suite de la décision du Tribunal de Commerce de Brazzaville prononçant la liquidation judiciaire de Commisimpex et la faillite personnelle de M. Hajaj ;*

*Attendu que conformément à l'Ordonnance de Procédure no. 8, Commisimpex a précisé ses demandes le 14 novembre 2012 ;*

*Attendu que ses demandes étaient les suivantes :*

> *« Commisimpex prie le Tribunal, dans le cadre de sa sentence à venir :*
>
> *(1) de prendre acte de la violation par le Congo de l'Ordonnance de procédure no.7 ;*
>
> *(2) de prendre acte du caractère intentionnel et abusif de cette violation ;*
>
> *(3) de constater le caractère abusif et frauduleux de la liquidation de Commisimpex ;*
>
> *(4) de dire, en conséquence, que, pour les besoins du présent arbitrage, il ne reconnaît pas la mise en liquidation judiciaire de Commisimpex ;*
>
> *(5) de constater, dans cet arbitrage, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex ;*
>
> *(6) d'ordonner en tout état de cause au Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de Commerce de Brazzaville en date du 30 octobre 2012, devant votre tribunal et/ou devant tout autre juridiction, judiciaire ou arbitrale ;*
>
> *(7) d'ordonner au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance de procédure n° 7 ; et*
>
> *(8) d'ordonner le remboursement par le Congo, au profit des demandeurs, de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation. »*

*Attendu que conformément à l'Ordonnance de Procédure no. 8, la République du Congo, a, le 21 novembre 2012, présenté ses commentaires sur la soumission de Commisimpex ;*

*Attendu que la République du Congo conclut à l'irrecevabilité des demandes de Commisimpex et demande au Tribunal Arbitral, en tout état de cause, de les rejeter comme mal fondées ;*

*Attendu que le 27 novembre 2012, le Secrétariat de la CCI a transmis au Tribunal Arbitral une lettre de M. Gaston Mossa, Président du Syndic de liquidation de Commisimpex, que le Secrétariat s'était vu signifié par huissier le 26 novembre 2012, que dans cette lettre, M. Gaston Mossa indiquait au Tribunal Arbitral que les actes accomplis par M. Hajaij au nom de Commisimpex étaient dorénavant nuls et de nul effet et que seul le syndic de liquidation était compétent à cet égard ;*

*Attendu que le même jour, le Tribunal Arbitral a transmis cette lettre aux parties pour discussion lors de la conférence téléphonique prévue le 28 novembre 2012 ;*

*Attendu qu'au cours de cette conférence téléphonique entre les parties et le Tribunal Arbitral, ont été débattues tant les questions soulevées par les écritures des parties que la lettre de M. Gaston Mossa ;*

*Attendu que le Tribunal Arbitral constate que l'Ordonnance de Procédure no.7 par laquelle il était ordonné « (...) à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en*

*liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage » n'a pas empêché le prononcé de la liquidation judiciaire de Commisimpex, sans qu'il en découle nécessairement une violation par la République du Congo de cette ordonnance ;*

*Attendu en effet que le Tribunal Arbitral a constaté que le Directeur de cabinet du Ministre de la Justice avait transmis « (...) l'Ordonnance de Procédure no. 7 au Procureur de la République près le Tribunal de Grande Instance de Brazzaville en lui donnant instruction de faire le nécessaire pour éviter qu'une décision de mise en faillite ne soit prononcée avant la sentence à intervenir »;*

*Attendu que le Tribunal Arbitral estime que, la décision faisant l'objet d'un recours, la République du Congo est en mesure de rétablir le statu quo entre les parties qui a été rompu et qu'il y a donc lieu de lui ordonner de le faire ;*

*Attendu que pour le reste des demandes de Commisimpex, le Tribunal Arbitral se déterminera dans sa sentence finale ;*

*Attendu qu'il y a lieu, dans ces circonstances, à prononcer à nouveau la clôture des débats ;*

### LE TRIBUNAL ARBITRAL DECIDE :

1. *Les débats sont clos conformément à l'article 22 (1) du Règlement d'arbitrage de la CCI.*

2. *La République du Congo doit prendre toutes les mesures nécessaires pour que le statu quo entre les parties soit rétabli dans les plus brefs délais et en tout cas avant le prononcé de la sentence finale. »*

**153.** A la même date, le Tribunal Arbitral a adressé à M. Gaston Mossa, avec copie aux parties et au Secrétariat de la CCI la lettre suivante :

*« Monsieur,*

*Le Tribunal Arbitral accuse réception de votre lettre en date du 19 novembre 2012 qui lui a été transmise par le Secrétariat de la Cour internationale d'arbitrage de la CCI le 27 novembre 2012, lui-même l'ayant reçue le 26 novembre 2012.*

*Le Tribunal Arbitral a pris note de l'indication selon laquelle un jugement du Tribunal de Commerce de Brazzaville du 30 octobre dernier a déclaré la société Commisimpex en liquidation judiciaire ainsi que la faillite personnelle de M. Hajaij.*

*Il a également pris en considération le fait que vous estimiez que les actes accomplis par M. Hajaij étaient dorénavant nuls et de nul effet et que seul le syndic de liquidation était compétent pour accomplir des actes au nom de Commisimpex.*

*Cependant, la validité de la décision du Tribunal de Commerce de Brazzaville est contestée et son opposabilité au Tribunal Arbitral fait l'objet d'un débat devant celui-ci.*

*Dans ces conditions, le Tribunal Arbitral ne peut reconnaître comme représentants de Commisimpex que ceux déjà constitués dans la procédure arbitrale, dans laquelle la clôture des débats a été prononcée.*

*Veuillez agréer, Monsieur, l'expression de mes sentiments distingués.*

*Yves DERAINS*
*Président du Tribunal Arbitral »*

**154.** Le 13 décembre 2012, et conformément à l'article 24(2) du Règlement, la Cour Internationale d'Arbitrage a prolongé le délai pour rendre la Sentence Finale jusqu'au 28 février 2013.

## III. POSITION DES PARTIES

### A. Position de la Demanderesse

**155.** Commisimpex demande l'exécution par le Congo du Protocole de 2003 qui constitue un accord entre le Congo et Commisimpex, par lequel le Congo reconnaît sa dette envers Commisimpex et s'engage à la régler en sa totalité. Le montant de la dette globale, qui s'élève à 960.000.000 FRF (équivalent de 48 milliards FCFA), est rappelé dans ce Protocole. Par ailleurs, l'article 6 du Protocole de 2003 prévoit que les parties s'engageraient *« à conclure un protocole d'accord définitif »*, fixant les éléments accessoires des accords. Bien que le Congo n'ait pas donné suite à son engagement, la validité et la portée du Protocole de 2003 ne sont pas affectées dans la mesure où ce protocole d'accord définitif ne devait être conclu qu'en complément et non pour validation du Protocole de 2003. Cet article ne renvoie pas à des négociations ultérieures de la créance de Commisimpex qui rendraient le protocole caduc si elles n'étaient pas menées. Les négociations mentionnées par le point 4 ne sont que des négociations en exécution du Protocole.

**156.** En sus d'arrêter le montant total de la dette, le Protocole de 2003 détermine les modalités de son règlement. Ainsi, au titre du Protocole de 2003, les parties sont convenues de scinder la dette globale : d'une part le *« règlement de 440 millions FRF correspondant à la dette toujours due par la République du Congo »* en vertu du Protocole de 1992 et due, aux termes du Protocole de 2003, par Commisimpex à la Banque Saradar ; d'autre part, *« le paiement de 520 millions FRF, correspondant à la partie restante de la dette du Congo envers Commisimpex, que le Congo aurait dû régler par l'attribution d'entreprises à privatiser »* avec un taux d'intérêt de 10% par an. Aux termes de l'article 4 du Protocole de 2003, la deuxième partie de la dette devrait faire l'objet d'un *« règlement en trois temps : un paiement comptant, l'attribution de sociétés à privatiser et le paiement du reliquat en 84 mensualités, sous réserve de l'émission d'une garantie du Congo au profit de Commisimpex »*.

**157.** Le Congo tente de remettre en cause le montant de la dite créance. Or, la dette du Congo à l'égard de Commisimpex a fait l'objet de vérification, notamment par les *« plus hauts responsables congolais »*. Tel est le cas de la vérification effectuée par la commission interministérielle du 27 mars 1987, matérialisée dans la Fiche de Calcul de 1991 qui évalue la créance de Commisimpex à 29.949.284.818 FCFA par la CCA. Les responsables congolais de l'époque ont d'ailleurs confirmé que le montant de la dette était proche de 29,9 milliards FCFA. Cette fiche de calcul comprend tous les marchés à l'origine de la créance de

Commisimpex et exclut les instruments non signés par Commisimpex en décembre 1986, les marchés annulés (le marché no. 043/86 du 20 mai 1986 qui n'a jamais été exécuté et le marché no. 185/84 escompté le 18 juin 1984 auprès de l'Equator Bank) et le paiement reçu par Commisimpex de 15 millions USD, effectué par le Congo le 28 avril 1987, seul paiement jamais reçu par Commisimpex.

**158.** Le Congo n'apporte pas la preuve que certains marchés aient été réglés comme il le soutient. Il a introduit au dossier une convention de refinancement de 1988 mais celle-ci n'a jamais été exécutée. Commisimpex n'a pas non plus reçu de paiement par le biais de l'escompte de billets à ordre, le seul ayant eu lieu étant auprès de l'Equator Bank dont les montants ne sont pas réclamés dans le présent arbitrage. Enfin, l'affirmation que Commisimpex aurait reçu des paiements « occultes » n'est pas non plus démontrée, M. Gossaki ayant même indiqué que si de tels paiements avaient eu lieu, le Congo aurait du pouvoir les retracer.

**159.** Le Congo, bien que contestant le montant de la créance de Commisimpex, n'a fourni aucun calcul. Il se fonde uniquement sur deux documents émis par la CCA en 1991 : une Fiche à l'attention de Monsieur le Ministre de l'Economie, des Finances et du Plan et la Note à l'attention de Monsieur le Ministre du Plan, des Finances et de l'Economie. Cependant le Congo a omis de fournir les annexes explicatives des calculs effectués. En tout état de cause, l'absence de crédibilité des montants dans ces documents est confirmée par la Fiche de calcul détaillée émise par la CCA en septembre 1991 qui donne le montant de la dette au 31 décembre 1986 (29.949.284.818 FCFA) et fournit le détail des marchés compris dans le calcul ainsi que le calcul des intérêts. Le montant calculé dans cette fiche a d'ailleurs été repris dans les actes de la Conférence nationale et du procès Lekoundzou en 1991-1992.

**160.** Puis, lors de réunions en septembre et octobre 1992, les parties sont convenues verbalement d'arrêter la dette globale du Congo envers Commisimpex à 48 milliards FCFA. La lettre du 7 octobre 1992 reflète d'ailleurs l'existence de ces réunions. La différence de montant s'explique par l'ajout des montants du procès-verbal du 13 février 1988 et du procès-verbal du 7 octobre 1988 et l'accumulation d'intérêts tout au long de cette période. Ce calcul a été confirmé par le cabinet Mazars.

**161.** Or, le Congo tente non seulement de contester l'existence de ces réunions, en faisant référence à un procès-verbal de délibération du conseil d'administration de Commisimpex datant de 1997, mais il conteste encore le caractère authentique de la lettre du 7 octobre 1992. Cependant, la CCA en a accusé réception en y apposant son tampon officiel. De plus, le Président de la République du Congo était en possession d'une copie de la lettre litigieuse, comme confirmé lors d'une entrevue avec M. Hajaij, le responsable de Commisimpex, en 2003.

**162.** Le Congo se fonde également sur le rapport d'expertise de M. Ricol, pour invoquer l'absence de cause du Protocole de 2003. « *Le Congo utilise aujourd'hui cette expertise et ces quelques documents, qui concluent, en raison des erreurs faites, à un montant de la dette totale du Congo envers Commisimpex significativement moins élevé qu'en réalité, pour prétendre que le Protocole de 2003 n'est pas causé* »[3]. Or, comme indiqué précédemment, les

---

[3]    Mémoire en Réplique, para 12, page 5.

parties sont, depuis septembre 1992, convenues que la dette du Congo envers Commisimpex ferait l'objet d'une scission, dont le Protocole de 2003 reflète le deuxième volet.

**163.** Quant au Protocole de 1992, il ne couvrait qu'une partie de la dette parce que la banque Saradar faisait pression sur M. Hajaij pour récupérer le montant qu'elle avait financé et menaçait d'exiger la mise en œuvre de la garantie de 1986. Le Protocole de 1992 avait en effet été signé dans une optique politique. Puis, contrairement à ce que prétend le Congo, Commisimpex n'a pas renoncé à une partie de sa créance et aucune preuve d'une telle renonciation n'existe.

L'annexe au protocole signée postérieurement à celui-ci et par le Congo uniquement, démontre que le protocole ne couvrait qu'une partie de la dette. Dès lors, l'article 8 du Protocole de 1992 sur la substitution de celui-ci à tous accords antérieurs doit être lu selon l'intention des parties qui entendaient régler une partie seulement de la dette. Par ailleurs, le Congo ne soutient pas que le Protocole de 1992 couvre l'ensemble des montants dus au titre des marchés d'origine car il indique que certains marchés avaient déjà été réglés, soit que le montant du Protocole de 1992 résulte de deux décotes, soit encore que le montant restant dû à Commisimpex n'a pas d'importance, le Congo semblant insinuer que le Protocole serait transactionnel. Ces arguments sont faux, le Congo n'étant pas parvenu à prouver un paiement autre que celui de 15 millions USD en 1987 et les décotes alléguées n'ayant jamais eu lieu. Par ailleurs, le Protocole de 1992 ne couvrant qu'une partie de la dette, la créance antérieure restait en vigueur.

**164.** En outre, les vérifications effectuées par Ernst & Young et la CCA confirment le montant de la créance de Commisimpex. Ernst & Young, intervenant dans le cadre de l'inscription de la dette dans les livres CCA par les tribunaux congolais, a d'abord évalué la créance à 48,5 milliards FCFA au 30 septembre 1992 mais l'a ensuite actualisé au 30 septembre 2001. Son rapport a été transmis à M. Gossaki, alors Directeur Général de la CCA. Ce rapport a été ensuite analysé et approuvé par le Tribunal de commerce et la Cour d'appel de Brazzaville. La Cour de cassation dans son arrêt de cassation du 27 juin 2003 ne l'a pas remis en cause. Puis le 24 janvier 2002, M. Gossaki a écrit à Ernst & Young et a indiqué dans une pièce jointe un montant de la créance de Commisimpex proche de celui calculé par Ernst & Young, montrant que la CCA avait vérifié ses calculs et procédé à certains ajustements. Le témoignage de M. Gossaki qui conteste l'estimation par la CCA de la créance de Commisimpex est donc dénué de crédibilité. En outre, Commisimpex fut ensuite convoquée et la fiche d'audition du 27 mars 2002 confirme que les travaux d'expertise effectués par Ernst & Young ont été vérifiés par la CCA et que la conclusion relative au montant avait reçu un avis favorable de la CCA et avait été signée par M. Ganféré, agent de la CCA qui a assuré le suivi du dossier Commisimpex. L'approbation du montant de la créance estimée fut confirmée par une fiche individuelle du 10 mai 2002. Ce document porte également la signature de M. Ganféré. MM. Gossaki et Ikemo, Directeur Général de la CCA, prétendent donc maintenant ne pas avoir suivi les actions de leur subordonné M. Ganféré.

**165.** Puis, contrairement à ce que soutient le Congo, le Protocole de 2003 a été valablement conclu sur délégation du Président de la République. Les signataires du Protocole de 2003 pour le Congo étaient MM. Longobé et Okemba qui agissaient « *sur délégation de Monsieur le Président de la République, son Excellence Monsieur Denis SASSOU NGUESSO et ayant pouvoir à cet effet* ». L'aval du Président avait été reçu. Ceci n'a d'ailleurs pas été démenti ultérieurement par ce dernier. En effet, suite à la non-exécution du Protocole de 2003,

Commisimpex a directement contacté le Président de la République par lettres du 29 décembre 2003 et du 1er août 2004 mais ce dernier n'a jamais remis en cause la validité du pouvoir des signataires du Protocole de 2003. Il en est de même de M. Okemba lors de son audition.

**166.** Au surplus, ainsi qu'expliqué par M. Longobé, la pratique était souvent celle d'une délégation présidentielle orale. Par un avis juridique du 7 juillet 2004, la Cour Suprême du Congo a d'ailleurs précisé que les signataires du Protocole de 2003 avaient reçu l'habilitation verbale par le Chef de l'Etat.

**167.** Puis, une lettre des signataires du Protocole, MM. Longobé et Okemba, au Ministère des Finances datée du 29 novembre 2003, donc postérieure au Protocole de 2003, a confirmé que le Protocole a été signé sur instructions du Président. M. Longobé a réitéré de tels propos dans le cadre de l'enquête de gendarmerie de 2003-2004. En outre, cette délégation a été confirmée par d'autres responsables congolais[4].

**168.** En tout état de cause, le comportement des diverses autorités congolaises a créé l'apparence d'une délégation présidentielle valide.

**169.** La jurisprudence française, en matière de conclusion des contrats internationaux, « *impose l'application du principe de l'apparence et de la croyance légitime aux questions de pouvoir et ce, au titre d'une règle matérielle du droit français* ».

**170.** Or, le jour de la conclusion du Protocole de 2003, la croyance de Commisimpex « *quant au pouvoir des signataires (...) d'engager valablement le Congo était légitime* », le Président de la République et le Ministre des Finances et du Budget ayant contribué à la conclusion du Protocole de 2003 et les signataires ayant agi, comme précédemment indiqué « *sur délégation de Monsieur le Président de la République* ».

**171.** Par ailleurs, la « *ratification peut résulter de tous actes, faits et circonstances qui manifestent, de la part du mandant, la volonté certaine de ratifier* ». A plusieurs reprises, les « *plus hautes autorités du Congo* » ont ratifié le Protocole de 2003 après sa signature. Tout d'abord, les signataires du Protocole ont insisté sur son exécution[5]. Par ailleurs, de nombreux représentants congolais ont également confirmé la validité du Protocole de 2003 et entamé des démarches en vue de l'exécuter[6]. Puis, le Congo a commencé à procéder à un début d'exécution du Protocole de 2003, d'abord en ce qui concerne le volet privatisation d'entreprises où le Ministre en charge des privatisations a, sur demande de M. Longobé, envoyé à Commisimpex une liste d'entreprises à privatiser le 4 mars 2004[7] puis, à travers le Ministre des Finances qui avait demandé au Directeur Général de la CCA, M. Nguekoumou, de « *commencer à payer la créance de COMMISIMPEX dont l'échéance du premier acompte de 6 milliards FCFA [était dépassé] à l'époque* »[8]. En outre, l'avis juridique rendu le 7 juillet 2004 par M. Lenga a confirmé la validité du Protocole de 2003.

---

[4] Pièces C32 et C71, Audition de M. Andely, Audition de M. Lenga.
[5] Pièces C163, C59, C167, C179 et C171.
[6] Pièces C30, C31, C35, C36, C163, C32 et C71.
[7] Pièces C69 et C172.
[8] Pièces C34 et C70.

**172.** Il convient de noter également que, contrairement aux allégations du Congo, l'intervention du Ministre des Finances n'est requise « *qu'en l'absence d'une intervention du Président de la République* ». En effet, « *les textes produits par le Congo contredisent la pratique des dirigeants congolais. Ainsi, « les nombreux marchés et avenants sous-jacents à la dette du Congo, accords qui engageaient les finances de l'Etat, ont été dans leur grande majorité signés par le Président de la République, et ne présentaient aucune trace d'une intervention du Ministre des Finances* ». De même, l'article 363 du décret n° 2000-187 du 10 août 2000, ainsi que l'article 43 de la loi n° 1-2000 du 1ᵉʳ février 2000 soulignent la subordination du Ministre des Finances aux décisions du Président de la République.

**173.** Enfin, le Protocole de 2003 est un contrat qui comporte des engagements contraignants. Les négociations qui ont duré 3 mois étaient réelles et ne visaient pas à être recommencées par le Ministre des Finances. Les termes même du Protocole de 2003 confirment la volonté de signer un acte contraignant, contrairement à ce qu'a prétendu M. Longobé à l'audience, qui n'a cessé d'affirmer qu'il n'avait pas le pouvoir d'engager et n'avait fait que suggérer que l'Etat « s'engage à ». Il convient de rappeler à ce titre que si le Protocole devait ne présenter que de simples propositions, il n'aurait pas pris la forme d'un contrat et il n'aurait pas été nécessaire de le faire signer par les deux parties.

**174.** Le Protocole de 2003 était final en dépit des affirmations contraires des témoins présentés par le Congo. M. Longobé a affirmé que le Protocole de 2003 était subordonné à la vérification ultérieure de la dette par le Ministère des Finances. Ceci n'est pas mentionné dans le Protocole. En outre, le Congo avait vérifié avant la conclusion du Protocole de 2003 sa dette vis-à-vis de Commisimpex : (i) en 2001-2003 par les juridictions congolaises et par le cabinet Ernst and Young, (ii) en 2002 par l'administration congolaise lors des travaux d'examen de la dette congolaise (iii) et par le Colonel Abia chargé de l'enquête de gendarmerie. Ceci était confirmé par une note de synthèse du 20 janvier 2004 rédigée par le conseiller juridique et administratif de la présidence Armand Ougoundou. La nécessité d'une vérification ultérieure de la dette paraît donc inutile et n'est pas justifiée par M. Andely, Ministre des Finances d'août 2002 à janvier 2005, qui s'est contenté d'affirmer son manque de confiance envers Ernst and Young.

**175.** Puis, contrairement à ce que soutient le Congo, le Protocole de 2003 n'est pas dépourvu de cause. Le Protocole de 2003 vaut reconnaissance de dette et prévoit les modalités de règlement de cette créance, notamment dans son Préambule qui prévoit la scission de la créance. En tout état de cause, la jurisprudence estime, en matière de reconnaissance de dette, que la cause de l'obligation est présumée et qu'il appartient au souscripteur d'en apporter la preuve contraire. Le Congo soutient que le Protocole de 1992 aurait un effet novatoire. Toutefois, un tel effet ne serait que partiel car « *la novation requiert l'extinction d'une obligation ancienne, la naissance d'une nouvelle et l'intention d'opérer novation de l'obligation* ». Or, « *Commisimpex n'a jamais voulu donner effet novatoire au Protocole de 1992 quant à la somme de 26 milliards correspondant aux entreprises à privatiser* ».

**176.** Par ailleurs, le Congo prétend que les demandes de Commisimpex seraient irrecevables en se fondant sur l'autorité de la chose jugée de la Sentence n° 9899. Or, le Protocole de 2003 constitue un contrat conclu postérieurement à la Sentence de 2000. Il ne fait donc aucun doute que cette sentence ne pouvait pas le couvrir. Puis, contrairement à ce que prétend le Congo, l'obligation de concentration de moyens n'est pas absolue. En effet, « *la portée de cette*

*obligation ne s'étend pas aux objets de demandes distinctes* ». Les demandes de Commisimpex fondées sur le Protocole de 2003 sont donc recevables.

**177.** En outre, la Sentence ne s'est prononcée que sur le Protocole de 1992 et ses billets à ordre, de sorte que l'autorité de la chose jugée qui s'y attache n'est « *limitée [qu'] à la partie de la dette couverte par le Protocole de 1992* ».

**178.** « *Considérant tout ce qui précède, Commisimpex demande respectueusement que le Tribunal arbitral :*

> *(i) condamne le Congo à payer les sommes dues au titre du Protocole de 2003, y compris (compte tenu de l'inexécution du Protocole de 2003 par le Congo) tous les intérêts dus sur ces sommes, après avoir tenu compte des montants accordés par la Sentence de 2000, soit, au 7 janvier 2011 :*
>
> - *3.247.161.007 francs français, soit 495.026.504 euros ;*
> - *65.634.875 livres sterling ;*
> - *105.820.227 dollars US ;*
> - *3.253.937.125 francs CFA, payables en euros, soit 4.960.595 euros ;*
>
> *(ii) condamne le Congo à payer des intérêts sur les montants dus à Commisimpex, de la date de la dernière actualisation de sa créance (le 7 janvier 2011) jusqu'à la date de la sentence, au taux de 10 ,5% par an, capitalisés annuellement ;*
>
> *(iii) condamne le Congo à payer tous les frais et dépens (y compris les frais payables à la CCI, les frais et dépens juridiques et les frais et dépens des experts, consultants et autres) contractés par Commisimpex pour la préparation et la poursuite de cette procédure d'arbitrage, dont le montant sera présenté au moment et dans la forme que le Tribunal arbitral voudra bien ordonner ;*
>
> *(iv) condamne le Congo à payer les intérêts post-sentence sur tous les montants ordonnés, de la date de la sentence jusqu'à réception du paiement par Commisimpex, au taux de 10,5% par an, capitalisés annuellement ; et*
>
> *(v) attache à sa décision toute autre conséquence de droit* ».[9]

**179.** De plus, à la suite du jugement du Tribunal de commerce de Brazzaville qui a prononcé sa mise en liquidation judiciaire, Commisimpex a formulé les demandes suivantes :

> « *Commisimpex prie le Tribunal, dans le cadre de sa sentence à venir :*
>
> *(1) de prendre acte de la violation par le Congo de l'Ordonnance de procédure no.7 ;*
>
> *(2) de prendre acte du caractère intentionnel et abusif de cette violation ;*
>
> *(3) de constater le caractère abusif et frauduleux de la liquidation de Commisimpex ;*

---

[9]    Mémoire Après-Audience de Commisimpex, 17 février 2012.

*(4) de dire, en conséquence, que, pour les besoins du présent arbitrage, il ne reconnaît pas la mise en liquidation judiciaire de Commisimpex ;*

*(5) de constater, dans cet arbitrage, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex ;*

*(6) d'ordonner en tout état de cause au Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de Commerce de Brazzaville en date du 30 octobre 2012, devant votre tribunal et/ou devant tout autre juridiction, judiciaire ou arbitrale ;*

*(7) d'ordonner au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance de procédure n° 7 ; et*

*(8) d'ordonner le remboursement par le Congo, au profit des demandeurs, de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation. »*

## B.   Position de la Défenderesse

**180.** Les parties ont conclu le 14 octobre 1992, un Protocole d'Accord, le Protocole de 1992, portant sur la consolidation et le règlement des créances restant dues à Commisimpex, au titre de marchés de travaux.

**181.** Le Protocole de 1992 ayant un caractère global, novatoire et forfaitaire, aboutissant dans la clôture du processus de détermination de la dette de la République du Congo, le tribunal arbitral no. 9899 a jugé le 3 décembre 2000, que la créance de Commisimpex s'élevait en octobre 1992, à un montant de 288.634.078 francs français en principal et a condamné la République du Congo au paiement d'environ 100 millions de dollars en principal et intérêts (montant actualisé au jour de la Sentence).

**182.** Dans la présente procédure, Commisimpex se fonde sur le Protocole de 2003 - fixant le montant de la dette du Congo, au 30 septembre 1992, à 960.000.000 francs français, en principal - pour demander la condamnation du Congo à payer plus de 650 millions d'euros.

**183.** Commisimpex prétend que les parties seraient convenues par un accord verbal d'arrêter la créance globale à 48 milliards FCFA (960.000.000 FRF) et de scinder la dette en deux parties. Ainsi, 22 milliards FCFA devaient être réglés dans le cadre du Protocole de 1992, qui faisait l'objet du précédent arbitrage n° 9899, et les 26 milliards FCFA restants, qui ne seraient pas couverts par le Protocole de 1992 et donc par la sentence n° 9899, devraient faire l'objet d'un paiement sous forme d'attribution d'entreprises à privatiser au profit de Commisimpex. En d'autres termes, Commisimpex prétend que le Protocole de 1992 ne couvre qu'une dette partielle, alors que le Protocole de 2003 couvre la totalité de la créance.

**184.** Or, le Protocole de 1992 avait pour « *objet d'arrêter le montant des sommes dues à Commisimpex et de fixer les modalités de leur règlement, étant précisé que, comme cela ressort de lettres de Commisimpex des 11 mars 1993 et 5 juin 1997 et comme le retiendra le*

*Tribunal n° 9899, les parties étaient convenues d'appliquer à cette créance une décote de 25% que le Protocole de 1992 devait intégrer. »*

**185.** Le préambule du Protocole de 1992 stipulait que « *les dettes restant dues sur travaux, après prise en compte des différents paiements effectués en faveur de la société Commisimpex et de l'escompte de certains billets à ordre, se montent à :*

> A.  *50.592.081,53 francs français (...)*
>
> B.  *21.201872,76 livres sterling (...)*
>
> C.  *34.521.293,24 dollars US (...)*
>
> D.  *1.426.623.801 francs CFA (...)*
>
> *La République du Congo d'une part, et la société Commisimpex d'autre part, ont considéré de déterminer les termes et conditions de règlement de ladite <u>dette restante</u> au moyen du présent accord.* » (Soulignement ajouté par la Défenderesse).

**186.** Commisimpex prétend dans le présent arbitrage qu'en plus de sa créance de 22 milliards FCFA, constatée par le Protocole de 1992, elle détient une créance de 26 milliards FCFA qui résulterait d'un accord verbal donné par le Président Lissouba et ses ministres lors de réunions tenues les 7 septembre, 23 septembre et 5 octobre 1992. Cet accord, dont il n'a pas été fait mention pendant plus de dix ans, n'aurait pas fait l'objet d'un écrit avant que soit remise en juin 2003 par le Président de la République à M. Hajaij copie d'une lettre datée du 7 octobre 1992 qui aurait été volée en 1998 à l'occasion d'un cambriolage des locaux de Commisimpex. Cette absence d'écrit paraît invraisemblable au regard de la rédaction précise apportée au Protocole de 1992. M. Hajaij a été jusqu'à inventer à l'audience l'existence d'un procès-verbal de la réunion du 5 octobre 1992 au cours de laquelle le Congo aurait reconnu cette créance. En réalité, cette créance de 26 milliards n'existe pas et il n'existe pas en conséquence de dette de 48 milliards FCFA. Il n'existe pas d'autre dette que celle résultant du Protocole de 1992 et la sentence de 2000 a fixé le montant des sommes dues. Le Protocole de 2003 est donc une fraude.

**187.** Commisimpex n'est pas en mesure de justifier du montant de la créance qu'elle revendique. De plus, aucune justification n'est donnée quant à la révision du montant de la créance qui avait été pourtant arrêté par la sentence de 2000.

Commisimpex fonde en effet ses calculs sur des documents sans pertinence qui sont le procès pénal Lekoundzou et la conférence nationale de 1991. L'arrêt Lekoundzou avait pour objet de statuer sur des malversations éventuelles et détournements de fonds publics commis dans le cadre du crédit BCCI de 45 millions USD souscrit par le Congo mais pas de statuer sur une créance dont l'arrêt ne donne d'ailleurs aucun détail.

**188.** M. Hajaij s'est également référé à de nombreuses reprises à une fiche de calcul de la CCA de septembre 1991. Ce document ne fait que reprendre les montants en devise des marchés d'origine auxquels ont été ajoutés des intérêts de 10,5% jusqu'en 1987. Ce document ne présente donc pas le solde de la créance après vérifications comptables fin 1986 et à plus forte raison en 1991. M. Hajaij n'a d'ailleurs pas pu justifier le taux de 10,5% d'intérêts, ce

qui s'explique par le fait qu'un tel taux est absent des différentes conventions. Puis, M. Hajaij a été confus sur les conditions dans lesquelles ce document a été retrouvé et il est révélateur que Commisimpex, qui a toujours disposé de ce document, ait choisi de ne pas le produire dans la procédure CCI no. 9899. En outre, ce document, qui n'est pas signé et ne ressemble pas aux autres documents émanant de la CCA n'a été reconnu par aucune des personnes auxquelles il a été présenté à l'audience. Les éléments issus du procès pénal Lekoundzou ne justifient pas la créance de Commisimpex.

**189.** M. Hajaij s'est également appuyé dans son attestation du 4 août 2011 sur des travaux de la conférence nationale de 1991 et en particulier sur une note de mai 1991 établie par une commission « Questions économiques et finances publiques » faisant état d'un montant de 29.949.284.818 FCFA[10] et d'une note du 18 juin 1991 établie par une commission « Bien mal acquis » faisant état d'un montant de 28.339.795.515 FCFA[11]. La première note, qui est désormais la seule invoquée par Commisimpex, n'est pas probante dans la mesure où la conférence nationale n'avait que pour seul objet d'éclaircir les conditions dans lesquelles le crédit BCCI de 45 millions USD avait été mis en place et employé et la seule décision prise par cette conférence- l'acte 225- ne fait aucune mention du montant de sa créance.

**190.** Par ailleurs, en ce qui concerne les réunions de 1992, il convient de noter l'absence surprenante de procès-verbaux les relatant. Pourtant, M. Hajaij a précisé à l'audience garder des preuves de tout ce qui s'est passé. De plus, M. Ikounga, directeur de cabinet depuis le 1er septembre 1992 du Président Lissouba a indiqué que le 7 septembre 1992, date de la première réunion, les ministres n'étaient pas encore désignés et que celle-ci était matériellement impossible. Enfin, M. Hajaij a désigné M. Mouamba en tant que Ministre des Finances et M. Nguila Mongouanga Nkombo en tant que Ministre du Plan, de l'Economie et de la Prospective comme présents à la réunion mais ils n'ont obtenu ces titres que par un remaniement postérieur du 25 décembre 1992. Quant à la réunion du 5 octobre 1992, M. Hajaij a prétendu pour la première fois à l'audience que cette réunion avait fait l'objet d'un procès-verbal dont il n'a cependant pas la copie, celle-ci ayant été volée en 1998. Ceci est contraire aux allégations de Commisimpex qui a indiqué que le seul engagement écrit résultant de ces réunions était le Protocole de 1992 qui se trouvait entre ses mains. De plus si un tel exemplaire existait, M. Mbéri l'aurait sans doute évoqué. En dernier lieu, Commisimpex en aurait certainement retrouvé une trace.

**191.** La lettre du 7 octobre 1992, qui est censée justifier de l'existence des réunions des 7 septembre, 23 septembre et 5 octobre 1992, est inexacte et a été fabriquée pour les besoins de la présente procédure. Elle fait notamment mention d'un Ministre des Finances et d'un Ministre du Plan fonctions à l'époque réunies en la personne de M. Mouamba et qui n'ont été séparées que postérieurement, le 25 décembre 1992. Les explications de M. Hajaij à ce titre ne sont pas crédibles et le contenu de la lettre montre bien que son auteur s'adressait bien à deux ministères différents. Cette lettre a donc été rédigée ex post facto par une personne ayant oublié la composition différente du premier gouvernement Lissouba. Il est en outre invraisemblable que Commisimpex n'ait pas conservé une copie de ce document dit indispensable et qu'aucun original ou aucune copie n'ait pu être retrouvée. Puis, si M. Mbéri avait reçu un exemplaire de cette lettre il en aurait fait mention dans sa déclaration du 31 juillet 2003. En réalité, il a seulement recopié dans son attestation le courrier du 7 octobre 1992 qui a été fabriqué a posteriori pour les besoins de Commisimpex.

---

[10]    Pièce C94.
[11]    Pièce C95.

**192.** Quant au montant de la créance, il convient de rappeler que Commisimpex avait dans la procédure CCI no. 9899 produit des documents faisant état d'une créance globale en 1992 de 29 milliards FCFA et qui montraient que le Protocole de 1992 couvrait l'intégralité des engagements conclus entre les parties. Tel est le cas notamment de sa lettre du 11 mars 1993 à la CCA, de sa lettre du 29 avril 1999 au Tribunal no. 9899 et de sa lettre du 5 juin 1997 au Ministre des Finances.

Par ailleurs, il est indéniable que le Protocole de 1992 avait un caractère global, forfaitaire et novatoire. Ceci ressort notamment de la Note du 16 janvier 1997[12] de la CCA au Ministre des Finances, communiquée par Commisimpex dans la procédure no. 9899, qui montre que le Protocole de 1992 couvrait bien l'ensemble des marchés.

**193.** Dans sa sentence no. 9899, le tribunal arbitral avait procédé à une analyse des documents fournis par Commisimpex et avait conclu ceci :

> « *la différence entre le total précité de FCFA 28.339.795.515 (actualisé au 31 octobre 1992 par COMMISIMPEX à FCFA 29.269.598.989) et le total des dettes visées au protocole no. 566 (FCFA 22.235.587.294) constitue la (seconde) décote d'environ 25% maintes fois évoquée par les parties durant les débats et expliquée par COMMISIMPEX à la CAISSE dans sa lettre précitée du 11 mars 2003 relative à l'exécution du protocole no. 566* ».

> « *iii) Tous les documents antérieurs au Protocole no. 566 émanant d'autorités congolaises et concernant les dettes envers COMMISIMPEX (supra, XI.B.1, 1°,b, pages 29-30) concordent pour fixer ces dettes, actualisées au 31 mai 1991, à FCFA 28.339.795.515 et au 31 octobre 1992, à FCFA 29.269.598.989, ce qui correspond globalement – après application d'une décote d'environ 25%- au total de FCFA 22.235.587.294 (ou 21.622.330.040) correspondant à la dette (composantes en FRF, GBP, USD et FCFA) arrêtée entre COMMISIMPEX et la REPUBLIQUE DU CONGO dans le Protocole no. 566. (...).* »

Il est donc évident, au vu des conclusions du tribunal no. 9899, que le Protocole de 2003 est dépourvu de cause.

**194.** Par ailleurs, compte tenu de l'autorité de chose jugée attachée à la sentence no. 9899, les demandes de Commisimpex sont irrecevables et mal fondées. En effet, l'autorité de chose jugée attachée à une décision rendue sur le fondement d'une reconnaissance de dette interdit au plaideur de réintroduire une demande en paiement au titre de la créance sous-jacente.

De plus, Commisimpex soutient qu'il n'y aurait pas autorité de la chose jugée en présence d'un fait nouveau ou lorsqu'une demande n'avait pas été incluse dans la demande initiale. Or, la théorie du fait nouveau n'est retenue que pour « *des événements postérieurs [qui] sont venus modifier la situation antérieurement reconnue en justice* », ce qui les distingue des moyens ou éléments de preuve nouveaux, lesquels ne font pas obstacle à l'autorité de chose jugée. Selon Commisimpex, le Protocole de 2003 serait une reconnaissance de dette, qui d'après la doctrine s'analyse en « *une simple révélation ou déclaration d'un droit préexistant*

---
[12] Pièce R73.

*[qui] n'engendre aucune situation juridique nouvelle* »[13]. Les demandes de Commisimpex sont donc irrecevables.

**195.** En ce qui concerne les décotes, Commisimpex prétend à tort que celles mentionnées dans ses lettres des 11 mars 1993 et 5 juin 1997[14] auraient été postérieures au Protocole de 1992 et conditionnées au paiement de la créance par le Congo. En effet, comme l'ont indiqué M. Mouamba et M. Andély, les accords au Congo supposaient toujours une décote. D'autre part, M. Hajaij ne peut prétendre avoir consenti une décote d'1 milliard FRF en 2003 et avoir refusé toute décote en 1992. Concernant la lettre du 11 mars 1993, M. Hajaij s'est contredit à de nombreuses reprises concernant la date et les conditions dans lesquelles elle a été signée. Puis, il convient de noter que M. Mouamba n'a pas empêché M. Hajaij de négocier les nouvelles traites mais plus simplement demandé qu'aucune négociation n'ait lieu « sans son accord préalable ». En outre, M. Hajaij est revenu sur son attestation en affirmant en effet que cette lettre faisait suite à une demande du Ministère des Finances de lui accorder après la signature du Protocole de 1992 une décote qui, si elle avait été consentie, aurait été appliquée sur les 26 milliards FCFA. Ceci cependant contraire aux termes de la lettre écrite par Commisimpex et contraire à ce qui avait été allégué dans le précédent arbitrage puisqu'il s'agissait alors d'une décote dans le Protocole. Concernant la lettre du 5 juin 1997, M. Hajaij a développé la même thèse de décotes conditionnelles mais ceci est également contraire à ce qui est écrit dans le courrier et à ce qu'il avait soutenu dans la procédure CCI no. 9899.

**196.** Enfin, les montants figurants dans le Protocole de 2003 n'ont pas été approuvés ou vérifiés par les autorités compétentes, Commisimpex ayant toujours refusé de se soumettre à la première étape qui est celle de la vérification de la dette. De plus, les documents qu'elle a présentés n'étaient pas pertinents. Tout d'abord ceux-ci ont été établis en 2002 pendant une période où la CCA s'opposait aux prétentions de Commisimpex devant les juridictions de Brazzaville, ce qui exclut toute idée d'accord de la CCA sur les chiffres avancés par Commisimpex. Le rapport d'expertise de M. Fylla Saint-Eudes, saisi à la demande de Commisimpex devant les juridictions congolaises, n'est pas fiable notamment car il a pris comme point de départ la fiche de calcul de 1991 et prétend avoir procédé à des vérifications profondes auprès de la CCA, souvenir que n'ont pas MM. Gossaki et Ikemo. M. Fylla Saint Eudes s'est en outre prononcé sur la base de documents fournis par Commisimpex et n'a pas tenté de les confronter à d'autres données. La fiche annexée au courrier de M. Gossaki du 24 janvier 2002[15] ne valide pas la créance contrairement à ce que prétend Commisimpex. En effet, M. Ganféré qui a signé cette fiche n'en avait pas le pouvoir. L'objet de l'audition n'était pas de faire valider une créance par la CCA et surtout la validation incombait en dernier ressort au Ministre des Finances qui ne l'a pas donnée. Ce document ne peut être une validation de sa créance par la CCA car M. Fylla Saint Eudes explique que le montant qui y est consigné est fondé sur son propre rapport d'expertise judicaire qui était contesté en justice par la CCA. Enfin, ce document, dont l'intitulé même démontre que les montants sont "contentieux", ne présente pas de "code Lazard" pour la créance Commisimpex, ce qui démontre qu'elle n'avait pas été vérifiée par la banque Lazard, mandatée à cet effet par le Ministre des Finances. En outre, le Congo comme la CCA ont devant la Cour Suprême du Congo contesté cette fiche.

---

[13]   Mémoire en Défense sur le Fond, para 374, page 130.
[14]   Pièces R48 et R68.
[15]   Pièce C56.

**197.** En tout état de cause, le Protocole de 2003 n'est pas valide dans la mesure où il n'a pas reçu l'approbation du Ministère des Finances et qu'il n'a pas été signé par des personnes habilitées, aucune n'ayant reçu de délégation du Président de la République.

**198.** Commisimpex n'a pas suivi la procédure imposée par les autorités compétentes (vérification-réconciliation-décoté-échéancier) et s'est donc fait consentir une reconnaissance de dette par des personnes n'en ayant pas le pouvoir. Commisimpex n'a en effet pas versé au débat de pièces justifiant d'une délégation de pouvoirs par le Président de la République. En réalité, seule une des pièces produites a été portée à la connaissance de celui-ci : il s'agit d'une note interne du département juridique du Cabinet de la Présidence au Président du 30 avril 2004[16]. Mais ce document ne fait pas état d'une délégation, n'annexe pas le Protocole de 2003 et renvoie au Ministre des Finances. Par ailleurs, M. Longobé, qui était le soi-disant délégataire de pouvoirs, nie avoir reçu instruction de conclure le Protocole de 2003 et indique ne pas avoir informé ce dernier du contenu du Protocole.

**199.** M. Boukamany a remis deux consultations par lesquelles il démontre qu'une reconnaissance de dette ne saurait engager l'Etat sans approbation du Ministère des Finances. Commisimpex n'a pas remis d'avis juridique en sens contraire et a préféré mettre en cause l'indépendance de M. Boukamany tout en refusant de l'interroger.

**200.** Enfin, M. Andély a bien confirmé à l'audience que le Protocole de 2003 n'avait pas été approuvé par le Ministre des Finances et qu'il n'avait reçu aucune instruction en ce sens du Président de la République.

**201.** Commisimpex ne peut invoquer la théorie de l'apparence sur le seul fondement de la consultation de M. Lenga du 7 juillet 2004 car celle-ci a été réalisée sur commande et a été établie après le Protocole de 2003. M. Hajaij connaissait les rouages de l'administration congolaise et Commisimpex ne pouvait ignorer que le contreseing du Ministre des Finances était une condition de validité du Protocole de 2003. De même, l'avis juridique de M. Lenga ne corrobore pas l'existence de la délégation car il se borne à confirmer une référence faite à cette délégation qui ne résultait donc pas d'une connaissance personnelle de l'existence de ladite délégation. Puis, la note de service du 4 août 2003 ne constitue en rien une délégation du Président. Elle confirme à l'inverse que M. Longobé n'avait pas le pouvoir de signer le Protocole de 2003 car elle visait à instituer une commission dont l'objet était « la coordination et le suivi du contentieux de l'Etat ». D'ailleurs, cette commission n'a jamais fonctionné d'après M. Boukamany.

**202.** En ce qui concerne les arguments de Commisimpex sur le contenu de la créance, ils reposent sur une réécriture des faits et documents et ne tiennent pas compte des témoignages. Tout d'abord, le Congo rappelle que le montant de la créance est celui arrêté dans la sentence de 2000. En effet, avant 1992, la CCA ne disposait pas d'un décompte exhaustif des paiements reçus par Commisimpex[17]. Elle n'était pas avisée de tous les escomptes et il était souvent difficile de retracer les paiements provenant de l'étranger, comme expliqué par M. Gossaki.

**203.** Le Congo a communiqué des copies d'écran de la base de données de la CCA qui faisait ressortir au 13 octobre 1992 une créance de 14 milliards FCFA, M. Ikemo ayant précisé que

---

[16]  Pièce C35.
[17]  Pièces R48, R36, R37 et R52.

ce montant comprenait les échéances en intérêts mais excluait les intérêts de retard à compter de la date d'échéance. Commisimpex a déformé les propos de M. Ikemo en déduisant du fait qu'il n'était pas en mesure d'identifier tous les marchés que ce document ne comportait pas la totalité des marchés. M. Ikemo, en tant que responsable de la CCA, n'a pas une connaissance détaillée des marchés et, ainsi qu'il l'a expliqué, la base représente la créance de Commisimpex dans les livres de la CCA et donc ce qui n'y figurait pas n'était pas du.

**204.** En réalité, Commisimpex a reconstruit une créance a posteriori car aucun document datant de la période 1992/2001 ne mentionne un montant de 48 milliards FCFA ni l'existence d'une créance hors Protocole de 1992 de 26 milliards FCFA. Tous les documents de Commisimpex sont postérieurs à 2001 et ont donc été établis pour elle par le biais de M. Fylla Saint-Eudes, du colonel Abia et des fonctionnaires congolais reprenant les termes du protocole de 1992 pour tenter de revenir sur la sentence no. 9899. Il en est de même des attestations provenant de l'affaire BCCI/Lekoudzou qui datent de 2002 et 2003. Aucun document antérieur à 2001 n'évoque les 48 milliards FCFA sauf la lettre du 7 octobre 1992. Commisimpex se fonde donc sur une fiche de 1991 qui ne fait état d'une créance de 48 milliards FCFA ni d'aucun montant pour 1991-1992, une lettre du 15 juillet 1997 qui ne fait pas non plus état d'une telle créance et l'affaire Qwinzy qui ne porte pas sur la créance de Commisimpex. Il est invraisemblable qu'aucun document ne stipulait que Commisimpex était titulaire d'une créance de 48 milliards FCFA en 1992.

**205.** Le Protocole de 2003 est donc frauduleux en ce qu'il reconnaît une créance inexistante. D'ailleurs M. Hajaij s'est révélé incapable de fournir spontanément une explication du montant de sa créance. Tel est notamment le cas de la fiche de calcul de 1991 pour laquelle M. Hajaij n'a pas spontanément indiqué qu'elle excluait du montant de 29.949.284.818 FCFA les deux procès-verbaux de 1988. En outre, M. Hajaij avait soutenu l'inverse en début d'audience. De même, M. Hajaij n'a pu expliquer l'augmentation du montant de la créance de 29 milliards à 48 milliards que par le biais de son conseil qui a indiqué qu'il s'agissait « d'une actualisation par application du taux d'intérêt ». Il en va de même des thèses relatives aux décotes où M. Hajaij s'est également contredit. Par exemple, Commisimpex soutient s'agissant de la lettre du 11 mars 1993 que la référence à une décote résultait d'une exigence de M. Mouamba visant à ce que Commisimpex écrive que le Protocole intégrait une telle décote. Or, ce n'est pas ce que dit M. Hajaij qui explique qu'il s'agissait d'une demande de M. Mouamba de lui accorder une décote après 1992 et non d'une demande visant à démontrer que le Protocole intégrait une décote. Concernant la lettre du 5 juin 1997, Commisimpex prétend que la référence à des décotes résultait de pressions et ajoute que ces décotes étaient inexistantes. Une fois encore, M. Hajaij n'a pas confirmé ceci et a indiqué que Commisimpex avait accordé des décotes prétendument conditionnelles. Enfin, les explications de Commisimpex quant à la décote mentionnée dans la lettre du 11 mars 1993 sont également incompatibles avec d'autres déclarations de M. Hajaij.

**206.** En définitive, le Protocole n'a pas été conclu avec l'approbation du Président et la signature de ce Protocole ne s'explique que par le réseau d'influence de M. Hajaij au sein de l'administration congolaise.

**207.** Sur ces fondements,

&laquo; *La République du Congo demande au tribunal de* :

*A titre principal,*

    *- Dire et juger les demandes de Commisimpex irrecevables en raison de l'autorité de chose jugée attachée à la sentence arbitrale finale du 3 décembre 2000 rendue dans l'affaire CCI N° 9899/AC/DB ;*

*A titre subsidiaire,*

    *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet en raison du défaut de pouvoir des signataires ;*

    *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet en raison de l'absence d'approbation du Ministre de l'Economie, des Finances et du Budget ;*

    *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet pour défaut de cause ;*

    *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet en raison du caractère vicié du consentement de la République du Congo ;*

    *- En conséquence, rejeter l'intégralité des demandes de Commisimpex ;*

*En tout état de cause,*

    *- Condamner Commisimpex à payer tous les frais et dépens nés de la présente procédure arbitrale, en ce compris les honoraires, frais et débours du tribunal et de la CCI, ainsi que les honoraires, frais et débours des conseils de la République du Congo, ainsi que tous autres frais liés à la procédure arbitrale* »[18].

**208.** De plus, la République du Congo conclut à l'irrecevabilité des demandes de Commisimpex formées à la suite du jugement du Tribunal de commerce de Brazzaville qui a prononcé sa mise en liquidation judiciaire et demande au Tribunal Arbitral, en tout état de cause, de les rejeter comme mal fondées.

## IV.  **DISCUSSION**

    ●   <u>QUESTIONS PRELIMINAIRES SOULEVEES PAR LA MISE EN LIQUIDATION JUDICIAIRE DE COMMISIMPEX</u>

---

[18]    Mémoire en Duplique sur le Fond.

**209.** Avant d'aborder le litige qui oppose les parties, le Tribunal Arbitral doit tirer les conséquences qu'est susceptible d'avoir sur la procédure arbitrale le jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012 qui a prononcé la mise en liquidation judiciaire de Commisimpex, à la lumière des positions et demandes des parties à cet égard, compte tenu de la prétention du liquidateur d'être depuis le 19 novembre 2012 le seul représentant de Commisimpex.

**210.** Commisimpex demande au Tribunal Arbitral de :

« *1.   Prendre acte de la violation par le Congo de l'Ordonnance de procédure no.7 ;*

*2.   Prendre acte du caractère intentionnel et abusif de cette violation ;*

*3.   Constater le caractère abusif et frauduleux de la liquidation de Commisimpex ;*

*4.   Dire, en conséquence, que, pour les besoins du présent arbitrage, il ne reconnaît pas la mise en liquidation judiciaire de Commisimpex ;*

*5.   Constater, dans cet arbitrage, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex ;*

*6.   Ordonner en tout état de cause au Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de Commerce de Brazzaville en date du 30 octobre 2012, devant le Tribunal Arbitral et/ou devant tout autre juridiction, judiciaire ou arbitrale ;*

*7.   Ordonner au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance de procédure n° 7 ;*

*8.   Ordonner le remboursement par le Congo, au profit des demandeurs, de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation ».*

**211.** La République du Congo conclut à l'irrecevabilité de ces demandes et, en tout état de cause, demande au Tribunal Arbitral de les rejeter comme mal fondées.

**212.** L'Ordonnance de Procédure no. 9 du 30 novembre 2012 a déjà disposé des demandes 1 et 2 car le Tribunal Arbitral y a constaté que « *que l'Ordonnance de Procédure no.7 par laquelle il était ordonné « (...) à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage* » *n'a pas empêché le prononcé de la liquidation judiciaire de Commisimpex, sans qu'il en découle nécessairement une violation par la République du Congo de cette ordonnance* ». La même Ordonnance s'est également prononcée sur la demande 7 en ordonnant à la République du Congo de « *prendre toutes les mesures nécessaires pour que le statu quo entre les parties soit rétabli dans les plus brefs délais et en tout cas avant le prononcé de la sentence finale* ». La présente sentence ne peut que confirmer la première de ces décisions. Quant à la seconde, elle n'aura plus d'objet après le prononcé de la sentence.

**213.** A l'exception de la demande 8 de Commisimpex concernant le remboursement des frais engendrés dans le présent arbitrage par la procédure de liquidation, les autres (3, 4, 5, et 6) supposent que le Tribunal Arbitral ait le pouvoir de se prononcer sur la régularité d'un jugement de faillite d'une des parties à la procédure arbitrale. Pour conclure à l'irrecevabilité des demandes de Commisimpex relatives au jugement de liquidation judiciaire, la République du Congo nie l'existence d'un tel pouvoir, « *encore moins lorsqu'aucune partie ne s'en est prévalue pour demander la suspension de la procédure arbitrale ou tenter de lui faire porter des effets afin de perturber la procédure arbitrale en cours* »[19]. A cet égard, la République du Congo souligne qu'elle ne s'est pas prévalue du jugement de mise en liquidation, survenu après la clôture des débats. De son côté, Commisimpex invoque une jurisprudence arbitrale selon laquelle les arbitres ne seraient pas contraints de reconnaître des effets à un jugement de mise en liquidation, et, plus particulièrement auraient « *le pouvoir d'apprécier, à titre incident, les conditions de mise en liquidation d'une des parties à l'instance arbitrale, et de lui reconnaître ou non, en conséquence, des effets dans la procédure arbitrale.* »[20] A cet égard, elle se réfère également à un arrêt de la Cour d'appel de Paris du 12 janvier 1993[21] selon lequel il a été admis qu'un tribunal arbitral, « *sans méconnaître l'ordre public international, mais pour en assurer au contraire le respect* » avait pu à juste titre considérer que donner effet à un jugement de déclaration de faillite aurait eu notamment pour conséquence inéluctable de retarder, de manière déloyale le déroulement de l'instance arbitrale. Mais, la République du Congo objecte que si « *dans certaines circonstances, il a pu être admis que le tribunal arbitral puisse se prononcer sur la régularité du jugement de faillite, il s'agissait uniquement d'affaires dans lesquelles une partie (ou un liquidateur) cherchait à se prévaloir du jugement de faillite étranger pour obtenir la suspension de l'arbitrage, voire pour y mettre un terme* ».[22] Elle ajoute qu' « *il a simplement été admis que le tribunal arbitral puisse se prononcer de manière incidente sur la régularité d'un jugement de faillite étranger dans le cadre de la résolution du litige qui lui est soumis et, pour autant qu'une partie se prévale du jugement de faillite au cours de la procédure arbitrale et que l'autre s'y oppose, et uniquement dans les cas exceptionnels où le jugement invoqué méconnaîtrait les exigences de l'ordre public international* ».[23] (soulignement ajouté)

**214.** Au-delà de l'exception d'irrecevabilité des demandes de Commisimpex relative au jugement de mise en liquidation judiciaire, motivée semble-t-il par le fait que ce jugement est intervenu après la clôture des débats et qu'elle ne s'en prévaut pas, la République du Congo conteste également la compétence du Tribunal Arbitral pour en décider, puisqu'elle lui dénie, dans les circonstances, le pouvoir de se prononcer sur la régularité du jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012. Le Tribunal Arbitral ne peut accueillir ni l'exception d'irrecevabilité, ni l'exception d'incompétence dans son intégralité.

**215.** Que le jugement de mise en liquidation judiciaire de Commisimpex soit intervenu après la clôture des débats et que la République du Congo ne s'en prévale pas ne permet pas de conclure à l'irrecevabilité des demandes de Commisimpex. Même si la République du Congo n'entend pas se prévaloir du jugement, le liquidateur, par lettre du 19 novembre 2012, a signifié dénier, désormais, toute valeur aux actes de M. Hajaij, représentant légal de

---

[19]    Lettre de la République du Congo du 22 novembre 2012, page 7.
[20]    Lettre de Commisimpex du 14 novembre 2012, page 4.
[21]    Pièce C-RJ 142.
[22]    Lettre de la République du Congo du 22 novembre 2012, page 8.
[23]    Lettre de la République du Congo du 22 novembre 2012, page 8.

Commisimpex lors de l'introduction du la procédure arbitrale, et indiqué qu'un nouvel avocat serait constitué pour la défense des intérêts de Commisimpex dans la procédure arbitrale. Celle-ci ne s'est pas éteinte par la clôture des débats et se poursuit jusqu'à la notification de la sentence et éventuellement après, par application des dispositions de l'article 29 du Règlement d'arbitrage de la CCI. Commisimpex a un intérêt indiscutable à ce que les conséquences du jugement de mise en liquidation sur la procédure arbitrale soient déterminées et, en tout état de cause, le Tribunal Arbitral doit se prononcer sur la qualité des représentants de Commisimpex dans cette procédure depuis le 19 novembre 2012.

**216.** Quant à la compétence du Tribunal Arbitral, celui-ci estime qu'il a non seulement le pouvoir, mais aussi le devoir de se prononcer sur les effets du jugement de mise en liquidation judiciaire de Commisimpex sur la procédure arbitrale, sans que ceci signifie nécessairement qu'il soit compétent pour statuer sur toutes les demandes de Commisimpex.

**217.** Ainsi que l'a rappelé la Cour d'appel de Paris dans un arrêt du 7 avril 2011[24] « *si les principes de l'arrêt des poursuites individuelles, de dessaisissement du débiteur et d'interruption de l'instance en cas de faillite sont d'ordre public international et s'imposent même au cas où l'arbitrage se déroulant en France n'est pas soumis à la loi française, il n'en appartient pas moins à l'arbitre de vérifier, avant de faire application de ces principes, que la décision judiciaire qui ouvre la procédure d'insolvabilité et désigne un mandataire ne méconnait pas elle-même les exigences de l'ordre public international* ». Il en résulte qu'un Tribunal Arbitral, informé de la mise en liquidation judiciaire d'une des parties à l'instance arbitrale, fut-ce la partie demanderesse revendiquant une créance, est tenu de s'interroger d'office sur les conséquences qui en découlent sur la poursuite de la procédure, à la lumière des exigences de l'ordre public international. C'est *a fortiori* le cas lorsque, comme dans la présente espèce, le liquidateur prétend nommer un conseil pour remplacer les conseils jusque là constitués par la partie mise en liquidation et que cette dernière s'y oppose. La République du Congo ne semble pas d'ailleurs contester sérieusement la compétence du Tribunal Arbitral pour examiner ainsi, de manière incidente, la régularité d'un jugement prononçant la faillite d'une des parties au litige.[25]

**218.** Cependant, la compétence du Tribunal Arbitral est limitée par sa raison d'être qui est d'apprécier les effets de la décision de faillite sur la procédure arbitrale. Comme l'a souligné le commentateur de l'arrêt de la Cour d'appel de Paris du 7 avril 2011 précité « *Le contrôle qu'il exerce* [l'arbitre] *sur le jugement étranger est uniquement lié à la possibilité, pour l'arbitre, de l'utiliser ou non en tant qu'élément déterminant la solution du litige qui lui est soumis.* »[26] Les demandes de Commisimpex relatives au jugement de mise en liquidation judiciaire du 30 octobre 2012 sont donc recevables et le Tribunal Arbitral est compétent pour les examiner, pour autant qu'elles portent sur les effets de ce jugement sur la procédure arbitrale. D'ailleurs, si les demandes de Commisimpex ne s'inscrivent pas dans ce cadre, on pourrait alors s'interroger sur leur recevabilité au regard des dispositions de l'article 19 du Règlement d'arbitrage, encore que la République du Congo n'ait pas invoqué cet argument.

**219.** Dans sa lettre du 22 novembre 2012 et lors de la conférence téléphonique du 28 novembre 2012, la République du Congo a fait valoir que si le Tribunal Arbitral devait

---

[24]     Revue de l'arbitrage 2011, no.3, pages 747 et s, Pièce R-RJ 79.
[25]     Voir n°211, supra.
[26]     Note S. Bollée sous Paris, 11 avril 2011, Pièce R-RJ 79, page 757, note 13.

décider d'instruire ces nouvelles demandes, un nouveau calendrier procédural devrait être établi qui permette *« aux parties de présenter dans un délai raisonnable leur argumentation sur la recevabilité et le bien-fondé de ces demandes de manière contradictoire et dans le respect de l'égalité des armes.»* La République du Congo souligne à cet égard que *« Contrairement à Commisimpex, l'Etat n'est pas partie à la procédure judiciaire de Brazzaville et ne dispose pas de tous les éléments de ce dossier ».*[27] Le Tribunal Arbitral ne peut accepter cette demande dépourvue de toute justification en fait et qui aurait pour effet, après la clôture des débats de retarder indûment le prononcé de la sentence arbitrale, ceci alors que la République du Congo a répété, à maintes reprises, qu'elle attendait la sentence et qu'elle n'entendait pas se prévaloir du jugement de mise en liquidation judiciaire de Commisimpex dans cette procédure et devrait donc être indifférente au sort des demandes de Commisimpex à son endroit, qui tendent à ce qu'il ne lui soit donné aucun effet dans cette procédure. Mais surtout, ces demandes ont été instruites de façon parfaitement contradictoire : à la suite de l'Ordonnance de Procédure no. 8 du 7 novembre 2012, Commisimpex a disposé d'un délai de 7 jours pour préciser ses demandes et les argumenter, ce qu'elle a fait par une lettre de 16 pages à laquelle la République du Congo a répondu le 22 novembre 2012 par une lettre de 18 pages, ayant bénéficié à sa demande d'une courte extension du délai fixé au 21 novembre 2012. Par la suite, les parties ont eu l'opportunité de développer et préciser leurs argumentations respectives lors de la conférence téléphonique du 28 novembre, à la lumière du contenu de la lettre du liquidateur du 19 novembre 2012, transmise au Tribunal Arbitral le 27 novembre. Quant à l'argument selon lequel la République du Congo connaîtrait moins bien que Commisimpex la procédure judiciaire de mise en liquidation, il n'est pas convaincant. Il n'est pas contesté que la CNSS est une organisation de l'Etat congolais, présidée de droit par le Ministre chargé de la Sécurité Sociale. Il n'est pas concevable que les plus hautes autorités de l'Etat n'aient pas été dûment tenues au courant d'une procédure visant à la liquidation judiciaire de Commisimpex, qui, par diverses procédures contre l'Etat, s'efforce d'obtenir l'exécution de la sentence arbitrale de 2000 et qui réclame par ailleurs à l'Etat des sommes supérieures à 500 millions d'euros dans la présente procédure où le Président de la République a déposé une déclaration de témoin. De plus, en exécution de l'Ordonnance de Procédure no. 7, comme le relève la République du Congo, le Ministère de la Justice et des Droits Humains a donné *« instruction au Parquet, placé sous son autorité, d'intervenir dans la procédure initiée par la Caisse Nationale de Sécurité Sociale («CNSS ») à l'encontre de Commisimpex devant le Tribunal de Commerce de Brazzaville.*[28]*»* Le Tribunal Arbitral en conclut donc que les parties, dans le respect de l'égalité des armes ont pu, de façon contradictoire, débattre des demandes de Commisimpex relatives à sa mise en liquidation judiciaire, la brièveté relative des délais étant justifiée par l'urgence. Le Tribunal Arbitral est donc en mesure de se prononcer sur ces demandes, dans les limites de sa compétence.

**220.** Dans sa demande 3, qui constitue la clé de voûte de toutes celles dont l'Ordonnance de Procédure no. 9 n'a pas disposées, Commisimpex demande au Tribunal Arbitral de constater le caractère abusif et frauduleux de la liquidation de Commisimpex. Commisimpex fournit nombre d'éléments troublant pour justifier sa demande, non contestés par la République du Congo pour l'essentiel :

-   La créance alléguée de la CNSS remonte à 1981;

[27] Lettre de la République du Congo du 22 novembre 2012, page 2.
[28] Lettre de la République du Congo du 22 novembre 2012, page 3.

- Par ordonnance du 28 septembre 2012, le Président du Tribunal de commerce de Brazzaville a fixé au 2 octobre 2012 (2 jours ouvrables) l'audience pour statuer sur le fond de la Requête datée du 26 septembre 2012, ordonnant à Commisimpex de produire sa défense « *huit jours au plus tard avant l'audience* »[29] ;

- Les conseils de Commisimpex ayant demandé un renvoi à un mois, seuls 8 jours lui ont été accordés, encore que l'audience ait été renvoyée au 9 octobre 2012, puis au 16 octobre;

- L'affaire a été plaidée le 23 octobre 2012 et le jugement de liquidation a été rendu le 30 octobre 2012.

- Ainsi, 34 jours se seront écoulés entre le dépôt de la Requête de la CNSS et le jugement de mise en liquidation de Commisimpex.

**221.** La République du Congo explique l'initiation de cette procédure environ 30 ans après la date de la créance alléguée en invoquant le risque de la prescription. Elle explique la procédure accélérée par le fait qu'il s'agissait d'une créance de salaires.[30] Ces arguments paraissent contradictoires car s'il y avait véritablement urgence compte tenu de la nature de la créance, on voit mal pourquoi elle n'a pas été réclamée plus tôt. On peut se demander, au contraire, si tant les procédures d'exécution de la sentence arbitrale de 2000 que l'imminence du prononcé de la sentence ne sont pas des explications plus probables de ce qui apparait comme une précipitation. Cependant, cette décision n'est pas définitive car frappée d'appel et, comme le relève à juste titre la République du Congo[31], il appartiendra à la Cour d'appel de Brazzaville d'en apprécier la régularité. Le Tribunal Arbitral n'a pas compétence pour le faire.

**222.** En revanche, le Tribunal Arbitral n'a pas besoin de se prononcer sur le caractère prétendument abusif et frauduleux de la liquidation de Commisimpex, comme cette dernière le lui demande, pour constater que lui reconnaitre des effets dans la présente procédure arbitrale ne répondrait pas aux exigences de l'ordre public international, ce pour quoi il est compétent.

Quand bien même la créance alléguée de 6.323.79, 920 FCFA (circ. US$12 millions) de la CNSS vis-à-vis de Commisimpex serait confirmée, l'Etat Congolais est débiteur de Commisimpex, à hauteur des montants auquel il a été condamné par la sentence de 2000 qui est définitive, le recours en annulation dont elle était l'objet ayant été rejeté par la Cour d'appel de Paris le 23 mai 2002. La République du Congo invoque l'autorité de la chose jugée de cette sentence dans la présente procédure. La créance certaine de Commisimpex à ce titre est de 165 416 012 millions d'Euros[32], soit plus de 10 fois supérieure à la créance alléguée par la CNSS. L'insolvabilité alléguée de Commisimpex n'a donc pour cause que le refus de la République du Congo d'exécuter une sentence arbitrale dont elle reconnait l'autorité de la chose jugée. Le Tribunal Arbitral ne peut accepter le cynisme dont elle fait preuve à cet égard lorsqu'elle écrit en note 29 de sa lettre du 22 novembre 2012 : « *Contrairement à ce que soutient Commisimpex, le fait qu'elle dispose d'une créance sur la République du Congo n'est pas de nature à remettre en cause sa cessation des paiements puisqu'une créance ne*

---

[29]  Pièce C-214.
[30]  Lettre de la République du Congo du 22 novembre 2012, page 14.
[31]  Lettre de la République du Congo du 22 novembre 2012, page 11.
[32]  Rapport Mazars du 7 janvier 2011, page 3, montants actualisés à cette date.

*peut être prise en compte dans l'actif disponible que dans des conditions strictes- en particulier des conditions de certitude et de perspectives réelle de recouvrement à cour terme – qui ne sont pas remplies ».* La République du Congo ne saurait être plus claire en reconnaissant que son refus de s'acquitter de ses obligations au titre de la sentence de 2000 suffit à expliquer la cessation de paiement alléguée de Commisimpex et la mise en liquidation judiciaire qui en découle. Il serait par conséquent contraire aux exigences de la bonne foi qui, comme l'a souligné la Cour d'appel de Paris dans son arrêt précité du 12 janvier 1993[33] participe de l'ordre public international, d'admettre que la mise en liquidation judiciaire de Commisimpex puisse avoir un effet dans la présente procédure arbitrale. La République du Congo semble d'ailleurs ne pas disconvenir de cette conclusion, sans pour autant en accepter les motifs, puisque le Ministère de la Justice a demandé au Parquet « *de faire le nécessaire pour éviter qu'une décision de mise en faillite ne soit prononcée avant la sentence à intervenir* [34]». Si ces efforts en exécution de l'Ordonnance de Procédure no. 7 n'ont pas abouti, le Tribunal Arbitral aime à croire que l'Ordonnance de Procédure no. 9 qui ordonne à la République du Congo de « *prendre toutes les mesures nécessaires pour que le statu quo entre les parties soit rétabli dans les plus brefs délais et en tout cas avant le prononcé de la sentence finale* » aura permis le rétablissement du status quo antérieur au jugement du 30 octobre 2012 lorsque la présente sentence sera notifiée.

**223.** Sur la base de ce qui précède, le Tribunal Arbitral se déclare incompétent pour statuer sur la demande 3 de Commisimpex mais déclare que les exigences de l'ordre public international s'oppose à ce que la mise en liquidation de Commisimpex ait des effets dans la présente procédure, accueillant la demande 4 de Commisimpex. En conséquence de quoi, il constate, comme lui demande Commisimpex dans sa demande 5, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex dans la présente procédure arbitrale.

**224.** Dans sa demande 6, Commisimpex demande que le Tribunal Arbitral ordonne à la République du Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de commerce de Brazzaville en date du 30 octobre 2012, devant le Tribunal Arbitral et/ou devant tout autre juridiction, judiciaire ou arbitrale. Cette prétention est superfétatoire en ce qui concerne le Tribunal Arbitral, en raison de la réponse donnée à la demande 4. Le Tribunal Arbitral doit se déclarer incompétent pour le surplus en ce qu'il ne lui appartient pas de se substituer aux autres juridictions qui pourraient être appelées à exécuter le jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012.

**225.** Dans sa demande 8, Commisimpex requiert la condamnation de la République du Congo au remboursement de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation. Le Tribunal Arbitral ne peut que rejeter cette demande car il n'a pas été établi que la procédure de liquidation ait été initiée par la Défenderesse à la présente procédure d'arbitrage.

**226.** Comme il a déjà été indiqué, l'Ordonnance de Procédure no. 9 du 30 novembre 2012 a déjà disposé des demandes 1, 2 et 7.

---

[33]   Revuc de l'arbitrage 1994, no. 4, pages 685 et s, Pièce C-RJ 142.
[34]   Lettre de la République du Congo du 22 novembre 2012, page 3.

- LE LITIGE ENTRE LES PARTIES

**227.** A titre principal, la société Commisimpex demande que le Tribunal Arbitral condamne :

*« Le Congo à payer les sommes dues au titre du Protocole de 2003, y compris (compte tenu de l'inexécution du Protocole de 2003 par le Congo) tous les intérêts dus sur ces sommes, après avoir tenu compte des montants accordés par la Sentence de 2000, soit au 7 janvier 2011 :*

- *3.247.161.007 francs français, soit 495.026.504 euros ;*
- *65.634.875 livres sterling ;*
- *105.820.227 dollars US ;*
- *3.253.937.125 francs CFA, payables en euros, soit 4.960.595 euros »[35].*

**228.** La République du Congo conclut, à titre principal, à l'irrecevabilité des demandes de Commisimpex en raison de l'autorité de la chose jugée attachée à la sentence arbitrale du 3 décembre 2000 rendue dans l'affaire CCI no. 9899. Dans sa sentence partielle du 20 août 2010, le Tribunal Arbitral a renvoyé au fond cette exception de chose jugée. Il l'examinera en premier lieu (A). Ce n'est que dans la mesure où il déciderait de la rejeter qu'il se prononcera sur la validité du Protocole de 2003 et son caractère contraignant, contestés par la République du Congo pour divers motifs (B). Si le Tribunal Arbitral constate la validité du Protocole de 2003, il se prononcera alors sur les montants dus à ce titre par la République du Congo à Commisimpex (C). Enfin il décidera de la répartition de la charge des frais de l'arbitrage (D).

A. Sur l'autorité de chose jugée de la Sentence CCI no. 9899 du 3 décembre 2000

**229.** La République du Congo à titre principal estime que :

*« la présente procédure n'aurait [...] pour objet que de remettre en cause le quantum, tel que déterminé par le Tribunal ayant rendu la Sentence no. 9899, de la dette née de l'exécution de ces mêmes marchés. En d'autres termes, ce que Commisimpex qualifie ici « d'autre partie de la dette » consisterait plus exactement en une amplification du montant de la dette née de l'exécution des contrats de marchés telle qu'arrêtée par les premiers arbitres. »[36]*

La République du Congo ajoute que :

*« les parties s'accordent sur le fait que l'intégralité des marchés conclus entre les parties et à l'origine de la créance de Commisimpex a été examinée dans le cadre de la Procédure CCI No. 9899 » et que « (...) le Tribunal No. 9899, après avoir jugé que les montants en résultant avaient fait l'objet d'une consolidation et d'une novation aux termes du Protocole de 1992, a, au point 1 de son dispositif, fixé le montant de la créance litigieuse (soit 288.634.078 FRF en principal, en octobre 1992).»*

---

[35]  Mémoire Après-Audience, 17 février 2012.
[36]  Mémoire sur la Compétence, paragraphes 98 et 99, page 32.

Elle en conclut qu'en raison de l'identité de cause et d'objet :

> « (...) toute demande de Commisimpex, qui, comme en l'espèce, vise au paiement d'une dette née des mêmes contrats de marché se heurte à l'autorité de chose jugée attachée à la Sentence CCI No. 9899 et est irrecevable. »[37]

**230.** Selon la Demanderesse :

> « (...) ce débat sur l'autorité de la chose jugée de la Sentence CCI n°9899 est tout d'abord sans pertinence : le Protocole de 2003, nouveau contrat conclu entre les parties postérieurement à la Sentence de 2000, justifie la prise en compte, dans le présent arbitrage, de l'ensemble de la dette globale du Congo envers Commisimpex et, ainsi, la recevabilité de l'ensemble des demandes de Commisimpex, sans que l'autorité de chose jugée de la Sentence de 2000 puisse lui être opposée. »[38]

Commisimpex précise ensuite que si l'autorité de la chose jugée de la sentence du 3 décembre 2000 devait être prise en considération, elle n'aurait qu'une portée limitée car ses demandes dans l'arbitrage no. 9899 portaient sur les montants dus au titre du Protocole de 1992 et non sur l'ensemble de la dette due par le Congo à Commisimpex ni sur les marchés sous-jacents.

**231.** Contrairement aux affirmations de la Défenderesse, il n'y a pas d'identité de cause et d'objet des demandes tranchées par la sentence du 3 décembre 2000 et de celles soumises au Tribunal Arbitral. Ces dernières sont exclusivement fondées sur le Protocole prétendument conclu entre les parties en 2003 et non pas sur le Protocole de 1992, fondement de la sentence arbitrale de 2000. Il est vrai que le texte du Protocole de 2003, dans sa description de la dette de la République du Congo, reprend un montant de 22 milliards de FCFA, « *objet du Protocole [de 1992]* » auquel il ajoute une « *deuxième partie* » de 26 milliards de FCFA mais il n'en résulte pas que les demandes de Commisimpex soient fondées, même partiellement, sur le Protocole de 1992. Elles sont fondées sur le Protocole de 2003 qui, s'il était reconnu valide, se substituerait au Protocole de 1992..

A cet égard, l'argumentation selon laquelle le Protocole de 2003 serait insusceptible de créer une situation juridique nouvelle parce qu'il s'agit d'une reconnaissance de dette n'est pas pertinent. Cette observation, juste s'agissant d'un acte unilatéral, ne l'est pas concernant un accord dans lequel deux parties conviennent ensemble que l'une doit à l'autre des montants déterminés. Quand bien même la dette ainsi constatée par les deux parties n'aurait pas d'existence préalable à l'accord, ce dernier peut la faire naître sa validité est reconnue, ce qui est en partie l'objet de la présente procédure. En effet, les parties peuvent d'un commun accord en établir la cause et, comme on l'a justement relevé, dans les contrats synallagmatiques, la cause découle de la nature même du contrat[39].

De plus, et de façon significative pour comprendre la position des parties, bien que le recours en annulation formé par la République du Congo et la CCA devant la Cour d'appel de Paris le 2 janvier·2001 ait été rejeté le 23 mai 2002, la sentence du 3 décembre 2000 n'a jamais été exécutée. Il n'y aurait donc rien de surprenant à ce que, tenant compte de cette situation de

---

[37] Mémoire en Duplique sur le Fond, para 325, pages 118 et 119.
[38] Mémoire en Réplique sur le Fond, para 514, page 225.
[39] Ph. Malaurie, L. Aynès, Droit Civil, Les obligations, 2eme Ed. 1990, n° 514, page 283.

fait, la République du Congo et Commisimpex, dans un nouveau protocole, aient réévalué la dette de la République et se soient accordées sur de nouvelles modalités de son règlement. L'autorité de la chose jugée de la sentence de 2000 ne saurait faire échec à la mise en œuvre par la voie arbitrale de ce nouvel accord. La Demanderesse tient d'ailleurs compte des sommes qui lui ont été allouées par la sentence de 2000 dans les calculs des sommes qu'elle prétend encaisser, reconnaissant par là-même l'autorité de la chose jugée de la sentence. Et si ce nouvel accord était inexistant ou dépourvu de validité, comme le prétend la République du Congo, pour, *inter alia*, défaut de cause ou toute autre raison, les demandes de Commisimpex ne seraient pas irrecevables mais devraient être rejetées. L'exception de chose jugée soulevée par la République du Congo ne peut donc prospérer et sera donc écartée par le Tribunal Arbitral.

### B.  Sur la validité du Protocole de 2003 et son caractère contraignant

**232.** Pour contester la validité du Protocole de 2003, qu'elle qualifie de frauduleux, la Défenderesse se fonde sur divers arguments que l'on peut regrouper en quatre grandes catégories : les premiers concernent l'absence de pouvoirs alléguée des signataires du Protocole pour engager la République du Congo (a), les seconds concernent l'absence alléguée de caractère contraignant du Protocole (b), les troisièmes concernent l'ignorance du montant de la créance tel que formulée par le Protocole de 2003 (c), et les derniers reposent sur le défaut allégué de cause du Protocole de 2003 du fait du montant erroné de la dette qu'il constate (d).

### a.   *Sur l'absence de pouvoirs alléguée des signataires du Protocole de 2003*

**233.** Selon la Défenderesse, les signataires du Protocole de 2003 n'avaient pas reçu d'habilitation du Président de la République, aucune délégation écrite n'ayant été versée au dossier.

**234.** Pour démontrer le contraire, la Demanderesse se fonde tout d'abord sur les termes mêmes du Protocole de 2003 qui mentionne l'existence d'une délégation de pouvoirs donnée à ses signataires par le Président de la République du Congo. Elle invoque également la théorie de l'apparence, renforcée par sa confirmation de la part de hautes autorités congolaises et le fait que le Protocole aurait reçu un début d'exécution de la part de l'administration congolaise.

**235.** Après un examen détaillé des positions respectives des parties ainsi que des pièces soumises par celles-ci au soutien de leurs prétentions respectives et des témoignages reçus, le Tribunal Arbitral conclut que quelles que soient les modalités de l'habilitation reçue par les signataires du Protocole de 2003 lors de sa signature, la République du Congo ne peut valablement invoquer l'absence de leurs pouvoirs pour en contester la validité.

**236.** S'il est vrai que la Demanderesse n'a pas produit de déclaration écrite du Président de la République qui autoriserait expressément les signataires du Protocole de 2003 à le signer pour lui et en son nom, le Tribunal Arbitral est convaincu que Messieurs Longobé et Okemba disposaient bien d'une telle habilitation, au vu d'un faisceau d'indices qui ne laisse aucune place au doute.

**237.** On constate tout d'abord que les deux signataires, MM. Longobé et Okemba, étaient des personnalités très proches du Président de la République. M. Longobé était le Secrétaire Général de la Présidence de la République et M. Okemba, Secrétaire d'Etat, Secrétaire Général du Conseil de Sécurité et de surcroit neveu du Président[40]. Or, ils n'ont pas hésité à déclarer expressément dans le Protocole de 2003 qu'ils agissaient « *sur délégation de Monsieur le Président de la République, son Excellence Monsieur Denis SASSOU NGUESSO et ayant pouvoir à cet effet* ». Il est peu crédible que de telles personnalités auraient fait, par écrit, une telle déclaration si elle avait été inexacte. D'ailleurs, dans son attestation du 6 mai 2011, M. Longobé ne dit nullement qu'il n'agissait pas sur délégation du Président de la République lorsqu'il a signé le Protocole de 2003. L'essence de son témoignage est qu'il ne s'agissait pas d'un protocole définitif mais d'un protocole de négociation et que « *seul un accord définitif conclu par le Ministre des Finances serait de nature à engager les deniers de l'Etat* [41]» car il n'avait pas autorité pour le faire. Il a confirmé, en la nuançant, cette affirmation à l'audience en déclarant qu'il n'avait pas excédé le pouvoir qui lui avait été donné mais que les solutions du Protocole de 2003 ne s'appliqueraient qu'à la condition qu'elles soient approuvées par les autorités compétentes, en l'espèce le Ministre des Finances[42].

**238.** L'habilitation de MM. Longobé et Okemba se trouve confirmée par de nombreux éléments. Il convient en premier lieu de rappeler que l'existence du Protocole n'a jamais été tenue secrète, bien au contraire. En effet, peu de temps après la date de conclusion de celui-ci (23 août 2003), M. Hajaij, par courriers des 29 décembre 2003 et 8 janvier 2004[43], s'adressant respectivement au Ministre d'Etat Secrétaire du Conseil Général de Sécurité et au Ministre de l'Economie, des Finances et du Budget, a rappelé la conclusion de celui-ci et demandé son exécution dans les termes suivants :

> « *Enfin, il nous échoit de rappeler qu'à la date du 31 décembre 2003, toutes les actions décrites à l'article 6 du protocole auraient dues être réalisées. Ce qui n'est pas le cas au 08/01/2004 (...). En désespoir de cause, nous nous sommes une fois de plus tourné vers Son Excellence Monsieur le Président de la République, qui nous a instruis verbalement le 6 janvier 2004, de vous relancer directement en vue de la mise en œuvre du protocole du 23 août 2003, objet de notre requête de ce jour* » se référant également à un souhait de « *concrétisation de l'accord conclu à l'amiable* »[44].

Par une lettre du 16 février 2004[45], M. Hajaij s'est également adressé au Ministre d'Etat, des transports et de la Privatisation afin de solliciter l'exécution de l'article 4 point 2 du Protocole

---

[40]   Attestation de M. Hajaij du 4 août 2011, n°68 p. 17.
[41]   Attestation de M. Longobé du 6 mai 2011, page 2.
[42]   Transcript de l'audience du 21 décembre 2011, page 13.
[43]   Pièces C28 et C29.
[44]   Pièce C29.
[45]   Pièce C33.

c'est-à-dire le remboursement de 20 milliards de FCFA sous forme de privatisation d'entreprises.

**239.** Par courrier du 30 janvier 2004[46], M. Mouko, Directeur de cabinet du Ministère à la Présidence, chargé du Contrôle d'Etat, répondant à une lettre de M. Hajaij du 6 janvier 2004, a accusé réception du Protocole de 2003 transmis par M. Hajaij, se félicitant :

> « *de la prise en compte de son travail* [celui du Ministère à la Présidence] *par la signature du protocole d'accord du 23 août 2003 qui a reconnu l'arrêt des comptes au 30 septembre 1992 à la somme de 960.000.000 Francs Français, soit un équivalent de 48.000.000.000 FCFA dont 26.000.000.000 FCFA au profit de COMMISIMPEX SA et 22.000.000.000 FCFA pour le compte de la banque SARADAR, d'une part, et d'autre part le protocole d'accord no. 566 du 14 octobre 1992 (...)* ».

Ainsi, en sus de confirmer l'existence du Protocole de 2003, cette lettre fait état de la créance de Commisimpex d'un montant de 48 millions FCFA arrêtée au 30 septembre 1992, sans la discuter en aucune façon.

De même, par lettre du 5 février 2004[47], M. Yoka, Ministre Directeur de Cabinet, a transmis au Ministre de l'Economie, des Finances et du Budget, « *pour compétence* » copie du Protocole de 2003 insistant sur le fait que :

> « *Le chef de l'Etat attache un intérêt particulier à l'exécution des clauses contenues dans ledit protocole d'accord afin, d'éviter à notre pays tout autre procédure judiciaire, et de geler aussi la garantie irrévocable donnée à cette société en date du 22 décembre 1986.* »

**240.** Il ne fait donc aucun doute que quelques mois après la signature du Protocole, les différents ministères concernés, Ministre d'Etat Secrétaire du Conseil Général de Sécurité, Ministre de l'Economie, des Finances et du Budget, Ministre d'Etat, des transports et de la Privatisation et le Directeur de cabinet du Ministère à la Présidence, chargé du Contrôle d'Etat, avaient été informés de l'existence et du contenu de ce Protocole et étaient invités à l'exécuter.

**241.** En outre, comme l'atteste une Note du département juridique et administratif du cabinet à la Présidence du 30 avril 2004[48], destiné au Président de la République directement, le Protocole avait, en réalité, été transmis au Ministre des Finances dès le 29 décembre 2003, celui-ci recevant du Ministre Directeur de Cabinet les 5 janvier et 15 mars 2004, des rappels de « *la nécessité et l'intérêt pour le pays d'exécuter ledit protocole d'accord* ». A cet instant précis, le Ministre des Finances n'a émis de réserves formelles ni sur la délégation de pouvoirs ni sur une quelconque obligation de sa part de valider le Protocole.

**242.** En tout état de cause, le Président de la République, M. Sassou N'Guesso avait été, si tel n'avait pas été le cas plus tôt, ce qui est très improbable, informé à ce stade de l'existence « *d'un protocole d'accord de règlement à l'amiable entre les deux parties* » et loin de s'indigner de l'existence d'un accord non signé par ses soins, s'était contenté de faire

---

[46]   Pièce C30.
[47]   Pièce C32.
[48]   Pièce C35.

remarquer qu'il lui faudrait « *interroger le Ministre des Finances, ce dernier m'ayant une fois fait rapport des contacts directs qu'il a avec les responsables de COMMISIMPEX* ».

**243.** Ainsi, très peu de temps après la signature du Protocole de 2003, ni le Président de la République, ni le Ministre des Finances n'ont mis en doute la validité du Protocole de 2003 et n'ont émis aucune remarque formelle quant à la procédure suivie pour sa signature. Le Tribunal Arbitral est convaincu que si ces signatures n'avaient pas été valables et si le Président de la République ou le Ministre des Finances avait ignoré l'existence d'un tel accord au moment de sa conclusion, ils auraient manifesté formellement et publiquement leur surprise, voire leur mécontentement ou leur opposition au plus tôt, les enjeux de cet accord étant trop importants pour rester silencieux.

**244.** De surcroît, très rapidement après la conclusion du Protocole de 2003, il a été question de son exécution par la République du Congo que ce soit par ses représentants ou par les signataires du Protocole. En effet, par courrier du 4 mars 2004[49], le Ministre d'Etat, Monsieur Isidore Mvouba, a accusé réception de la copie du Protocole et, se fondant sur la disposition relative à la privatisation d'entreprises prévue dans le Protocole, a fourni une liste d'entreprises au Président Directeur Général de Commisimpex, en mentionnant cependant que « *la loi cadre sur la privatisation exclut toute forme de compensation* ».

**245.** De même, par courrier du même jour[50], le Directeur Général de la CCA, Monsieur Georges Nguekoumou, après avoir rappelé les termes du Protocole et les modalités de remboursement de la dette, a souligné que « *la CCA n'a pas encore reçu les fonds nécessaires à la constitution du dépôt bancaire de 6 milliards de F CFA* » qui correspondait à une partie des 26 milliards que l'Etat devait rembourser par cette voie.

**246.** De façon encore plus significative, les signataires du Protocole ont eux-mêmes sollicité des diverses autorités étatiques l'exécution du Protocole. Monsieur Longobé, dès le 15 janvier 2004[51], a en effet insisté auprès du Ministre de l'Economie, des Finances et du Budget afin qu'il accepte :

> « *(...) de (...) recevoir Monsieur HODJEIJ, Représentant de COMMISIMPEX et d'arrêter avec lui les principales modalités d'application du protocole d'accord de négociation du 23 août 2003* » et ce « *tenant compte des contraintes résultant des garanties données par l'Etat Congolais et, considérant la nécessité d'éviter d'autres complications notamment avec la Banque SARADAR* ».

Ces propos confirment bien que le Protocole de 2003 était connu des plus hautes autorités qui avaient l'intention de le mettre en œuvre.

**247.** Ceci est d'ailleurs rappelé par Monsieur Okemba par lettre du 29 novembre 2003[52] à l'attention du Ministre de l'Economie des Finances et du Budget indiquant :

> « *(...) il vous est demandé d'organiser la mise en œuvre de cet accord en relation avec COMMISIMPEX ainsi qu'avec d'autres départements ministériels concernés.* »

---

[49]    Pièce C69.
[50]    Pièce C70.
[51]    Pièce C59.
[52]    Pièce C163.

**248.** De même, Monsieur Okemba a indiqué au Ministre d'Etat, chargé de la coordination gouvernementale, Ministre des Transports et des Privatisations que :

> « *dans le cadre de la mise en œuvre dudit protocole, avons-nous l'honneur de vous le transmettre, pour compétence, dans la mesure où un élément de celui-ci intéresse éventuellement la privatisation.* » [53]

**249.** Enfin, par une lettre commune de MM. Longobé et Okemba du 29 mars 2004[54], ceux-ci demandaient au Ministre de l'Economie, des Finances et du Budget « *de bien vouloir consolider les acquis du protocole d'accord du 23 août 2003* ».

**250.** L'ensemble de ces correspondances prive de toute portée l'observation de la Défenderesse selon laquelle :

> « *(...) l'absence de réponse circonstanciée aux allégations contenues dans le flot de courriers intempestifs adressés par Commisimpex, aux fins de se ménager des preuves a posteriori, ne constitue pas une preuve de la véracité de ces allégations* »

Il en de même lorsqu'elle ajoute que :

> « *les allégations de Commisimpex ne permettent donc pas de remettre en cause l'affirmation du Président de la République lorsqu'il atteste n'avoir pas donné de délégation pour signer le Protocole de 2003* ».[55]

**251.** Le Tribunal Arbitral constate en effet qu'il n'est pas nécessaire de se fonder sur des courriers de Commisimpex pour conclure que les plus hautes autorités congolaises s'estimaient liées par le Protocole de 2003, sans qu'il soit besoin de s'interroger sur la volonté de Commisimpex de se « *ménager des preuves a posteriori* ». Les lettres contemporaines de l'administration congolaises sont en effet suffisantes et rendent bien peu crédibles les affirmations du Président Sassou N' Guesso dans ses lettres des 6 mai et 27 octobre 2011[56], intervenant huit ans plus tard, selon lesquelles il n'aurait pas donné instruction d'exécuter le Protocole de 2003. Il est invraisemblable qu'autant de représentants de l'Etat Congolais aient pu agir à son insu et que, ayant nécessairement eu connaissance de leurs actions, il n'y ait pas immédiatement mis fin si le Protocole avait été signé sans autorisation de sa part. Il est à cet égard regrettable qu'il se soit abstenu de venir témoigner à l'audience, ce qui s'oppose à ce que le Tribunal Arbitral tire une quelconque conséquence de son attestation écrite.

**252.** A cet égard, l'argumentation de la République du Congo selon laquelle Commisimpex ne pourrait se prévaloir d'aucune ratification ultérieure d'une délégation inexistante est inopérante. La Défenderesse soutient en effet qu'une ratification « *ne peut être invoquée que dans deux hypothèses : (i) une ratification expresse par le mandant, qui reprend à son compte les engagements pris par le mandataire en dépassement de ses pouvoirs, ou (ii) une ratification implicite mais non équivoque* » ajoutant que la ratification doit « *émaner du*

---

[53] Pièce C167.
[54] Pièce C179.
[55] Mémoire en Défense sur le Fond, paras 242 et 243, pages 80 et 81.
[56] Pièces R 55 et R92.

*mandant lui-même* »[57]. Mais, comme indiqué, le Tribunal Arbitral est convaincu de la réalité de l'existence de la délégation contestée en raison du faisceau d'indices mentionnés ci-dessus. Aucune ratification n'est donc nécessaire. De plus, s'il est certain que le Président de la République n'a pas ratifié de façon expresse le Protocole de 2003, il apparait à la lumière des documents précédemment évoqués et notamment de la pièce C35 où était conseillé d'exécuter le dit protocole, que le Président de la République l'a ratifié puisqu'il n'a manifesté aucune surprise concernant l'existence du Protocole, n'a pas objecté à son contenu et s'est contenté d'indiquer qu'il fallait « *interroger le Ministre des Finances* » non pas sur le Protocole lui-même mais apparemment sur son exécution.

**253.** Compte tenu de ce qui précède, le Tribunal Arbitral rejette la demande de la République du Congo de juger nul le Protocole de 2003 pour défaut de pouvoir de ses signataires.

### *b. Sur l'absence alléguée de caractère contraignant du Protocole de 2003*

**254.** Pour contester le caractère contraignant du Protocole de 2003, la République du Congo invoque deux types d'arguments qui se nourrissent mutuellement. Le premier, déjà évoqué à l'occasion du rappel du témoignage de l'un de ses signataires, M. Longobé, est que le Protocole ne reflétait pas un accord définitif mais un Protocole de négociations, dans lequel « *l'Etat s'engageait simplement à négocier pour rechercher un accord sur le montant de la dette à rembourser et le paiement échelonné* ».[58] Selon M. Longobé, on l'a vu, les pouvoirs délégués aux signataires du Protocole de 2003 ne les autorisaient qu'à rechercher des pistes de négociation destinées à être ensuite conduite par le Ministre des Finances qui pourrait éventuellement engager l'Etat dans un accord définitif.[59] Mais, la République du Congo prétend également que quand bien même les signataires auraient effectivement bénéficié d'une délégation de pouvoirs leur permettant d'aller au-delà de la définition d'éléments de négociation, le Protocole aurait du recevoir le contreseing du Ministre des Finances pour engager l'Etat, comme le prescrirait la loi n° 1-2000 du 1er février 2000 portant loi organique relative au régime financier en son article 74 qui dispose que :

> « *Tout décret, toute convention, et d'une manière générale, toute mesure, de quelque nature qu'elle soit, susceptible d'engager les finances publiques, est revêtu du contreseing du ministre des finances* ».

**255.** Ces arguments de la République du Congo, bien qu'étroitement liés, soulèvent deux problèmes distincts. La République du Congo a-t-elle, dans le Protocole de 2003 pris des engagements fermes qui vont au-delà d'un accord sur des bases de négociation ? Dans l'affirmative, ces engagements sont-ils définitifs et contraignants faute du contreseing du Ministre des Finances ?

**256.** Le Tribunal Arbitral note que bien que le Protocole de 2003 soit intitulé « PROTOCOLE D'ACCORD DE NEGOCIATIONS ENTRE L'ETAT DU CONGO ET LA SOCIETE COMMISIMPEX S.A. », il présente toutes les apparences d'un contrat créateur de droits et d'obligations pour les parties par les termes employés, qui tendent, principalement, à

---

57 Mémoire en Défense sur le Fond, para 305, page 97.
58 Attestation de M. Longobé du 6 mai 2011, page 2.
59 Attestation de M. Longobé du 6 mai 2011, page 2.

lui conférer force obligatoire. Il précise qu'il est le résultat de « *négociations engagées le 27 mai 2003 à Brazaville* » entre les parties « *à propos de la dette du Congo à l'égard de la société COMMISIMPEX* »[60] ce qui parait justifier son titre de Protocole d'accord de négociations. Les négociations ne sont pas à venir, elles sont passées et le Protocole acte leur résultat. Sur cette base, les deux parties « *conviennent* »[61] des caractéristiques et du montant de la dette du Congo, lequel « *reconnait que la dette de 960.000.000 FRF* » a été partagée aux termes de deux réunions des 7 et 23 septembre 1992[62]. Ensuite, il est indiqué que les parties « *ont* (sic) *convenu* » un certain nombre d'engagements fermes rédigés en termes contraignants :

- « *Article 1-l'Etat du Congo prend à sa charge, la dette de la société COMMISIMPEX, et celle du groupe et famille Hojeij (...)* ;

-*Article 2-l'Etat du Congo s'engage à négocier directement avec la banque SARADAR (...)* ;

-*Article 3- l'Etat du Congo s'engage à rembourser à la société COMMISIMPEX, la somme en principal de 520 millions de FRF (...)* ;

-*Article 4- l'Etat du Congo s'engage à régler à la société COMMISIMPEX, la somme de 520.000.000 FRF (...)*

**257.** Le Tribunal Arbitral ne peut donc que conclure que le Protocole de 2003 a un contenu obligatoire pour la République du Congo que son Article 6 ne suffit pas à supprimer. Cet article se lit comme suit :

« *l'Etat du Congo s'engage, d'ici au 30 décembre 2003 :*

- A mettre en place la garantie du moratoire visée à l'alinéa 3 de l'Article 4 ci-dessus,
- A signer les actes de cession des entreprises visées à § 4 alinéa 2
- A finaliser les négociations avec la Banque SARADAR, visées à l'Article 2 ci-dessus,
- Et à conclure avec la société COMMISIMPEX, un Protocole d'Accord Définitif en remplacement du présent Protocole, pour clore les négociations en cours ».

**258.** En effet, cette référence à un protocole d'accord définitif ne remet pas en cause le caractère obligatoire et contraignant du Protocole de 2003. Il s'agit comme le précise d'ailleurs l'article 6 d'un document de « clôture » constatant la réalisation d'un certain nombre d'actions de mise en œuvre d'obligations contenues dans le Protocole de 2003.

**259.** En outre, ainsi qu'il a été noté ci-dessus, les hautes autorités congolaises ne s'y sont pas trompées lorsqu'elles ont indiquées que la Présidence de la République « *a reconnu l'arrêt des comptes au 30 septembre 1992 à la somme de 960.000.000 Francs Français*»[63], et que « *Le chef de l'Etat attache un intérêt particulier à l'exécution des clauses contenues dans*

[60] Pièce C27 : Protocole de 2003, pages 1 et 2.
[61] Pièce C27 : Protocole de 2003, page 2.
[62] Pièce C27 : Protocole de 2003, page 2.
[63] Pièce C30.

*ledit protocole d'accord ».[64]* Il en est de même lorsque le département juridique et administratif du cabinet de la Présidence, le 30 avril 2004[65] décrivait au Président de la République le Protocole de 2003 comme un « *protocole de règlement à l'amiable entre les deux parties* » et lui recommandait « *d'instruire le Ministre des finances afin qu'il exécute les engagements pris».* Que ce document fût signé par procuration ne change rien à la qualification qu'il donne au Protocole de 2003.

**260.** De même, la République du Congo ne peut opposer à la Demanderesse les dispositions de l'article 74 la loi n° 1-2000 du 1er février 2000 portant loi organique relative au régime financier. Ce texte, au contenu très général qui indique effectivement que toute mesure, quelle qu'elle soit, « *susceptible d'engager les finances publiques* » doit être revêtue du contreseing du Ministre des Finances, apparaît comme une règle administrative applicable à l'autorisation du paiement attaché à une décision et non pas comme une règle applicable à la validité de celle-ci. Le fait qu'elle concerne un décret aussi bien qu'une convention le confirme. S'il en allait autrement, le Ministre des Finances et non pas le Président de la République serait la plus haute autorité de l'Etat et le seul à disposer d'un pouvoir effectif. Ce n'est évidemment pas le cas. Le Ministre des Finances reçoit des instructions du Chef de l'Etat, comme l'illustre la note précitée du 30 avril 2004[66] du département juridique et administratif du cabinet de la Présidence recommandant au Président de la République « *d'instruire le Ministre des finances afin qu'il exécute les engagements pris»* dans le Protocole de 2003. D'ailleurs, le Protocole de 2003 ne contient aucune mention relative à la nécessité d'un contreseing du Ministre des Finances et aucun des représentants de la République du Congo n'a fait allusion à une telle nécessité à l'époque.

**261.** Enfin, quand bien même le Tribunal Arbitral n'aurait pas constaté sur la base des preuves contemporaines fournies tant l'existence des pouvoirs des signataires du Protocole de 2003 pour engager la République du Congo que le caractère contraignant de ce Protocole, il ne pourrait que suivre la Demanderesse lorsqu'elle souligne que :

> « *le comportement du Congo a créé chez Commisimpex une croyance légitime dans les pouvoirs et le champ de la mission des signataires du Protocole* » et que « *la légitimité de cette croyance fut ultérieurement confirmée par l'Avis Juridique signé par les deux plus hauts magistrats congolais et concluant à la validité du Protocole de 2003 ».[67]*

**262.** En effet, l'argumentation de la République du Congo selon laquelle Commisimpex ne peut se fonder sur la théorie de l'apparence car elle n'aurait pas « *démontrer de manière cumulative, d'une part, qu'elle pouvait légitimement croire que les signataires du Protocole de 2003 avaient reçu pouvoir de signer ledit Protocole, d'autre part, qu'elle pouvait légitimement croire que l'intervention du Ministre des Finances- avec lequel Commisimpex a signé tous les actes portant sur le règlement de sa créance depuis vingt ans- n'était pas requise »[68]* n'est pas pertinente.

**263.**Tout d'abord, si comme le soutient la Défenderesse, l'apparence doit se vérifier au moment de la conclusion du Protocole, il est indéniable que le Protocole indiquait que MM.

[64] Pièce C32.
[65] Pièce C35.
[66] Pièce C35.
[67] Mémoire Après-Audience de Commisimpex du 17 février 2012, para 16, page 5.
[68] Mémoire en Duplique de la République du Congo du 15 novembre 2011, para 544, page 49.

Longobé et Okemba agissaient sur « *délégation de Monsieur le Président de la République* ». C'est donc pourquoi la Défenderesse conteste la légitimité de la croyance de Commisimpex dans cette apparence. Mais, à moins d'admettre, que la fraude alléguée par la Défenderesse ne se soit pas limitée aux signataires du Protocole et à la Demanderesse, ce que la Défenderesse ne suggère pas, on ne peut douter de la légitimité de la croyance en la validité du Protocole manifestée par de nombreuses autorités congolaises et notamment celles qui lui ont donné un début d'exécution.

**264.** Le caractère légitime de la croyance de Commisimpex en la validité du Protocole de 2003 a trouvé une autre confirmation dans l'Avis Juridique du 7 juillet 2004, signé par M. Lenga, agissant en qualité de Premier Président de la Cour Suprême et, cosigné par Monsieur Henri Bouka, Vice-Président de la Cour Suprême, saisi sur demande du Secrétaire général de la Présidence de la République. Cet avis rapporte que :

> « *Monsieur LONGOBE et Monsieur Jean Dominique OKEMBA ont reçu de Monsieur le Président de la République la mission de négocier et de signer avec COMMISIMPEX S.A (...) le Protocole d'Accord de négociation* » et qu'en droit congolais « *l'habilitation même verbale donnée par le Chef de l'Etat lie irrévocablement l'Etat Congolais quant aux engagements pris par les Plénipotentiaires sauf si le Président de la République venait à contester le pouvoir prétendument donné, ce qui n'est pas le cas en l'espèce* ».

Il est donc ainsi confirmé qu'une habilitation orale des signataires du Protocole était suffisante et que les obligations découlant du Protocole de 2003 sont des engagements irrévocables de l'Etat congolais.

**265.** Il est vrai qu'en date du 25 février 2011, dans une lettre adressée aux conseils de la République du Congo dans la présente procédure[69], Monsieur Lenga n'a pas hésité à expliquer avoir établi un « *avis juridique de circonstance* », « *rendu par bienveillance* ». Il y indique que le Protocole de 2003 « *pour autant qu'il engage les finances publiques, aurait dû être conclu avec le contreseing du Ministère des Finances, comme cela avait d'ailleurs été le cas pour le protocole de 1992 sur lequel mon avis avait été sollicité à l'époque* ». Cette lettre est pour le moins étonnante car M. Lenga y affirme que c'est :« *(...) en tenant compte de la sociologie du milieu que j'ai rendu cet avis juridique, à titre personnel, la Cour Suprême ne pouvant pour sa part émettre des avis que dans des cas bien précis prévus par la loi portant organisation de la Cour suprême* ».

**266.** Ni la lettre de M. Lenga ni les conclusions qu'en tire la Défenderesse ne sont convaincantes. Dans sa lettre du 25 février 2011, M. Lenga précise avoir :

> « *(...) rédigé cet avis juridique allant dans le sens qui m'* [lui] *était demandé par le Secrétaire Général de la Présidence et Monsieur Hojeij, ami du Congo, pour leur rendre service* ».[70]

**267.** Ceci incite à apprécier la crédibilité qu'il faut attacher à ses déclarations avec la plus grande précaution. Par exemple, si l'approbation du Ministre des Finances était nécessaire, comme il l'affirme dans sa lettre de 2011, on voit mal pourquoi il ne l'a pas mentionné dans l'Avis Juridique et a préféré que le Protocole lie irrévocablement l'Etat congolais.

---

[69]     Pièce R54.
[70]     Pièce R54.

**268.** Sa justification selon laquelle :

> « *j'ai cependant considéré pouvoir soutenir que le protocole engageait l'Etat dans la mesure où il était un protocole de négociation et qu'il devait, comme me l'avait affirmé M. Longobé, faire l'objet d'actes définitifs ultérieurs conclus avec l'intervention du Ministre des Finances* »

ne convainc pas, en ce qu'elle se concilie mal avec la notion d'engagement irrévocable contenue dans l'Avis Juridique.

**269.** Le Tribunal Arbitral peut à juste titre s'interroger sur la date à laquelle M. Lenga s'est exprimé avec sincérité. Contrairement à la République du Congo qui estime que l'Avis Juridique : « *(....) ne peut toutefois fonder une quelconque apparence dans les pouvoirs des signataires du Protocole de 2003, d'une part, parce qu'elle a été réalisée sur commande comme l'a confirmé M. Lenga, d'autre part, parce qu'elle a été établie après le Protocole de 2003 (...)* »[71], le Tribunal Arbitral considère qu'un Avis Juridique établi moins d'un an après la signature du Protocole, à une époque où aucune autorité congolaise n'en contestait la validité et l'efficacité, est plus crédible qu'une lettre adressée environ sept ans après les faits, pour les besoins d'une procédure arbitrale. Quoi qu'il en soit, la République du Congo ne peut se soustraire à cet avis, après l'avoir sollicité, par l'intermédiaire du Secrétaire Général de la Présidence de la République, simplement parce que sept ans après, il lui serait défavorable.

**270.** Mais surtout, quel que soit la sincérité de l'Avis Juridique, le fait que le Président et le Vice-président de la Cour Suprême n'aient pas hésité à l'établir, alors de surcroit que ces deux hauts magistrats avaient participé au rendu de l'arrêt de la Cour suprême du 27 juin 2003[72] traitant de la créance de Commisimpex, ne peut que confirmer la légitimité de la croyance de Commisimpex en la validité du Protocole de 2003. Lorsque deux hautes autorités judiciaires congolaises confirment par écrit qu'un Protocole signé par le Secrétaire Général de la Présidence de la République et Secrétaire d'Etat, Secrétaire Général du Conseil de Sécurité, lie irrévocablement la République du Congo et que de hautes autorités se comportent comme si tel était bien le cas, on voit mal pourquoi Commisimpex aurait douté de la validité du Protocole.

**271.** En soulignant que «*le comportement du Congo a créé chez Commisimpex une croyance légitime dans les pouvoirs et le champ de la mission des signataires du Protocole* [73]» d'où résulterait aussi l'engagement de la République du Congo, Commisimpex vise en réalité dle principe bien connu de l'estoppel ou plus communément en droit français de l'interdiction de se contredire au détriment d'autrui. Sur la base de ce principe, la République du Congo ne pouvait donner l'apparence qu'elle avait conclu valablement le Protocole de 2003 et soudainement alléguer qu'il est invalide lorsqu'il s'agissait de l'exécuter. De même, l'article 1.8 des principes UNIDROIT dispose qu' « *une partie ne peut agir en contradiction avec une attente qu'elle a suscitée chez l'autre partie lorsque cette dernière a cru raisonnablement à cette attente et a agi en conséquence à son désavantage* ». En tout état de cause, c'est une

---

[71] Mémoire Après-Audience de la République du Congo du 17 février 2012, para 139, pages 49 et 50.
[72] Pièce C26.
[73] Mémoire Après-Audience de Commisimpex du 17 février 2012, para 16, page 5.

position constante de la jurisprudence française[74] qui considère qu'une partie ne peut, sur le fondement du principe de la bonne foi, adopter successivement des positions contradictoires.

**272.** Ayant jugé que l'approbation du Ministère des Finances n'était pas nécessaire, le Tribunal Arbitral rejette la demande de la République du Congo que soit déclaré, sur ce fondement, nul le Protocole de 2003.

   c.   *Sur l'ignorance du montant de la créance tel que présenté dans le Protocole de 2003*

**273.** Au surplus, la République du Congo ne peut invoquer l'ignorance qu'auraient eu ses représentants de la créance de Commisimpex dans la mesure où celle-ci avait été discutée dans de nombreux documents dont notamment:

-    la Fiche à la plus haute attention de Monsieur le Ministre de l'Economie, des Finances et du Plan par la CCA de juin 1991[75];

-    la Note à l'attention de Monsieur le Ministre du Plan, des Finances et de l'Economie par la CCA de juin 1991[76] ;

-    la Fiche de calcul détaillée de 1991[77] par la CCA qui a évalué la créance de Commisimpex en 1986 à 29.949.284.818 FCFA ;

-    le Protocole de 1992 ;

-    le rapport Ricol du 14 avril 2000 produit dans le cadre de l'arbitrage CCI no. 9899[78] ;

-    le rapport du cabinet Mazars du 26 janvier 2000 ;

-    la Sentence du 3 décembre 2000 ;

-    le rapport de Ernst & Young du 25 septembre 2001 ;[79]

-    les décisions du Président du Tribunal de Commerce de Brazzaville[80], l'arrêt de la Cour d'Appel de Brazzaville du 12 juillet 2002[81] et l'arrêt de la Cour Suprême du 27 juin 2003[82].

**274.** Il est vrai que ces différents documents n'évaluent pas tous le montant de la créance de Commisimpex de façon identique. Il n'en reste pas moins que l'existence de cette créance

---

[74]   Cass. Com., 8 mars 2005, RDC 2005, obs. D. Mazeaud ; Cass. Civ. 1ere , 6 juillet 2005, Rev. arb. 2005, page 993 , note Ph. Pinsolle.
[75]   Pièce R81.
[76]   Pièce R82.
[77]   Pièce C98.
[78]   Pièce R27.
[79]   Pièce C17.
[80]   Pièce C20.
[81]   Pièce C24.
[82]   Pièce C26.

était admise et connue de tous et que son montant avait été longuement débattu. Les plus récents mentionnent le montant qui sera retenu dans le Protocole de 2003. C'est donc en parfaite connaissance de cause que les représentants de la République du Congo ont signé en 2003 le Protocole et ont accepté le montant y figurant. En effet, la différence entre le montant figurant dans le Protocole de 2003 et les montants de la créance tels que mentionnés dans les divers documents antérieurs est significative : le Protocole de 2003 vise une créance supplémentaire de l'ordre de 26 milliards de FCFA. Il ne fait aucun doute que les représentants du Congo n'ont pu ignorer cette différence substantielle quant à l'expression du montant de la dette de Commisimpex. En tout état de cause, il n'existe aucune trace contemporaine de contestation par les autorités congolaises de ce montant après la conclusion du Protocole de 2003 bien que celles-ci, y compris le Président de la République, avaient bien été informées de la créance et de son montant, comme rappelé précédemment.

**275.** C'est pourquoi l'argumentation de la République du Congo selon laquelle le consentement des signataires du Protocole aurait été vicié car ceux-ci auraient été trompés sur le montant de la dette et la nature même du Protocole n'est pas convaincante. Comme indiqué ci-avant, la Défenderesse ne peut fonder son raisonnement sur une prétendue ignorance du montant de la dette dans la mesure où, comme on l'a vu, de nombreux documents antérieurs faisaient état de cette dette. Il apparaît dès lors très douteux que M. Longobé qui indique avoir participé à des « *discussions* » ait accepté de signer le Protocole de 2003 en ignorant « *les montants de la dette* » et sans procéder à aucune vérification du montant mentionné et ce alors qu'il indique que « *comme cela ressort du protocole d'accord de négociation lui-même, [que] l'Etat s'engageait simplement à négocier pour rechercher un accord sur le montant de la dette à rembourser et le paiement échelonné* »[83] (soulignement ajouté par le Tribunal Arbitral). En effet, si le but ultime des négociations était que les parties trouvent un accord sur le montant de la dette, le montant indiqué dans le Protocole de 2003 ne pouvait être sans importance. De plus, si le consentement de M. Longobé avait été surpris par l'erreur, il serait incompréhensible que lui-même et différentes autorités congolaises aient plaidé pour l'exécution du Protocole de 2003 pendant une longue période après la date de sa signature, alors que les uns et les autres avaient eu tout le temps de s'informer mieux sur l'existence de la créance et son montant.

**276.** Le Tribunal Arbitral conclut donc qu'en raison de l'information dont elle disposait la République du Congo ne peut avoir été trompée sur le montant de la dette, ce que confirme son absence de contestation après la signature du Protocole de 2003 et sa volonté de l'exécuter manifestée pendant une période suffisamment longue pour qu'elle ait eu le temps de se ressaisir si son consentement avait été surpris. De ce fait, le Tribunal Arbitral rejette la demande de la République du Congo que le Protocole de 2003 soit déclaré nul en raison du caractère vicié du consentement qu'elle a donné.

### d. *Sur l'absence alléguée de cause du Protocole de 2003*

**277.** La République du Congo soutient que le montant de la créance de Commisimpex a été fixé par le tribunal arbitral dans l'affaire no. 9899, que le Protocole de 1992 a un caractère « *négocié, novatoire, global et forfaitaire* » et que le montant de la dette de 26 milliards

---

[83]     Pièce R60 : Attestation de M. Longobé du 6 mai 2011.

FCFA ajouté dans le Protocole de 2003 aux 22 milliards FCFA du Protocole de 1992 est donc sans cause. Commisimpex ne serait pas créancière d'un montant de 48 milliards FCFA comme l'attestent les lettres des 11 mars 1993, 29 avril 1999 et 5 juin 1997.[84]

**278.** Elle souligne que le seul écrit évoquant ce montant avant la conclusion dudit Protocole de 1992 est une copie d'une lettre datée du 7 octobre 1992[85], prétendument remise en juin 2003 par le Président de la République à M. Hajaij, à qui elle aurait été volée en 1998. La République du Congo soutient que la lettre datée du 7 octobre 1992 aurait été fabriquée *a posteriori*, expliquant en ce sens certaines incohérences dans le corps de la lettre et soulignant qu'il est surprenant qu'une copie de cette lettre n'ait pas été gardée.

**279.** Commisimpex, pour sa part, a indiqué que le Protocole de 1992 ne couvrait qu'une partie de la dette, que les prétendues décotes évoquées par la Défenderesse n'ont jamais existé et que le tribunal CCI dans l'affaire n° 9899 n'a pas déterminé le montant total de la créance en 1992 sur la base des marchés, des paiements ou des décotes mais s'est contenté de constater que le Protocole de 1992 était causé.

**280.** Pour le Tribunal Arbitral, ce débat n'est pas pertinent même si le Tribunal Arbitral a relevé les incohérences du contenu de la lettre du 7 octobre 1992 et s'étonne qu'elle n'ait pas été mentionnée avant le Protocole de 2003, sans parler des circonstances rocambolesques de sa disparation et de sa réapparition. Comme le relève à juste titre Commisimpex, le Protocole de 2003 contient une reconnaissance de dette par le Congo à l'égard de Commisimpex. Il indique en effet :

> « (...)
> • *L'Etat du Congo, reconnaît définitivement, et sans objections ni réserves, l'exécution de l'intégralité des marchés et fournitures visées à l'alinéa 1 ci-dessus.*
> • *(...)*
> • *La validité de la dette, a été irrévocablement et officiellement reconnue par les Administrations concernées lors des deux réunions solennelles du 07 et du 23 septembre 1992. Elle a été, à l'issue et à la lumière des travaux de ces deux réunions, entérinée par la Présidence de la République, laquelle en a fixé le montant à l'équivalent de 48 milliards FCFA (Quarante huit milliards Francs CFA) représentant la contre valeur en FCFA des dettes reconnues et libellées en différentes devises au 30 septembre 1992, soit 96 milliards FCFA après dévaluation du Francs CFA en 1994. La société COMMISIMPEX a pris acte de cette reconnaissance de dette, par courriers du 7 octobre et 24 novembre 1992.*
> • *Le montant de la dette du Congo arrêtée le 30 septembre 1992, s'élève en principal à la somme de 960.000.000 FRF. (neuf cent soixante millions de Francs Français) qui représentait en 1992 la somme de 48 milliards de FCFA, l'équivalant (sic) de 96.000.000.000 FCFA (quatre vingt seize milliards FCFA), dont le remboursement final sera effectué en devises, puisqu'il s'agit au départ d'un financement étranger et en devises.*
> • *(...)*
> • *L'Etat du Congo, reconnaît que la dette de 960.000.000 FRF, valeur 30 septembre 1992, a été partagée comme suit, conformément à l'accord conclu au terme des*

[84] Pièces R48, R36 et R36 annexe III.
[85] Pièce C4.

*réunions du 07 et 23 septembre 1992 sus visées et confirmé par courrier de la société COMMISIMPEX du 7 octobre 1992 :*
*- une première partie est fixée à 440.000.000 FRF (Quatre cent quarante millions de Francs Français), soit l'équivalent de 22 milliards de FCFA, objet du Protocole d'Accord no. 566 du 14 octobre 1992.*
*-une deuxième partie est fixée à 520.000.000 FRF (Cinq cent vingt millions de Francs Français) soit l'équivalent de 26 milliards de FCFA. »*

**281.** L'affirmation du Congo selon laquelle « *la cause d'une reconnaissance de dette doit être trouvée dans l'existence d'une dette préexistante* »[86] est exacte et non contestée, mais on ne saurait en déduire qu'il appartient au créancier d'établir l'existence d'une telle cause.

**282.** La Demanderesse a en effet justement souligné en se fondant sur la jurisprudence et la doctrine que « *lorsque la cause est exprimée, il existe une apparence de cause* » et que dans un tel cas « *il revient à celui qui voudrait établir son absence de le démontrer* », citant un exemple de doctrine[87] précisant que « *(...) lorsque la cause apparaît à la lecture de la structure contractuelle ou lorsque, sans y apparaître, elle est révélée par une mention de l'acte, il existe une apparence de cause....Il revient donc à celui qui voudrait établir son absence, son caractère fictif, ou sa non-conformité à ce qu'elle aurait du être, de le démontrer. La charge de la preuve pèse donc sur ce dernier* ».[88]

**283.** Le Tribunal Arbitral note en effet comme l'a relevé la doctrine, et souligné la jurisprudence[89], que l'article 1132 du Code civil français institue une présomption d'existence et de licéité de la cause[90] et que c'est au débiteur de prouver l'inexistence ou l'illicéité de la cause qu'il entend invoquer[91]. La République du Congo ne le conteste d'ailleurs pas, en indiquant à juste titre que la preuve peut être apportée par tous les moyens.

**284.** Le Tribunal Arbitral estime à la majorité que la République du Congo n'a pas rapporté la preuve de l'inexistence ou de l'illicéité de la cause du Protocole de 2003 telle qu'exposée dans le texte de ce document, à savoir que la dette du Congo à l'égard de Commisimpex arrêtée au 30 septembre 1992 représentait la somme de 48 milliards de FCFA.

---

[86]    Réponse à la Requête d'arbitrage, paras. 93-94.

[87]    J. Rochfeld, Répertoire Civil Dalloz, janvier 2005, voir « Cause », para 107, Pièce CRJ 91.

[88]    Mémoire en Demande sur le Fond, para 142, page 57.

[89]    Voir par exemple, Cass. Civ. 1re, 7 avril 1992, Bull. civ I n° 114 « *la cause de l'obligation est présumée exacte ; dès lors, il incombe aux signataires d'une reconnaissance de dette de prouver la réalité de l'absence de remise des fonds* », ou encore Cass. Civ. 1re, 21 octobre 1997, pourvoi n°95-19.398 « *La cause des obligations prévues dans une reconnaissance de dette étant présumée exacte, il appartient aux débiteurs de prouver la réalité de l'absence de remise des fonds, sans que cette cause puisse être recherchée dans des faits postérieurs à la reconnaissance.* »

[90]    Article 1132 dispose que « *La convention n'est pas moins valable, quoique la cause n'en soit pas exprimée* ».

[91]    Voir Droit Civil, Les Obligations, Le Contrat, Tome III, 5eédition, Christian Larroumet, Economica, page 450 : « *Sur le fondement de l'article 1132 du Code civil la jurisprudence considère qu'il appartient au débiteur de prouver que son engagement est dépourvu de cause et non pas au créancier de prouver que l'obligation dont il réclame l'exécution est causée.* », Voir aussi Pièce C RJ91 : « *En conséquence, quand bien même la cause n'est pas exprimée, le créancier peut demander l'exécution du contrat sans avoir à la prouver (l'article 1132 pose ainsi une nuance à l'article 1315 selon lequel « celui qui réclame l'exécution d'une obligation doit la prouver* », c'est-à-dire établir son existence et son objet ; V. pour cette confrontation, Cass. 1re Civ., 2 mai 2011, préc.). La charge de la preuve revient donc au débiteur de l'obligation qui prétendrait se délier de son engagement : il doit établir l'absence de cause ou sa fausseté (par ex., Cass. 1re Civ. 1er oct. 1986, Bull. civ. I, n°230).

**285.** Pour ce faire, il lui appartenait d'établir qu'à cette date la dette vis-à-vis de Commisimpex était d'un montant différent. Or, elle a préféré se fonder sur le montant visé au Protocole de 1992 – 22 milliards de FCFA – en soulignant que ce Protocole était « *un accord de rééchelonnement de sa dette dont la cause, et donc la validité, est indissociable de son caractère global et novatoire* »[92], ainsi que sur la sentence arbitrale de 2000 rendue sur la base de ce Protocole.

**286.** Une référence au Protocole de 1992 et à la sentence de 2000 ne peut être utile à la démonstration de l'inexistence de la cause du Protocole de 2003, précisément en raison du caractère global, novatoire et forfaitaire du Protocole de 1992, relevé par la sentence de 2000 elle-même[93]. Comme l'ont alors souligné les arbitres « *le mobile déterminant de la RÉPUBLIQUE DU CONGO (mobile d'ailleurs commun à COMMISIMPEX) était d'obtenir – par la négociation et la signature du Protocole n°566[94] – une réduction substantielle de la dette globale et plus encore, le rééchelonnement du paiement de cette dette jusqu'en 2002 (c'est-à-dire jusqu'à presque 20 années à dater des premiers marchés publics concernés)[95]* ». Il est donc hors de doute que le Protocole de 1992 n'était pas représentatif du montant réel de la dette globale à la date à laquelle il a été signé. Les lettres de Commisimpex postérieures à cette signature ne le sont pas non plus, puisqu'elles interviennent à une période où elle s'efforçait d'obtenir par la République du Congo le respect de ses engagements selon le Protocole de 1992 ceci de façon d'ailleurs assez confuse.

**287.** Comme le Tribunal Arbitral l'a déjà souligné[96], il n'y a rien de surprenant à ce qu'en 2003, la République du Congo et Commisimpex aient réévalué la créance de cette dernière et se soient accordées sur de nouvelles modalités de son règlement. A l'époque, la République du Congo se refusant à donner effet au Protocole de 1992, dont elle avait contesté la validité dans la procédure arbitrale, s'abstenait d'exécuter la sentence de 2000, bien que le recours en annulation qu'elle avait introduit devant la Cour d'appel de Paris ait été rejeté le 23 mai 2002. La situation était bloquée et il était dans l'ordre des choses de remettre en question le forfait de 1992.

**288.** Le Tribunal Arbitral considère à la majorité que la République du Congo n'a fourni aucun élément convaincant établissant qu'en octobre 2003 sa dette vis-à-vis de Commisimpex était d'un montant autre que les 48 milliards FCFA visés au Protocole de 2003, alors que Commisimpex a expliqué de façon plausible l'origine de ce montant : une évaluation de la créance de Commisimpex au titre des marchés à 29.949.284.818 FCFA fin 1986. Par application d'un taux d'intérêt de 10,5% avec capitalisation annuelle et sur la base d'une conversion des montants en devises étrangères aux taux envisagés à la date de la signature des marchés, on obtient un montant d'environ FRF 960.000.000, soit les 48 milliards FCFA du Protocole de 2003[97].

---

[92]  Mémoire Après-Audience du 23 mars 2012, para 82, page 24.
[93]  Pièce C14, page 42.
[94]  Le Protocole de 1992.
[95]  Pièce C14, page 47.
[96]  N°197 supra.
[97]  Ce calcul figure à la page 15 du rapport Mazars du 2 août 2011 et son exactitude n'a pas été contestée par la République du Congo.

**289.** Cette évaluation de 29.949.284.818 FCFA fin 1986 est confirmée par plusieurs documents produits au cours de la procédure arbitrale. Il s'agit tout d'abord d'une « *Fiche de Calcul Détaillée* » intitulée « *Dette du Congo en 1987 due à COMMISIMPEX d'un montant de 29.949.284.818 francs CFA. Communiquée par le CCA et le Ministère des Finances au Procureur général et au Ministère de la Justice en septembre 1991* »[98]. Contrairement à ce que prétend la République du Congo[99], ce document indique clairement un montant de la dette de 29.949.284.818 FCFA. Ce même montant est repris plusieurs fois dans les actes du procès dont fut l'objet l'ancien Ministre des Finances, M. Lekoundzou. Ainsi, Joseph Hondjulla Miokono déclare sous serment en 1991 qu'ayant été nommé à la Caisse Congolaise d'Amortissement en 1985 en qualité de Directeur général, il a « *trouvé un dossier COMMISIMPEX selon lequel l'État congolais devait à cette société plus de 29 milliards de FCFA* »[100]. De même, dans les réquisitions d'octobre 1991, Madame le Procureur Général près la Cour d'Appel de Brazzaville écrit : « *En 1987, l'État Congolais qui connaissait d'énormes difficultés financières étant incapable d'honorer la dette de la société COMMISIMPEX qui s'élevait à 29.949.184.818 FCA* »[101]. De plus, dans une attestation du 16 avril 2003[102], M. Ernest Komko, ancien Président de la Conférence Nationale Souveraine de février à juin 1991 fait état de travaux de deux commissions qui, à l'époque, ont constaté une créance de Commisimpex sur la République du Congo « *qui oscillait autour de 30 milliards de FCFA* ».

**290.** Pour contester cette évaluation de la dette à 29.949.184.418 FCFA fin 1986, la République du Congo invoque deux documents de la CCA de juin 1991 qui évaluent la dette à 21 milliards au 31 décembre 1988[103]. Mais ces documents donnent l'impression que les montants indiqués sont le résultat de négociations et sont de toute façon antérieurs à la « *Fiche de Calcul Détaillée* » de la CCA de septembre 1991 qui déclare que la dette est de 29.949.184.418 FCFA. Le chiffre de 21 milliards fin 1988 ne sera repris dans aucun autre document par la suite. Seule l'évaluation de 29.949.184.418 FCFA est utilisée avec constance par des sources congolaises.

**291.** Ce même montant de 29.949.184.818 FCFA fin 1986 sera ultérieurement repris par un rapport d'expertise d'Ernst & Young du 25 septembre 2001[104], rendu sur ordonnance du Président du Tribunal de Commerce de Brazzaville. C'est sur cette base, qu'en procédant à l'actualisation décrite ci-dessus, Ernst & Young évalue la créance de Commisimpex à 48 milliards FCFA au 30 septembre 1992 (p. 41 du rapport d'expertise). Le Président du Tribunal de Commerce de Brazzaville se fondera sur ce rapport pour ordonner l'inscription de la dette par la Caisse Congolaise d'Amortissement le 9 novembre 2001[105]. Le Président du Tribunal de Commerce, se référant à la « *Fiche de Calcul Détaillée* » de la CCA de septembre 1991[106], déclare que « *le Tribunal a pu constater, comme l'expert, que la Caisse Congolaise d'Amortissement elle-même avait communiqué aux Autorités Judiciaires du pays à l'occasion du procès du Ministre Lekoundzou en 1991 que la dette des Défendeurs s'élevait à*

---

[98]   Pièce C98.
[99]   Mémoire après audience n°1, n°14, page 4.
[100]  Pièce C96.
[101]  Pièce C99.
[102]  Pièce C152.
[103]  Pièces R81 et R82. Cf. aussi R80, de 1989 qui utilise la même évaluation, sans la justifier.
[104]  Pièce C17.
[105]  Pièce C20.
[106]  Pièce C98.

*29.948.284.818 Francs CFA à la fin de 1986* » (p.2). A partir de là, il n'est pas étonnant qu'il entérine le calcul d'Ernst & Young, qui part de la même constatation.

**292.** La République du Congo fait valoir à juste titre que la procédure devant le Président du Tribunal de Commerce de Brazzaville n'était pas contradictoire, et que la République du Congo a objecté aux constatations qui y étaient faites lorsqu'elle l'a pu, ce qui en réduit considérablement la portée. Mais on ne peut en dire autant de la procédure d'appel qui a suivi, initiée par la CCA et l'État congolais. La Fiche de Calcul Détaillée de la CCA de 1991, qui constate l'existence d'une créance de 29.949.284.818 FCFA fin 1986, est également reprise par la Cour d'appel dans sa décision du 12 juillet 2002[107] qui fait aussi état de l'évaluation à 48 milliards FCFA de la créance au 30 septembre 1992 par Ernst & Young. Et la Cour d'appel relève :

> « *Considérant qu'il ressort de cette note que l'évolution de la dette et son actualisation au 30 septembre 1992 a été calculée par l'expert au montant de 48.532.681.474 FCFA ;*
>
> *Considérant que le 14 octobre 1992 les parties avaient conclu le Protocole d'accord n.566, ayant comme objet la consolidation partielle de la dette à hauteur de 22.000.000.000 de FCFA ;*
>
> *Considérant qu'il ressort donc que le montant de 26.532.681.474 FCFA n'avait pas été compris dans ledit Protocole d'accord ;*
>
> *Considérant que la Caisse Congolaise d'Amortissement soutient que le Protocole d'Accord n.566 du 14 octobre 1992 serait une transaction et elle en découle que ce contrat aurait réglé toutes les créances dont la société COMMISIMPEX SA aurait été titulaire à l'encontre de la République et de la CCA* ».

**293.** Il est vrai que l'arrêt de la Cour d'appel a été cassé par la Cour Suprême le 27 juin 2003[108]. Mais, outre que, par hypothèse, la décision d'annulation ne porte en rien sur les constatations de fait relatées ci-dessus, l'ensemble des documents qui viennent d'être évoqués permettent au Tribunal Arbitral de constater deux points essentiels : 1) l'évaluation de la dette du Congo vis-à-vis de Commisimpex fin 1986 à 29.949.184.818 FCFA semblait largement admise tant en 1991 qu'en 2002-2003 ; 2) son actualisation à 48 milliards FCFA en octobre 1992 prête peu à discussion puisqu'il s'agit d'un calcul mathématique effectué par Ernst & Young et contrôlé par le Cabinet Mazars au cours de la présente procédure arbitrale[109]. Mais surtout, quelque soit le montant réel de la créance de Commisimpex en octobre 1992, il résulte de ce qui précède que les parties au Protocole de 2003 ont adopté une évaluation connue et débattue. Le montant de 48 milliards FCFA repose sur une évaluation des sommes dues à Commisimpex articulée dès 1991 et actualisée à fin septembre 1992. Il ne s'agit aucunement d'un montant sorti d'un chapeau par des négociateurs pour des raisons obscures et sans aucun fondement factuel.

**294.** On peut évidemment s'étonner qu'en signant le Protocole de 1992, précisément en octobre, Commisimpex ait accepté un montant de 22 milliards. S'agissait-il d'un accord aux

---

[107]  Pièce C24.
[108]  Pièce C26.
[109]  Il est à noter à cet égard que la République du Congo n'a pas estimé nécessaire de soumettre le cabinet Mazars à contre-interrogatoire.

fins transactionnelles, comme l'a prétendu la CCA devant la Cour d'appel de Brazzaville et admis le Tribunal Arbitral qui a rendu la sentence de 2000 ? Le présent Tribunal Arbitral ne peut ignorer que les parties ont eu, en cours de procédure, des échanges assez confus sur l'existence de décotes qu'aurait consenties Commisimpex à la République du Congo, l'une de 30% en 1998 et puis de 25% en 1992[110] ou que la République du Congo lui aurait imposées. Les explications contradictoires des parties, surtout de Commisimpex sur ce point, n'ont pas permis au Tribunal Arbitral de se faire une opinion définitive sur l'existence et surtout l'origine de ces décotes. Mais une telle opinion n'est pas nécessaire puisque les parties font remonter ces décotes au plus tard à la signature du Protocole de 1992 qui, comme l'a indiqué la sentence de 2000 retient un montant global et forfaitaire, le détail des calculs qui ont permis de l'arrêter n'important pas pour la solution du présent litige. Simplement, le Tribunal Arbitral ne peut s'empêcher de relever que si la créance de Commisimpex en septembre 1992, hors décote, était effectivement de 48 milliards FCFA, l'application successive d'une décote de 30%, puis d'une décote de 25% avant la signature du Protocole de 1992 donne un chiffre de 25,2 milliards FCFA, bien proche des 26 milliards FCFA absents du Protocole de 1992 et présent dans le Protocole de 2003. Est-ce seulement une coïncidence ? Peut-être. Mais ces observations viennent renforcer le caractère plausible de la dette de 48 milliards FCFA présentés comme la cause du Protocole de 2003 par ses auteurs et dont l'existence est présumée.

**295.** Sur la base de ce qui précède, le Tribunal Arbitral conclut à la majorité que la République du Congo n'a pas démontré l'absence de cause du Protocole de 2003. Il constate au contraire que Commisimpex, bien qu'elle n'avait pas la charge de la preuve de l'existence de la cause, a fourni au Tribunal Arbitral un faisceau d'indices qui seraient suffisants pour déclarer que cette cause existe si elle n'était pas déjà présumée. Il ne s'agit pas ici pour le Tribunal Arbitral de se prononcer sur le montant de la dette en octobre 2003 dont aucune des Parties n'a établi le montant de façon indiscutable. Il s'agit simplement de constater que l'évaluation à 48 milliards FCFA était la seule clairement retenue à l'époque et que, faute de preuve apportée par la République du Congo, la réalité de la cause présumée du Protocole de 2003 s'en trouve confirmée.

**296.** Cependant, le Tribunal Arbitral ne peut se contenter de cette conclusion qui concerne seulement la cause objective du Protocole de 2003. La République du Congo ayant allégué que la conclusion du Protocole de 2003 était le résultat d'une fraude, il convient alors de s'interroger sur la licéité de sa cause subjective. Les signataires du Protocole l'ont-ils conclu dans un but illégitime ou, plus précisément, est-ce le résultat d'une fraude dont ses signataires pour la République du Congo avaient été victimes, cette dernière n'ayant jamais suggéré qu'ils aient pu être complices de la fraude imputée à Commisimpex ? Elle explique que :

> « *La signature du Protocole de 2003 par des personnes influençables ou ignorantes du dossier de la créance de Commisimpex ne s'explique que par les pratiques peu orthodoxes de Commisimpex et le réseau d'influence de M. Hojeij au sein de l'administration congolaise dont il connaît les faiblesses et en a largement profité* »[111].

**297.** Les allégations de fraude articulées par la République du Congo sont particulièrement peu convaincantes. Il a été montré dans la section B c) ci-dessus que les signataires congolais du Protocole de 2003 ne pouvaient avoir donné leur accord sur le montant de la créance de

---

[110]  Pièce R61, lettre du Conseil de Commisimpex du 28 février 1998.
[111]  Mémoire Après-Audience du 23 mars 2012, para 147, page 49.

Commisimpex qu'en parfaite connaissance de cause. Cette observation est confirmée par la présente section où il apparaît que le montant de 48 milliards repris dans le Protocole de 2003 avait fait l'objet d'un débat public. On voit mal alors comment une fraude aurait pu intervenir sans qu'ils en soient complices, ce que, on l'a dit, ne prétend pas la République du Congo. D'ailleurs, si fraude il y avait, il faudrait qu'il s'agisse d'une fraude à très grande échelle puisqu'elle impliquerait un grand nombre de fonctionnaires congolais, et pas seulement les signataires du Protocole. Il faudrait aussi que la fraude se fut étalée sur une longue période, puisqu'elle remonterait au moins à l'évaluation de la dette à 29.949.184.818 FCFA fin 1986, en 1991, fondement de l'évaluation à 48 milliards en septembre 1992. Le moteur de la fraude devrait être la corruption et le trafic d'influence, alors que la République du Congo n'a formulé aucune accusation précise à cet égard et que les protagonistes congolais de l'affaire ne paraissent pas avoir été inquiétés depuis 2003/2004.

**298.** Il est évidemment légitime de se demander pourquoi les représentants du Président de la République du Congo, avec l'aval de celui-ci, ont décidé de payer en 2003 une dette ancienne qu'ils s'étaient refusé à acquitter jusqu'ici. Mais on se demande de même pourquoi la République du Congo, après avoir signé le Protocole de 1992, avantageux pour elle, a décidé de renier ses engagements et a lutté avec âpreté pour ne pas l'exécuter, de même que la sentence qui en résultait. Le Tribunal Arbitral ne peut qu'être frappé de constater que pour se soustraire au Protocole de 1992 – qu'elle invoque aujourd'hui comme reprenant l'intégralité de sa dette- elle invoquait comme dans la présente procédure sa nullité et la fraude de Commisimpex. Un extrait d'une sentence intérimaire de 1999, rendue dans la procédure qui aboutit à la sentence de 2000, et cité par celle-ci, est éloquent[112] :

> « *Dans son « mémoire en réponse et en demande de sursis à statuer » du 26 février 1999 » l'examen du « caractère mal fondé de la demande de Commisimpex (pages 13 à 18) et la « nullité du protocole 566 et des engagements souscrits en exécution du protocole 566 pour vice de consentement » (pages 19 à 21) comporte de manière répétée des allégations de « fraude procédurale », de « multiples fraudes constitutives de faux et d'escroquerie, que Commisimpex a commises et commet encore », de « manœuvres, intrigues et fraudes dont Commisimpex faisait son lot quotidien » et d'« erreur provoquée », pour conclure (page 21) que « des développements qui précèdent, il est patent que la RÉPUBLIQUE DU CONGO et la CAISSE CONGOLAISE D'AMORTISSEMENT ont été victimes d'escroquerie, laquelle est caractérisée par l'utilisation par Commisimpex à leur encontre de manœuvres frauduleuses pour se faire remettre des billets à ordre n'ayant pas de cause ». »*

Le Tribunal Arbitral qui a rendu la sentence de 2000 n'a retenu aucune fraude et a constaté la validité du Protocole no.566 de 1992 que la République du Congo ne conteste plus aujourd'hui et dont au contraire, elle se prévaut. De même le présent Tribunal Arbitral constate que la République du Congo n'a pas prouvé que la cause du Protocole de 2003 était entachée d'illicéité en raison d'une fraude, pas plus qu'elle n'a établi l'inexistence de sa cause ou le vice dont son consentement serait entaché.

**299.** Le Tribunal Arbitral a constaté que la République du Congo ne pouvait valablement invoquer l'absence de pouvoirs des signataires du Protocole de 2003 pour en contester la validité et que ce dernier contenait des engagements de caractère contraignant. De plus, il a

---

[112]  Pièce C14, Sentence du 3 décembre 2000.

conclu que la République du Congo ne pouvait alléguer une ignorance du montant de sa dette lorsque le Protocole de 2003 a été signé. En l'absence de preuve de son défaut de cause ou du caractère illicite de celle-ci, le Protocole de 2003 lie donc bien les parties et la République du Congo doit exécuter les obligations qu'elle a contractées en le signant.

C.   Sur les montants dus par la République du Congo à Commisimpex

**300.** Dans le Protocole de 2003, la République du Congo prend les engagements financiers suivants :

- *« Article 1- l'Etat du Congo prend à sa charge, la dette de la société COMMISIMPEX, et celle du groupe et famille Hojeij, à l'égard de la banque libanaise SARADAR à hauteur de l'engagement du Protocole d'Accord n°566 du 14 octobre 1992, et les garanties correspondantes, dont la créance en principal, valeur du 30 septembre 1992 est libellée dans les devises suivantes :*

*A- 50.592.81, 53 FRF*
*B- 21.201.872, 76 Livres Sterling*
*C- 34.521.293, 24 Dollars US*
*D- 1.426.6253.801 F CFA*

*Le total représentant, à cette date, la contre valeur de 440.000.000 FRF, soit 22 Milliards FCFA à la parité de l'époque.*

*-Article 2- l'Etat du Congo s'engage à négocier directement avec la banque SARADAR et pourra déterminer les modalités de remboursement des montants ci-dessus mentionnés en principal et en intérêt, en dehors de tout engagement, ni responsabilité de la part de la société COMMISIMPEX, ni du groupe et famille Hojeij.*

*Les retombées directes et indirectes de ces négociations, ne concernent en aucun cas la société COMMISIMPEX ni le groupe et la famille Hojeij.*

*-Article 3- l'Etat du Congo s'engage à rembourser à la société COMMISIMPEX, la somme en principal de 520 millions de FRF, non compris les intérêts qui s'élèvent à 941.141.586 FRF, pour la période du 30 septembre 1992 au 30 juillet 2003 au taux de 10% l'an,*

*-Article 4- l'Etat du Congo s'engage à régler à la société COMMISIMPEX, la somme de 520.000.000 FRF (cinq cent vingt millions de francs français) selon les modalités suivantes :*

*1. Paiement comptant d'un montant de 60.000.000 de FRF (soixante millions de Francs Français), soit 6 milliards FCFA.*

*2. Une deuxième partie de ladite somme en principal, correspondant à 200.000.000 FRF (Deux cents millions de Francs Français), soit 20 milliards de FCFA, portera, à titre de compensation, sur l'acquisition par la société COMMISIMPEX, de certaines*

*entreprises appartenant à l'Etat du Congo dont la viabilité technique et financière, et dont la rentabilité et le prix d'évaluation, auront été positivement démontrés par un auditeur agréé et accepté par la société COMMISIMPEX.*

*3. Le reliquat, soit la somme en principal de 260.000.000 FRF (deux cent soixante millions de Francs Français), soit 26 milliards de FCFA, fera l'objet d'un moratoire que l'Etat du Congo s'engage à rembourser en 84 (quatre vingt quatre) mensualités constantes d'une valeur de 3.095.238 FRF par mois, soit une mensualité de 309.523.809 FCFA. Ce moratoire est subordonné à l'octroi, en faveur de COMMISIMPEX, d'une garantie ferme, inconditionnelle et irrévocable de 1ᵉʳ ordre, internationalement acceptée.*
*Cette garantie a pour objet, au-delà de l'aspect couverture du risque, de faciliter les conditions de refinancement aussi bien des entreprises relevant actuellement du groupe Hojej, dont les besoins en fonds de roulement dépassent largement les douze milliards de Francs CFA, que ceux des établissements publics visés au § 4 alinéa 2 » :*

**301.** Ces quatre articles couvrent les deux composantes de la dette de la République du Congo arrêtée au 30 septembre 1992, telle que confirmée dans le Préambule du Protocole : 440.000.000 FRF dits objets du Protocole de 1992 et 520.000.000 FRF.

<div align="center">

a. <u>*la dette de 440.000.000 FRF (Article 1ᵉʳ du Protocole de 2003)*</u>

</div>

**302.** Selon l'article 1ᵉʳ la République du Congo prend à sa charge la dette de Commisimpex et du groupe Hajaij envers la Banque Saradar à concurrence des 440.000.000 FRF découlant du Protocole de 1992 et s'engage à entrer en négociation avec la banque à cet égard d'ici le 31 décembre 2003 (Articles 2 et 6). Commisimpex explique en effet que c'est la banque Saradar qui a financé ce montant.

Selon une lettre de la Banque Audi Saradar, antérieurement Saradar, du 24 décembre 2010, la République du Congo ne s'est jamais rapprochée d'elle et c'est finalement Commisimpex qui aurait réglé elle-même sa dette vis-à-vis de la Banque.

**303.** La République du Congo ne conteste pas n'avoir jamais réglé la Banque Saradar. En revanche, elle soutient que Commisimpex n'est pas recevable à solliciter le paiement du montant de 440.000.000 FRF au 30 septembre 1992, porté à 360.515.125 euros au 7 janvier 2011 selon les calculs du cabinet Mazars,[113] qui selon le Protocole de 2003 est du à la Banque Saradar. La République du Congo prétend en effet que la délégation visée au Protocole serait une délégation parfaite, dont l'effet est de libérer le débiteur délégué, c'est-à-dire elle même, à l'égard du délégant, Commisimpex.

**304.** Commisimpex considère au contraire que le Protocole ne prévoyait qu'une délégation imparfaite et que :

*« Du fait de l'inexécution du Congo, la délégation prévue au Protocole de 2003, envisagée à titre de simple modalité de règlement d'une partie de la dette du Congo*

---

113    Mémoire en Duplique sur le Fond, para 294, page 110.

*envers Commisimpex, n'a jamais pu être concrétisée et son inexécution par le Congo renvoie les parties à la situation contractuelle pré-existante. »*[114]

**305.** La République du Congo ajoute que quand bien même la délégation serait une délégation imparfaite, Commisimpex ne pourrait exiger le paiement de la somme qui en est l'objet car, tout en reconnaissant n'avoir pas procédé au règlement des sommes dues à la Banque Saradar elle estime qu'elle :

> *« (...) n'a pas été défaillante à l'égard de la Banque Saradar puisque cette dernière ne lui a jamais rien demandé au titre du Protocole de 2003 ».*[115]

**306.** Le Tribunal Arbitral ne peut suivre la République du Congo dans son argumentation pour deux raisons essentielles. Tout d'abord, la délégation au profit de la Banque Saradar prévue par le Protocole de 2003 ne saurait être une délégation parfaite faute de l'accord de cette dernière, en sa qualité de délégataire. C'est en effet l'accord du créancier à la substitution de débiteur qui caractérise la délégation parfaite. Tel est le sens de l'article 1275 du Code civil français.[116] Or, il n'est pas établi ni même prétendu que la Banque Saradar ait donné son accord à la substitution de débiteur. La délégation prévue par le Protocole de 2003 doit donc bien être qualifiée de délégation imparfaite.

**307.** Il est vrai que comme le relève la République du Congo, la Cour de cassation[117] a déclaré que *« ... ni le déléguant ni ses créanciers ne peuvent, avant la défaillance du délégué envers le délégataire, exiger paiement »*. Mais cette solution est difficilement transposable à la présente espèce où les conditions de règlement par la République du Congo à la Banque Saradar n'ont jamais été définies, ceci en raison de la carence de la République du Congo elle-même. Selon l'article 2 du Protocole de 2003, la République du Congo s'engageait à négocier directement avec la Banque Saradar les modalités de remboursement de la dette déléguée, au plus tard le 31 décembre 2003, ainsi que le précise l'article 6 du Protocole. La République du Congo ne l'a pas fait, indiquant seulement que la Banque Saradar ne lui a rien demandé au titre du Protocole de 2003, ce qui est la conséquence du non respect de son engagement de négocier avec cette dernière. La République du Congo ne peut se prévaloir de sa propre défaillance qui a rendu la délégation prévue dans le Protocole de 2003 sans effet.

**308.** La République du Congo souligne encore que Commisimpex n'apporte aucune preuve d'avoir réellement payé sa dette envers la Banque Saradar et encore moins de preuve de la date et du montant du paiement allégué, ni qu'il s'agisse du paiement de la dette qui devait être acquittée au moyen de la délégation.[118] Ce n'est que partiellement exact car la lettre de la Banque Audi Saradar du 24 décembre 2010 confirme que la dette de Commisimpex à son égard a été payée.[119] Quoi qu'il en soit, cette argumentation est sans pertinence. Ce qui importe n'est pas que Commisimpex ait ou n'ait pas réglé sa dette envers la Banque Saradar mais que la République du Congo ne l'ait pas fait à sa place, au mépris de l'engagement pris dans le Protocole de 2003. Il en résulte que la dette de 440.000.000 FRF, au 30 septembre 1992, reconnue par la République du Congo envers Commisimpex dans le Protocole de 2003

---

[114] Mémoire en Réplique sur le Fond, para 508, page 223.
[115] Mémoire en Duplique sur le Fond, para 303, page 113.
[116] Voir en ce sens Ph. Malaurie et L. Aynès, Droit Civil, les Obligations, 1990, n° 1250, page 711.
[117] Pièce CRJ 199 : Cass. Com, 16 avril 1996, n° 94-14618.
[118] Mémoire en Réplique sur le Fond, paras 306-307, pages 113- 114
[119] C75.

« *à hauteur de l'engagement du Protocole d'Accord n°566 du 14 octobre 1992 ...* », dont le montant devait servir, par délégation, au paiement de la dette de Commisimpex à l'égard de la Banque Saradar ne s'est pas éteinte et que la République du Congo doit s'en acquitter.

**309.** Selon le rapport Mazars du 7 janvier 2011[120] sur lequel s'appuie Commisimpex, la dette de 440.000.000 FRF au 30 septembre 2011 s'élèverait à 360.515.125 euros au 7 janvier 2011. Pour obtenir ce montant, le cabinet Mazars procède au calcul suivant, à partir des différents montants en devises diverses qui, selon le Protocole de 2003, constituent la somme de 440.000.000 FRF: il ajoute aux montants mentionnés dans le Protocole de 2003 des intérêts composés au taux de 10,5% l'an à compter du 23 août 2003 jusqu'au 7 janvier 2011, date du rapport, puis ajoute également à ces montants des intérêts composés au taux de 10% l'an du 30 septembre 1992 au 30 juillet 2003 et cumule le tout.

**310.** Le Tribunal Arbitral estime que ce calcul, que conteste la République du Congo, n'est pas compatible avec les accords des parties et le texte du Protocole de 2003. Ainsi qu'il a déjà été relevé, la dette de 440.000.000 FRF de Commisimpex que prenait en charge la République du Congo à l'égard de la Banque Saradar en vertu du Protocole de 2003, était « *à hauteur de l'engagement du Protocole d'Accord n°566 du 14 octobre 1992 ...* ». L'engagement de la République du Congo selon le Protocole de 1992 en août 2003, ne pouvait être autre que celui résultant de la sentence du 3 décembre 2000, objet d'un recours en annulation qui avait été rejeté le 23 mai 2002 et qui était donc définitif. Commisimpex n'a pas renoncé au bénéfice de cette sentence en signant le Protocole de 2003, comme le confirme le fait qu'il déduise des montants qu'il réclame au titre du Protocole de 2003 ceux qui lui ont été alloués par la Sentence de 2000[121] dont les deux parties reconnaissent l'autorité de la chose jugée. Le Tribunal Arbitral constate donc d'une part que le montant global de la dette prise en charge par la République du Congo à hauteur de l'engagement du Protocole de 1992 est celui fixé par la Sentence de 2000 et d'autre part que Commisimpex lui demande de déduire ce montant global des condamnations que le Tribunal Arbitral prononcerait en sa faveur dans la présente procédure. Par conséquent, le Tribunal Arbitral constatera que les montants dus par la République du Congo au titre de l'article 1er du Protocole de 2003 sont ceux qui lui ont été alloués par la sentence de 2000, donnera acte à Commisimpex de sa demande de déduction de ces montants des condamnations que prononcerait le Tribunal Arbitral et, ayant effectué cette déduction, ne prononcera aucune condamnation au titre de l'article 1er du Protocole de 2003.

### b. *La dette de 520.000.000 FRF (Articles 3 et 4 du Protocole de 2003)*

**311.** Par ailleurs, la République du Congo devra rembourser Commisimpex le montant de 520.000.000 FRF visé à l'article 3 du Protocole de 2003, augmentés d'intérêts de 941.141.586 FRF soit 222.749.598, 82 euros, pour la période du 30 septembre 1992 au 30 juillet 2003 (appliquant un taux de 10% par an), comme prévu par les articles 3 et 5 du Protocole de 2003.

**312.** En ce qui concerne le calcul des intérêts pour la période postérieure au Protocole de 2003, Commisimpex se fonde sur le rapport du cabinet Mazars du 7 janvier 2011 qui retient un taux de 10,5%. Le Cabinet Mazars justifie ce taux par le fait qu'il était « *(...) également*

---

[120]   Rapport Mazars du 7 janvier 2011, page 11, n° 2.3.
[121]   Rapport Mazars du 7 janvier 2011, page 3.

*celui qui était stipulé dans la garantie émise par la République du Congo le 22 décembre 1986 et qui avait été retenu par la CCA dans son calcul de la dette de la République du Congo à Commisimpex au 31 décembre 1986 »*[122].

**313.** Le Tribunal Arbitral estime cette justification incompatible avec l'accord reflété par la méthode retenue dans le Protocole lorsqu'il s'agit d'arrêter le montant des intérêts sur 520 millions de FRF pour la période du 30 septembre 1992 au 30 juillet 2003.[123] Ceci est d'ailleurs expliqué par le rapport Mazars qui reprend à son compte cette méthode pour calculer les intérêts sur le montant de 440.000.000 FRF lorsqu'ils sont antérieurs au Protocole :

> « *Le montant I2 de 941 millions de FRF d'intérêts figurant au Protocole de 2003 est calculé selon les modalités suivantes :*
>
> *- Montant en base : 520 millions FRF,*
> *- Taux de 10% l'an, avec capitalisation annuelle au 30 septembre (année de 360 jours et mois de 30 jours),*
> *-Période du 30 septembre 1992 au 30 juillet 2003 »*[124].

**314.** Le Tribunal Arbitral ne voit aucune raison de ne pas retenir également cette méthode contractuelle pour calculer les intérêts de retard courant à compter de 2003, la justification apportée par le Cabinet Mazars et Commisimpex d'appliquer un taux de 10,5% n'étant pas satisfaisante.

**315.** En outre, le cabinet Mazars fait courir les intérêts à compter du 23 août 2003, date de signature du Protocole de 2003. Or, l'article 6 du Protocole prévoyant de façon plus générale que le Protocole d'Accord définitif devait être conclu le 31 décembre 2003, le Tribunal Arbitral considère que c'est à compter de cette date que tous les intérêts de retard doivent courir et non à compter de la date de signature du Protocole. C'est en effet au soir du 31 décembre 2003 que l'inexécution du Protocole est définitive. Le cabinet Mazars l'a d'ailleurs relevé dans son calcul des intérêts en ce qui concerne les 200 millions de FRF relatifs aux entreprises à privatiser pour lesquels il fait courir les intérêts à compter du 31 décembre 2003 du fait de l'absence de signature d'actes de cession d'entreprises à cette date tel que le prévoyait l'article 6. Une telle restriction est injustifiée car c'est au plus tard le 31 décembre qu'un document définitif devait être signé, susceptible de s'appliquer à l'ensemble des modalités d'exécution des engagements pris par la République du Congo. Les intérêts sur la somme de 520 millions FRF devront donc courir à compter du 31 décembre 2003 et jusqu'au parfait paiement de la dette par la République du Congo (la date du 7 janvier 2011 fixé par le cabinet Mazars n'ayant plus d'application dans la mesure où le Tribunal Arbitral ne retient pas la méthode utilisée par celui-ci) à un taux d'intérêt de 10% avec capitalisation annuelle au 31 décembre de chaque année.

**316.** La République du Congo doit donc payer à Commisimpex, en exécution du Protocole de 2003, un montant de 520.000.000 FRF soit 79.273.488,96 euros[125] + 941.141.586 FRF soit 143.476.109,86 euros = 222.749.598, 82 euros plus intérêts de 10% l'an avec capitalisation

[122] Rapport Mazars du 7 janvier 2011, page 11, n° 2.2.3.
[123] Pièce C27, Article 3 du Protocole de 2003.
[124] Rapport Mazars du 7 janvier 2011, page 10.
[125] Taux de conversion applicable : 6,55957 FRF= 1 euro.

annuelle au 31 décembre, sur la période entre le 31 décembre 2003 et jusqu'au parfait paiement ;

### D. La répartition de la charge des frais de l'arbitrage

**317.** L'article 31 (3) du Règlement d'arbitrage laisse au Tribunal Arbitral la liberté de décider de la charge des frais de l'arbitrage.

**318.** Les frais de l'arbitrage tels que fixés par la Cour Internationale d'Arbitrage lors de sa session du 9 janvier 2013 s'élèvent à US$ 1,140,000. Commisimpex indique que ses propres frais (honoraires, frais de déplacement) s'élèvent, au 2 novembre 2012, à 4 282 791 Euros (5 163 998 Euros- 881 207 Euros) tandis que ceux de la République du Congo s'élèvent à 2 674 300 Euros. Chacune des parties demande que son adversaire supporte l'intégralité de ses frais.

**319.** Le Tribunal Arbitral relève que si la Demanderesse a succombé pour une partie de ses demandes, en raison de l'absence de condamnation relative à la part des 440.000.000 FRF, qui se confond avec les montants dus au titre de la sentence de 2000, et de la réduction des intérêts y relatifs, la République du Congo succombe pour l'essentiel : son exception d'incompétence a été rejetée par la Sentence Partielle du 20 août 2010; son exception d'autorité de la chose jugée l'a été par la présente sentence, qui a par ailleurs écarté ses objections à la validité du Protocole de 2003 et la condamne à l'exécuter.

**320.** Pour toutes ces raisons, le Tribunal Arbitral décide que la République du Congo doit supporter 75% des frais d'arbitrage fixés par la Cour Internationale d'Arbitrage à US$ 1,140,000. Commisimpex ayant avancé 100% de la provision d'arbitrage, la République du Congo doit donc lui verser US$ 855,000 au titre des frais de l'arbitrage.

**321.** En ce qui concerne les frais légaux supportés par les parties, le Tribunal Arbitral décide que la République du Congo doit être condamnée à rembourser 75% des frais raisonnables de Commisimpex et que Commisimpex doit être condamnée à rembourser à la République du Congo 25% de ses frais raisonnables. Le Tribunal Arbitral constate une disparité significative entre le montant des frais légaux exposés par Commisimpex- 4.282.791 Euros- et le montant de ceux exposés par la République du Congo-2.674.300 Euros. Il est certain que chaque partie est libre de consacrer à une procédure les moyens financiers qui lui paraissent nécessaires, mais il l'est tout autant que ceci ne justifie pas que la partie qui succombe en tout ou en partie soit tenue de supporter les conséquences des choix de l'autre partie à cet égard. En l'espèce, le Tribunal Arbitral estime que compte tenu des caractéristiques du litige, le montant des frais raisonnables de Commisimpex doit être arrêté à 3.500.000 Euros. Il en résulte que la République du Congo doit être condamnée à rembourser 75% des frais raisonnables de Commisimpex, soit 3.500.000 Euros X 75% = 2.625.000 Euros et que Commisimpex doit être condamnée à rembourser à la République du Congo 25% de ses frais, soit 2.674.300 Euros X 25% = 668.575 Euros. Par conséquent, la République du Congo sera condamnée à rembourser à Commisimpex la somme de 2.625.000 Euros – 668.575 Euros= 1.956.425 Euros au titre de ses frais légaux.

## PAR CES MOTIFS, LE TRIBUNAL ARBITRAL :

1) Déclare que les demandes de Commisimpex relatives au jugement de mise en liquidation judiciaire du 30 octobre 2012 sont donc recevables et retient sa compétence pour en connaître pour autant qu'elles portent sur les effets de ce jugement sur la procédure arbitrale ;

2) Déclare que les exigences de l'ordre public international s'oppose à ce que la mise en liquidation de Commisimpex ait des effets dans la présente procédure arbitrale ;

3) Constate, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex dans la présente procédure arbitrale ;

4) Rejette la demande de Commisimpex de remboursement par la République du Congo des frais engendrés dans le présent arbitrage par la procédure de liquidation.

5) Déclare qu'il est incompétent pour connaître des autres demandes de Commisimpex relatives à sa mise en liquidation judiciaire ou qu'elles ont été rendues dépourvues d'objet par les Ordonnances de Procédure no 7 et 9.

6) Rejette l'exception de chose jugée de la Sentence arbitrale du 3 décembre 2000 rendue dans l'affaire CCI n°9899 opposée par la République du Congo ;

7) Constate, à la majorité, la validité du Protocole du 23 août 2003 et son caractère contraignant pour les parties ;

8) Constate que les montants dus par la République du Congo au titre de l'article 1$^{er}$ du Protocole du 23 août 2003 sont ceux qui lui ont été alloués par la Sentence arbitrale du 3 décembre 2000 ;

9) Donne acte à Commisimpex de sa demande de déduction de ces montants des condamnations que prononcerait le Tribunal Arbitral et, ayant effectué cette déduction ne prononce aucune condamnation au titre de l'article 1$^{er}$ du Protocole du 23 août 2003 ;

10) Condamne la République du Congo à payer à Commisimpex, au titre des articles 2 et 3 du Protocole du 23 août 2003, la somme de 222.749.598, 82 Euros plus intérêts de 10% l'an avec capitalisation annuelle au 31 décembre, sur la période entre le 31 décembre 2003 et jusqu'au parfait paiement ;

11) Décide que la République du Congo devra supporter 75% des frais de l'arbitrage fixés par la Cour Internationale d'Arbitrage de la CCI à US$ 1,140,000 et que Commisimpex devra supporter 25% de cette somme ;

12) En conséquence, condamne la République du Congo à verser US$ 855,000 ;

13) Condamne la République du Congo à rembourser à Commisimpex la somme de 1.956.425 Euros au titre de ses frais légaux ;

14) Rejette toutes les autres demandes des parties.


Lieu de l'arbitrage : Paris (France)
Date:2/10/2013
Signatures:


Yves DERAINS
Président


Bernard HANOTIAU
Arbitre


Carole MALINVAUD
Arbitre