Exhibit 11



**International Chamber of Commerce**
*The world business organization*

**International Court of Arbitration** • **Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration** • **Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org   E-mail arb@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 16257/EC/ND/MCP

COMMISSIONS IMPORT EXPORT S.A., USING THE BUSINESS NAME COMMISIMPEX

(Rep. of the Congo)

v.

REPUBLIC OF THE CONGO

(BRAZZAVILLE) (Republic of the Congo)

This document is an original version of the Final Award rendered pursuant to the ICC International Court of Arbitration's Rules of Arbitration.

# INTERNATIONAL CHAMBER OF COMMERCE

## FINAL AWARD

### ICC Case No. 16257/EC/ND/MCP

**BETWEEN:**

**COMMISSIONS IMPORT EXPORT S.A.,** using the business name "Commisimpex" with its headquarters at 86, avenue Foch, Quartier Cathédrale, BP 1244 Brazzaville, **REPUBLIC OF THE CONGO;**

Represented by Mr. Michael Polkinghome, Mr. Charles Nairac, Mr. Christophe Seraglini and Mrs. Elizabeth Lefebvre-Gross, WHITE & CASE, 19 place Vendôme, 75001 Paris, **FRANCE**

Claimant,

Hereinafter "Commisimpex" or the "Claimant"

**AND:**

**THE REPUBLIC OF THE CONGO,** President of the Republic, Palais Présidentiel, Quartier Plateau, Brazzaville, **REPUBLIC OF THE CONGO;**

Represented by Mr. Jean-Pierre Vignaud, Mr. Jean-Yves Garaud and Mr. Charles de Taffin, CLEARY, GOTTLIEB, STEEN & HAMILTON LLP., 12 rue de Tilsitt, 75008 Paris, **France,**

Respondent,

Hereinafter "the Congo" or "Republic of the Congo" or "Respondent"

# TABLE OF CONTENTS

I.      FACTS ................................................................................................................................. 3
II.     PROCEDURE ...................................................................................................................... 4
III.    POSITION OF THE PARTIES ......................................................................................... 32
   A.  Position of the Claimant ................................................................................................ 32
   B.  Position of the Respondent ............................................................................................ 38
IV.     DISCUSSION ..................................................................................................................... 45
   •    PRELIMINARY MATTERS ARISING FROM THE COURT-ORDERED LIQUIDATION
        OF COMMISIMPEX ...................................................................................................... 45
   •    THE DISPUTE BETWEEN THE PARTIES ................................................................. 52
   A.   Regarding the *res judicata* effect of ICC Award No. 9899 dated 3 December 2000 ...... 52
   B.   Regarding the validity of the 2003 Protocol and its binding nature ............................... 54
        a.  Regarding the alleged absence of authority of the signatories
            of the 2003 Protocol ............................................................................................ 54
        b.  Regarding the alleged non-binding nature of the 2003 Protocol ............................. 59
        c.  Regarding the ignorance of the amount of the debt-as presented
            in the 2003 Protocol ............................................................................................ 64
        d.  Regarding the alleged absence of *causa* of the 2003 Protocol ............................ 65
   C.   Regarding the amounts owed by the Republic of the Congo to Commisimpex .............. 73
        a.  The 440,000,000 FRF debt (Article 1 of the 2003 Protocol) ................................. 74
        b.  The 520,000,000 FRF debt (Articles 3 and 4 of the 2003 Protocol) ...................... 76
   D.   Allocation arbitration costs ........................................................................................... 78

# I.    **FACTS**

**1.**   From 1984 to 1986, Commisimpex and the Republic of the Congo executed several contracts for public works and the supply of equipment and amendments to these contracts[1], financed by means of credit granted by Commisimpex in favor of the State, in the form of promissory notes issued by the *Caisse Congolaise d'Amortissement* (hereinafter "CCA") to be guaranteed by the State.  The completion of such works was verified by means of completion certificates.

**2.**   On 22 December 1986, the Republic of the Congo, represented by its Ministry of Finance and Budget and the *Caisse Congolaise d'Amortissement*, issued to Commisimpex a guarantee for payment of certain contracts and addenda executed with this guarantee, subject to their complete performance (hereinafter the "1986 Guarantee").

**3.**   Commisimpex and the Republic of the Congo signed on 14 October 1992 Protocol No. 566 (hereinafter the "1992 Protocol," Exhibit C-5).  The 1992 Protocol intended to establish the terms of settlement of the *"outstanding debts"* to repay the suppliers' credits granted by Commisimpex for the *"contracts and addenda attached as appendices to this protocol".*[2]  The *"outstanding debts"* were denominated in French francs, pounds sterling, US dollars and CFA francs; representing approximately 22 billion CFA francs.

**4.**   In its request for arbitration submitted to the International Court of Arbitration of the ICC (hereinafter the "International Court of Arbitration") on 13 March 1998 (Exhibit R-2), in case No. 9899, Commisimpex requested that the Republic of the Congo and CCA be ordered to pay amounts not settled pursuant to the 1992 Protocol. Pursuant to the final award rendered on 3 December 2000 (Exhibit C14), the then arbitral tribunal ordered the Republic of the Congo and the CCA to jointly and severally pay 107 million US Dollars, limiting the award to the amount corresponding to the former promissory notes returned by Commisimpex.

The award was held to be enforceable by the Paris *Tribunal de Grande Instance* on 12 December 2000.  The Congo and CCA filed an appeal for nullity before the Court of Appeal of Paris on 2 January 2001, which was rejected on 23 May 2002.

**5.**   On 23 August 2003, Commisimpex, on the one hand and Mr. Gabriel Longobé, designated minister, Secretary General of the Office of the President of the Republic, and Mr. Jean-Dominique Okemba, Secretary of State, Secretary General of the Security Council, on the other, executed Protocol No. 706 (hereinafter the "2003 Protocol") (Exhibit C27).  The 2003 Protocol established the procedures for the repayment of the debt of the Republic of the Congo, which was considerably higher than that set out in the 1992 Protocol and estimated at 48 billion CFA francs as of 30 September 1992.  The 2003 Protocol described *"the debt of the*

---

[1]        Contract 353/83 was executed by the Congo and the company APV Hall International Limited on 10 November 1983 (Exhibit C-40).  Commisimpex and the State then executed addenda Nos. 1, 3, 4 and 5 to Contract 353/83 (Exhibits R-23, R-24, R-21 and R-22); as well as Contract 185/84 dated 25 June 1984 (Exhibit R-6); Contract 83/85 dated 24 June 1985 and addendum No. 1 thereto (Exhibits R-25 and R-26); Contract 009/86/G dated 12 February 1986 (Exhibit R-19); contract 015/86 dated 26 March 1986 and addendum No. 1 thereto (Exhibits R-4 and R-20) and Contract 53/86 dated 1 July 1986 (Exhibit R-5).

[2]        The appendix to the 1992 Protocol, however, has not been communicated in these proceedings.

*Congolese State"* as comprising a *"first portion"* of 22 billion CFA francs, [that was] *"the subject of the [1992] Protocol,"* and a *"second portion"* of 26 billion CFA francs. The 2003 Protocol provided for the State to agree to *"execute with Commisimpex a Definitive Protocol replacing the present Protocol, to close out the negotiations in progress"* (Article 6).

**6.** This dispute relates to the effects of the 2003 Protocol, the enforcement of which is requested by Commisimpex, which argues that this Protocol amounts to the acknowledgement by the Republic of the Congo of its total debt to Commisimpex, while the Republic of the Congo claims that it is null and void. According to the Congo, the issue of its debt owed to Commisimpex was definitively settled by the 1992 Protocol and by the arbitral tribunal established in ICC case No. 9899, which led to an award carrying the *res judicata* effect.

## II. **PROCEDURE**

**7.** On 21 April 2009, the Secretariat of the International Court of Arbitration of the ICC (hereinafter the "ICC Secretariat") acknowledged receipt of the request for arbitration submitted by Commisimpex on 17 April 2009. The Claimant noted that it wished the matter to be submitted to a panel of three arbitrators and appointed Professor Bernard Hanotiau as arbitrator.

**8.** On 22 April 2009, the ICC Secretariat conveyed this request for arbitration to the Republic of the Congo.

**9.** On 4 and 5 May 2009, the Claimant forwarded to the ICC Secretariat a letter accompanied by a two page modification to its request for arbitration, receipt of which the Secretariat acknowledged on 6 May 2009.

**10.** On 26 May 2009, the firm Cleary Gottlieb informed the ICC Secretariat that it represented the Respondent in this matter and indicated that the Respondent, having agreed that the matter be submitted to a panel of three arbitrators, appointed Me. Carole Malinvaud as an arbitrator.

**11.** On 3 June 2009, the ICC Secretariat forwarded a copy of the statement of acceptance and independence of Me. Carole Malinvaud to the parties.

**12.** On 4 June 2009, the ICC Secretariat forwarded a copy of the statement of acceptance and independence of Professor Bernard Hanotiau to the parties.

**13.** On 8 June 2009, the Respondent informed the ICC Secretariat that it intended to challenge the existence, the scope and the validity of the arbitration clause invoked by the Claimant in its request. The Respondent added that it agreed that the place of arbitration would be Paris and that the arbitration would be conducted in French.

**14.** On the same day, the Claimant accepted the proposal of the Respondent regarding the joint appointment of the Chair of the Arbitral Tribunal by the co-arbitrators and suggested a deadline for this appointment of 30 June 2009.

**15.** On 11 June 2009, the ICC Secretariat requested whether the parties would, if the arbitration were to take place, agree to a special term to be granted to the co-arbitrators as of the date on which they receive notification of their confirmation in order to attempt to jointly appoint the Chairman of the Arbitral Tribunal.

**16.** On 18 June 2009, the parties stated by their respective letters to the ICC Secretariat that the co-arbitrators had a term of three weeks as of the date on which they received notification of their confirmation to jointly appoint the Chairman of the Arbitral Tribunal. The ICC Secretariat acknowledged receipt of these letters on 19 June 2009.

**17.** On 25 June 2009, the Responded requested an additional term of fifteen days, i.e. through 10 July 2009, to submit its response to the request for arbitration.

**18.** On 26 June 2009, the Claimant indicated its hope that the Respondent would submit its response to the request for arbitration as soon as possible.

**19.** On 29 June 2009, the ICC Secretariat extended the term granted to the Respondent to submit its response to the request for arbitrationuntil 6 July 2009.

**20.** On 8 July 2009, the ICC Secretariat acknowledged receipt of the response to the request for arbitration from the Respondent, dated 6 July 2009.

**21.** On 17 July 2009, the Claimant forwarded its comments regarding the objections to the jurisdiction of the Tribunal put forth by the Respondent. The ICC Secretariat acknowledged receipt of this letter on 20 July 2009.

**22.** On 30 July 2009, the ICC Secretariat informed the parties that the International Court of Arbitration of the ICC had decided that the arbitration would take place pursuant to Article 6 (2) of the Rules and confirmed Professor Bernard Hanotiau and Me. Carole Malinvaud as co-arbitrators.

**23.** On the same date, the ICC Secretariat informed the co-arbitrators that they had 21 days to jointly appoint the Chairman of the Arbitral Tribunal.

**24.** On 7 August 2009, Me. Carole Malinvaud informed the ICC Secretariat that she and Professor Hanotiau jointly proposed that Me. Yves Derains be Chairman of the Arbitral Tribunal.

**25.** On 10 August 2009, Professor Bernard Hanotiau confirmed to the ICC Secretariat that he and Me. Carole Malinvaud had jointly proposed that Me. Yves Derains be Chairman of the Arbitral Tribunal.

**26.** On 14 August 2009, the ICC Secretariat forwarded to the parties a copy of the statement of acceptance and independence of Me. Yves Derains.

**27.** On 28 August 2009, the Secretary General of the International Court of Arbitration of the ICC confirmed Me. Yves Derains as the Chairman of the Arbitral Tribunal, and the Tribunal was thus established as follows:

Professor Bernard Hanotiau
HANOTIAU & VAN DEN BERG
IT Tower, 9th Floor
480 Avenue Louise – Box 9
1050 Brussels
Belgium
Tel.:      +32 2 290 39 00
Fax:      +32 2 290 39 39
Email:  Bernard.hanotiau@hvdb.com
(Co-arbitrator)

Me. Carole Malinvaud
GIDE LOYRETTE NOUEL
26, Cours Albert 1er
75008 Paris
France
Tel.:      +33 (0) 1 40 75 36 66
Fax:      +33 (0) 1 40 75 69 36
Email:  malinvaud@gide.com
(Co-arbitrator)

Me. Yves Derains
DERAINS & GHARAVI
25 rue Balzac
75008 Paris
France
Tel.:      +33 (0) 1 40 55 51 00
Fax: +33 (0) 1 40 55 51 05
Email:  yvesderains@derainsgharavi.com
(Chairman of the Arbitral Tribunal)

**28.** On the same date, the case file was forwarded to the arbitrators.

**29.** On 11 September 2009, the Arbitral Tribunal forwarded the drafts of the Terms of Reference and Procedural Order No. 1 to the parties, in order to obtain their comments as well as a summary of their positions.

**30.** On 21 September 2009, the parties forwarded their comments regarding the Terms of Reference as well as the summary of their positions to the Arbitral Tribunal.

**31.** On 24 September 2009, the Arbitral Tribunal forwarded another draft of the Terms of Reference incorporating the positions of the parties as well as their comments.

**32.** On 30 September 2009, the Claimant made a new request for reparation of non-pecuniary harm.

**33.** On 1 October 2009, a meeting between the Arbitral Tribunal and the parties was held in Paris.

**34.** On the same day, the Arbitral Tribunal forwarded to the International Court of Arbitration the Terms of Reference signed by the parties and the Tribunal.

**35.** On the same day, the Arbitral Tribunal also forwarded to the parties Procedural Order No. 1, which read as follows:

> *"Whereas on 1 October, a meeting was held in Paris before the Arbitral Tribunal, the parties and their counsel;*
>
> *Whereas on the same date, the parties executed the Terms of Reference;*
>
> *Whereas Me. Catherine Schroeder was appointed as Secretary of the Arbitral Tribunal;*
>
> *Whereas by letter dated 30 October 2009 the Claimant reported that it was not at that time able to discuss the provisional calendar:*
>
> ***The Arbitral Tribunal holds as follows:***
>
> ***1.     Provisional Calendar***
>
> *1.1.1   The Parties will attempt to jointly establish a provisional calendar and will report on the status of their discussions to the Arbitral Tribunal by 16 October 2009.*
>
> *1.1.2   A conference call between the Parties and the Arbitral Tribunal will take place on 20 October in order to finalize the provisional calendar.*
>
> ***2.     Exchange of Submissions***
>
> *2.1     The Parties may submit their arguments of fact and of law in two successive exchanges of briefs, according to the established calendar.*
>
> *2.2     The briefs must be submitted in A4 or A5 format and in electronic version (Word and PDF).*
>
> *2.3     The briefs of the parties must include all arguments of fact and all arguments of law justifying the conclusions reached, in the form of numbered paragraphs. The parties shall make separate submissions, specifically numbering each of their arguments.*
>
> *2.4     In their briefs, the parties shall indicate the nature of the evidence that they intend to submit to support their arguments of fact (exhibits, witness statements, expert opinions, etc.) or of law (extracts of case law or legal scholarship, with complete references).  The briefs shall be accompanied by a table of contents.*
>
> *2.5     The exhibits submitted by the parties to the Arbitral Tribunal shall be numbered sequentially (for the Claimant, "C-..."; for the Respondent, "R-...") and attached to the briefs to which they correspond.  They will furthermore be accompanied by a list indicating the date and the author of each of them; this list will be updated by the parties whenever a new exhibit is submitted.  The appendices containing passages of case law or legal scholarship will be numbered sequentially (for the Claimant, "CL-..."; for the Respondent, "RL-...").*

2.6     Exhibits submitted to the Arbitral Tribunal must be submitted in their entirety and the specified passages must be identified. Photocopies will be sufficient, unless the opposing party challenges the authenticity of the document, in which case the Arbitral Tribunal may request the production of the original document or of a certified copy of the original.

2.7     One party may request that the opposing party submit any document which it does not have if the same is in possession of it or, [if it is] under the control of the opposing party, if the document is sufficiently identified and relevant to the resolution of the dispute.

        If the party to whom such a request was submitted refuses to comply, the Arbitral Tribunal can order the production of the document(s) in question, upon request by the concerned party. The parties must make any claims to the Arbitral Tribunal jointly, on the date indicated in the provisional calendar above. This joint request must identify the document(s) in a sufficiently clear manner and must indicate how the document(s) is (are) relevant ("Redfern Schedule"). The Arbitral Tribunal shall have full authority to rule and shall in particular take into consideration the legitimate interests of the party to which the production request was sent. IF a document was considered confidential by the party receiving the request, it shall so inform the Arbitral Tribunal and the opposing party. The Arbitral Tribunal shall then take all measures necessary to ensure that this document is protected while making an effort, to the extent possible, to authorize its production.

        The Arbitral Tribunal shall freely evaluate and determine the consequences of any refusal by a party to comply with the order to produce documents.

2.8     The Arbitral Tribunal may also at any time request that either of the parties submit a document that it deems relevant for resolution of the dispute.

2.9     The parties shall not be authorized to submit new exhibits after the exchange of submissions, subject to express authorization by the Arbitral Tribunal.

3.      **Testimony by witnesses and experts**

3.1     Any person may be heard, including the parties and their managers.

3.2     The parties shall submit written statements of the witnesses indicated in their submissions, as attachments thereto, except for witnesses that are under the control of the opposing party or those who refuse to testify.

3.3     Only the witnesses that are requested to be cross-examined by a party shall testify. The appearance of others will be waived, unless the Arbitral Tribunal wishes to hear from them. If one party does not require the cross-examination of a witness, it shall nonetheless not be considered to have accepted the contents of that witness' affidavit. In this case, it will be at the sole discretion of the Arbitral Tribunal to attribute value to the affidavit.

3.4     Witnesses / experts shall in principle be summoned by the party from which they provided a written statement or a report.

3.5     When a summoned witness is subject to the control of the opposing party, that party will use its best endeavors to have the witness appear.

3.6    If a duly summoned witness cannot appear for a valid reason, that witness' written statement may nevertheless be taken into consideration by the Arbitral Tribunal, according to the circumstances and inasmuch as it is not challenged.

3.7    The hearings for witnesses and experts shall in principle take place according to the following procedure:

a.    The witnesses and experts shall first be invited by the Arbitral Tribunal to confirm their written statement. This shall take place under direct examination subject to a possible brief introduction.

b.    Notwithstanding an order to the contrary by the Arbitral Tribunal, witnesses and experts whose statements were delivered in a written statement will be questioned only by the counsel for the opposing party ("cross examination").

c.    The counsel for the opposing party shall, if it requests, have the opportunity to ask questions related to the answers given (re-examination); the opportunity will then be offered to the counsel of the other party to ask additional questions.

d.    The Arbitral Tribunal may ask witnesses and experts questions at any time and may authorize additional questioning.

3.8    If it is deemed necessary, the experts may begin with an introduction, which must, however, be brief.

3.9    The Arbitral Tribunal reserves the right to hear from several witnesses or experts simultaneously, in order to be able to compare their points of view.

3.10   The representatives of the parties may attend all hearings; the witnesses and the experts may only attend after their hearing.

3.11   The costs related to hearing a witness or an expert shall be borne by the party that summoned that witness or expert, subject to the final award of the Arbitral Tribunal regarding the distribution of such expenses. If a witness is summoned by both parties, the party under whose control this witness is shall bear the costs related to his testimony. If a witness is not under the control of either party, the costs related to his testimony shall be divided evenly between the parties.

3.12   Testimony hearings shall have minutes drawn up in French, prepared by a stenographer, the costs of which shall be advanced in equal parts by the parties."

**36.**    On 16 October 2009, the Claimant informed the Arbitral Tribunal of the status of the discussions between the parties regarding the provisional calendar, indicating that they would like the Arbitral Tribunal to rule, by way of a partial award, on the matter of its jurisdiction, before any substantive consideration of the merits of the parties' claims. The Claimant forwarded a provisional calendar prepared by the parties in the event that the Tribunal granted this request.

**37.**    On the same day, the Respondent stated that, for its part, the matter of jurisdiction was tied to the merits, but that it would defer to the wisdom of the Tribunal. The Respondent added that in the event that the Arbitral Tribunal accepted the bifurcation of the proceedings, such bifurcation should cover all procedural pleas and that it was only in that case that it

would accept the calendar established by Commisimpex. Otherwise, it confirmed that it was in agreement to establish a provisional calendar with the Claimant.

**38.**     On 19 October 2009, the Arbitral Tribunal acknowledged receipt of the respective letters of the parties and confirmed the conference call that was to take place between the parties and the Tribunal on 20 October 2009 in order for them to state their respective positions. On 20 October 2009, a conference call took place between the parties and the Arbitral Tribunal.

**39.**     On the same day, the counsel for the Respondent forwarded to the Arbitral Tribunal its power of attorney to represent Republic of the Congo, signed by Ambassador Lopès.

**40.**     On the same day, the Arbitral Tribunal forwarded Procedural Order No. 2 to the parties, which specified that:

> *"Whereas pursuant to Procedural Order No. 1, the parties have, by letters dated 16 October 2009, informed the Arbitral Tribunal of the status of their discussions regarding the establishment of a procedural calendar;*
>
> *Whereas the parties have reported their respective positions regarding the bifurcation of the proceedings during a conference call between them and the Arbitral Tribunal on 20 October 2009;*
>
> ***The Arbitral Tribunal holds as follows:***
>
> *1.1     The Arbitral Tribunal accepts the provisional calendar established by the parties, assuming that the bifurcation takes place, as follows:*
>
>> *- Memorial of the Respondent regarding jurisdiction and procedural pleas: 11 December 2009;*
>>
>> *- Counter-Memorial from the Claimant: 29 January 2010;Reply from*
>>
>> *- Reply from the Respondent: 26 February 2010;*
>>
>> *- Rejoinder from the Claimant: 26 March 2010.*
>>
>> *- A hearing is scheduled for 26 April 2010.*
>
> *1.1.1     The Arbitral Tribunal reserves the right, after these two exchanges of briefs, or upon completion of the scheduled hearing, to adjourn any plea as to jurisdiction and/or procedure on the merits if it believes that it has insufficient information to rule on these matters."*

**41.**     On 29 October 2009, the Claimant requested that the Respondent provide a power of attorney signed before a notary as well as a copy of the documents demonstrating the authority of Ambassador Lopès to make commitments on behalf of the Congo.

**42.**     On the same day, the Arbitral Tribunal invited the Respondent to submit its comments regarding the letter of the Claimant by 3 November 2009.

**43.**     On 3 November 2009, the Respondent challenged the submission of a power of attorney having to be signed by a notary, as such is not required by French law proposed instead, a presumption of an *ad litem* mandate in favor of the attorneys.

**44.**     On 5 November 2009, the Claimant stated that it was satisfied with the assurances provided by the Respondent as to its capacity to represent the Republic of the Congo.

**45.**     On the same date, the Respondent informed the ICC Secretariat that it considered this proceeding to be abusive and reported significant financial difficulties.

**46.**     On 6 November 2009, the Arbitral Tribunal acknowledged receipt of the respective letters from the parties and noted that the matter of the representation of the Respondent was now settled.

**47.**     On 12 December 2009, the Respondent its sent Memorial on Jurisdiction to the Arbitral Tribunal and to the Claimant.

**48.**     On 29 January 2010, the Claimant sent its Counter-Memorial Jurisdiction to the Arbitral Tribunal and to the Respondent.

**49.**     On 26 February 2010, the Responde sent
nt its Reply on Jurisdiction to the Arbitral Tribunal and to the Claimant.

**50.**     The International Court of Arbitration, during its session on 11 March 2010, pursuant to Article 24 (2) of the Rules, extended the term for issuing a Final Award through 30 June 2010.

**51.**     On 26 March 2010, the Claimant it sent
s Rejoinder on Jurisdiction to the Arbitral Tribunal and to the Respondent.

**52.**     On 8 April 2010, the Arbitral Tribunal confirmed to the parties that a hearing would take place on 26 April 2010.

**53.**     On 14 April 2010, the Arbitral Tribunal received a letter from the Claimant reporting that an agreement had been reached by the parties regarding the procedures for organizing the hearing, subject to the approval of the Arbitral Tribunal.

**54.**     On the same day the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and approved the procedures for organizing the hearing.

**55.**     By letter dated 22 April 2010, the Arbitral Tribunal forwarded to the parties an email that read as follows:

> *"The Arbitral Tribunal would appreciate if the parties were willing to present their views at Monday's hearing regarding the notion and the legal consequences of the 'registration by CCA of the Commisimpex debt as a debt owed by the State which appears in the reasoning of two Congolese first instance decisions:*
> -         *'order that the* Caisse Congolaise d'Amortissement (CCA) *record all these amounts as a debt owed by the State etc....' (C 20 pp. 34 and 35).*

-       *'order the* Caisse Congolaise d'Amortissement (CCA) *to record the totality of the amounts owed confirmed by Commisimpex, acknowledged and ordered per the hearing sheet dated 27 March 2002 etc....' (C24, pp. 47-49)."*

**56.**      The hearing was held on 26 April as scheduled. During the hearing, it was decided that the parties would inform the Arbitral Tribunal whether, and within what term, they would be prepared to submit the elements of Congolese law specifying the nature of recording a debt as a debt owed by the State.

**57.**      On 3 May 2010, the Arbitral Tribunal set a term ending on 7 May 2010 to the parties for providing such information.

**58.**      At the request of the Respondent, this term was extended to 19 May 2010 by letter from the Arbitral Tribunal dated 10 May 2010. In the same letter, the Arbitral Tribunal ordered that the proceedings be closed, pursuant to Article 22 (1) of the ICC arbitration rules.

**59.**      By letter dated 11 May 2010, the Arbitral Tribunal specified that, in the event that the Claimant made a request after examination of any documents submitted by the Respondent, it would take appropriate measures.

**60.**      By letter dated 19 May 2010, the Respondent submitted the following texts of Congolese Law:

-       Law No. 1.2000 dated 1 February 2000, the institutional act relative to the State financial system;
-       Decree No. 2000-187 dated 10 August 2000, regarding the general regulation on public accounting.

**61.**      The Claimant did not make any request whatsoever after these texts were submitted.

**62.**      On 9 June 2010, the Arbitral Tribunal acknowledged receipt, as a matter of form, of the texts of Congolese law submitted by the Respondent on 19 May 2010.

**63.**      The International Court of Arbitration, during its session on 10 June 2010, pursuant to Article 24 (2) of the Rules, extended the term for rendering the Final Award to 31 August 2010.

**64.**      On 20 August 2010, the Arbitral Award rendered its Partial Award, which was notified to the parties by the Secretariat of the Court on 24 August 2010. In this award, the Arbitral Tribunal held that:

*"1) The Arbitral Tribunal declares itself competent to settle this dispute;*

*2) The Arbitral Tribunal assigns the matter of the* res judicata *effect of the arbitration award dated 3 December 2000 rendered in ICC Case No. 9899 to the merits of this case;*

*3) The allocation of costs of the arbitration corresponding to this phase of the proceeding will be decided in the final award;*

*4) All other claims of the parties are assigned for consideration during discussion of the merits."*

In order to issue this award, the Arbitral Tribunal based its decision on the following arbitration clause:

*"In the event of a disagreement as to the interpretation, performance or any other difficulties of the parties relative to the present protocol, the parties agree to work together to reach an amicable settlement; absent the same, the dispute shall be resolved by one or several arbitrators appointed pursuant to the arbitration rules of the International Chamber of Commerce (Paris), ruling in the first and final instance."*

appearing in Article 10 of the Protocol dated 14 October 1992, the signatories of which are the Republic of the Congo and Commisimpex, and which is applicable in the case before us as stated by the Partial Award dated 20 August 2010. Since this clause is silent as to applicable law, it was decided, by agreement of the parties, that the applicable law was French law (Item VIII of the Terms of Reference).

**65.** On 2 September 2010, the Arbitral Tribunal informed the parties that the International Court of Arbitration, in its session dated 12 August 2010, had extended the term for rendering the Final Award through 30 November 2010.

**66.** On 7 September 2010, the Arbitral Tribunal requested that the parties forward their proposals regarding proceedings as to the merits by 17 September 2010, adding that after this submission a conference call would take place with the Arbitral Tribunal.

**67.** On 17 September 2010, the Claimant stated that the parties were in the process of preparing a joint calendar and that they would contact the Arbitral Tribunal within the next several days with a joint proposed calendar. They also requested that the conference call be postponed to a later date.

**68.** On 20 September 2010, the Arbitral Tribunal acknowledged receipt of the email from the Claimant dated 20 September 2010 and noted that the scheduled conference call would not take place. On the same day, the Arbitral Tribunal proposed other dates to the parties for holding this conference call.

**69.** After discussion with the parties, the Arbitral Tribunal stated on 23 September 2010 that the conference call would be held on 30 September 2010.

**70.** On 27 September 2010, the Claimant informed the Arbitral Tribunal that the parties had agreed on the procedural calendar. On the same date, the Arbitral Tribunal acknowledged receipt of this message.

**71.** On 30 September 2010, a conference call was held between the Arbitral Tribunal and the parties.

**72.** On 4 October 2010, the Arbitral Tribunal forwarded Procedural Order No. 3 to the parties, which read as follows:

*"Whereas a conference call was held between the Arbitral Tribunal and the parties on 30 September 2010, in order to organize the proceedings as to the merits;*

*Whereas the parties indicated that they had agreed to the following dates for submission of their respective briefs:*

> *- Memorial, 10 January 2011;*
> *-Counter-Memorial, 10 May 2011;*
> *- Reply, 10 August, 2011;*
> *- Rejoinder, 10 November 2011.*

*Whereas it was scheduled that the parties would inform the Arbitral Tribunal on 18 November 2011 of the names of witnesses that they wished to be heard at the hearing;*
*Whereas a conference call was scheduled to prepare for the hearing between the Arbitral Tribunal, which could be represented by its Chairman, and the parties, on 23 November 2011 at 6 p.m.;*
*Whereas the dates of 19 December through 23 December 2011 were selected for holding the hearing as to the merits in Paris, with the understanding that it is possible that not all the days would be used.*

### *THE ARBITRAL TRIBUNAL HOLDS:*

1.  *The following schedule is adopted:*

| Procedural Act | Date | Parties |
|---|---|---|
| *Memorial* | *10 January 2011* | *Claimant* |
| *Counter-Memorial* | *10 May 2011* | *Respondent* |
| *Reply* | *10 August 2011* | *Claimant* |
| *Rejoinder* | *10 November 2011* | *Respondent* |
| *Names of witnesses to be heard at the hearing* | *18 November 2011* | *Claimant / Respondent* |
| *Conference call* | *23 November 2011* | *Arbitral Tribunal (Chairman) / Parties* |
| *Hearing* | *19 to 23 December 2011* | *Arbitral Tribunal / Parties* |

2.      *The provisions of Procedural Order No. 1 remain applicable."*

**73.**     On 17 November 2010, the Arbitral Tribunal informed the parties that the International Court of Arbitration had, in its meeting on 10 November 2010, and pursuant to Article 24 (2) of the ICCRules, extended the term for the submission of the Final Award to 31 May 2011.

**74.**     On 10 January 2011, the Claimant submitted its Memorial.

**75.**     On 9 May 2011, the Respondent informed the Arbitral Tribunal that it was not able to submit its Counter-Memorial by 10 May and requested, by agreement with the Claimant, an extension to 15 May 2011.  On the same date, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and agreed to the extension of the term to 15 May 2011.

**76.**     On 10 May 2011, the Claimant acknowledged the extension, which it had approved of, emphasizing that the rest of the procedural calendar would be unchanged.  On the same date, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant.

**77.**     On 16 May 2011, the Respondent sent its Counter-Memorial on the merits to the Arbitral Tribunal.

**78.**     On 17 May 2011, the ICC Secretariat informed the Arbitral Tribunal and the parties that, during its session on 12 May 2011, and pursuant to Article 24 (2) of theRules, the International Court of Arbitration had extended the term for rendering the Final Award to 31 March 2012.

**79.**     On 19 May 2011, the Arbitral Tribunal asked the parties whether they had taken the necessary steps regarding the booking of a room for the hearing.

**80.**     On 20 July 2011, the Claimant stated, on behalf of the parties, that they understood that the hearing would take place over a period of 4 days, from 19-22 December 2011, and that the hearing would take place in the offices of White and Case.  On the same day, the Arbitral Tribunal acknowledged receipt of the joint letter from the parties.

**81.**     On 11 August 2011, the Claimant sent its Reply on the merits to the Arbitral Tribunal.

**82.**     On 26 October 2011, the Arbitral Tribunal proposed changing the time of the conference call scheduled for 23 November 2011 and requested that the parties specify the items that they wished to deal with during the conference call no later than on 15 November.

**83.**     On 4 November 2011, the Arbitral Tribunal, in the absence of a response by one of the parties, confirmed the time change of the conference call.

**84.**     On 9 November 2011, the Respondent stated that it was not able to file its Rejoinder by 10 November 2011 and requested an extension to 20 November 2011.  On the same date, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and invited the Claimant to make any comments by 10 November 2011.  On the same date, the Claimant challenged this extension and requested that the

Arbitral Tribunal order the Respondent to submit its Rejoinder by 13 November 2011. On 10 November 2011, the Arbitral Tribunal stated that it was aware of the request for an extension by the Respondent as well as the objections of the Respondent [sic] and extended the submission deadline for the Rejoinder to 15 November 2011, deeming the extension requested by the Respondent to be excessive.

**85.**     On 15 November 2011, the Claimant forwarded the points that it wished to cover during the conference call scheduled for 23 November 2011 to the Arbitral Tribunal. On the same day, the Respondent also indicated the subjects that it thought should be covered.

**86.**     On 16 November 2011, the Respondent forwarded its Rejoinder to the Arbitral Tribunal.

**87.**     On the same day, the Arbitral Tribunal acknowledged receipt of the letters from the parties dated 15 November 2011 concerning the organization of the hearing and indicated the agenda for the conference call to be held on 23 November 2011.

**88.**     On 18 November 2011, the parties informed the Arbitral Tribunal of the list of witnesses and experts that they wished to hear at the hearing.

**89.**     On 23 November 2011, the Claimant requested that the Arbitral Tribunal kindly accept the inclusion in the case of a new affidavit of Mr. Mbéri, witness, which was attached to his email. On the same day, the Respondent made comments regarding the production of such an affidavit, stating that if the Arbitral Tribunal were to accept this submission, a term must be granted to the Respondent for it to submit an answer.

**90.**     On the same day, a conference call took place between the Arbitral Tribunal and the parties.

**91.**     On the same day, the Respondent stated that it had failed to mention during the conference call that the President of the Republic, Mr. Sassou N'Guesso, a witness, was not able to come to testify at the hearing due to his schedule. Further, the Respondent forwarded a complete copy of the affidavit of Mr. Ikemo, witness, of October 2011, which lacked an appendix.

**92.**     On 24 November 2011, the Arbitral Tribunal forwarded Procedural Order No. 4 which read as follows:

*"Whereas a conference call was held between the Arbitral Tribunal and the parties on 23 November 2011 for the purpose of organizing the hearing to hear witnesses scheduled for 19-22 December 2011;*
*Whereas by letter dated 23 November 2011, the Claimant forwarded to the Arbitral Tribunal and to the Respondent an additional affidavit of Mr. Mbéri, requesting that it be added to the case;*
*Whereas by letter on the same day, the Respondent challenged this submission, stating that it would consequently request the right to submit documents and/or an affidavit in answer;*

*Whereas the parties had the opportunity to clarify their position in this regard during the conference call:*

### THE ARBITRAL TRIBUNAL HOLDS:

1) *Organization of the hearing*

- *The hearing will begin every day at 9:30 a.m. and will end at 5:30 p.m. (reserving the possibility of extending the ending time, if necessary);*

- *There will be two short breaks during the day, and a lunch break lasting one and one-half hours, during which each party is free to do what it wishes (the Arbitral Tribunal however accepts the offer of the parties relative to meal choices for the 1st day of the hearing);*

- *The hearing of introductory statements from the Claimant and then the Respondent will last about one hour each;*

- *Then the witnesses and experts will be heard, in an order that the parties will be invited to agree upon, knowing that in any event, the witnesses of the Claimant will be questioned first, followed by the witnesses and experts of the Respondent;*

- *The statements by the Claimant's witnesses will take place through 20 December in the evening and will be followed by those of the Respondent through 22 December in the evening;*

- *The parties may directly examine their witnesses/experts for a period of 10 minutes before they submit [sic] to cross-examination by the opposing party;*

- *At the end of the hearing, it will be decided whether the Arbitral Tribunal wishes to hear concluding statements from the parties on a subsequent date or whether it prefers to receive post-hearing briefs in writing;*

- *The parties must submit to the questioned witness/expert, to the opposing party and to each member of the Arbitral Tribunal, a copy of the documents that they wish to use during the examination of said witness, in the form deemed the most appropriate by each of the parties;*

- *The parties must also make available to the Arbitral Tribunal a complete file of all the file components as well as a chronological file containing the initial references to the items. The Claimant shall be responsible for preparing the latter.*

2) *The affidavit of Mr. Mbéri is accepted for inclusion in the file;*

3) *The Respondent is granted until 12 December 2011 to comment on this affidavit and/or to submit a new affidavit in reply,along with any exhibits;*

4) *The parties are invited to forward to the Arbitral Tribunal the order of hearing of witnesses and experts agreed upon by the parties, no later than 12 December 2011."*

**93.**     On 25 November 2011, the Claimant commented on the letter of the Respondent relative to the inability of President Sassou N'Guesso to come to testify at the hearing

noting that it would invite the Arbitral Tribunal to draw all applicable conclusions from the refusal of President Sassou N'Guesso to testify.

**94.** On 12 December 2011, the Respondent stated that it was not submitting another affidavit in answer to that of Mr. Mbéri, forwarded by Commisimpex on 23 November 2011. On the same date, the Claimant forwarded the order in which it wished to question the witnesses presented by the Respondent and requested that four new documents be included in the case file.

**95.** On 15 December 2011, the Respondent requested that the Arbitral Tribunal authorize it to submit another affidavit from Mr. Boukamany, a witness, and indicated the order in which it wished to question the witnesses presented by Commisimpex. On the same day, the Arbitral Tribunal wrote to the parties regarding the order of examination of the witnesses and reminded them to make a complete file of all the case documents as well as a chronological file available to the Arbitral Tribunal.

**96.** On the same day, the Claimant informed the Arbitral Tribunal that Mr. Mbéri had still not arrived in Paris, although he was to arrive on 11 December, stating that he had been physically prevented, and requested that the Arbitral Tribunal order the Republic of the Congo to make every effort necessary to ensure the safety of Mr. Mbéri and allow him to depart from Brazzaville to participate in the hearing.

**97.** On 16 December 2011, the Arbitral Tribunal acknowledged receipt of the letter of the Respondent dated 15 December in which the latter indicated that it wished to include in the case file another affidavit from Mr. Boukamany and invited the Claimant to raise any comments by 17 December 2011. On the same day, the Claimant stated that it had no objection to the inclusion of the affidavit of Mr. Boukamany if Exhibits C200 through C203 were also accepted by the Arbitral Tribunal. It further requested that the order of hearing for witnesses from the Congo by Commisimpex be unchanged.

**98.** On the same day, the Respondent requested to be informed by the Claimant as to where Mr. Mbéri was and specify the measures expected of the Republic of the Congo to allow him to leave the country.

**99.** On the same day, the Arbitral Tribunal acknowledged receipt of the respective correspondence from the parties dated 15 and 16 December 2011, relative to Mr. Mbéri. The Arbitral Tribunal stated that it did not doubt that the Republic of the Congo would make every effort necessary to facilitate the witness' trip to Paris, that it wished to cross-examine, while stating that if Mr. Mbéri or any other witness could not appear at the hearing due to the actions or omissions of either of the parties, it would draw all necessary consequences with regard to the party in question.

**100.** On 17 December 2011, the Claimant reported where Mr. Mbéri was and specified that he was still being prevented from leaving. It then reiterated its request that the Respondent do all that is necessary to immediately grant Mr. Mbéri the freedom to travel.

**101.** On the same day, the Respondent confirmed that the witnesses could be heard in the order desired by the Claimant except for Mr. Andely. In addition, it requested authorization to forward as an exhibit R100 an affidavit from Mr. Mouamba.

**102.** In another letter on the same day, the Respondent also stated that it was not in any way restricting the freedom of movement of Mr. Mbéri and that he had stated that he chose to remain in Brazzaville for personal reasons and had planned to come to Paris on the evening flight next Monday or Wednesday.

**103.** On the same day, the Arbitral Tribunal acknowledged receipt of the correspondence from the parties relative to the status of Mr. Mbéri and invited the Claimant to comment on the statements made by the Respondent. In the evening, the Arbitral Tribunal again wrote to the parties, expressing its surprise that its email had not generated any response. The Claimant then stated that it had not been able to clarify the situation and noted that it would get back to the Arbitral Tribunal the next day.

In addition, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent on the same day relative to the order of examination of witnesses and the request to include another affidavit, stating that any procedural problems resulting therefrom would be discussed at the hearing.

**104.** On 18 December, the Claimant informed the Arbitral Tribunal that, according to a relative of Mr. Mbéri, Mr. Mbéri had been pressured by the Congolese government, which had indicated that his witness testimony would not be welcome. He added that if a conference call were scheduled, Mr. Mbéri would not be speaking freely. The Claimant expressed its disapproval as to the steps taken by the Congo.

On the same day, the Claimant asked whether the Arbitral Tribunal wished it to express its position in writing regarding the request for acceptance of an affidavit from Mr. Mouamba by the Respondent.

The Arbitral Tribunal responded that it had no objection to the Claimant stating its position in writing before the hearing regarding the request for the inclusion of another affidavit, but it was not absolutely necessary. Furthermore, it noted that at this stage the Claimant did not expect any specific action regarding the testimony of Mr. Mbéri but stated that it eagerly wished that Mr. Mbéri could be heard at the hearing and that it trusted that the respondent would do everything in its power to facilitate his travel. Lastly, the Arbitral Tribunal stated that it was available to participate in a conference call with a representative of each of the parties and of Mr. Mbéri in order to clarify the situation.

The Respondent agreed to participate in such a conference call, specifying that the Claimant had stated that it would be able to organize it. The Chairman of the arbitral Tribunal stated that he would conduct this conference call alone, by agreement with his fellow arbitrators. The Claimant then stated that it was not able to organize this conference call, contrary to what the Respondent claimed, since it had not been able to speak to Mr. Mbéri directly. The Claimant then invited the Chairman of the Arbitral Tribunal to contact him directly, while saying that it was available for a conference call after the Chairman had spoken to Mr. Mbéri or his entourage. The Respondent reaffirmed that Mr. Mbéri had never been the subject of any measures preventing him from leaving the Congo and that he had stated to the Minister of State, the Coordinator of Sovereignty, the Minister of Justice and Human Rights, that he had not left Congo for personal reasons and that he intended to take a flight on 19 December. The

Arbitral Tribunal thus concluded that it was no longer necessary, given this information, to have a conversation with Mr. Mbéri before the hearing. The Claimant expressed its agreement and thanked the Respondent for this information.

**105.** A hearing took place in Paris on 19-22 December 2011. On 19 December 2011, the Claimant submitted in writing to the Arbitral Tribunal Exhibit R101 (Decree No. 92-978 dated 25 December 1992 regarding the nomination of members of the government), submitted by the Respondent for the purposes of the hearing.

**106.** On 26 December 2011, the Arbitral Tribunal forwarded Procedural Order No. 5 to the parties, as follows:

> *"Whereas a hearing as to the merits took place in Paris on 19-22 December 2011;*
> *Whereas Messers. Hajaij, Wehbe, Longobé, Lenga, Andely, Ikounga, Boueno, Ikémo, Gossaki and Mouamba were heard as witnesses;*
> *Whereas the parties had the opportunity to fully present their respective positions;*
> *Whereas the Arbitral Tribunal wishes to received post-hearing briefs;*
> *Whereas the Arbitral Tribunal stated that it would like these briefs to be limited in size (approximately fifty pages);*
> *Whereas these briefs must not be accompanied by new exhibits except with the prior authorization of the Arbitral Tribunal;*
> *Whereas these briefs should have the primary purposes of exploiting the witness statements made during the hearing;*
>
> *Whereas the arbitral tribunal wishes more specifically for the parties to state the following two matters: the scope of the 2003 Protocol and the content of the debt owed to Commisimpex, regarding which both parties are invited to make statements;*
>
> *Whereas, although the post-hearing briefs should not be strictly limited to these matters:*
>
> ### THE ARBITRAL TRIBUNAL HOLDS:
>
> *1. The parties shall simultaneously submit their post-hearing briefs on 17 February 2012.*
>
> *2. The parties shall have until 23 March 2012 to simultaneously submit their answers."*

**107.** On 27 January 2012, Mrs. Carole Malinvaud told the parties that one of the members of her firm had signed a contract for services with Quantic Finance Ltd. to perform a general study of Congolese regulations for the implementation of a regulatory framework for the creation of special economic zones and confirmed her impartiality in relation to the parties.

**108.** On 14 February 2012, the Claimant stated that it had no comments to make regarding the information provided by Mrs. Carole Malinvaud.

**109.** On 16 February 2012, Chair of the Arbitral Tribunal received a letter from Mr. Mbéri in which he apologized for his absence from the hearing and confirmed the validity of his affidavits. The Chairman of the Arbitral Tribunal forwarded this letter to the parties on 17 February 2012, and invited them to forward their comments on the same by 24 February 2012.

**110.** On 17 February 2012, Mrs. Carole Malinvaud acknowledged receipt of the letter from the Claimant dated 14 February 2012 and stated that she would inform the parties if the duties of her firm changed.

**111.** On the same day, the parties forwarded to the Arbitral Tribunal their first post-hearing brief.

**112.** On 18 February 2012, the Arbitral Tribunal acknowledged receipt of the post-hearing briefs of the parties.

**113.** On 20 February 2012, the Respondent sent its comments on the letter sent by Mr. Mbéri to the Arbitral Tribunal, proposing a hearingdate for cross-examination, suggesting his possible presence in Paris. On the same day, the Arbitral Tribunal acknowledged receipt of this letter.

**114.** On 24 February 2012, the Claimant requested from the Arbitral Tribunal that it be granted until 27 February 2012 to submit its comments regarding the letter from Mr. Mbéri, which term was granted by the Arbitral Tribunal on the same day.

**115.** On 27 February 2012, the Claimant informed the Arbitral Tribunal that Mr. Mbéri was back in the Congo but stated that if he could come back to Paris, he would respond favorably to a hearing being held. The Claimant added that in such a case, it would be timely to take the opportunity to also hear President Sassou N'Guesso and also proposed to confront the points of view ofMessrs. Mbéri, Mouamba, Boueno and President Sassou N'Guesso, all of whom submitted affidavits relative to the meetings of September and October 1992.

**116.** On 1 March 2012, the Arbitral Tribunal told the parties that it had received their correspondence from 20 and 27 February 2012, and proposed that the Chairman hold a conference call alone with the parties.

**117.** On 8 March 2012, a conference call was held between the Chairman of the Arbitral Tribunal and the parties.

**118.** On 9 March 2012, the Claimant forwarded the letter from Mr. Mbéri dated 14 February 2012 as Exhibit C204 as agreed during the conference call.

**119.** On the same day, the Arbitral Tribunal forwarded to the parties Procedural Order No. 6, which read as follows:

> *"Whereas Mr. Mbéri contacted the Chairman of the Arbitral Tribunal alone in a letter dated 14 February 2011 (sic) in which he stated that he was not able to be present for the hearing as a witness for reasons beyond his control and confirmed the validity of his affidavits;*
>
> *Whereas in an email dated 17 February 2012, the Chairman of the Arbitral Tribunal forwarded a copy of the letter from Mr. Mbéri to the parties and to his fellow arbitrators, inviting the parties to forward their comments relative to this letter by 24 February 2012;*

*Whereas in a letter dated 20 February 2012, the Respondent stated that the absence of credibility of the affidavits of Mr. Mbéri had been established in the hearing, adding that if the Arbitral Tribunal had any doubt in this regard, a hearing could be organized to hear Mr. Mbéri, who perhaps would still be in France at that time;*

*Whereas in an email dated 24 February 2012, the Claimant requested an extension of the term for submitting its comments until 27 February 2012;*

*Whereas in an email on the same day, the Arbitral Tribunal acknowledged receipt of the email from the Claimant and granted it the requested extension;*

*Whereas on 27 February 2012 the Claimant stated that Mr. Mbéri was no longer in France and that if circumstances had changed as to the possibility of Mr. Mbéri returning to France to testify, it would not be opposed to holding such a hearing. The Claimant also added that in such an event, it believed that it would be opportune to also hear from President Sassou N'Guesso and proposed, if the Arbitral Tribunal deemed it helpful, to compare the points of view of Mr. Mbéri, Hajaij, Mouamba, Boueno and of President Sassou N'Guesso;*

*Whereas in an email dated 1 March 2012, the Arbitral Tribunal stated that it had been informed of the correspondence from the parties, Mr. Yves Derains, by agreement with his fellow arbitrators, proposed holding a conference call alone with the parties;*

*Whereas a conference call was held between the Chairman of the Arbitral Tribunal and the parties on 8 March 2012;*

*Whereas during this conference call, the parties stated their approval that the letter dated 14 February 2012 from Mr. Mbéri would be included in the case file;*

*Whereas the Respondent reiterated its request to hear Mr. Mbéri as a witness, the Claimant reiterated its request to hear from President Sassou N'Guesso in the event that Mr. Mbéri was to be heard.*

*Whereas the Chairman of the Arbitral Tribunal reported the content of this conference call to his fellow arbitrators;*

*Whereas the Arbitral Tribunal believes that it is not helpful at this stage to hear from Mr. Mbéri to the extent that the parties must still exchange answers to the post-hearing briefs on 23 March 2012;*

*Whereas the Arbitral Tribunal believes that it will be better placed to decide whether to hear Mr. Mbéri after these submissions;*

### *THE ARBITRAL TRIBUNAL HOLDS:*

*1.     No decision regarding scheduling a new hearing to examine Mr. Mbéri was made at this point.*
*2.     The Arbitral Tribunal reserves the right to revisit this subject with the parties after having seen the last submission of briefs by the parties."*

**120.**   On 13 March 2012, the ICC Secretariat informed the Arbitral Tribunal and the parties that during its session on 8 March 2012, and pursuant to Article 24(2) of the Rules, the

International Court of Arbitration extended the term for rendering the Final Award to 30 June 2012.

**121.**     On 23 March 2012, the parties forwarded to the Arbitral Tribunal their second post-hearing briefs.

**122.**     On 30 March 2012, the Claimant forwarded its comments as to the procedure for calculation carried out by the Respondent in its second post-hearing brief to update from late 1986 to 1997 the amounts appearing in the *Fiche de calcul détaillée*.  On 2 April 2012, the Respondent stated that a substantive error had been made in its second post-hearing brief and forwarded new pages 38 and39, including the corrections of said mistakes.  It stated that this did not affect its reasoning as to the incoherent and artificial nature of the calculations made by the Claimant.  On 4 April 2012, the Claimant acknowledged the correction made by the Respondent and emphasized that this change, on the contrary, affected the reasoning employed by the Republic of the Congo.  On 5 April 2012, the Respondent submitted additional brief comments in response to the letter from the Claimant dated 4 April.  On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and declared that the proceedings were closed regarding that matter.

**123.**     On 14 June 2012, the Court Secretariat informed the Arbitral Tribunal and the parties that during its session on 14 June 2012, and pursuant to Article 24(2) of the Rules, the Court extended the term for rendering the Final Award through 28 September 2012.

**124.**     On 17 July 2012, the Respondent informed the Arbitral Tribunal of a ruling of the Court of Appeal of Paris dated 12 June 2012 that rejected the annulment proceeding of filed by the Respondent against the partial award dated 20 August 2011.

**125.**     On 14 September 2012, the Court Secretariat informed the Arbitral Tribunal and the parties that during its session on 13 June 2012, and pursuant to Article 24(2) of the Rules, the Court extended the term for rendering the Final Award through 31 October 2012.  The Court Secretariat also stated that Mrs. Marie-Camille Pitton was now the member responsible for the case.

**126.**     On 1 October 2012, the Claimant submitted to the Arbitral Tribunal a request for emergency measures relative to a request filed by the Caisse Nationale de Sécurité Sociale of the Congo for Commisimpex to be declared in default of payments and to be liquidated at a hearing of the Commercial Court of Brazzaville on 2 October 2012.

**127.**     On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and ordered that the Respondent do everything necessary to maintain the status quo between the parties and to inform it of the actions that it had taken by 10:00 a.m. the next morning.

**128.**     On 2 October 2012, the Respondent provided its comments to the Arbitral Tribunal indicating that the scheduled hearing was only an initial procedural hearing.

**129.**     On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent.

**130.**     On 4 October 2012, the Claimant sent a request for provisional measures to the Arbitral Tribunal.

**131.** On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and invited the Respondent to send its comments by 8 October at 10:00 a.m.

**132.** On 8 October 2012, the Arbitral Tribunal forwarded Procedural Order No. 7 to the parties, which read as follows:

> *"Whereas in an email dated 1 October 2012, the Claimant submitted a request for emergency measures to the Arbitral Tribunal;*
>
> *Whereas the Claimant stated that by petition to the Commercial Court of Brazzaville dated 26 September 2012, the* Caisse Nationale de Sécurité Sociale *of the Congo requested that 'Commisimpex be declared in default of payments, that its assets be liquidated and that the court appoint liquidation entities,' alleging that Commisimpex owed social security fees dating to 1981;*
>
> *Whereas the Claimant again explained that the President of the Commercial Court of Brazzaville had, after having invoked a pointless attempt to reconcile the parties, by order dated 28 September 2012, scheduled a hearing for 2 October 2012 at 8:00 a.m. 'in order to rule on the merits of said petition,' requesting that Commisimpex 'produce [its] defense no later than eight days before the hearing';*
>
> *Whereas the Claimant stated to the Arbitral Tribunal that no attempt at conciliation had been undertaken, the terms established by the court were in complete violation of the right to due process and these proceedings were intended to 'allow the Congolese authorities to fraudulently take control of Commisimpex via the liquidator that would be appointed by the Commercial Court of Brazzaville, so as to short-circuit your forthcoming award (…)';*
>
> *Whereas the Claimant requested that the Arbitral Tribunal 'order the Congo to give the instructions necessary to its* Caisse Nationale de Sécurité Sociale, *a public entity, to agree to postponement of the hearing from 2 October 2012 to a later hearing, at which time Commisimpex could present its defense and/or request other provisional measures from your Court;*
>
> *Whereas in an email dated 1 October 2012, the Arbitral Tribunal acknowledged receipt of the letter of the Claimant and ordered the Respondent 'to immediately make every effort so that no measure would change the status quo between the parties and possibly affect the order and the effects of the forthcoming arbitration award to not occur before the Arbitral Tribunal could investigate, respecting the adversarial process, the request for emergency measures that was submitted to it [this evening] and make a decision in this regard';*
>
> *Whereas the Arbitral Tribunal also requested that the Respondent inform it of the actions that it had taken by 10 a.m. the next morning;*
>
> *Whereas on 2 October 2012, the Respondent stated that the hearing scheduled for that date was only a preliminary procedural hearing and that in any event a ruling would not be made at that hearing at the request of* Caisse Nationale de Sécurité Sociale, *specifying that this matter would be the subject of an adversarial investigation and that Commisimpex would have the opportunity to present its defense.*
>
> *Whereas on the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and thanked the Respondent for its timely response;*

*Whereas on 4 October 2012, the Claimant submitted to the Arbitral Tribunal a request for provisional measures, explaining that the proceeding filed against Commisimpex by* Caisse Nationale de Sécurité Sociale *was based on alleged late payments of social security fees on salaries owed by Commisimpex for the period of 1981 through 2011 and that the* Caisse *had requested the liquidation of Commisimpex and the personal bankruptcy of Mr. Hajaij, and not the payment of the amount that was allegedly owed;*

*Whereas the Claimant specified that beyond the fact that this action was sudden, the terms imposed in this proceeding were surprising and in violation of the principle of the adversarial process;*

*Whereas the Claimant also asserted that the challenged facts were unjustified to the extent that operations of Commisimpex were suspended by resolution of its Meeting of Shareholders dated 28 June 1991, as is also demonstrated by a certificate of non-taxation by the Direct Revenue Service of the Congo, that it did not owe any contribution to the* Caisse Nationale de Sécurité Sociale *of the Congo and that no notification had otherwise been sent to it;*

*Whereas the Claimant requested that the Arbitral Tribunal 'order the Congo to give the necessary instructions to its* Caisse Nationale de Sécurité Sociale, *a public entity, to withdraw its action regarding cessation of payments and liquidation, without prejudice to any action on the merits that the* Caisse *may deem necessary to file in order for a ruling to be issued, in full respect of the rights of due process, regarding the alleged amounts owed by Commisimpex' and 'in any event (…) to acknowledge, in the context of the forthcoming award, of its declarations as to the regularity and justification of the case filed by* Caisse Nationale de Sécurité Sociale *in the courts of the Republic of the Congo';*

*Whereas in an email dated 4 October 2012, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and invited the Respondent to comment on this letter by 10 a.m. on 8 October 2012;*

*Whereas the Respondent did not make comments within the terms specified by the Arbitral Tribunal;*

*Whereas the Republic of the Congo cannot invoke any legitimate interest in the liquidation of Commisimpex occurring within a short time period and, in any event, before the end of this arbitration;*

### THE ARBITRAL TRIBUNAL HOLDS:

*1.      The parties must make every effort to avoid any change in the status quo between the parties until the final award is issued.*

*2.      In this regard, it is ordered that the Republic of the Congo make every effort required so that no State agency of the Congo would cause Commisimpex to be placed in liquidation before the final award is rendered in this arbitration proceeding."*

**133.**    On the same day, after this Order was issued, the Respondent provided the Arbitral Tribunal with its comments on the letter from the Claimant dated 4 October 2012.  The Arbitral Tribunal acknowledged receipt of this letter and noted that its contents were not of such a nature to challenge the resolutions made in Procedural Order No. 7.

**134.** On 10 October 2012, the Arbitral Tribunal informed the parties that the proceedings were closed pursuant to Article 22 (2) of the ICC Rules, since it was not deemed useful to schedule another hearing to question Mr. Mbéri after the receipt of the Post-Hearing Briefs, as envisioned in Procedural Order No. 6 dated 9 March 2012.

**135.** On October 11, 2012, and pursuant to Article 24(2) of the Rules, the International Court of Arbitration extended the term for rendering the Final Award to 31 December 2012.

**136.** The parties submitted letters to the Arbitral Tribunal dated 18, 19 and 25 October 2012, regarding the proceedings relative to the liquidation of Commisimpex.

**137.** On 29 October 2012, Mrs. Carole Malinvaud informed the parties that one of her firm's partners planned to grant the request by the Republic of the Congo to assist in the completion of drafts of the new oil code and the sample production sharing agreement prepared by the government of the Congo and stated that this would have no connection with the present matter.

**138.** On 30 October 2012, the Arbitral Tribunal acknowledged receipt of the letters from the parties dated 18, 19 and 25 October 2012 regarding the proceedings for the liquidation of Commisimpex and informed the parties that these letters were not accepted into the case file, since the closure of proceedings had been declared in the letter dated 10 October 2012.

On the same day, the Claimant informed the Arbitral Tribunal of the ruling of the Commercial Court of Brazzaville declaring the liquidation and dissolution of Commisimpex as well as the personal bankruptcy of Mr. Hajaij, the head of Commisimpex. In this regard, the Claimant requested, among other things, that the Arbitral Tribunal reopen the proceedings.

**139.** On 31 October 2012, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant dated 30 October 2012 and invited the Respondent to comment on this letter by 2 November at 7:00 p.m.

**140.** On 2 November 2012, the parties submitted to the Arbitral Tribunal their claims relative to arbitration costs. On the same date, the Respondent indicated that since it was not able to contact its client, it confirmed the content of the letters dated 8 and 19 October 2012.

**141.** On 7 November 2012, the Arbitral Tribunal forwarded Procedural Order No. 8 to the parties, which read as follows:

> *"Whereas by letter dated 8 October 2012, the Respondent forwarded comments relative to the letter from Commisimpex dated 4 October 2012;*
>
> *Whereas the Arbitral Tribunal acknowledged receipt of these comments, noting that they were forwarded after delivery of Procedural Order No. 7 and stated that the content of this letter was not of such a nature to challenge the resolutions made in that order;*
>
> *Whereas in a letter dated 18 October 2012, a copy of which was forwarded to the Arbitral Tribunal, the counsel for the Claimant requested that the counsel for the Respondent*

*ensure that its client respects Procedural Order No. 7 of the Arbitral Tribunal, explaining that during the procedural hearing on 16 October 2012 before the Commercial Court of Brazzaville, that Court had, at the request of the attorney for the* Caisse Nationale de Sécurité Sociale ("CNSS") *and without even verifying the availability of counsel, scheduled a motions hearing for 23 October 2012 and that a ruling should, therefore, be issued shortly;*

*Whereas by letter dated 19 October 2012, a copy of which was also forwarded to the Arbitral Tribunal, the counsel for the Respondent acknowledged receipt of the letter from the counsel for the Claimant and attached a letter sent on 11 October 2012 by the Director of the Office of the Minister of State, the Keeper of the Seals, the Minister of Justice and Human Rights to the Public Prosecutor at the* Tribunal de Grande Instance *of Brazzaville in which the Director of the Office of the Minister forwarded to the Public Prosecutor '(…) so that you may perform your duty before the* Tribunal de Grande Instance *of Brazzaville, Procedural Order No. 7 issued on 8 October 2012 by the Arbitral Tribunal of Paris in the matter of Commisimpex v. the Government of the Congo submitted for a ruling to be rendered no later than next month.' It was stated that 'In this order the Arbitral Tribunal orders the Congolese government and its agencies to not short-circuit the forthcoming award by a ruling of the liquidation of Commisimpex, referencing the action filed to this end by the CNSS before the Commercial Court of Brazzaville.' Furthermore, the counsel for the Respondent also attached the 'Submission of the Public Prosecutor dated 17 October 2012' in which it recommended 'avoiding a liquidation ruling declaring the liquidation of Commisimpex (in the matter of CNSS v. Commisimpex) before the pronouncement of the arbitration award.'*

*Whereas on 25 October 2012, the counsel for the Claimant informed the Arbitral Tribunal that CNSS had not halted its proceedings, in violation of the provisions of Procedural Order No. 7 and that a motions hearing was therefore held on 23 October 2012 during which Commisimpex, on the one hand, had requested 'that the ruling be deferred, in particular due to the complaint filed the previous day by Commisimpex as a civil party for forgery, use of forged documents, and fraud with the chief investigating judge of the* Tribunal de Grande Instance *of Brazzaville,' as well as the absence from the merits of a debt owed to CNSS and, the Public Prosecutor of the Republic of the Congo, and on the other hand had requested that the liquidation proceedings be deferred based on the complaint filed by Commisimpex. The counsel for the Claimant stated that the ruling of the President should be issued by 30 October 2012;*

*Whereas on 30 October 2012 the Arbitral Tribunal acknowledged receipt of the letters from the parties dated 18, 19 and 25 October 2012 regarding the proceedings in relation to the liquidation of Commisimpex and informed the parties that these letters were not accepted into the proceedings, since the proceedings had been declared closed by letter dated 10 October 2012;*

*Whereas on the same date, the counsel for the Claimant informed the Arbitral Tribunal that the Commercial Court of Brazzaville had ruled in favor of the liquidation and dissolution of Commisimpex, appointed the liquidation entities and declared the personal bankruptcy of Mr. Hajaij, also preventing him from conducting commercial activity or managing a business for ten years. The counsel for the Claimant stated that the Claimant and Mr. Hajaij had filed an appeal but that according to Congolese law, an appeal had no suspensive force. As a result, the counsel for the Claimant petitioned the Tribunal:*

> *'- to authorize the reopening of the proceedings pursuant to Article 22(1) in fine of the ICC Rules, in order to be able to consider this claim*

*- to acknowledge the violation of the Order by the Congo;*

*- to acknowledge the intentional and harmful nature of this violation;*

*- to issue an award (1) reiterating its Order; (2) ordering the Congo to take the measures necessary so that the CNSS would allow the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures allowing the* status quo *to be reestablished pursuant to the provisions of the Order; (3) ordering the Congo to take the measures necessary so that the CNSS would allow a request for suspension of enforcement of the ruling of the Court of Commerce while awaiting the future decision in the appeal; and (4) ordering in any event that the Congo waive the enforcement of the ruling of the Court of Commerce of Brazzaville on this date before any judicial or arbitration jurisdiction; and to incur any other consequence that it may deem necessary'.*

*Whereas on 31 October 2012, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant dated 30 October 2012 and invited the Respondent to comment on the same by 2 November 2012;*

*Whereas in a letter dated 2 November 2012, the counsel for the Respondent stated that it was not able to contact its client to obtain information and receive instructions and therefore had nothing to add to the items appearing in its letters dated 8 and 19 October 2012;*

*Whereas the Arbitral Tribunal confirms its Procedural Order No. 7 which specifies that:*

*1.     The parties must make every effort to avoid any change in the status quo between the parties until the final award is issued.*

*2.     In this regard, it is ordered that the Republic of the Congo make every effort required so that no State agency of the Congo would cause Commisimpex to be placed in liquidation before the final award is rendered in this arbitration proceeding."*

*Whereas the Arbitral Tribunal believes that in this case the reopening of the proceedings is necessary, as specified in Article 22 (1) of the Arbitration Rules, in order to be able to examine the claim of Commisimpex:*

***THE ARBITRAL TRIBUNAL HOLDS:***

*1. The proceedings are reopened as provided for by Article 22 (1) of the ICC Arbitration Rules.*

*2. The Claimant will specify its claims by 14 November 2012.*

*3. The Respondent will submit its comments by 21 November 2012.*

*4. A conference call between the parties and the Arbitral Tribunal will take place in late November or early December 2012 to discuss these matters."*

**142.**     On 12 November 2012, the Arbitral Tribunal told the parties that the conference call referenced in Procedural Order No. 8 was scheduled for 28 November at

5:30 p.m. On the same day, the parties confirmed their availability for that date. The Arbitral Tribunal then confirmed that the conference call would take place on 28 November 2012.

**143.** On 14 November 2012, the Claimant specified its claims pursuant to Procedural Order No. 8 in a letter accompanied by factual exhibits C-205 through C-217 and legal exhibits C-RJ 142 through C-RJ 149.

**144.** On 15 November 2012, the ICC Secretariat informed the parties that it had been visited by Mr. Gaston Mossa, who introduced himself as the court-appointed liquidator of Commisimpex and requested the contact information for the counsel of Commisimpex. The Secretariat invited Commisimpex to indicate by 16 November 2012 whether it authorized the Secretariat to provide Mr. Mossa with this information.

**145.** On 16 November 2012, the counsel [of] Commisimpex told the Secretariat that it was not opposed to its contact information being forwarded but it stated that no other information should be conveyed. Commisimpex also stated that it thought that Mr. Mossa was not the actual liquidator.

**146.** On 19 November 2012, the Secretariat indicated that it had acknowledged the instructions of Commisimpex and confirmed that it would provide its contact information to Mr. Gaston Mossa, which it did the same day.

**147.** On 21 November 2012, the Respondent requested an extension until 22 November, at 2:00 p.m. to submit its comments in answer, pursuant to Procedural Order No. 8. On the same day, the Arbitral Tribunal granted the requested extension.

**148.** On 22 November 2012, the Respondent submitted its comments in answer, in a letter accompanied by factual exhibit R-102 and legal exhibit R-RJ 79.

**149.** On 27 November 2012, the Secretariat forwarded to the Arbitral Tribunal a letter from Mr. Gaston Mossa dated 19 November 2012 addressed to its Chairman and acknowledged by the Clerk to the International Court of Arbitration on 26 November 2012. This letter was submitted to the parties on the same day for discussion during the conference call scheduled for 28 November 2012.

**150.** On 27 November 2012, the Claimant forwarded exhibits C218, C219 and C220 to the Arbitral Tribunal for the conference call scheduled for 28 November 2012.

**151.** On 28 November 2012, a conference call was held between the parties and the Arbitral Tribunal.

**152.** On 30 November 2012, the Arbitral Tribunal forwarded Procedural Order No. 9 to the parties, which read as follows:

> *"Whereas by Procedural Order No. 8 dated 7 November 2012, the proceedings were reopened at the request of Commisimpex, following the ruling of the Commercial Court of Brazzaville declaring the court-ordered liquidation of Commisimpex and the personal bankruptcy of Mr. Hajaij;*

*Whereas pursuant to Procedural Order No. 8, Commisimpex specified its claims on 14 November 2012.*

*Whereas its petitions were as follows:*

> *'Commisimpex petitions the Tribunal, in the context of its forthcoming award:*
>
> *(1) to acknowledge the violation by the Congo of Procedural Order No. 7;*
>
> *(2) to acknowledge the intentional and harmful nature of that violation;*
>
> *(3) to acknowledge the harmful and fraudulent nature of the liquidation of Commisimpex;*
>
> *(4) to state, as a result, that, for the purposes of this arbitration, it does not recognize the court-ordered liquidation of Commisimpex;*
>
> *(5) to acknowledge, in this arbitration, the lack of standing of the liquidators appointed to represent Commisimpex;*
>
> *(6) to order in any case that the Congo waive asserting and/or enforcing the ruling of the Commercial Court of Brazzaville dated 30 October 2012, before your court and/or before any other judicial or arbitral jurisdiction;*
>
> *(7) to order the Congo to take the measures necessary so that the CNSS will grant the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures allowing the reestablishment of the status quo pursuant to the provisions of Procedural Order No. 7; and*
>
> *(8) to order the reimbursement by the Congo, for the benefit of the claimants, of all the expenses incurred in this arbitration in relation to the liquidation proceedings.'*

*Whereas pursuant to Procedural Order No. 8 the Republic of the Congo on 21 November 2012, submitted its comments regarding the submission of Commisimpex;*

*Whereas the Republic of the Congo concluded that the claims by Commisimpex were inadmissible and requests from the Arbitral Tribunal in any event to reject them as unjustified;*

*Whereas on 27 November 2012, the ICC Secretariat forwarded to the Arbitral Tribunal a letter from Mr. Gaston Mossa, Chair of the Committee of Bankruptcy Trustees of Commisimpex, that the Secretariat was notified by the clerk on 26 November 2012, that in this letter, Mr. Gaston Mossa informed the Arbitral Tribunal that the actions taken by Mr. Hajaij on behalf of Commisimpex were hereafter null and void and that only the liquidation committee had competent authority in this regard;*

*Whereas on the same day the Arbitral Tribunal forwarded this letter to the parties for discussion during the conference call scheduled for 28 November 2012;*

*Whereas during the conference call between the parties and the Arbitral Tribunal, the matters raised by the submissions of the parties as well as the letter of Mr. Gaston Mossa were discussed;*

*Whereas the Arbitral Tribunal observed that Procedural Order No. 7, by means of which it was ordered that ' (...) the Republic of the Congo make every effort required so that no Congolese State entity cause Commisimpex to be placed into*

*liquidation before the final award is rendered in this arbitration' did not prevent the declaration of the court-ordered liquidation of Commisimpex, without it necessarily being considered a violation of this order by the Republic of the Congo;*

*Whereas the Arbitral Tribunal noted that the Director of the Office of the Minister of Justice had forwarded ' (…) Procedural Order No. 7 to the State Prosecutor of the Republic with the Court of Grande Instance of Brazzaville, giving him instruction to do what is necessary for a declaration of liquidation not be issued before the forthcoming award';*

*Whereas the Arbitral Tribunal believes that, since the court judgment is the subject of an appeal, the Republic of the Congo is able to reestablish the status quo between the parties that it breached and that it is therefore opportune to order it to do so;*

*Whereas the Arbitral Tribuanl will rule on the remaining claims of Commisimpex in its final award;*

*Whereas given the circumstances, it is relevant to again declare the closure of the proceedings;*

### *THE ARBITRAL TRIBUNAL HOLDS:*

1. *The proceedings are closed pursuant to Article 22 (1) of the Arbitration Rules of the ICC.*

2. *The Republic of the Congo must do whatever is necessary to reestablish the status quo between the parties as quickly as possible and in any event before the final award is issued."*

**153.** On the same date, the Arbitral Tribunal forwarded to Mr. Gaston Mossa, with a copy to the parties and the ICC Secretariat, the following letter:

*"Dear Sir,*

*The Arbitral Tribunal acknowledges receipt of your letter dated 19 November 2012 which was forwarded by the Secretariat of the International Court of Arbitration of the ICC on 27 November 2012, which itself had received it on 26 November 2012.*

*The Arbitral Tribunal has acknowledged the indication according to which a ruling of the Commercial Court of Brazzaville dated 30 October 2012 declared Commisimpex to be in court-ordered liquidation, as well as the personal bankruptcy of Mr. Hajaij.*

*It also took into consideration the fact that you believe that the actions taken by Mr. Hajaij were from that point forward null and void, and that only the liquidation committee had competent authority to carry out actions on behalf of Commisimpex.*

*However, the validity of the ruling of the Commercial Court of Brazzaville is contested and its opposability on the Arbitral Tribunal is the subject of discussion before it.*

*Given this situation, the Arbitral Tribunal can recognize as representatives of Commisimpex only those parties already established in the arbitration proceedings, which have been declared to be closed.*

*Very truly yours,*

*Yves Derains*
*Chairman, Arbitral Tribunal"*

**154.** On 13 December 2012, and pursuant to Article 24(2) of theRules, the International Court of Arbitration extended the term for issuing the Final Award to February 28, 2013.


## III. <u>POSITION OF THE PARTIES</u>

### A. <u>Position of the Claimant</u>

**155.** Commisimpex requests the performance by Congo of the 2003 Protocol that constitutes an agreement between the Congo and Commisimpex, by means of which the Congo recognizes the debt it owed to Commisimpex and agrees to pay it in full. The whole amount of the debt, totaling 960,000,000 FRF (equivalent to 48 billion CFA francs), is mentioned in this Protocol. Furthermore, Article 6 of the 2003 Protocol provides that the parties agree *"to enter into a definitive protocol,"* establishing the necessary components of the agreements. Although Congo did not follow up on its commitment, the validity and the scope of the 2003 Protocol are not affected to the extent that this definitive agreement would only be entered into as a supplement and not with a view to validating the 2003 Protocol. This article does not refer to subsequent negotiations of the debt owed to Commisimpex that would render the protocol null and void if they were not carried out. The negotiations referenced in Item 4 are only negotiations with a view to the performance of the Protocol.

**156.** In addition to specifying the total amount of the debt, the 2003 Protocol determines the procedures for its settlement. Therefore, pursuant to the 2003 Protocol, the parties agreed to divide the total debt: on the one hand, the *"settlement of 440 million FRF corresponding to the debt still owed by the Republic of the Congo"* in virtue of the 1992 Protocol and owed, pursuant to the 2003 Protocol, by Commisimpex to Banque Saradar; on the other hand, *"the payment of 520 million FRF, corresponding to the remaining portion of the debt of the Congo owed to Commisimpex, that the Congo reportedly had to pay by the attribution of companies to be privatized,"* with an interest rate of 10% per year. Pursuant to Article 4 of the 2003 Protocol, the second portion of the debt was to be the subject of a *"payment in three installments: one payment in cash, the attribution of companies to be privatized and the payment of the remaining portion in 84 monthly installments, subject to the issuance of a guarantee by the Congo for the benefit of Commisimpex".*

**157.** The Congo attempts to question the amount of this debt. Therefore, Congo's debt owed to Commisimpex was the subject of verification, in particular by the *"highest-ranking Congolese officials"*. This is the case for the audit carried out by the inter-ministerial committee dated 27 March 1987, which is contained in the 1991 *Fiche de calcul* that evaluates the debt owed to Commisimpex at 29,949,284,818 CFA francs by the CCA. Congolese officials at the time further confirmed that the amount of the debt was around 29.9 billion CFA francs. This *Fiche de calcul* includes all the original contracts for the debt owed to

Commisimpex and excludes the instruments not signed by Commisimpex in December 1986, the cancelled contracts (Contract No. 043/86 dated 20 May 1986 which was never performed and Contract No. 185/84 which was discounted on 18 June 1984 from Equator Bank) and the payment received by Commisimpex in the amount of 15 million USD, made by Congo on 28 April 1987, the only payment ever received by Commisimpex.

**158.** The Congo did not provide any proof that certain contracts were paid for, as it claims. It submitted in the proceedings a refinancing agreement from 1988 but it was never performed. Commisimpex also never received payment through the discounting of promissory notes, and the only one was made through Equator Bank, the amounts of which are not claimed in this arbitration. Lastly, the assertion that Commisimpex allegedly received "concealed" payments has not been proved. Mr. Gossaki even indicated that if such payments took place, the Congo would have been able to trace them.

**159.** The Congo, despite contesting the amount of the debt owed to Commisimpex, did not provide any calculations. It relies solely on two documents issued by the CCA in 1991: a memo addressed to the Minister of the Economy, Finance and Planning and a note addressed to the Minister of Planning, Finance and the Economy. However, the Congo failed to provide the explanatory appendices for the calculations carried out. In any event, the lack of credibility of the amounts set forth in these documents is confirmed by the *Fiche de calcul détaillée* issued by the CCA in September 1991 which shows the amount of the debt as of 31 December 1986 (29,949,284,818 CFA francs) and provides a detail of the contracts included in the calculation as well as the calculation of interest. The amount calculated in this *Fiche* is also mentioned in the minutes of the Conference Council and the Lekoundzou proceedings in 1991-1992.

**160.** Thus, during the meetings in September and October 1992, the parties verbally agreed to declare the total debt of the Congo owed to Commisimpex to be 48 billion CFA francs. The letter dated 7 October 1992 further reflects the existence of those meetings. The difference in amount is explained by the addition of the amounts from the report dated 13 February 1988, the report dated 7 October 1988, and the compounding of interest during that period. This calculation has been confirmed by Mazars.

**161.** The Congo attempts not only to challenge the existence of these meetings, referring to the minutes of the resolutions of the Board of Directors of Commisimpex dating from 1997, but it further challenges the authenticity of the letter dated 7 October 1992. However, the CCA acknowledged receipt of it by affixing its official seal. Furthermore, the President of the Republic of the Congo was in possession of this disputed letter, as confirmed during a discussion with Mr. Hajaij, head of Commisimpex, in 2003.

**162.** The Congo also bases its argument on the expert report of Mr. Ricol, citing the lack of *causa* for the 2003 Protocol. *"Congo today uses this expert opinion and those few documents, which, based on the errors made, lead to an amount of the total debt of the Congo owed to Commisimpex that is significantly lower than the actual figure, to claim that the 2003 Protocol lacks* causa".[3] However, as indicated above, the

---

[3]    Reply, Paragraph 12, page 5.

Parties have agreed since September 1992 that the debt of the Congo to Commisimpex would be split in two parts, the second part of which is covered by the 2003 Protocol.

**163.**    With regards to the 1992 Protocol, it only covered a portion of the debt since Banque Saradar was pressuring Mr. Hajaij to recover the amount that it had financed and was threatening to call the 1986 guarantee. The 1992 Protocol had been signed for political purposes. Further, contrary to what the Congo claims, Commisimpex did not waive a portion of its debt and no proof of such a waiver exists.

The appendix to the protocol signed after the protocol by the Congo only, shows that the protocol covered just a portion of the debt. As such, Article 8 of the 1992 Protocol regarding the substitution of the protocol for all prior agreements must be read according to the intention of the parties who intended to settle only a portion of the debt. Furthermore, the Congo does not claim that the 1992 Protocol covered all of the amounts owed pursuant to the original contracts because it stated that certain contracts had already been settled, either because the amount of the 1992 Protocol results from two mark-downs, or, as the amount still owed to Commisimpex was not significant, Congo seemed to insinuate that the Protocol was transactional. These arguments are false, since the Congo was not able to prove any payment other than the 15 million USD in 1987 and the claimed mark-downs never took place. Furthermore, as the 1992 Protocol covered only a portion of the debt, the prior debt was still in force.

**164.**    Furthermore, the verifications carried out by Ernst & Young and the CCA confirmed the amount of the debt owed to Commisimpex. Ernst & Young, participating in the context of the recording of the debt in CCA's books by the courts of the Congo, first assessed the debt at 48.5 billion CFA francs as of 30 September 1992, but then updated it as of 30 September 2001. Its report was forwarded to Mr. Gossaki, then General Director of the CCA. This report was then analyzed and approved by the Commercial Court and the Court of Appeal of Brazzaville. The Court of Cassation in its cassation ruling of 27 June 2003 did not question it. Then on 24 January 2002, Mr. Gossaki wrote to Ernst & Young and stated in an attachment a debt owed to Commisimpex near that calculated by Ernst & Young, showing that CCA had verified its calculations and carried out certain adjustments. The witness statement of Mr. Gossaki that challenges the estimate by CCA of the debt owed to Commisimpex is therefore devoid of any credibility. In addition, Commisimpex was then summoned and the hearing sheet dated 27 March 2002 confirms that the expert report prepared by Ernst & Young had been verified by CCA and that the conclusion relative to the amount had received a favorable opinion on the part of CCA and had been signed by Mr. Ganféré, a CCA employee, who followed the Commisimpex case. The approval of the estimated amount of the debt was confirmed by an individual sheet dated 10 May 2002. This document also bears the signature of Mr. Ganféré. Messrs. Gossaki and Ikemo, General Director of CCA therefore now claim not to have followed the actions of their subordinate, Mr. Ganféré.

**165.**    Further, contrary to the Congo's claims, the 2003 Protocol was validly executed following a delegation by the President of the Republic. The signatories of the 2003 Protocol for the Congo were Messrs. Longobé and Okemba who acted *"by delegation of the President of the Republic, his Excellency, Mr. Denis SASSOU NGUESSO and having authority to this end"*. The approval of the President had been received. This was not subsequently denied by the President. Following the failure to perform the 2003 Protocol,

Commisimpex directly contacted the President of the Republic in letters dated 29 December 2003 and 1 August 2004, but the latter never questioned the validity of the authority of the signatories of the 2003 Protocol. The same applied to Mr. Okemba during his hearing.

**166.** In addition, as Mr. Longobé explained, the practice was often to have a verbal presidential delegation. In a legal opinion dated 7 July 2004, the Supreme Court of the Congo furthermore specified that the Head of State had verbally authorized the signatories of the 2003 Protocol.

**167.** Further, a letter from the signatories of the Protocol, Messrs.Longobé and Okemba to the Ministry of Finance dated 29 November 2003, i.e., after the 2003 Protocol, confirmed that the Protocol had been signed following the instructions of the President. Mr. Longobé reiterated this statement in the context of a police investigation in 2003-2004. Furthermore, this delegation was confirmed by other Congolese officials.[4]

**168.** In any event, the behavior of the various Congolese officials created the appearance of a valid presidential delegation.

**169.** French case law, in regards to the execution of international contracts, *"imposes the application of the principle of the appearance and the legitimate belief in matters of authority, pursuant to a substantive rule of French law"*.

**170.** So, on the date of the execution of the 2003 Protocol, the belief of Commisimpex *"as to the authority of the signatories (…) to validly act to bind the Congo was legitimate,"* since the President of the Republic and the Minister of Finance and Budget had contributed to the execution of the 2003 Protocol and the signatories had acted, as previously indicated, *"by delegation of the President of the Republic"*.

**171.** Furthermore, *"ratification may result from all acts, facts and circumstances that manifest, on the part of the principal, a degree of willingness to ratify"*. On multiple occasions, the *"highest officials of the Congo"* ratified the 2003 Protocol after it was signed. First of all, the signatories of the Protocol emphasized its performance.[5] Furthermore, many Congolese representatives also confirmed the validity of the 2003 Protocol and undertook proceedings to enforce it.[6] Then the Congo began to proceed to the performance of the 2003 Protocol, first with regards to the privatization of companies in which the Minister responsible for privatizations , at the request of Mr. Longobé, sent to Commisimpex a list of companies to privatize on 4 March 2004[7] then, through the Minister of Finance who had requested that the General Director of CCA, Mr. Nguekoumou, *"start to pay the amount owed to Commisimpex, the due date for the first 6 billion CFA franc installment of which [had passed] at that time"*.[8] Furthermore, the legal opinion rendered on 7 July 2004 by Mr. Lenga confirmed the validity of the 2003 Protocol.

---

[4]  Exhibits C32 and C71, Hearing of Mr. Andely, Hearing of Mr. Lenga.
[5]  Exhibits C163, C59, C167 and C171.
[6]  Exhibits C30, C31, C35, C36, C163, C32 and C71.
[7]  Exhibits C69 and C172.
[8]  Exhibits C34 and C70.

**172.** It is helpful to also note that, contrary to the claims made by the Congo, the participation of the Minister of Finance was required *"only in the absence of an intervention by the President of the Republic"*. The texts submitted by the Congo in fact contradict the practice of Congolese leaders. Thus, *"many contracts and addenda related to the debt owed by the Congo, which agreements committed State finances, were in their vast majority signed by the President of the Republic, and presented no sign of an intervention of the Minister of Finance"*. Similarly, Article 363 of Decree No. 2000-187 dated 10 August 2000, as well as Article 43 of Law No. 1-2000 dated 1 February 2000 emphasize the subordination of the Minister of Finance to the decisions of the President of the Republic.

**173.** Lastly, the 2003 Protocol is a contract that includes binding commitments. The negotiations, which lasted 3 months, were real and were not re-started by the Minister of Finance. The very provisions of the 2003 Protocol confirm the willingness to sign a binding instrument, contrary to Mr. Longobé's statements at the hearing, who still states that he did not have the authority to commit [the Congo] and only suggested that the State would "agree to". It is helpful to recall in this regard that if the Protocol had only presented simple recommendations, it would not have taken the form of a contract and it would not have been necessary to have it signed by both parties.

**174.** The 2003 Protocol was final in spite of the statements to the contrary by the witnesses presented by the Congo. Mr. Longobé stated that the 2003 Protocol was subjected to subsequent verification of the debt by the Ministry of Finance. This was not mentioned in the Protocol. In addition, the Congo before executing the 2003 Protocol had verified its debt owed to Commisimpex: (i) in 2001-2003 by Congolese jurisdictions and the firm Ernst & Young; (ii) in 2002 by the Congolese government during review of the debts of the Congo; and (iii) by Colonel Abia charged with the police investigation. This was confirmed by a summary report dated 20 January 2004 prepared by the administrative and legal advisor to the Office of the President, Armand Ougoundou. The need for subsequent verification of the debt therefore seems pointless and was not justified by Mr. Andely, the Minister of Finance from August 2002 through January 2005, who simply stated his lack of trust in Ernst & Young.

**175.** Then, contrary to what the Congo claims, the 2003 Protocol is not devoid of *causa*. The 2003 Protocol recognized the Congo's debt and provided for terms for the payment of that debt, in particular in its Preamble, which provided for the splitting up of the amount of the debt. In any event, case law considers, with regards to the acknowledgement of debt, that the justification of the obligation is presumed and that it is the responsibility of the subscriber to disprove it. The Congo claims that the 1992 Protocol had the effect of a novation. However such an effect would be only partial, because *"the novation requires elimination of a former obligation, the emergence of a new one and the intent to carry out the novation of the obligation"*. So, *"Commisimpex never intended to grant the effect of a novation to the 1992 Protocol, with regards to the sum of 26 billion corresponding to the companies to be privatized"*.

**176.** Furthermore, the Congo alleges that the claims of Commisimpex would be inadmissible based on the *res judicata* effect of Award No. 9899. However, the 2003 Protocol is a contract entered into after the 2000 Award. There is therefore no doubt that this award could not cover it. Furthermore, contrary to what the Congo claims, the obligation to concentrate please is not absolute. In fact *"the scope of this*

*obligation does not extend to the objects of distinct claims"*. The claims of Commisimpex founded on the 2003 Protocol are therefore admissible.

**177.** Furthermore, the Award was only handed down regarding the 1992 Protocol and its promissory notes, so that the *res judicata* effect related thereto is [only] *"limited to the portion of the debt covered by the 1992 Protocol"*.

**178.** *"Based on the foregoing, Commisimpex respectfully requests that the Arbitral Tribunal:*

*"(i)       order the Congo to pay the amounts owed in relation to the 2003 Protocol, including (considering the lack of enforcement of the 2003 Protocol by Congo) all interest owed on those amounts, after consideration of the amounts granted by the 2000 Ruling, i.e. as of 7 January 2011:*

- *3,247,161,007 French francs, i.e. 495,026,504 Euros;*
- *65,634,875 Pounds sterling;*
- *105,820,227 US Dollars;*
- *3,253,937,125 CFA francs, payable in Euros, i.e. 4,960,595 Euros*

*(ii)      order the Congo to pay interest on the amounts owed to Commisimpex, from the date of the last update of the amount owed (7 January 2011), through the date of the award, at a rate of 10.5% per year, compounded annually;*

*(iii)     order the Congo to pay all expenses and costs (including expenses payable to the ICC, legal expenses and costs, and expenses and costs of the expert, consultant and others), contracted by Commisimpex for the preparation and continuation of this arbitration proceeding, the amount of which shall be presented at the time and in the form that the Arbitral Tribunal will order;*

*(iv)     order the Congo to pay post-award interest on all amounts ordered, from the date of the award through the receipt of payment by Commisimpex, at the rate of 10.5% per year, compounded annually; and*

*(v)      attach any other consequence of law to its decision."[9]*

**179.** Furthermore, following the judgment of the Commercial Court of Brazzaville which ordered liquidation, Commisimpex made the following claims:

*"Commisimpex petitioned the Tribunal, in relation to its forthcoming award:*

*(1) to acknowledge the violation by the Congo of Procedural Order No. 7;*

*(2) to acknowledge the intentional and harmful nature of that violation;*

*(3) to acknowledge the harmful and fraudulent nature of the liquidation of Commisimpex;*

---

[9]       Post-hearing Brief of Commisimpex, 17 February 2012.

*(4) to state, as a result, that, for the purposes of this arbitration, it does not recognize the court-ordered liquidation of Commisimpex;*

*(5) to acknowledge, in this arbitration, the lack of standing of the liquidators appointed to represent Commisimpex;*

*(6) to order in any case that the Congo waive asserting and/or enforcing the ruling of the Commercial Court of Brazzaville dated 30 October 2012, before your court and/or before any other judicial or arbitral jurisdiction;*

*(7) to order the Congo to take the measures necessary so that the CNSS will grant the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures allowing the reestablishment of the status quo pursuant to the provisions of Procedural Order No. 7; and*

*(8) to order the reimbursement by the Congo, for the benefit of the claimants, of all expenses incurred in this arbitration by the liquidation proceedings.'*

### B.  Position of the Respondent

**180.**    The parties on 14 October 1992 executed a Protocol, the 1992 Protocol, regarding the consolidation and the settlement of debts still owed to Commisimpex, in relation to contracts for works.

**181.**    Since the 1992 Protocol a global character, amounts to the novation of the debt and included an inclusive amount, resulting in the closing of the process for determination of the debt of the Republic of the Congo, Arbitral Tribunal No. 9899 on 3 December 2000 ruled that the debt owed to Commisimpex totaled in October 1992 a principal amount of 288,634,078 French francs, and ordered the Republic of the Congo to pay approximately 100 million dollars in principal and interest (amount updated as of the date of the Award).

**182.**    In this proceeding, Commisimpex bases its arguments on the 2003 Protocol, establishing the principal amount of the Congo's debt, as of 30 September 1992, at 960,000,000 French francs, to request that the Congo be ordered to pay more than 650 million Euros.

**183.**    Commisimpex claims that the parties were allegedly bound by a verbal agreement to set the total amount of the debt owed at 48 billion CFA francs (960,000,000 FRF) and to split the debt into two portions.  Thus 22 billion CFA francs were settled in the context of the 1992 Protocol, which was the subject of the prior arbitration proceeding No. 9899, and the remaining 26 billion CFA francs, which were not covered by the 1992 Protocol, and therefore by Award No. 9899, should have been paid in the form of the attribution of companies to be privatized in favor of Commisimpex. In other words, Commisimpex claims that the 1992 Protocol covers only a partial debt, while the 2003 Protocol covers the entirety of the debt.

**184.**    So, the purpose of the 1992 Protocol was *"to draw up the amounts owed to Commisimpex and to determine the terms of their settlement, having specified that, as it arises from letters of Commisimpex dated 11 March 1993 and 5 June 1997, and as Tribunal No. 9899 noted,*

*the parties were agreed to apply to this debt a mark-down of 25% that the 1992 Protocol should have included".*

**185.** The preamble of the 1992 Protocol specified that *"debts still owed for works, after consideration of the various payments made in favor of Commisimpex and the discounting of certain promissory notes totaled:*

> *A – 50,592,081.53 FRF  (…)*

> *B – 21,201,872.76 Pounds Sterling (…)*

> *C – 34,521,293.24 U.S. Dollars (…)*

> *D – 1,426,623,801 CFA francs (…)*

> *The Republic of the Congo as one party, and Commisimpex as the other, agreed to determine the terms and conditions of the settlement of said <u>remaining debt</u> by means of this agreement."* (Emphasis added by the Respondent).

**186.** Commisimpex claims in this arbitration that in addition to its 22 billion CFA franc debt that it is owed, specified in the 1992 Protocol, it holds a debt of 26 billion CFA francs that allegedly is the result of a verbal agreement granted by President Lissouba and his ministers during meetings held on 7 September, 23 September and 5 October 1992. This agreement, which was not mentioned for more than ten years, was allegedly not put in written form until June 2003 when the President of the Republic gave Mr. Hajaij a copy of a letter dated 7 October 1992 that was reportedly stolen in 1998 at the time the facilities of Commisimpex were burgled. This lack of a written instrument seems unbelievable given the specific drafting of the 1992 Protocol. Mr. Hajaij went so far as to invent in the hearing the existence of minutes of a meeting held on 5 October 1992 during which the Congo reportedly acknowledged this debt. In reality, this debt of 26 billion did not exist and therefore the 48 billion CFA franc debt does not exist either. No debt other than that resulting from the 1992 Protocol exists and the 2000 award determined the amount of the debt owed. The 2003 Protocol is therefore fraudulent.

**187.** Commisimpex is not able to justify the amount of the debt that it claims. Furthermore, no justification was given as to the adjustment of the amount of the debt that had been decreed by the 2000 award.

Commisimpex bases its calculations on irrelevant documents that include the Lekoundzou criminal proceedings and the 1991 national council. The purpose of the Lekoundzou ruling was to rule on possible embezzlement and misappropriations of public funds committed in the context of the BCCI loan for 45 million USD subscribed by the Congo, but not to rule on a debt, the determination of which provides no detail.

**188.** Mr. Hajaij also referred multiple times to a CCA *Fiche de calcul* dated September 1991. This document only summarizes the amounts in foreign currencies of the original contracts, to which 10.5% interest was added through 1987. This document therefore does not present the balance of the amount of the debt after accounting audits in late 1986 and particularly in 1991. Therefore Mr. Hajaij was not able to justify the 10.5% interest rate, which

is explained by the fact that such a rate is missing from the various agreements. Further, Mr. Hajaij was confused as to the terms under which this document was issued and it is revealing that Commisimpex, which has always had this document, chose not to produce it in ICC Case No. 9899. Furthermore, this document, which was not signed and does not resemble the other documents issued by the CCA, was not recognized by any of the persons to whom it was presented at the hearing. The elements from the Lekoundzou criminal proceedings do not justify the debt owed to Commisimpex.

**189.** Mr. Hajaij was also relying in his affidavit dated 4 August 2011 on the work of the 1991 national council and in particular on a note from May 1991 prepared by an "Economic and public finance matters" committee mentioning an amount of 29,949,284,818 CFA francs[10] and a note dated 18 June 1991 prepared by an "Improperly acquired asset" committee mentioninf an amount of 28,339,795,515 CFA francs[11]. The first memo, which henceforth is the only one cited by Commisimpex, is not probative to the extent that the national council had but a single purpose: to clarify the conditions under which the 45 million USD BCCI credit had been in put place and used, and the only decision made by that conference – Act 225 – makes no mention of the amount owed.

**190.** Furthermore, concerning the meetings in 1992, it is helpful to note the surprising lack of corresponding minutes. Yet, Mr. Hajaij mentioned at the hearing that he kept evidence of everything that had taken place. Furthermore, Mr. Ikounga, director of the cabinet of President Lissouba since 1 September 1992, stated that on 7 September 1992, the date of the first meeting, the ministers were not yet appointed and that such a meeting could not have taken place. Lastly, Mr. Hajaij mentioned Mr. Mouamba as Minister of Finance and Mr. Nguila Mongouanga Nkombo as Minister of Planning, Economy and Forecasting as being present at the meeting but they did not receive these titles until a reorganization that took place after 25 December 1992. As to the meeting on 5 October 1992, Mr. Hajaij claimed for the first time at the hearing, that the meeting was the subject of minutes, of which he nevertheless does not have a copy, since it was stolen in 1998. This is contrary to the claims of Commisimpex which indicated that the only written obligation arising from those meetings was the 1992 Protocol, which it held a copy of. Furthermore, if such a copy existed, Mr. Mbéri would undoubtedly have mentioned it. Lastly, Commisimpex would certainly have found a trace of it.

**191.** The letter dated 7 October 1992, which is deemed to justify the existence of the meetings on 7 September, 23 September and 5 October 1992, is inaccurate and was fabricated for the purposes of these proceedings. In particular it mentions a Minister of Finance and a Minister of Planning, which duties at the time were fulfilled by Mr. Mouamba and which were not separated until later, on 25 December 1992. The explanations by Mr. Hajaij in this regard are not credible, and the contents of the letter reliably show that its author was writing to two separate ministers. This letter therefore must have been drafted ex post facto by a person who forgot the different composition of the first Lissouba government. It is therefore not credible that Commisimpex would not have kept a copy of this document referred to as indispensable, and that no original or copy could be found. So, if Mr. Mbéri had received a copy of this letter, he would have mentioned it in his statement on 31 July 2003. In reality, he only copied in his affidavit the message dated 7 October 1992, which was fabricated a posteriori to suit the needs of Commisimpex.

---

[10]     Exhibit C94.

[11]     Exhibit C95.

**192.**     As for the amount of the debt, it is helpful to recall that Commisimpex had, in ICC Proceeding No. 9899, submitted documents summarizing a total debt in 1992 of 29 billion CFA francs, which reportedly showed that the 1992 Protocol covered the entirety of the commitments concluded between the parties. This is particularly the case of its letter dated 11 March 1993 to the CCA, its letter dated 29 April 1999 to Tribunal No. 9899 and of its letter dated 5 June 1997 to the Minister of Finance.

Furthermore, it is undeniable that the 1992 Protocol had a global character, included in an inclusive amount and amounted to a novation of the debt. This is demonstrated in particular by the Note dated 16 January 1997[12] from the CCA to the Minister of Finance, produced by Commisimpex in Case No. 9899, which shows that the 1992 Protocol covered all the contracts.

**193.**     In Award No. 9899, the Arbitral Tribunal analyzed documents supplied by Commisimpex and concluded that:

> *"the difference between the aforementioned total of 28,339,795,515 CFA francs (updated as of 31 October 1992 by COMMISIMPEX to 29,269,98,989 CFA francs) and the total debts specified in Protocol No. 566 (22,235,587,294 CFA francs) is the (second) mark-down of approximately 25% that has been frequently cited by the parties during the proceedings, and explained by COMMISIMPEX to the CCA in its aforementioned letter of 11 March 2003, relative to the implementation of Protocol No. 566."*

> *"iii) All documents prior to Protocol No. 566 come from Congolese agencies and related to debts owed to COMMISIMPEX (XI.B.1, 1, h, pp. 29-30 above) and are in agreement as to determining these debt amounts, updated as of 31 May 1991, in the amount of 28,339,795,515 CFA francs and as of 31 October 1992 in the amount of 29,269,598,989, which in total corresponds, after applying a mark-down of approximately 25%, to the total of 22, 235,587,294 (or 21,622,330,040) CFA francs corresponding to the debt (components in FRF, GBP, USD and CFA francs) decreed between Commisimpex and the REPUBLIC OF THE CONGO in Protocol No. 566 (…)."*

It is therefore apparent, in view of the conclusions of the tribunal [in case] No. 9899, that the 2003 Protocol lack *causa*.

**194.**     Furthermore, considering the *res judicata* effect attached to Award No. 9899, the claims of Commisimpex are inadmissible and baseless. The *res judicata* effect attached to a decision rendered on the basis of the recognition of a debt prohibits the party from reintroducing a claim for payment based on the underlying debt.

Furthermore, Commisimpex claims that there is no *res judicata* effect in the presence of a new fact or when a claim was not included in the initial claim. Such that the theory of the new fact is only considered for *"subsequent events [that] change the situation previously acknowledged in court,"* which distinguishes new elements or means of proof, which are not an obstacle to the *res judicata* effect. According to Commisimpex, the 2003 Protocol is reportedly the acknowledgement of debt, which, according to legal scholarship, can be analyzed as *"a simple revelation or declaration of a preexisting right*

---

12      Exhibit R73.

*[that] does not engender any new legal situation".[13]* The claims of Commisimpex are therefore inadmissible.

195.     Concerning the mark-downs, Commisimpex erroneously claims that those mentioned in its letters of 11 March 1993 and 5 June 1997[14] reportedly came after the 1992 Protocol and was subject to the payment of the debt by the Congo.  As was indicated by Mr. Mouamba and Mr. Andely, the Congo agreements however presumed a mark-down.  Furthermore, Mr. Hajaij cannot claim that he agreed to a mark-down of 1 billion FRF in 2003 and refused any mark-down in 1992.  Regarding the letter dated 11 March 1993, Mr. Hajaij contradicted himself multiple times regarding the date and the terms under which it was signed.  So, it is helpful to note that Mr. Mouamba did not prevent Mr. Hajaij from negotiating new terms, but more simply requested that no negotiation would take place "without his prior approval".  In addition, Mr. Hajaij corrected his affidavit, confirming that this letter followed a request by the Ministry of Finance to grant a mark-down after the execution of the 1992 Protocol that, if it had been granted, would have been applied to the 26 billion CFA francs.  This, however, is contrary to the provisions of the letter written by Commisimpex and contrary to what had been claimed in the previous arbitration, since at that time it involved a mark-down in the Protocol.  Regarding the letter of 5 June 1997, Mr. Hajaij developed the same idea of conditional mark-downs, but that is also contrary to what is written in the letter and what he had claimed in ICC case No. 9899.

196.     Lastly, the amounts appearing in the 2003 Protocol were not approved or verified by the competent authorities, since Commisimpex has always refused to submit to the first stage, i.e. verification of the debt.  Furthermore, the documents that it presented were not relevant.  First of all, they were prepared in 2002 during a period when the CCA was challenging the claims of Commisimpex in court in Brazzaville, which excludes any idea of agreement by the CCA regarding the figures put forth by Commisimpex.  The expert report of Mr. Fylla Saint-Eudes, filed at the request of Commisimpex with Congolese courts, is not reliable, in particular because it takes as its starting point the 1991 *fiche de calcul* and claims to have carried out in-depth verifications with the CCA, which Mr. Gossaki and Mr. Ikemo do not remember.  Mr. Fylla Saint Eudes further reached a determination based on documents supplied by Commisimpex and did not attempt to compare those documents with other data.  The spreadsheet attached to Mr. Gossaki's letter dated 24 January 2002[15] does not validate the debt, contrary to what is claimed by Commisimpex.  Mr. Ganféré who signed that spreadsheet did not have the authority to do so.  The purpose of the hearing was not to validate a debt owed by CCA  the and in particular the validation was the ultimate responsibility of the Minister of Finance who did not do so.  This document cannot be a validation of what is owed by the CCA because Mr. Fylla Saint Eudes explains that the amount shown therein is based on his own court-ordered expert report which was challenged in court by the CCA.  Lastly, this document, the very title of which shows that the amounts are "in dispute," does not bear the "Lazard code" for the Commisimpex debt, which shows that it was not verified by Lazard Bank, required for this purpose by the Ministry of Finance.  In addition, Congo as well as the CCA challenged this spreadsheet before the Supreme Court of the Congo.

---

[13]     Counter-Memorial on the Merits, para. 374, page 130.

[14]     Exhibits R48 and R68.

[15]     Exhibit C56.

**197.**     In any event, the 2003 Protocol is not valid to the extent that it was not approved by the Ministry of Finance, and it was not signed by authorized persons, since none of them had received a delegation by the President of the Republic.

**198.**     Commisimpex did not follow the procedure imposed by the competent authorities (verification-reconciliation-mark-down-payment schedule) and therefore the debt was acknowledged by persons who did not have the authority to do so.  Commisimpex did not bring any evidence as to the existence of the delegation of authority by the President of the Republic.  In reality, only one of the exhibits produced was made known to the latter : an internal note from the legal department of the Office of the President to the President dated 30 April 2004.[16]  However this document does not mention a delegation of authority, it does not have the 2003 Protocol attached and it refers back to the Minister of Finance.  Furthermore Mr. Longobé, who received the so-called delegation of authority, denies having received instructions to execute the 2003 Protocol and states that he did not inform the latter of the content of the Protocol.

**199.**     Mr. Boukamany submitted two consultations in which he shows that a the acknowledgement of a debt is not binding on the State without the approval of the Ministry of Finance.  Commisimpex did not submit any legal opinion to the contrary and preferred to question the impartiality of Mr. Boukamany while refusing to question him.

**200.**     Lastly, Mr. Andely confirmed in the hearing that the 2003 Protocol had not been approved by the Minister of Finance and that he did not receive any instructions in this regard from the President of the Republic.

**201.**     Commisimpex cannot invoke the theory of appearance on the sole basis of the consultation of Mr. Lenga dated 7 July 2004 because it was made upon request and was established after the 2003 Protocol.  Mr. Hajaij knew how the Congolese government worked and Commisimpex could not be unaware that the approval of the Minister of Finance was a prerequisite for the 2003 Protocol to be valid.  Likewise, the legal opinion of Mr. Lenga does not corroborate the existence of the delegation of authority because it is limited to confirming a reference made to that delegation that therefore does not result from personal knowledge of the existence of the said delegation.  So, the *note de service* dated 4 August 2003 does not in any way constitute a delegation of authority by the President.  On the contrary, it confirms that Mr. Longobé did not have the authority to execute the 2003 Protocol because it was intended to establish a commission the purpose of which was to "coordinate and follow the Government's dispute".  Furthermore, that commission never was in operation, according to Mr. Boukamany.

**202.**     With regards to the arguments of Commisimpex concerning the amount of the debt, they rely on a rewriting of the facts and documents and do not consider witness testimony.  First of all, the Congo reiterated that the amount of the debt is that specified in the 2000 award.  Before 1992, the CCA did not have a complete breakdown of the payments received by Commisimpex.[17]  It was not informed of all the discounts and it was often difficult to trace payments coming from abroad, as Mr. Gossaki explained.

**203.**     The Congo forwarded copies of the CCA database screen shots that showed as of 13 October 1992 an amount owed of 14 billion CFA francs, and Mr. Ikemo stated that

---

[16]     Exhibit C35.

[17]     Exhibits R48, R36, R37 and R52.

this amount included interest but excluded penalty interests as of the due date. Commisimpex twisted the words of Mr. Ikemo in deducing from the fact that he was not able to identify all the contracts, that this document did not include all the contracts. Mr. Ikemo, as an officer of the CCA, did not have detailed knowledge of the contracts and, as he explained, the base amount represents the amount owed to Commisimpex in the books of CCA and therefore anything that was not included therein was not owed.

**204.** In reality, Commisimpex reconstructed a debt after the fact, because no document dating from the 1992-2001 period mentions an amount of 48 billion CFA francs or the existence of a debt beyond the 1992 Protocol amount of 26 billion CFA francs. All the documents from Commisimpex post-date 2001 and therefore were established by Mr. Fylla Saint-Eudes, since Colonel Abia and Congolese officials went back over the terms of the 1992 Protocol to attempt to review Award No. 9899. The same applies to the affidavits from the BCCI/Lekoudzou matter, dating from 2002 and 2003. No document predating 2001 mentions the 48 billion CFA francs, except the letter dated 7 October 1992. Commisimpex relies therefore on a spreadsheet from 1991 that does not mention a 48 billion CFA franc debt or any amount for 1991-1992, a letter dated 15 July 1997 that also does not mention such a debt and the Qwinzy case that does not relate to the Commisimpex debt. It is implausible that no document specified that Commisimpex held a debt in the amount of 48 billion CFA francs in 1992.

**205.** The 2003 Protocol is therefore fraudulent in that it acknowledges a debt that does not exist. Furthermore, Mr. Hajaij was incapable of spontaneously providing an explanation for the amount of the debt owed to him. This is in particular the case for the 1991 *Fiche de calcul*, for which Mr. Hajaij did not spontaneously state that it excluded the two 1988 reports from the amount of 29,949,284,818 CFA francs. Furthermore, Mr. Hajaij had claimed the opposite at the beginning of the hearing. Likewise, Mr. Hajaij was not able to explain the increase in the amount of the debt from 29 billion to 48 billion, except by means of his counsel who stated that it was related to "an adjustment by application of the interest rate". The same applies to the theories concerning the mark-downs, where Mr. Hajaij also contradicted himself. For example, Commisimpex claims in regards to the letter of 11 March 1993, that the reference to a mark-down resulted from a demanded by Mr. Mouamba, which was willing that Commisimpex write that the Protocol included such a mark-down. However this is not what Mr. Hajaij stated, when he explained that it related to a request by Mr. Mouamba to grant a mark-down after 1992 and not a request aiming to show that the Protocol included a mark-down. Regarding the letter dated 5 June 1997, Commisimpex claims that the reference to mark-downs resulted from pressure and adds that those mark-downs did not exist. Once again, Mr. Hajaij did not confirm this and stated that Commisimpex had granted mark-downs that allegedly were conditional. Lastly, the explanations from Commisimpex as to the mark-down mentioned in the letter of 11 March 1993 are also incompatible with other statements by Mr. Hajaij.

**206.** Ultimately, the Protocol was not executed with the approval of the President and the signature of this Protocol can only be explained by the network of influence of Mr. Hajaij within the Congolese government.

**207.** Based on the foregoing,

*"The Republic of the Congo petitions that the Tribunal:*

*Principal claim:*

> *- Hold and determine the petitions of Commisimpex to be inadmissible due to the* res judicata *effect attached to the final arbitration award of 3 December 2000 in ICC Case No. 9899/AC/DB;*

*Subsidiary claims:*

> *- Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to the lack of authority of the signatories;*

> *- Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to the lack of approval of the Minister of the Economy, Finance and Budget;*

> *- Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to lack of* causa*;*

> -   *Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to the defective nature of the consent of the Republic of the Congo;*

> *-Therefore, reject the claims of Commisimpex in their entirety;*

*In any event:*

> *- Order Commisimpex to pay all expenses and costs arising from this arbitral proceeding, including fees, expenses and costs for the court and the ICC, as well as the fees, expenses and costs of counsel for the Republic of the Congo, and any other expenses related to the arbitral proceeding."[18]*

**208.** Furthermore, the Republic of the Congo considers as inadmissable Commisimpex's claims made following the ruling of the Commercial Court of Brazzaville ordering its liquidation and petitions the Arbitral Tribunal to reject them as unfounded


**IV.** **DISCUSSION**

- **PRELIMINARY MATTERS ARISING FROM BY THE COURT-ORDERED LIQUIDATION OF COMMISIMPEX**

---

[18] Rejoinder on the Merits.

**209.** Before getting to the dispute between the parties, the Arbitral Tribunal must determine the consequences on the arbitral proceedings of the ruling of the Court of Commerce of Brazzaville dated 30 October 2012 which ordered the liquidation of Commisimpex, in light of the positions and requests of the parties in this regard, considering the liquidator's contention that he is the sole representative of Commisimpex since 19 November 2012.

**210.** Commisimpex has requested that the Arbitral Tribunal to:

> *"1. Acknowledge the violation by the Congo of Procedural Order No. 7;*
>
> *2. Acknowledge the intentional and improper nature of that violation;*
>
> *3. Acknowledge the improper and fraudulent nature of the liquidation of Commisimpex;*
>
> *4. State, as a result, that, for the purposes of this arbitration proceeding, it does not recognize the court-ordered liquidation of Commisimpex;*
>
> *5. Acknowledge, in this arbitration proceeding, the lack of standing of the liquidators appointed to represent Commisimpex;*
>
> *6. Order the Congo in any event to waive asserting and/or enforcing the ruling of the Court of Commerce of Brazzaville dated 30 October 2012 before the Arbitral Tribunal and/or before any other judicial or arbitral jurisdiction;*
>
> *7. Order the Congo to take the measures necessary so that the CNSS will comply with the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures to restore the status quo pursuant to the provisions of Procedural Order No. 7;*
>
> *8. Order the reimbursement by the Congo, to the claimants, of all expenses incurred in this arbitration proceeding by the liquidation proceedings."*

**211.** The Republic of the Congo concluded that these demands were inadmissible and, in any event, asked the Arbitral Tribunal to reject them as unfounded.

**212.** Procedural Order No. 9 dated 30 November 2012 has already disposed of Petitions 1 and 2 because the Arbitral Tribunal noted *"that Procedural Order No. 7 which ordered ' (…) the Republic of the Congo to take all measures required so that no Congolese State entity would place Commisimpex in liquidation before the final award is handed down in this arbitration proceeding' did not prevent the declaration of the court-ordered liquidation of Commisimpex, without it necessarily resulting in a violation by the Republic of the Congo of this order"*. The same Order was also made in respect of Petition 7 ordering the Republic of the Congo to *"take all measures necessary to restore the status quo between the parties as quickly as possible and in any event before the pronouncement of the final award"*. This award can only confirm the first of these decisions. As for the second, it will be irrelevant after the award is issued.

**213.**    With the exception of Petition 8 by Commisimpex regarding the reimbursement of expenses incurred during this arbitration by the liquidation proceedings; the others (3, 4, 5 and 6) assume that the Arbitral Tribunal has the authority to rule as to whether a bankruptcy judgment by one of the parties to the arbitration is valid. In order to determine whether the complaints by Commisimpex regarding the court-ordered liquidation ruling are admissible, the Republic of the Congo denies the existence of such authority, *"all the more so since no party asserted them to request the suspension of the arbitration proceeding or attempt to enforce them in order to disrupt the arbitration proceeding that is in progress".*[19]   In this regard, the Republic of the Congo emphasizes that it did not assert the liquidation ruling, which was issued after the closure of the proceedings. For its part, Commisimpex invokes arbitration case law according to which the arbitrators are not constrained to acknowledge the effects of a liquidation order, and more specifically, have *"the authority to evaluate, as applicable, the terms and conditions of the liquidation of one of the parties to the arbitration proceedings, and whether or not to apply its effects in the arbitration proceedings".*[20]   In this regard, it refers also to a ruling by the Court of Appeal of Paris dated 12 January 1993[21]   according to which it was accepted that an Arbitral Tribunal, *"without disregarding international public policy, but, in contrast, to ensure compliance therewith"* was properly able to consider that enforcing a bankruptcy declaration ruling would have, in particular, inevitably resulted in unfairly delaying the conduct of the arbitration proceedings.   However the Republic of the Congo objected that although *"in certain circumstances, it  has been held that the Arbitral Tribunal could rule on the legality of the bankruptcy declaration, this only involved matters in which one party (or a liquidator) was seeking to assert a foreign bankruptcy ruling to suspend the arbitration, or even to terminate it".*[22]   The Republic of the Congo adds that *"it was simply agreed that the Arbitral Tribunal could rule <u>incidentally on </u>the legality of a foreign bankruptcy declaration in the context of the resolution of the dispute submitted to it and, <u>where one party invoked</u> the bankruptcy declaration during the arbitral proceeding and the other opposed it, and only in extraordinary cases where the declaration breached the requirements of international public policy".*[23] (Emphasis added)

**214.**    Beyond the challenge as to admissibility of the complaints of Commisimpex on the court-ordered liquidation, seemingly justified by the fact that this ruling occurred after the closure of proceedings and that the Congo did notinvoke such liquidation, the Republic of the Congo also challenged the jurisdiction of the Arbitral Tribunal to decideon such matters, since the Congo denies that the Tribunal, in these circumstances, has any authority to rule on the validity of the ruling of the Court of Commerce of Brazzaville dated 30 October 2012.  The Arbitral Tribunal can admit neither the challenge on inadmissibility nor the challenge on jurisdiction in its entirety.

**215.**    The fact that the ruling for the court-ordered liquidation of Commisimpex occurred after the closure of the proceedings and that the Republic of the Congo did not invoke it does not lead to the conclusion that the complaints of Commisimpex are inadmissible.  Even if did not intend to invoke the ruling, the liquidator, by letter dated 19 November 2012 nevertheless denied the validity of  the actions of Mr. Hajaij, the legal representative of

---

[19]      Letter from Republic of the Congo, dated 22 November 2012, Page 7.

[20]      Letter from Commisimpex dated 14 November 2012, Page 4.

[21]      Exhibit C-RJ 142.

[22]      Letter from Republic of the Congo dated 22 November 2012, Page 8.

[23]      Letter from Republic of the Congo dated 22 November 2012, Page 8.

Commisimpex during the filing of the arbitral proceedings, and indicated that a new attorney would be designated to defend the interests of Commisimpex in the arbitral proceedings. Those proceedings are not terminated by the completion of the parties' submissions, and continue until notification of the award and possibly afterwards, pursuant to the provisions of Article 29 of the ICC Arbitration Rules. Commisimpex has an indisputable interest in the determination of the consequences of the liquidation ruling on the arbitral proceedings and, in any event, the Arbitral Tribunal must rule on the standing of the representatives of Commisimpex in this proceeding after 19 November 2012.

216.    As to the jurisdiction of the Arbitral Tribunal, the  Tribunal believes that it has not only the authority, but also the duty to rule on the effects of the ruling for court-ordered liquidation of Commisimpex on the arbitral proceeding, without this necessarily signifying that it has jurisdiction to rule on all of Commisimpex's claims.

217.    As was recalled by the Court of Appeal of Paris in a ruling dated 7 April 2011[24] *"although the principles of halting individual cases, relinquishment of the debtor and interruption of the proceedings in the event of bankruptcy are part of international public policy and are applicable even where the arbitration taking place in France is not subject to French law, the arbitrator is simply responsible for verifying, before applying these principles, that the judicial decision that opens the bankruptcy proceedings and appoints a representative is itself compliant with the requirements of international public policy"*.    And so an Arbitral Tribunal, informed of the court-ordered liquidation of one of the parties to the arbitral proceedings, even if it is a claimant recovering a debt, must automatically question the consequences that would arise if the proceedings were to continue, in light of the requirements of international public policy. This is *a fortiori* the case when, as here, the liquidator intends to appoint counsel to replace the counsel established previously by the party ordered into liquidation and the latter opposes this. The Republic of the Congo furthermore does not seem to seriously challenge the jurisdiction of the Arbitral Tribunal to thus examine, incidentally, the legality of a ruling declaring the liquidation of one of the parties in the case.[25]

218.    Nevertheless the jurisdiction of the Arbitral Tribunal is limited by its *raison d'être*, which is to evaluate the effects of the bankruptcy ruling on the arbitration proceedings.  As emphasized by the commentator on the judgment of the Court of Appeal of Paris dated 7 April 2011 cited above, *"The control exercised* [by the arbitrator] *over the foreign ruling is only related to the possibility, for the arbitrator, to use or not use it as a determining factor in the resolution of the dispute that is submitted to it"*.[26]   The complaints by Commisimpex relative to the ruling of court-ordered liquidation dated 30 October 2012 are therefore admissible and the Arbitral Tribunal has jurisdiction to examine them, inasmuch as they relate to the effects of the ruling on the arbitral proceedings.  Furthermore, although the complaints of Commisimpex are not within this framework, one could question their admissibility vis-à-vis the provisions of Article 19 of the ICC Arbitration Rules, although the Republic of the Congo has not invoked this argument.

219.    In its letter dated 22 November 2012, and during the conference call on 28 November 2012, the Republic of the Congo asserted that if the Arbitral Tribunal should

---

[24]    2011 Arbitration Review, No. 3, Pages 747 ff., Exhibit R-RJ 79.

[25]    See No. 211 above.

[26]    Note S. Bollée under Paris, 11 April 2011, Exhibit R-RJ 79, Page 757, Note 13.

decide to investigate these new complaints, a new procedural calendar must be established to allow *"the parties to present their arguments regarding admissibility and the justification of those complaints in adversarial proceedings within a reasonable time, and in compliance with the equality of arms principle"*. The Republic of the Congo in this respect emphasized that *"Unlike Commisimpex, the State is not a party to the judicial proceedings in Brazzaville and does not have all the components of that case file"*.[27]  The Arbitral Tribunal cannot accept this complaint in the absence of any justification in fact, as such complaint would have the effect, after the closure of the proceedings, of unduly delaying the pronouncement of the arbitral award, while the Republic of the Congo many times reiterated that it expected the ruling and that it did not intend to assert the ruling for the court-ordered liquidation of Commisimpex in this proceeding and should therefore be indifferent to the outcome of the complaints by Commisimpex in this respect, which are aiming to obtain a declaration that the court-ordered liquidation be devoid of any effect in this proceeding.  Particularly, these complaints were investigated in a perfectly adversarial manner: following Procedural Order No. 8 dated 7 November 2012, Commisimpex had 7 days to state its complaints and argue them, which it did in a 16-page letter to which the Republic of the Congo responded on 22 November 2012 with a letter of 18 pages, having received upon request a short extension of the deadline on 21 November 2012.  Thereafter, the parties had the opportunity to prepare and state their respective arguments during the conference call on 28 November, in light of the contents of the letter from the liquidator dated 19 November 2012, forwarded to the Arbitral Tribunal on 27 November.  As for the argument according to which the Republic of the Congo was allegedly less familiar than Commisimpex with the judicial proceedings for liquidation, it is not convincing.  It is not challenged that the CNSS is a Congolese State entity, led by law by the Minister responsible for Social Security.  It is not conceivable that the highest State authorities wouldn't have been properly kept informed of a proceeding related to the court-ordered liquidation of Commisimpex which had, through various cases against the State, attempted to obtain the enforcement of the 2000 Award and that also claimed amounts in excess of 500 million Euros from the State in this proceeding, in which the President of the Republic filed a witness statement.  Furthermore, for the enforcement of Procedural Order No. 7, as is noted by the Republic of the Congo, the Ministry of Justice and Human Rights gave *"instructions to the Public Prosecutor's Office, placed under its authority, to participate in the case filed by the* Caisse Nationale de Sécurité Sociale *("CNSS") against Commisimpex before the Court of Commerce of Brazzaville"*.[28]  The Arbitral Tribunal therefore concluded that the parties, in accordance with the principle of equality of resources, were able, in adversarial proceedings, to debate the complaints of Commisimpex relative to its court-ordered liquidation, given the short time periods justified by urgency.  The Arbitral Tribunal therefore was able to rule on these complaints, within the limits of it jurisdiction.

**220.**     In its Petition 3, which is the keystone of all the complaints that were not settled by Procedural Order No. 9, Commisimpex asked the Arbitral Tribunal to acknowledge the harmful and fraudulent nature of the liquidation of Commisimpex.  Commisimpex provided a number of disturbing items to support its claim. These were not, for the most part, challenged by the Republic of the Congo:

- The debt claimed by CNSS dates back to 1981;

---

[27]     Letter from Republic of the Congo dated 22 November 2012, Page 2.
[87]     Letter from Republic of the Congo dated 22 November 2012, Page 3.

- By order dated 28 September 2012, the President of the Court of Commerce of Brazzaville scheduled for 2 October 2012 (2 business days) the hearing for ruling on the legal grounds of the Request dated 26 September 2012, ordering Commisimpex to present its defense *"within eight days before the hearing"*[29];

- Counsel for Commisimpex requested a one-month continuation, but only 8 days were granted, even though the hearing was postponed to 9 October 2012, then to 16 October;

- The matter was argued on 23 October 2012 and the ruling for liquidation was handed down on 30 October 2012;

- Thus, 34 days passed between the filing of the Request by CNSS and the ruling ordering liquidation of Commisimpex.

**221.**    The Republic of the Congo explains the filing of this proceeding about 30 years after the date of the alleged debt by citing the risk of expiration of the statute of limitations. The Republic explained the accelerated proceeding by the fact that it involved a debt related to salaries.[30] These arguments seem contradictory because if it really was a truly urgent matter considering the nature of the receivable, it was difficult to tell why it was not claimed earlier. One could ask, on the other hand, whether the proceedings for enforcement of the arbitral award of 2000 and the imminence of the pronouncement of the ruling were not more probable explanations for what appeared to be haste. However, this ruling was not definitive because it was appealed and, as the Republic of the Congo properly demonstrated[31], it was for the Court of Appeal of Brazzaville to evaluate the validity of the same. The Arbitral Tribunal did not have jurisdiction to do so.

**222.**    In contrast, the Arbitral Tribunal does not need to rule on the allegedly harmful and fraudulent nature of the liquidation of Commisimpex, as the latter requested, to note that recognizing its effects in this arbitration proceeding would not comply with the requirements of international public policy, with regards to which it has jurisdiction.

Even if the claimed debt of 6,323,79. 920 CFA francs (approximately USD 12 million) allegedly owed to CNSS by Commisimpex was confirmed, the Congolese Government owes Commisimpex the amounts that it was ordered to pay in the 2000 Award which is final, since the appeal to quash that award was rejected by the Court of Appeal of Paris on 23 May 2002. The Republic of the Congo invokes the authority of *res judicata* of that ruling in this proceeding. The certain debt of Commisimpex in this regard totals 165,416,012 million Euros[32], i.e. more than 10 times greater than the debt claimed by CNSS. The alleged insolvency of Commisimpex therefore was caused only by the refusal of Republic of the Congo to comply with an arbitral award the authority of which it recognized as *res judicata.* The Arbitral Tribunal cannot accept the Congo's cynicism that it revealed in this regard, when writing in Note 29 of its letter dated 22 November 2012: *"Contrary to what Commisimpex claims, the fact that it has a debt vis-à-vis the Republic of the Congo is not likely to challenge its cessation of payments since a debt*

---

[29]    Exhibit C-214.

[30]    Letter from Republic of the Congo dated 22 November 2012, Page 14.

[31]    Letter from Republic of the Congo dated 22 November 2012, Page 11.

[32]    Mazars report dated 7 January 2011, Page 3, amounts adjusted as of that date.

*cannot be considered to be part of the liquid assets except under strict conditions – in particular the conditions of certainty and actual prospects for recovery in the short term – which is not fulfilled"*.  The Republic of the Congo could not be clearer in recognizing that its refusal to fulfill its obligations with regard to the 2000 award was sufficient to explain the alleged cessation of payment of Commisimpex and the court-ordered liquidation that resulted therefrom.  As a result it would therefore be contrary to the requirements of good faith that, as was emphasized by the Court of Appeal of Paris in its aforementioned ruling of 12 January 1993[33], is a part of international public policy, to admit that the court-ordered liquidation of Commisimpex could have an effect in this arbitration proceeding.  The Republic of the Congo further seems not to disagree with this conclusion, without however accepting the reasons for the same, since the Ministry of Justice requested that the Government Prosecutor's Office *"do what is necessary to avoid a ruling of bankruptcy being handed down before the award to come".[34]*  Although these efforts for enforcement of Procedural Order No. 7 were not carried out, the Arbitral Tribunal trusts that Procedural Order No. 9, which orders the Republic of the Congo to *"take all measures necessary to restore the status quo between the parties as quickly as possible and in any event before the pronouncement of the final award"* will have permitted the reestablishment of the status quo prior to the ruling of 30 October 2012 upon notification of this award.

**223.**    Based on the above, the Arbitral Tribunal declares to have jurisdiction to rule on Petition 3 of Commisimpex but declares that the requirements of international public policy oppose the liquidation of Commisimpex having any effects in this proceeding, thereby admitting Petition 4 of Commisimpex.  As a result of which, and as is requested by Commisimpex in Petition 5, the Arbitral Tribunal notes the lack of standing of the liquidators appointed to represent Commisimpex in this arbitral proceeding.

**224.**    In Petition 6, Commisimpex requests that the Arbitral Tribunal order the Republic of the Congo to waive asserting and/or enforcing the ruling of the Court of Commerce of Brazzaville dated 30 October 2012, before the Arbitral Tribunal and/or before any other jurisdiction, whether judicial or arbitral.  This claim is superfluous with regard to the Arbitral Tribunal, due to the response given to Petition 4.  The Arbitral Tribunal must declare itself not to have jurisdiction otherwise, in that it does not have standing to replace the other jurisdictions that could be called upon to enforce the ruling of the Court of Commerce of Brazzaville dated 30 October 2012.

**225.**    In its Petition 8, Commisimpex requests that the Republic of the Congo be ordered to reimburse all expenses incurred in this arbitration by the liquidation proceeding.  The Arbitral Tribunal can only dismiss this request because it did not establish that the liquidation proceeding was initiated by the respondent in the present arbitration proceeding.

**226.**    As was already stated, Procedural Order No. 9 dated 30 November 2012 has already disposed of Petitions 1, 2 and 7.

---

[33]     1994 Arbitration Review, No. 4, Pages 685 ff., Exhibit C-RH 142.

[34]     Letter from Republic of the Congo dated 22 November 2012, Page 3.

- **THE DISPUTE BETWEEN THE PARTIES**

**227.** Primarily, Commisimpex petitions the Arbitral Tribunal to order:

> *"The Congo to pay the amounts owed in relation to the 2003 Protocol, including (considering the lack of enforcement of the 2003 Protocol by Congo) all interest owed on those amounts, after consideration of the amounts granted by the 2000 Ruling, i.e. as of 7 January 2011:*
>
> - *3,247,161,007 French francs, i.e. 495,026,504 Euros;*
> - *65,634,875 Pounds sterling;*
> - *105,820,227 US Dollars;*
> - *3,253,937,125 CFA francs, payable in Euros, i.e. 4,960,595 Euros."[35]*

**228.** The Republic of the Congo concludes, primarily, that these petitions by Commisimpex were inadmissible due to the *res judicata* effect attached to the arbitral award of 3 December 2000 rendered in ICC case No. 9899. In its partial award dated 20 August 2010, the Arbitral Tribunal postponed consideration of this *res judicata* defense to the merits stage. It will examine it first (A). It is only to the extent that it would decide to reject such defense that it would rule on the validity of the 2003 Protocol and its binding nature, both challenged by the Republic of the Congo on various grounds (B). If the Arbitral Tribunal confirms the validity of the 2003 Protocol, it will then rule on the amounts owed in application thereto by the Republic of the Congo to Commisimpex (C). Lastly, it will rule on the allocation of the burden of the arbitration costs (D).

A. Regarding the *res judicata* effect of ICC Award No. 9899 dated 3 December 2000.

**229.** The Republic of the Congo considers primarily that:

> *"this proceeding would[…] only be intended to question th equantum, as determined by the Tribunal that rendered Award No. 9899, of the debt arising out of the enforcement of the same contracts. In other words, what Commisimpex qualifies here as 'another part of the debt' consists more precisely of an amplification of the amount of the debt arising from the enforcement of the contracts as held by the first arbitrators."[36]*

The Republic of the Congo adds that:

> *"the parties agree on the fact that the entirety of the contracts entered into between the parties and that serve as the basis of the debt to Commisimpex was examined in the context of ICC Proceeding No. 9899"* and that *" (…) Tribunal No. 9899, after having determined that the resulting amounts had been the subject of consolidation and novation of the terms of the 1992 Protocol, in Item I of its order, established the amount of the debt in dispute (i.e. 288,634,078 FRF in principal, in October 1992)."*

[35] Post-hearing Brief, 17 February 2012.
[36] Brief regarding Jurisdiction, Paragraphs 98 and 99, Page 32.

It concludes that, based on the shared identity of *causa* and object:

> " (…) any petition by Commisimpex that, as in this case, targets the payment of a debt arising out of the same contracts conflicts with the res judicata *effect attached to ICC Award No. 9899 and is inadmissible.*"[37]

**230.** According to the Claimant :

> " (…) this debate regarding the res judicata *effect of ICC Award No. 9899 is first of all irrelevant: the 2003 Protocol, a new contract entered into by the parties subsequent to the 2000 Award, justifies the consideration, in this arbitration, of the entirety of the total debt of the Congo to Commisimpex and, thus, the admissibility of all the petitions of Commisimpex. As such, the* res judicata *effect of the 2000 Award cannot be invoked against Commisimpex.*"[38]

Commisimpex then specifies that if the *res judicata* effect of the 2000 Award was taken into consideration, it only has a limited scope because these petitions in Arbitration Proceeding No. 9899 involved the amounts owed under the 1992 Protocol and not the entirety of the debt owed by Congo to Commisimpex or the related contracts.

**231.** Contrary to the statements of the Respondent, there is no shared identity of *causa* and object of the petitions decided by the 2000 Award and those submitted to the Arbitral Tribunal. The latter were solely based on the Protocol supposedly concluded between the parties in 2003 and not by the 1992 Protocol, the basis of the 2000 Award. It is true that the text of the 2003 Protocol, in its description of the debt of the Republic of the Congo, represents an amount of 22 billion CFA francs, *"the subject of the [1992] Protocol"* to which it adds a *"second portion"* of 26 billion CFA francs, but it does not follow that the petitions of Commisimpex are founded, even partially, on the 1992 Protocol. They are founded on the 2003 Protocol which, if it is considered to be valid, would replace the 1992 Protocol.

In this regard, the argument according to which the 2003 Protocol is unlikely to create a new legal situation because it involves the acknowledgement of a debt is not relevant. This observation, simply regarding a unilateral act, does not relate to an agreement in which two parties agree together that one owes specific amounts to the other. Although such a debt acknowledged by both parties would not have any existence prior to the agreement, the latter could cause it to be created if its validity was recognized, which is in part the subject of this proceeding. The parties may, by mutual agreement, establish the *causa* and, as has properly been seen, in bilateral contracts, the *causa* flows from the nature of the contract itself.[39]

Furthermore, and as an important aspect allowing the comprehension of the position of the parties, although the annulment proceedings filed by the Republic of the Congo and the CCA before the Court of Appeal of Paris on 2 January 2001 was rejected on 23 May 2002, the 2000 Award was never enforced. Therefore it is not surprising that, taking into account such

---

[37] Rejoinder on the Merits, Para. 325, Pages 118 and 119.

[38] Reply on the Merits, Para. 514, Page 225.

[39] Ph. Mallaurie, L. Aynés, Civil Law, Obligations, 2nd Ed., 1990, No. 514, Page 283.

facts, the Republic of the Congo and Commisimpex, in a new protocol, reevaluated the debt of the Republic and came to an agreement regarding new settlement terms. The *res judicata* effect of the 2000 ruling could not fail to be implemented by the arbitral provisions of this new agreement. The Claimant further takes into account amounts that were allocated to it by the 2000 Award in the calculations of the amounts that it seeks, recognizing itself the *res judicata* effect of the award. And if this new agreement was non-existent or invalid, as the Republic of the Congo contends, *inter alia*, by absence of *causa* or for any other reason, the petitions of Commisimpex would not be inadmissible but would be rejected. The defense of *res judicata* raised by the Republic of the Congo cannot therefore be successful and will be rejected by the Arbitral Tribunal.

B.    <u>Regarding the validity of the 2003 Protocol and its binding nature</u>

**232.** In order to challenge the validity of the 2003 Protocol, which it claims to be fraudulent, the Respondent relies on various arguments that can be grouped into four major categories: the first concerns the alleged lack of authority of the signatories of the Protocol to bind the Republic of the Congo (a), the second relates to the alleged absence of a binding nature of the Protocol (b), the third concerns the ignorance of the amount of the debt as formulated by the 2003 Protocol (c), and the final arguments are based on the alleged absence of *causa* of the 2003 Protocol due to the erroneous amount of the debt that it states(d).

*a.*    *<u>Regarding the alleged absence of authority of the signatories of the 2003 Protocol</u>*

**233.** According to the Respondent, the signatories of the 2003 Protocol had not received the authorization from the President of the Republic, since no written delegation had been provided in the file.

**234.** In order to show otherwise, the Claimant bases its argument first on the terms of the 2003 Protocol itself, which mentions the existence of a delegation of authority given to its signatories by the President of the Republic of the Congo. The Claimant also invokes the theory of apparent authority, strengthened by its confirmation on the part of high-ranking Congolese officials and its allegation that the Congolese government had begun to enforce the Protocol.

**235.** After a detailed examination of the respective positions of the parties as well as the exhibits submitted by them in support of their respective claims and the witness statements received, the Arbitral Tribunal concludes that regardless of the procedures for authorization received by the signatories of the 2003 Protocol during its signature, the Republic of the Congo cannot validly claim lack of authority in order to challenge its validity.

**236.**     Although it is true that the Claimant did not submit a written statement from the President of the Republic that expressly authorized the signatories of the 2003 Protocol to sign it for him and on his behalf, the Arbitral Tribunal is convinced that Messrs. Longobé and Okemba had such authority, in light of many signs that leave no room for doubt.

**237.**     First and foremost it is noted that the two signatories, Messrs. Longobé and Okemba, were very close to the President of the Republic.  Mr. Longobé was the General Secretary of the Office of the President of the Republic and Mr. Okemba was the Secretary of State, Secretary General of the Security Council and furthermore the nephew of the President.[40]   Further, they did not hesitate to expressly state in the 2003 Protocol that they were acting *"further to a delegation by the President of the Republic, his Excellency Mr. Denis SASSOU NGUESSO and having authority to this end"*.  It is hardly credible that the said persons would have made such a statement in writing if it had been inaccurate.  Furthermore, in the affidavit dated 6 May 2011, Mr. Longobé does not in any way state that he was not acting by delegation of the President of the Republic when he signed the 2003 Protocol.  The essence of his statement is that it was not a final protocol but a negotiation protocol and that *"only a final agreement concluded by the Minister of Finance would be binding on the State officials"*[41] because he did not have the authority to do so. He confirmed, with qualification, this statement at the hearing by stating that he did not exceed the authority that he had been given but that the solutions of the 2003 Protocol would only be applicable if they were approved by the competent authorities, in this case the Minister of Finance.[42]

**238.**     The authorization of Messrs. Longobé and Okemba is confirmed by multiple elements.  It is helpful first to recall that the existence of the Protocol was never kept secret—quite the contrary.  Shortly after the signature date (23 August 2003), Mr. Hajaij, in letters dated 29 December 2003 and 8 January 2004[43], addressing the Minister of State, Secretary of the General Security Council and the Minister of the Economy, Finance and Budget, respectively, recalled the conclusion of the same and petitioned for its enforcement, as follows:

> *"Lastly, we must recall that as of 31 December 2003, all the actions described in Article 6 of the protocol should have been carried out.  This is not the case as of 08/01/2004 (…).  Out of desperation, we once again turned to His Excellency, the President of the Republic, who verbally instructed us on 6 January 2004 to directly contact you again in order to implement the protocol of 23 August 2003, the purpose of our request today"* referring also to a desire to *"make concrete the amicable agreement that was entered into."*[44]

In a letter dated 16 February 2004[45], Mr. Hajaij also addressed the Minister of State, Transport and Privatization in order to request the enforcement of Article 4, Item 2 of the Protocol,

---

[40]     Affidavit of Mr. Hajaij dated 4 August 2011, No. 68, p. 17.

[41]     Affidavit of Mr. Longobé dated 6 May 2011, Page 2.

[42]     Transcript of the hearing of 21 December 2011, Page 13.

[43]     Exhibits C28 and C29.

[44]     Exhibit C29.

[45]     Exhibit C33.

i.e. the reimbursement of 20 billion CFA francs in the form of the privatization of companies.

**239.**     In a letter dated 30 January 2004[46], Mr. Mouko, Director of the Cabinet of the Office of the President, charged with Government Auditing, in response to a letter from Mr. Hajaij dated 6 January 2004, acknowledged receipt of the 2003 Protocol forwarded by Mr. Hajaij, congratulating himself:

> *"for the consideration of his work* (that of the Office of thePresident) *by the execution of the protocol dated 23 August 2003, which recognized the closing of accounts of 30 September 1992 in the amount of 960,000,000 French Francs, i.e. the equivalent of 48,000,000,000 CFA francs, including 26,000,000,000 CFA Francs for COMMISIMPEX S.A. and 22,000,000,000 CFA francs for the account of Banque SARADAR, on the one hand, and on protocol No. 566 dated 14 October 1992, on the other hand (…)."*

So, beyond confirming the existence of the 2003 Protocol, this letter summarizes the debt to Commisimpex in the amount of 48 million CFA francs decreed as of 30 September 1992, without discussing it in any way.

Likewise, by letter dated 5 February 2004[47], Mr. Yoka, Minister Director of the Cabinet, forwarded to the Minister of the Economy, Finance and Budget, *"for competence,"* a copy of the 2003 Protocol, insisting on the fact that:

> *"The Head of State attaches particular interest to the enforcement of the clauses set forth in said protocol, in order to avoid any judicial proceeding against our country, and also to freeze the irrevocable guarantee granted to this company on 22 December 1986."*

**240.**     There is therefore no doubt that several months after the signature of the Protocol, the various ministries involved, the Minister of State, Secretary of the General Security Council, the Minister of Economy, Finance and Budget, the Minister of State, Transport and Privatization and the Director of the Cabinet of the Office of the Presidency, charged with Government Auditing, had been informed of the existence and the content of this Protocol and had been invited to enforce it.

**241.**     In addition, as is attested to by a Note from the legal and administrative department of the Office of the President dated 30 April 2004[48], addressed to the President of the Republic directly, the Protocol had, in reality, been forwarded to the Minister of Finance on 29 December 2003, who received reminders from the Director of the Cabinet on 5 January and 15 March 2004 *"of the need and interest of the country in enforcing said protocol"*. At that specific moment, the Minister of Finance did not issue any formal reservations either regarding the delegation of authority or regarding any obligation on its part to validate the Protocol.

**242.**     In any event, the President of the Republic, Mr. Sassou N'Guesso had been, even if it wasn't the case earlier, which is very improbable, informed at this stage of the existence *"of a protocol of agreement for the amicable settlement between the two parties"* and far from being outraged at the existence of an agreement not signed by his office, he merely

---

46      Exhibit C30.
47      Exhibit C32.
48      Exhibit C35.

Noted that he would have to *"ask the Minister of Finance, since the latter had once reported to me that he has direct contacts with COMMISIMPEX officials"*.

**243.**     So, very briefly after the signature of the 2003 Protocol, neither the President of the Republic nor the Minister of Finance, questioned the validity of the 2003 Protocol nor made any formal remark regarding the procedure leading to its signature.  The Arbitral Tribunal is convinced that if these signatures had not been valid and if the President of the Republic or the Minister of Finance were unaware of the existence of such an agreement when it was executed, they would have formally and publicly stated their surprise, even their displeasure or their opposition as early as possible, since the stakes at play in this agreement were too significant to be kept silent.

**244.**     Furthermore, soon after the execution of the 2003 Protocol, the question of its enforcement by the Republic of the Congo either by its representatives or by the signatories of the Protocol arose.  In a letter dated 4 March 2004[49], the Minister of State, Mr. Isidore Mvouba, acknowledged receipt of the copy of the Protocol and, basing himself on the provision relative to the privatization of companies specified in the Protocol, provided a list of companies to the Chairman and CEO of Commisimpex, mentioning however that *"the framework law regarding privatization excludes any form of compensation"*.

*245.*     Similarly, in a letter dated the same day[50], the General Director of CCA, Mr. Georges Nguekoumou, after having recalled the terms of the Protocol and the procedures for repayment of the debt, emphasized that the *"CCA still has not received the funds necessary to establish the bank deposit of 6 billion CFA francs"* that corresponded to a portion of the 26 billion that the State had to repay in this way.

**246.**     Even more meaningfully, the signatories of the Protocol themselves requested that the various State authorities enforce the Protocol.  Mr. Longobé, as of 15 January 2004[51], in effect stressed to the Minister of the Economy, Finance and Budget, for him to agree:

> *"(…) to (…) receive Mr. HODJEIJ, Representative of COMMISIMPEX and to determine with him the procedures for application of the negotiation protocol dated 23 August 2003"* and *"considering the procedures constraints arising from the warranties given by the Congolese Government and, considering the need to avoid other complications, particularly with Banque SARADAR."*

These words confirm that the 2003 Protocol was known to the highest ranking officials, who intended to implement it.

**247.**     This is further recalled by Mr. Okemba in a letter dated 29 November 2003[52], to the attention of the Minister of the Economy, Finance and Budget, indicating:

> *" (…) you are requested to organize the implementation of this agreement in relation to COMMISIMPEX and with the other ministerial departments involved."*

[49]     Exhibit C69.
[50]     Exhibit C70.
[51]     Exhibit C59.
[52]     Exhibit C163.

**248.** Likewise, Mr. Okemba stated to the Minister of State, charged with government coordination, the Minister of Transport and Privatization, that:

*"in the context of the implementation of the said protocol, we are pleased to forward this to you, for your review, to the extent that a component of this matter may relate to privatization."[53]*

**249.** Lastly, in a letter from the Longobé and Okemba dated 29 March 2004[54], they requested that the Minister of the Economy, Finance and budget *"kindly consolidate the achievments of the protocole dated 23 August2003"*.

**250.** All of this correspondence deprives the comment of the Respondent of any impact when it states:

*"(...) the absence of a detailed response to the allegations set forth in the flood of untimely letters by Commisimpex, in order to maintain* a posteriori *evidence, is not proof of the veracity of those allegations"*

And the same goes for when the Respondent adds that:

*"the allegations of Commisimpex therefore cannot lead to the challenge of the statement of the President of the Republic according to which he attests to not having given any delegation to sign the 2003 Protocol."[55]*

**251.** The Arbitral Tribunal notes that it is not necessary to use as a basis the letters of Commisimpex to conclude that the highest Congolese authorities considered themselves to be bound by the 2003 Protocol, without the need to question Commisimpex's willingness to *"establish* a posteriori *evidence"*. Contemporary letters from the Congolese administration are sufficient and make the statements of President Sassou N'Guesso in his letters dated 6 May and 27 October 2011, occurring eight years later, according to which he allegedly did not give any instruction to sign the 2003 Protocol, not very credible. It is unlikely that so many agents of the Congolese State could have acted, without him knowing, and that, having necessarily learned about their actions, he would not have immediately taken action for termination if the Protocol had been signed without his authorization. In this regard it is regrettable that he refrained from coming to testify at the hearing, preventing the Arbitral Tribunal from considering his written statement.

**252.** In this regard, the argument of the Republic of the Congo according to which Commisimpex could not claim a subsequent ratification by a non-existent delegation is meaningless. The Respondent claims that a ratification *"can only be cited in two cases: (i) an express ratification by the principal, who assumes for its own account the commitments made by the agent beyond its authority; or (ii) an implicit yet unequivocal ratification"* adding that the ratification must *"emanate from the*

---

[53]    Exhibit C167.
[54]    Exhibit C179.
[55]    Counter-Memorial on the Merits, Paras. 242 and 243, Pages 80 and 81.
[56]    Exhibits R 55 and R92

*principal itself*".[57]  However, as indicated, the Arbitral Tribunal is convinced of the reality of the existence of the contested delegation due to the many signs mentioned above.  No ratification is therefore necessary.  Furthermore, although it is true that the President of the Republic did not expressly ratify the 2003 Protocol, it appears in light of the previously mentioned documents and in particular Exhibit C35 in which he was advised to enforce said Protocol, that the President of the Republic ratified it, since he did not state any surprise regarding its existence, did not object to its content and merely stated that it was necessary to *"ask the Minister of Finance"* not about the Protocol itself but apparently about its enforcement.

**253.**  Considering the foregoing, the Arbitral Tribunal rejects the Republic of the Congo's claim that the 2003 Protocol is null and void due to a lack of authority on the part of its signatories.


       *b.*     <u>Regarding the alleged non-binding nature of the 2003 Protocol</u>

**254.**  In order to challenge the binding nature of the 2003 Protocol, the Republic of the Congo invokes two types of arguments which feed off each other.  The first, already invoked when the testimony of one of its signatories, Mr. Longobé, was mentioned, is that the Protocol did not reflect a firm agreement but rather a Protocol for negotiations, according to which *"the State agreed simply to negotiate to seek an agreement regarding the amount of the debt to be repaid and the staggering of payments"*.[58]  According to Mr. Longobé, as was observed, the authority delegated to the signatories of the 2003 Protocol only authorized them to seek out avenues of negotiation intended to then be conducted by the Minister of Finance, who could then commit on behalf of the State in a final agreement.[59] However the Republic of the Congo also claims that even if the signatories actually had a delegation of authority allowing them to go beyond the determination of elements for negotiation, the Protocol would require the countersignature of the Minister of Finance in order to be binding on the State, as was required by Law No. 1-2000 dated 1 February 2000 regarding the institutional act on the financial system, in Article 74, which provides that:

> *"Any decree, convention and in general any measure, of any type whatsoever, likely to commit public finances, shall have the countersignature of the Minister of Finance."*

**255.**  These arguments on the part of the Republic of the Congo, although closely related, bring up two distinct problems.  Did the Republic of the Congo, in the 2003 Protocol, assume firm commitments that went beyond an agreement setting out the grounds for negotiations? If so, are these commitments firm and binding, in the absence of the countersignature of the Minister of Finance?

**256.**  The Arbitral Tribunal notes that although the 2003 Protocol is entitled "PROTOCOL FOR NEGOTIATIONS BETWEEN THE GOVERNMENT OF THE CONGO AND COMMISIMPEX S.A.," it closely resembles an agreement creating rights and obligations for the parties due to the terms used, which aim, primarily, to

---

[57]      Counter-Memorial on the Merits, Para. 305, Page 97.

[58]      Affidavit of Mr. Longobé dated 6 May 2011, Page 2.

[59]      Affidavit of Mr. Longobé dated 6 May 2011, Page 2.

give it mandatory force.  It specifies that it is the result of *"negotiations undertaken on 27 May 2003 at Brazzaville"* between the parties *"in regards to the debt of the Congo vis-à-vis COMMISIMPEX,"*[60] which seems to justify its title as Protocol for negotiations.  The negotiations are notto come, theyhave already taken place, and the Protocol embodies their result.  On this basis, both parties *"agree"*[61] to the features and the amount of the debt owed by the Congo, which *"recognized that the debt of 960,000,000 FRF"* was shared as a result of the meetings held on 7 and 23 September 1992.[62]  Then, it was stated that the parties *"have* (sic) *agreed to"* a number of firm commitments drafted in binding terms:

> - *"Article 1 – The Government of Congo <u>assumes responsibility for</u> the debt of  COMMISIMPEX  and that of the Hojeij group and family (…);*
>
> - *Article 2 – The Government of Congo agrees to negotiate directly with Banque SARADAR (…);*
>
> - *Article 3 – The Government of Congo <u>agrees to reimburse</u> COMMISIMPEX  the amount in principal of 520 million FRF (…);*
>
> - *Article 4 – The Government of <u>Congo agrees to pay</u> COMMISIMPEX the amount of 520,000,000 FRF (…)"*

**257.**     The Arbitral Tribunal can therefore only conclude that the 2003 Protocol has binding contents vis-à-vis the Republic of the Congo, that Article 6 thereof is not sufficient to suppress.  That article reads as follows:

> *"the Government of Congo agrees, by 30 December 2003:*
>
> - *To put in place the moratorium specified in Article 3 above,*
> - *To execute the transfer instruments for the companies specified in §4-2,*
> - *To finalize negotiations with Banque SARADAR, specified in Article 2 above,*
> - *And to conclude a Definitive Protocol with COMMISIMPEX to replace the present Protocol, in order to close out the negotiations in progress."*

**258.**     This reference to a definitive protocol does not call into question the binding and mandatory nature of the 2003 Protocol.  It serves, as is stated in Article 6, as a "closing" document setting forth the accomplishment of certain actions for the implementation of the obligations contained in the 2003 Protocol.

**259.**     In addition, as was noted above, the high authorities of the Congo were not mistaken when they stated that the Office of the President of the Republic *"acknowledged the declaration of accounts as of 30 September 1992 in the amount of 960,000,000 French Francs,"*[63] and that *"The Head of State has particular interest in the enforcement of the clauses set forth in*

---

[60]     Exhibit C27: 2003 Protocol, Pages 1 and 2.

[61]     Exhibit C27: 2003 Protocol, Page 2.

[62]     Exhibit C27: 2003 Protocol, Page 2.

[63]     Exhibit C30.

*The said protocol"[64]*  The same can be said of when the legal and administrative unit of the Office of the President, on 30 April 2004, [65] described the 2003 Protocol the President of the Republic as a *"protocol for amicable settlement between the parties"* and recommended that he *"instruct the Minister of Finance to carry out the commitments that were made".*  That this document was signed by proxy in no way changes the description given to the 2003 Protocol.

**260.**    Likewise, the Republic of the Congo cannot enforce on the Claimant the provisions of Article 74, of Law No. 1-2000 dated 1 February 2000 regarding the institutional act on the financial system.  This text, with very general content indicating effectively that any measure which is *"likely to commit public finances,"* should bear the countersignature of the Minister of Finance, as a rule, appears to be an administrative rule applicable to the authorization of a payment related to a decision, and not a rule applicable to the validity of that decision.  The fact that it relates to a decree as well as a convention confirms this.  If it were otherwise, the Minister of Finance and not the President of the Republic would be the highest State authority and the only one to have actual authority.  That is obviously not the case.  The Minister of Finance receives instructions from the Head of State, as is illustrated by the aforementioned note dated 30 April 2004[66] from the legal and administrative unit of the Office of the President recommending that the President of the Republic *"instruct the Minister of Finance to carry out the commitments that were made"* in the 2003 Protocol.  Furthermore, the 2003 Protocol contains no mention of the requirement of the countersignature of the Minister of Finance and none of the representatives of the Republic of the Congo referred to such a requirement at that time.

**261.**    Finally, even if the Arbitral Tribunal would not find, on the on the basis of contemporary evidence provided, the existence of the authority of the signatories of the 2003 Protocol to commit the Republic of the Congo or the binding nature of that Protocol, one can only agree with the argument of the Claimant when it emphasizes that:

> *"the behavior of Congo created on the part of Commisimpex a legitimate belief in the authority and the charge given to the signatories of the Protocol"* and that *"the legitimacy of that belief was subsequently confirmed by the Legal Opinion signed by the two highest judges of the Congo concluding to the validity of the 2003 Protocol."[67]*

**262.**    The argument of the Republic of the Congo according to which Commisimpex cannot use the theory of apparent authority because it allegedly did not *"cumulatively demonstrate, on the one hand, that it could legitimately believe that the signatories of the 2003 Protocol had received authority to execute said Protocol, and on the other, that it could legitimately believe that the intervention of the Minister of Finance, with whom Commisimpex signed all the instruments regarding the settlement of its debt for twenty years, was not required"[68]* is not relevant.

**263.**    First of all, if, as the Respondent claims, the appearance had to be verified at the time the Protocol was concluded, it is undeniable that the Protocol stated that

---

[64]      Exhibit C32.

[66]      Exhibit C35.

[67]      Post-hearing Brief of Commisimpex dated 17 February 2012, Para. 16, Page 5.

[68]      Republic of the Congo's Rejoinder dated 15 November 2011, Para. 544, Page 49.

Messrs. Longobé and Okemba were acting upon *"the delegation of the President of the Republic"*. That, therefore, was why the Respondent challenged the legitimacy of Commisipex's belief in thisapparent authority. However, unless the fraud alleged by the Respondent wasnot limited to the signatories of the Protocol and theClaimant, which the Respondent does not suggest, one cannot doubt the legitimacy of the belief in the validity of the Protocol shown by multiple Congolese authorities and in particular those that started to carry it out.

264.    The legitimate nature of the belief of Commisimpex in the validity of the 2003 Protocol was also confirmed in the Legal Opinion dated 7 July 2004, signed by Mr. Lenga, acting as the First Chief Justice of the Supreme Court and, co-signed by Mr. Henri Bouka, Associate Chief Justice of the Supreme Court, ruling at the request of the Secretary General of the Office of the President of the Republic. This opinion states that:

> *"Mr. LONGOBE and Mr. Jean Dominique OKEMBA received from the President of the Republic the task of negotiating and signing with COMMISIMPEX S.A. (...)the Protocol for Negotiations"* and that according to Congolese law *"authorization, even if verbal, given by the Head of State is irrevocably binding on the Congolese State in regards to the commitments made by the Plenipotentiaries unless the President of the Republic challenges the authority previously granted, which is not the case here."*

It is thus confirmed that a verbal authorization for the signatories of the Protocol was sufficient and that the obligations arising from the 2003 Protocol are irrevocable commitments of the Congolese State.

265.    It is true that on 25 February 2011, in a letter addressed to the counsel of the Republic of the Congo in this case[69], Mr. Lenga did not hesitate to explain having an *"ad hoc legal opinion,"* *"delivered favorably"*. He states that the 2003 Protocol, *"inasmuch as it commits public finances, should have been entered into with the countersignature of the Minister of Finance, as had in other cases been done for the 1992 protocol, regarding which my opinion had been requested at the time"*. This letter is, to say the least, surprising, because Mr. Lenga confirms that it was: *" (...) in consideration of the sociology of the context that I rendered this legal opinion, acting personally, and the Supreme Court for its part can only issue opinions in very specific cases specified by the law regarding the establishment of the Supreme Court"*.

266.    Neither the letter of Mr. Lenga nor the conclusions drawn therefrom by the Respondent are convincing. In his letter dated 25 February 2011, Mr. Lenga states that he:

> *" (...) drafted that legal opinion going in the direction that was asked* [of me] *by the Secretary General of the Office of the President and Mr. Hojeij, a friend of the Congo, as a favor."*[70]

267.    This leads one to assess the credibility to be attached to his statements with the greatest caution. For example, if the approval of the Minister of Finance was necessary, as he states in his 2011 letter, it is difficult to see why he did not mention it in the Legal Opinion and rather stated that the Protocol was irrevocably binding on the Congolese State.

---

[69]    Exhibit R54.
[70]    Exhibit R54.

**268.**     His justification, according to which:

> *"I nevertheless considered being able to claim that the protocol was binding on the State to the extent that it was a negotiation protocol and that it should be, as had been stated to me by Mr. Longobé, the subject of subsequent definitive instruments entered into with the participation of the Minister of Finance"*

is not convincing, inasmuch as it is difficult to reconcile with the notion of the irrevocable commitment contained in the Legal Opinion.

**269.**     The Arbitral Tribunal may rightly wonder when Mr. Lenga expressed himself with sincerity.  Contrary to the Republic of the Congo which believes that the Legal Opinion: *" (…) cannot however give any appearance of authority tothe signatories of the 2003 Protocol, on the one hand, because it was made to order, as Mr. Lenga confirmed, and furthermore, because it was prepared after the 2003 Protocol (…),"*[71] the Arbitral Tribunal believed that a Legal Opinion given less than one year after the execution of the Protocol, at a time when no Congolese authority challenged the validity and efficacy of that Protocol, is more credible than a letter sent about seven years later, for the purposes of an arbitration proceeding.  Regardless, the Republic of the Congo cannot retreat from that opinion, after having requested it, through the Secretary General of the Office of the President of the Republic, simply because seven years later, it is unfavorable to its interests.

**270.**     But more specifically, regardless of the sincerity of the Legal Opinion, the fact that the Chief Justice and the Associate Chief Justice of the Supreme Court did not hesitate to give it, moreover since these two top judges had also participated in delivering the Supreme Court ruling, dated 27 June 2003[72] regarding the debt owed to Commisimpex, can only confirm the legitimacy of the belief on the part of Commisimpex in the validity of the 2003 Protocol.  When two high judicial authorities of the Congo confirm in writing that a Protocol signed by the Secretary General of the Office of the President of the Republic and the Secretary of State, Secretary General of the Security Council, is irrevocably binding on the Republic of the Congo, and when those two authorities behave as if this were the case, it is difficult to believe that Commisimpex could have questioned the validity of the Protocol.

**271.**     In emphasizing that *"the behavior of the Congo created on the part of Commisimpex a legitimate belief in the authority and the scope of the authority granted to the signatories of the Protocol,"*[73] from which the commitment of the Republic of the Congo also allegedly arises, Commisimpex in reality refers to the well-known principle of estoppel or, more commonly in French law, the prohibition against contradicting oneself to the detriment of another party.  Based on this principle, the Republic of the Congo cannot give the appearance that it validly entered into the 2003 Protocol and then suddenly allege that it is invalid when the time comes to perform the obligations.  Similarly, Article 1.8 of the UNIDROIT principles states that *"one party cannot act in contraction of an expectation that it created on the part of the other party when the other party reasonably believed said expectation and acted correspondingly to its own detriment"*.  In any event, this is a

[71]     Post-hearing Brief of the Republic of the Congo dated 17 February 2012, Para. 139, Pages 49 and 50.

[72]     Exhibit C26.

[73]     Post-hearing Brief of Commisimpex dated 17 February 2012,  Para. 16, Page 5.

consistent position of French case law[74] that considers that one party cannot, based on the principle of good faith, successively adopt contradictory positions.

**272.** Having held that the approval of the Minister of Finance was not necessary, the Arbitral Tribunal rejects the petition by the Republic of the Congo that the 2003 Protocol be declared null and void on this basis.

### c. *Regarding the ignorance of the amount of the debt as presented in the 2003 Protocol*

**273.** Moreover, the Republic of the Congo cannot invoke the alleged ignorance of its representatives regarding the debt owed to Commisimpex to the extent that it had been discussed in many documents, including:

- the Note to the attention of the Minister of the Economy, Finance and Planning by the CCA dated June 1991[75];

- the Note to the attention of the Minister of Planning, Finance and the Economy by the CCA dated June 1991[76];

- the *Fiche de calcul détaillée* of 1991[77] by the CCA that estimated the debt owed to Commisimpex in 1986 at 29,949,284,818 CFA francs;

- the 1992 Protocol;

- the Ricol report dated 14 April 2000 produced in the context of ICC Arbitration No. 9899[78];

- the Mazars report dated 26 January 2000;

- the Award dated 3 December 2000;

- the Ernst & Young report dated 25 September 2001[79];

- the rulings of the President of the Court of Commerce of Brazzaville[80], the order of the Court of Appeal of Brazzaville dated 12 July 2002[81] and the order of the Supreme Court dated 27 June 2003.[82]

**274.** It is true that these various documents do not all estimate the amount of the debt owed to Commisimpex in an identical manner. Nevertheless, the existence of this debt

---

[74] Cass. Com., 8 March 2005, RDC 2005, Note D. Mazeaud; Cass. Civ. 1st, 6 July 2005, 2005 Arbitration Review, Page 993, note Ph. Pinsolle.
[75] Exhibit R81.
[76] Exhibit R82.
[77] Exhibit C98.
[78] Exhibit R27.
[79] Exhibit C17.
[80] Exhibit C20.
[81] Exhibit C24.
[82] Exhibit C26.

was accepted and known to all and its amount had long been discussed.  The more recent documents mention the amount that will be used in the 2003 Protocol.  Therefore it was with perfect knowledge that the representatives of the Republic of the Congo in 2003 signed the Protocol and agreed to the amount appearing therein.  The difference between the amount appearing in the 2003 Protocol and the amounts of the debt as mentioned in the various prior documents is significant: the 2003 Protocol specifies an additional amount in the order of 26 billion CFA francs.  There is no doubt that the representatives of the Congo were not unaware of this substantial difference in the statement of the amount of the debt owed to Commisimpex.  In any event, there is no contemporaneous sign of a challenge by the Congolese authorities of this amount after the conclusion of the 2003 Protocol, although these authorities, which include the President of the Republic, had been well informed of the debt and the amount thereof, as was stated previously.

275.     This is why the argument of the Republic of Congo, according to which the consent of the signatories of the Protocol was rendered defective because they were allegedly mistaken regarding the amount of the debt and the very nature of the Protocol, is not convincing.  As indicated above, the Respondent cannot base its reasoning on the alleged ignorance of the amount of the debt because, as was shown, many prior documents reported the debt.  It therefore seems very doubtful that Mr. Longobé, who indicated having participated in *"discussions"*, agreed to sign the 2003 Protocol while being unaware of *"the amount of the debt"* and without verifying the amount, whilst also stating that *"as shown in the protocol for negotiations itself, [that] the State <u>agreed simply to negotiate to seek an agreement regarding the amount of the debt to be repaid and the staggering of payments</u>"*[83] ( Emphasis added by the Arbitral Tribunal).  If the ultimate goal of the negotiations was for the parties to reach an agreement regarding the amount of the debt, the amount indicated in the 2003 Protocol could not be irrelevant.  Furthermore, if the consent of Mr. Longobé was vitiated by mistake, it would be incomprehensible for him and various Congolese authorities to have lobbied for the implementation of the 2003 Protocol for a long time after its execution, while they all had sufficient time to become better informed of the existence of the debt owed and the amount thereof.

276.     The Arbitral Tribunal concludes therefore that based on the information that it had at its disposal, the Republic of the Congo cannot have been mistaken regarding the amount of the debt owed. This is confirmed by the fact that it did not challenge this amount after the execution of the 2003 Protocol and that it manifested the willingness to perform this Protocol during a period of time long enough for it to realize that its consent had been tainted by mistake. Therefore the Arbitral Tribunal rejects the petition of the Republic of the Congo that the 2003 Protocol be declared null and void based on the defective nature of the consent that it gave.

> d.     <u>Regarding the alleged absence of causa of the 2003 Protocol</u>

277.     The Republic of the Congo claims that the amount of the debt owed to Commisimpex was determined by the Arbitral Tribunal in Case No. 9899, that the 1992 Protocol was *"negotiated, amounted to a novation of the debt, had a global character and included an inclusive amount"*, and that the amount of the debt of 26 billion

---

[83]     Exhibit R60: Affidavit of Mr. Longobé dated 6 May 2011.

CFA francs added in the 2003 Protocol to the 22 billion CFA francs of the 1992 Protocol was therefore unjustified. Commisimpex would not be owed 48 billion CFA francs as was claimed in the letters dated11 March 1993, 29 April 1999 and 5 June 1997.[84]

**278.**     The Republic of the Congo emphasizes that the sole document citing this amount before the execution of the 1992 Protocol is a copy of a letter dated 7 October 1992[85], allegedly sent in June 2003 by the President of the Republic to Mr. Hajaij, from whom it was stolen in 1998.  The Republic of the Congo claims that the letter dated 7 October 1992 was fabricated *a posteriori,* explaining in this regard certain inconsistencies in the body of the letter and emphasizing that it is surprising that a copy of this letter was not kept.

**279.**     Commisimpex, for its part, stated that the 1992 Protocol only covered a portion of the debt, that the alleged mark-downs of the debt invoked by the Respondent never occurred and that the ICC tribunal in Case No. 9899 did not determine the total amount of the debt in 1992 based on the contracts, payments ormark-downs, but rather limited itself to noting that the 1992 Protocol had a valid *causa.*

**280.**     For the Arbitral Tribunal, this debate is not relevant, even though the Arbitral Tribunal notes the inconsistencies within the contents of the letter dated 7 October 1992, and expresses its surprise that it had not been mentioned before the 2003 Protocol, also notes the extravagant circumstances of its disappearance and reappearance. As is rightly noted by Commisimpex, the 2003 Protocol contains an acknowledgement of debt by Congo to Commisimpex.  It states:

> *" (…)*
> • *The State of the Congo definitively and without objection or reservation acknowledges the enforcement of the entirety of the contracts and supplies specified in Paragraph 1 below.*
> • *(…)*
> • *The validity of the debt has been irrevocably and officially acknowledged by the Entities in question during formal meetings held on 7 and 23 September 1992.  It was, upon the conclusion and in light of the work conducted at these two meetings, confirmed by the Office of the President of the Republic, which determined the amount to be equivalent to 48 billion CFA francs (Forty-eight billion CFA Francs), representing the counter-value in CFA francs of the acknowledged debts denominated in various currencies as of 30 September 1992, i.e. 96 billion CFA francs after the devaluation of the CFA franc in 1994.  COMMISIMPEX has acknowledged this recognition of the debt, in letters dated 7 October and 24 November 1992.*
> • *The amount of the debt owed by Congo determined as of 30 September 1992 totals a principal amount of 960,000,000 FRF (nine hundred sixty million French francs), which in 1992 represented 48 billion CFA francs, the equivalent of 96,000,000,000 CFA francs (ninety-six billion CFA francs) the final repayment of which shall be made in foreign currencies, since from the start it consisted of foreign financing in foreign currencies.*
> • *(…)*
> • *The State of the Congo acknowledged that the debt of 960,000,000 FRF, valued as of 30 September 1992, was broken down as follows, pursuant to the agreement entered into upon completion of the*

---

[84]     Exhibits R48, R36 and R36 Appendix III.
[85]     Exhibit C4.

*meetings held on 7 and 23 September 1992 referenced above, and confirmed by a letter from COMMISIMPEX dated 7 October 1992:*
*- a first installment is set at 440,000,000 FRF (four hundred forty million French francs), i.e. the equivalent of 22 billion CFA francs, the subject of Protocol No. 566 dated 14 October 1992.*
*- a second installment is set at 520,000,000 FRF (Five hundred twenty million French francs), i.e. the equivalent of 26 billion CFA francs."*

**281.** The statement by the Congo that *"the* causa *for an acknowledgement of a debt must be found in the existence of a preexisting debt"*[86] is accurate and not challenged, but one cannot deduce therefrom it is the creditor that must determine the existence of such a *causa*.

**282.** The Claimant in fact correctly emphasized, based on the case law and legal scholarship, that *"when the* causa *is expressed, there is an appearance of causa"* and that in such a case *"it is up to the party that wants to establish the absence of* causa *to so demonstrate,"* citing an example of legal scholarship[87] stating that *" (…) when the* causa *appears from reading the contractual structure or when, without appearing therein, it is demonstrated by a mention of the instrument, there exists an appearance of* causa . . . *It therefore is incumbent upon the party that wishes to prove its absence, its fictitious nature or its non-compliance with what it should have been, to demonstrate it. The burden of proof, is therefore on the latter party".*[8]

**283.** The Arbitral Tribunal notes, as is shown by legal scholarship and emphasized by case law,[89] that Article 1132 of the French Civil Code establishes a presumption of the existence and lawfulness of the *causa*[90] and that it is the responsibility of the debtor to prove that the *causa* does not exist or is not lawful.[91] In fact, the Republic of the Congo did not challenge this, and correctly indicated that the proof must be provided by all means.

**284.** The Arbitral Tribunal believes in the majority that the Republic of the Congo did not bring evidence as to the absence or unlawfulness of the *causa* of the 2003 Protocol as was stated in the text of this document, i.e. that the debt owed by Congo to Commisimpex decreed as of 30 September 1992 represented an amount of 48 billion CFA francs.

---

[86]    Reply to the Request for Arbitration, Paras. 93-94.

[87]    J. Rochfield, Repertoire Civil Dalloz, January 2005, See "Cause"

[88]    Memorial on the Merits, Para. 142, Page 57.

[89]    See for example, Cass. Civ., 1st, 7 April 1992, Civ. Bull. I No. 114 *"the cause of the obligation is presumed to be accurate; thereafter, it is the responsibility of the signatories of an acknowledgement of debt to prove the actual absence of delivery of funds,"* of Cass. Civ. 1st, 21 October 1997, Appeal No. 95-19,398 *"Since the cause of obligations provided for in an acknowledgement of debt is presumed to be accurate, it is the responsibility of the debtors to prove the actual absence of delivery of funds, without this cause being able to be researched in facts subsequent to the acknowledgement."*

[90]    Article 1132 specifies that *"The convention is no less valid, if the cause is not stated."*

[91]    See Civil Law, Obligations, Contracts, Vol. III, 5th Edition, Christian Larroumet, Economica, Page 450: *"Regarding the foundation of Article 1132 of the Civil Code, case law considers that the debtor must prove that its obligation is unjustified and not that the creditor must prove that the obligation it is enforcing is justified."* Also see Exhibit C RJ91: *"As a result, although the cause is not stated, the creditor may request the enforcement of the agreement without having to prove it (Article 1132 thus presents a slight difference to Article 1315, according to which 'the party that claims the enforcement of an obligation must prove it,'* i.e. to establish its existence and its purpose; For this comparison, see Cass. 1st Civ., 2 May 2011, above). The burden of proof therefore falls to the party owing the obligation that was attempting to become released from its commitment; it must establish the absence of cause or that it is false (for example, Cass 1st Civ., 1 Oct. 1986, Bull. Civ. 1, No. 230).

**285.**    In order to do this, the Congo has to show that as of that date the amount of the debt owed to Commisimpex was different.    Thus, it preferred to base its argumentation on the amount specified in the 1992 Protocol of  22 billion CFA francs as a basis, while stressing that that Protocol was *"an agreement to restructure its debt, the* causa *of which, and therefore the validity of which, is inseparable from its global character and the fact that it amounted to a novation of the debt",[92]* as well as on the 2000 Award which was rendered on the basis of that Protocol.

**286.**    A reference to the 1992 Protocol and to the 2000 Award cannot be useful for demonstrating the absence of *causa* for the 2003 Protocol, specifically due to the fact that the 1992 Protocol had a global character, amounted to a novation of the debt and included an inclusive amount, as stated by the 2000 Award itself.[93]    As the arbitrators then stressed: *"the determining cause for the REPUBLIC OF THE CONGO (which also was a cause shared by COMMISIMPEX) was to obtain, by negotiating and signing Protocol No. 566[94], a substantial reduction in the overall debt, and what's more, a restructuring of the payment of that debt through 2002 (i.e. to nearly 20 years following the first public contracts concerned)".[95]* There is therefore no doubt that the 1992 Protocol was not representative of the actual amount of the overall debt as of the date on which it was executed. Letters from Commisimpex following that signature are not representative either, since they were issued during a period when it was attempting to obtain from the Republic of the Congo in fulfillment of its commitments based on the 1992 Protocol, in, by the way, a rather confused manner.

**287.**    As the Arbitral Tribunal has already stressed[96], there is no surprise that in 2003 the Republic of the Congo and Commisimpex reevaluated the debt owed to the latter and agreed to new terms for its settlement.  At the time, the Republic of the Congo, while refusing to honor the 1992 Protocol, the validity of which it had challenged in the arbitration proceedings, was refraining from complying with the 2000, even though the annulment proceedings which it had filed before the Court of Appeal of Paris was rejected on 23 May 2002.  The situation was at a stalemate and it was appropriate to question the inclusive amount set out in 1992.

**288.**    The Arbitral Tribunal believes in the majority that the Republic of the Congo did not provide any convincing fact establishing that in October 2003 its debt owed to Commisimpex totaled any amount other than the 48 billion CFA francs specified in the 2003 Protocol, while Commisimpex provided a plausible explanation as to the origin of this amount: an evaluation of the debt held by Commisimpex for contracts totaling 29,949,284,818 CFA francs at the end of 1986.  By applying an interest rate of 10.5% compounded annually and on the basis of conversion of the amounts in foreign currencies at the rates in force on the date of execution of the contracts, an approximate amount of FRF 960,000,000 is reached, i.e. the 48 billion CFA francs specified in the 2003 Protocol.[97]

---

[92]    Post-hearing Brief dated 23 March 2012, Para. 82, Page 24.

[93]    Exhibit C14, Page 42.

[94]    The 1992 Protocol.

[95]    Exhibit C14, Page 47.

[96]    No. 197 above.

[97]    This calculation appears on Page 15 of the Mazars report dated 2 August 2011, and its accuracy is not challenged by the Republic of the Congo.

**289.**    This evaluation of 29,949,284,818 CFA francs as of the end of 1986 is confirmed by several documents produced during the arbitration proceedings. First of all there is a *"Fiche de Calcul Détaillée"* entitled *"Debt of the Congo in 1987 owed to COMMISIMPEX in the amount of 29,949,284,818 CFA francs. Sent by the CCA and the Minister of Finance to the Public Prosecutor and to the Ministry of Justice in September 1991."*[98]    Contrary to what the Republic of the Congo claims,[99] this document clearly indicates a debt amounting to 29,949,284,818 CFA francs. This same amount is mentioned several times in the documents from the trial of the former Minister of Finance, Mr. Lekoundzou. Thus, Joseph Hondjulla Miokono stated under oath in 1991 that having been appointed to the *Caisse Congolaise d'Amortissement* in 1985 as the General Director, he *"found a COMMISIMPEX file according to which the Congolese Government owed that company in excess of 29 billion CFA francs".*[100] Similarly, in summonses from October 1991, Madam the Public Prosecutor to the Court of Appeal of Brazzaville wrote:  *"In 1987, the Congolese Government which was having tremendous financial difficulties was unable to pay the debt owed to COMMISIMPEX which totaled 29,949,184,818 CFA francs".*[101]    Furthermore, in an affidavit dated 16 April 2003[102], Mr. Ernest Komko, the former Chair of the National Sovereign Council from February to June 1991, summarized the work of the two committees that, at the time, had verified a debt owed to Commisimpex by the Republic of the Congo *"that ranged around 30 billion CFA francs."*

**290.**    In order to challenge this assessment of the debt at 29,949,184,418 CFA francs as of the end of 1986, the Republic of the Congo invokes two CCA documents from June 1991 that evaluate the debt at 21 billion as of 31 December 1988.[103]    However, these documents give the impression that the amounts indicated were the result of negotiations and are in any event prior to the *"Fiche de calcul Détaillée"* of the CCA from September 1991 that states that the debt is 29,949,184,418 CFA francs. The figure of 21 billion as of the end of 1988 is not used in any subsequent document. Only the evaluation of 29,949,184,418 CFA francs is used consistently by Congolese sources.

**291.**    This same amount of 29,949,184,818 CFA francs as of the end of 1986 will subsequently be mentioned by an expert report of Ernst & Young dated 25 September 2001[104], rendered at the request of the President of the Court of Commerce of Brazzaville. It was on this basis that, when updating the amount as described above, Ernst & Young evaluated the debt owed to Commisimpex at 48 billion CFA francs as of 30 September 1992 (p. 41 of the expert report). The President of the Court of Commerce of Brazzaville later used this report as a basis to order the recording of the debt by the *Caisse Congolaise d'Amortissement* on 9 November 2001.[105]    The President of the Court of Commerce, referring to the *"Fiche de calcul Détaillée"* of the CCA from September 1991[106], states that *"the Court was able to note, as did the expert, that the* Caisse Congolaise d'Amortissement *itself before communicating to the Judicial Authorities of the country in relation to the trial of Minister Lekoundzou in 1991, that the debt of the Respondents totaled*

---

[98]    Exhibit C98.

[99]    Post-hearing Brief No. 1, No. 14, Page 4.

[100]    Exhibit C96

[101]    Exhibit C99.

[102]    Exhibit C152.

[103]    Exhibits R81 and R82. Cf. also R80, from 1989 that uses the same assessment, without justifying it.

[104]    Exhibit C17.

[105]    Exhibit C20.

[106]    Exhibit C98.

*29,948,284,818 CFA francs as of the end of 1986"* (p. 2). Thereafter, it was not surprising that it confirmed the calculation of Ernst & Young, which started with the same acknowledgement.

**292.** The Republic of the Congo rightly asserts that the trial before the President of the Court of Commerce of Brazzaville was not adversarial, and that the Republic of the Congo objected to the acknowledgements made therein when it could, which considerably reduced its scope. But the same could not be said of the appeal proceedings that followed, filed by the CCA and the Congolese Government. The *Fiche de calcul Détaillée* of the CCA of 1991, which demonstrated the existence of a debt in the amount of 29,949,284,818 CFA francs as of the end of 1986, is also mentioned by the Court of Appeal in its ruling dated 12 July 2002[107] which also summarizes the assessment of 48 billion CFA francs for the debt amount as of 30 September 1992 by Ernst & Young. And the Court of Appeal states:

> *"Whereas it is shown by this note that the progression of the debt and its updating through 30 September 1992 was calculated by the expert to total 48,532,681,474 CFA Francs;*
>
> *"Whereas as of 14 October 1992 the parties had concluded Protocol No. 566, the purpose of which was the partial consolidation of the debt totaling 22,000,000,000 CFA francs;*
>
> *Whereas it is shown therefore that the amount of 26,532,681,474 CFA francs had not been included in said Protocol;*
>
> *Whereas the* Caisse Congolaise d'Amortissement *claims that Protocol No. 566 dated 14 October 1992 is a transaction and it results therefrom that that contract allegedly settled all debts owed to COMMISIMPEX S.A. by the Republic and the CCA."*

**293.** It is true that the ruling of the Court of Appeal was quashed by the Supreme Court on 27 June 2003.[108] However, notwithstanding the possibility that the Supreme Court's decision had no links with the observations of facts related above, all the documents that were just cited allow the Arbitral Tribunal to note two essential points: 1) the evaluation of the debt of Congo to Commisimpex as of the end of 1986 at 29,949,184,818 CFA Francs seemed to be widely accepted in 1991 as well as in 2002-2003; 2) its updated amount of 48 billion CFA francs as of October 1992 warrants little debate since it is a calculation was performed by Ernst & Young and verified by Mazars during this arbitration proceeding.[109] However most significantly, regardless of the actual amount of the debt owed to Commisimpex in October 1992, it results from the foregoing that the parties to the 2003 Protocol adopted a well-known and much-discussed assessment. The amount of 48 billion CFA francs rests on an assessment of the amounts owed to Commisimpex in 1991 and updated through the end of September 1992. It does not in any way involve an amount randomly picked by negotiators for obscure reasons and with no factual basis.

**294.** One may of course be surprised that when executing the 1992 Protocol, precisely in October, Commisimpex agreed to the amount of 22 billion. Was it an agreement

---

[107] Exhibit C24.

[108] Exhibit C26.

[109] It should be noted in this regard that the Republic of the Congo did not deem it necessary to subject Mazars to cross examination.

For transactional purposes, as the CCA claimed before the Court of Appeal of Brazzaville and as admitted by the Arbitral Tribunal that rendered the 2000 Award? This Arbitral Tribunal cannot ignore that the parties had, during proceedings, rather confusing exchanges regarding the existence of mark-downs that may have been granted by Commisimpex to the Republic of the Congo, one of 30% in 1998 and then 25% in 1992,[110] or that the Republic of the Congo may have imposed. The contradictory explanations of the parties, in particular of Commisimpex, regarding this point, did not allow the Arbitral Tribunal to reach definitive opinion regarding the existence and especially the origin of these mark-downs. However forming such an opinion is not necessary since the parties trace these mark-downs back to the execution of the 1992 Protocol at the latest, which as indicated in the 2000 Award, mentions a global and inclusive amount, and since the detail of the calculations leading to this amount arenot relevant to the resolution of the present dispute. Simply, the Arbitral Tribunal is forced to note that if the debt owed to Commisimpex in September 1992, excluding any relief of the same, was effectively 48 billion CFA francs, the subsequent application of partial relief of 30%, then of 25% before the execution of the 1992 Protocol, results in a figure of 25.2 billion CFA francs, which is very close to the 26 billion CFA francs missing from the 1992 Protocol and present in the 2003 Protocol. Is this simply a coincidence? Perhaps. Yet these observations strengthen the plausibility of the debt of 48 billion CFA francs presented as the *causa* for the 2003 Protocol by its authors, the existence of which is presumed.

**295.** Based on the foregoing, the Arbitral Tribunal concludes in the majority that the Republic of the Congo did not establish the absence of *causa* for the 2003 Protocol. On the contrary, it has noted that Commisimpex, although it did not carry the burden of proving the existence of *causa*, provided the Arbitral Tribunal with a set of evidence that would allow a ruling to effect such *causa* exists, if such *causa* was not already presumed. The issue here is not for the Arbitral Tribunal to rule on the amount of the debt as of October 2003, which neither of the Parties candetermine in undisputed fashion. It is simply to observe that the assessment at 48 billion CFA francs was the only one clearly used at the time and that, in the absence of evidence presented by the Republic of the Congo, the reality of the presumed *causa* of the 2003 Protocol is confirmed.

**296.** However, the Arbitral Tribunal cannot be content with this conclusion, which involves only the objective *causa* of the 2003 Protocol. Since the Republic of the Congo alleged that the execution of the 2003 Protocol was the result of fraud, it is helpful, then, to wonder about the lawfulness of its subjective *causa*. Did the signatories of the Protocol execute it for an unlawful purpose or, more specifically, is it the result of a fraud of which the signatories for the Republic of the Congo were the victims, since the Republic of the Congo never suggested that such signatories could have been complicit in the fraud attributed to Commisimpex? The Congo explains that:

> *"The signature of the 2003 Protocol by persons who were impressionable or unaware of the file related to the debt to Commisimpex is only explained by the unorthodox practices of Commisimpex and the sphere of influence of Mr. Hojeij within the Congolese government, since he was familiar with its weaknesses and extensively profited from them."[111]*

**297.** The allegations of fraud made by the Republic of the Congo are particularly unconvincing. It was shown in Section B c) above that the Congolese signatories of the 2003 Protocol could not have given their approval of the amount of the debt

---

[110]      Exhibit R61, letter from the Counsel of Commisimpex dated 28 February 1998.

[111]      Post-hearing Brief dated 23 March 2012, Para. 147, Page 49.

due to Commisimpex without perfect knowledge of the same. This observation was confirmed by the presemt section, in which it is shown that the amount of 48 billion mentioned in the 2003 Protocol was the subject of public debate. It is difficult, then, to see how a fraud could have occurred without them being complicit in the same, which, as we have stated, the Republic of the Congo has not claimed. Furthermore, if there was a fraud, it would necessarily be a verylarge-scale fraud, since it would involve a large number of Congolese officials, and not only the signatories of the Protocol. It would also have been necessary for the fraud to have been spread out over a long period of time, since it dated back at least to the evaluation of the debt at 29,949,184,818 CFA francs as of the end of 1986, in 1991, which was the basis for the evaluation of 48 billion in September 1992. What could have driven such a fraud would have been corruption and influence peddling, but the Republic of the Congo did not make any specific accusation in this regard and the Congolese protagonists in the matter do not seem to have been targeted by any such accusation since 2003/2004.

**298.**    It is clearly legitimate to ask why the representatives of the President of the Republic of the Congo, with the assurance of the President, decided in 2003 to pay an old debt that they had refused to pay up until that point. But one could even ask why the Republic of the Congo, after having executed the 1992 Protocol, which was beneficial for it, decided to deny its obligations and fought hard not to comply with its enforcement, or the award resulting therefrom. The Arbitral Tribunal can only be stunned to note that in order to avoid the performance of the 1992 Protocol, which it invokes today as the agreement containing the entirety of its debt, it invoked, as it does in this proceeding, its nullity and the fraud committed by Commisimpex. An extract of the interim award dated 1999 delivered in the proceedingsthat led to the 2000 Award, and cited by it, is eloquent[112]:

> *"In its 'Brief in reply and petition for a stay of proceedings' dated 26 February 1999" the examination of the 'unjustified nature of the petition by Commisimpex' (Pages 13 through 18) and the "nullity of Protocol 566 and the obligations assumed for the enforcement of Protocol 566 for lack of consent" (Pages 19 through 21) repeatedly includes allegations of "procedural fraud," of "multiple frauds comprising lies and suspected fraud, that Commisimpex committed and is still committing," "manoeuvers, schemes and fraud that Commisimpex committed daily," and "induced errors," to conclude (Page 21) that "based on previous developments , it is obvious that the REPUBLIC OF THE CONGO and the* CAISSE CONGOLAISE D'AMORTISSEMENT *were victims of suspected fraud, which was characterized by the use of fraudulant manoeuvers against them by Commisimpex to obtain from the same promissory notes that had no basis."*

The Arbitral Tribunal that rendered the 2000 Award did not detect any fraud and noted the validity of Protocol No. 566 of 1992, which the Republic of the Congo no longer challenges today and which, by contrast, it asserts. Likewise this Arbitral Tribunal notes that the Republic of the Congo did not prove that the *causa* for the 2003 Protocol was unlawful due to fraud, and that it did not establish the absence of its *causa* or that its consent was defective.

**299.**    The Arbitral Tribunal has noted that the Republic of the Congo could not validly invoke the lack of authority of the signatories of the 2003 Protocol to challenge its validity, and that the latter contained commitments of a binding nature. Furthermore, it

---

[112]        Exhibit C14, Award dated 3 December 2000.

concluded that the Republic of the Congo could not invoke ignorance of the amount of its debt since the 2003 Protocol was executed. In the absence of proof of its lack of *causa* or the unlawful nature thereof, the 2003 Protocol is therefore binding on the parties and the Republic of the Congo must perform the obligations that it assumed by signing it.

C. <u>Regarding the amounts owed by the Republic of the Congo to Commisimpex</u>

**300.** In the 2003 Protocol, the Republic of the Congo assumes the following financial commitments:

*- "Article 1 – The Government of the Congo <u>assumes responsibility</u> for the debt of COMMISIMPEX and that of the Hojeij group and family, vis-à-vis the Lebanese Banque SARADAR, up to the amount of the commitment of Protocol No. 566 dated 14 October 1992, and the corresponding guarantees, the principal amount of which, as of 30 September 1992, is denominated in the following currencies:*

*A – 50,592,81.53 FRF*
*B – 21,201,872.76 Pounds Sterling*
*C – 34,521,293.24 U.S. Dollars*
*D – 1,426,6253,801 CFA francs*

*The total of which represents, at this date, the counter-value of 440,000,000 FRF, i.e. 22 billion CFA francs, according to the exchange rates at the time.*

*- Article 2 – The Government of Congo agrees to negotiate directly with Banque SARADAR and may determine the procedures for reimbursement of the principal and interest amounts specified above, outside of any obligation or liability on the part of COMMISIMPEX or the Hojeij family and group.*

*The direct and indirect consequences of these negotiations shall not under any circumstances relate to COMMISIMPEX-or the Hojeij family and group.*

*- Article 3 – The Government of Congo <u>agrees to reimburse</u> COMMISIMPEX the principal amount of 520 million FRF, not including interest totaling 941,141,586 FRF, for the period of 30 September 1992 through 30 July 2003 at the rate of 10% per year;*

*- Article 4 – The Government of <u>Congo agrees to pay</u> to COMMISIMPEX the amount of 520,000,000 FRF (five hundred twenty million French francs) according to the following terms:*

*1. Cash payment in the amount of 60,000,000 FRF (sixty million French francs), i.e. 6 billion CFA francs.*

*2. A second portion of said principal amount, corresponding to 200,000,000 FRF (two hundred million French francs), i.e. 20 billion CFA francs shall be considered as consideration for the acquisition by COMMISIMPEX of certain*

*companies belonging to the Congolese State, the technical and financial viability of which and the profitability and price assessment of which will have been confirmed by an auditor approved by and acceptable to COMMISIMPEX.*

*3. The remainder, i.e. the principal amount of 260,000,000 FRF (two hundred sixty million French francs), i.e. 26 billion CFA francs, will be the subject of a moratorium that the Government of Congo agrees to repay in 84 (eighty-four) monthly installments consisting of 3,095,238 FRF per month, i.e. a monthly installment of 309,523,809 CFA francs. This moratorium is subject to the granting of a firm, unconditional and irrevocable, 1st order, and internationally accepted guarantee to COMMISIMPEX.*
*The purpose of this guarantee, beyond the aspect of risk coverage, is to facilitate the terms and conditions for refinancing the companies that are currently part of the Hojeij group, the needs for operating capita of which far exceed twelve billion CFA francs, as well as those of the public entities specified in §4-2."*

**301.** These four articles cover the two components of the debt of the Republic of the Congo decreed as of 30 September 1992, as it was confirmed in the Preamble of the Protocol: 440,000,000 FRF related to the purpose of the 1992 Protocol and 520,000,000 FRF.

      *a.    the 440,000,000 FRF debt (Article 1 of the 2003 Protocol)*

**302.** According to Article 1, the Republic of the Congo assumes responsibility for the debt of Commisimpex and the Hajaij group to Banque Saradar in the amount of 440,000,000 FRF arising from the 1992 Protocol and agrees to negotiate with the bank in this regard by 31 December 2003 (Articles 2 and 6). Commisimpex explains that it is Banque Saradar that financed this amount.

According to a letter from Banque Audi Saradar, formerly Saradar, dated 24 December 2010, the Republic of the Congo never approached it and in the end it was Commisimpex that itself settled its debt with the Bank.

**303.** The Republic of the Congo does not dispute never having paid Banque Saradar. In contrast, it claims that Commisimpex was not entitled to request payment of the amount of 440,000,000 FRF as of 30 September 1992, converted to 360,515,125 Euros as of 7 January 2011, according to the calculations by Mazars,[113] which was owed to BanqueSaradar under the 2003 Protocol. The Republic of the Congo intended for the assignment specified in the Protocol to be aperfect assignment, which would release the designated debtor, i.e. itself, vis-à-visthe assignor, Commisimpex.

**304.** Commisimpex believes, in contrast, that the Protocol only provided for animperfect assignment, and that:

    *"Based on the failure of the Congo to fulfill its obligation, the assignment specified in the 2003 Protocol, envisioned as a simple means of settling a part of the debt of the Republic of the Congo*

---

[113]    Rejoinder on the Merits, Para. 294, Page 110.

*To Commisimpex, was never carried out and the failure of the Congo to do so brings the parties back to the preexisting contractual situation."[114]*

**305.** The Republic of the Congo adds that if the assignment was imperfect, Commisimpex could not request payment of the amount in question because, while acknowledging not having settled the amounts owed to Banque Saradar, it believed that:

*" (…) it was not in default vis-à-vis Banque Saradar since the latter had never requested anything from the Congo in relation to the 2003 Protocol."[115]*

**306.** The Arbitral Tribunal cannot follow the argument of the Republic of the Congo for two essential reasons. First of all, the assignment to Banque Saradar specified by the 2003 Protocol cannot be a perfect assignment without the approval of the latter, in its capacityas creditor. The approval of the creditor as to the replacement of the debtor is a characteristic of aperfect assignment. This is the meaning of Article 1275 of the French Civil Code.[116] It is not established or even claimed that Banque Saradar granted its approval of the replacement of the debtor. The assignment specified by the 2003 Protocol must therefore be characterized as animperfect assignment.

**307.** It is true that as is stated by the Republic of the Congo, the Court of Cassation[117] has stated that *"… neither the assignor nor its creditors can, before the default of the assignee vis-à-visthe creditor, require payment"*. Yet this solution is difficult to transpose to this case, where the terms for payment by the Republic of the Congo to Banque Saradar were never defined, due to the default of the Republic of the Congo itself. According to Article 2 of the 2003 Protocol, the Republic of the Congo agreed to negotiate directly with Banque Saradar as to the terms of repayment of the assigned debt, no later than on 31 December 2003, as stated by Article 6 of the Protocol. The Republic of the Congo did not do this, stating only that Banque Saradar never asked it for anything on the basis of the 2003 Protocol, which is the result of the Congo's failure to perform its commitment to negotiate with the latter. The Republic of the Congo cannot rely on its own failure which rendered the assignment specified in the 2003 Protocol null and void.

**308.** The Republic of the Congo stresses that Commisimpex did not provide any proof of having actually paid its debt to Banque Saradar. It also did not provide any proof of the date and amount of the alleged payment, or that such payment was made to settle the debt that should have been paid by the assignment.[118] This is true only in part because the letter from Banque Audi Saradar dated 24 December 2010 confirms that the debt that Commisimpex owed to it was paid.[119] Regardless, this argument is irrelevant. What is important is not that Commisimpex did or did not settle its debt with Banque Saradar, but rather that the Republic of the Congo did not do so in its place, in default of the commitment made in the 2003 Protocol. As a result, the debt of 440,000,000 FRF as of 30 September 1992, acknowledged by the Republic of the Congo as owing to Commisimpex in the 2003 Protocol

---

[114] Reply on the Merits, Para. 508, Page 223.

[115] Rejoinder on the Merits, Para.. 303, Page 113.

[116] See in this regard Ph. Malaurie and L. Aynès, Civil Law, Obligations, 1990, No. 1250, Page 711.

[117] Exhibit CRJ 199: Comm. Cass, 16 April 1996, No. 94-14618.

[118] Reply on the Merits, Paras. 306-307, Pages 113-114.

[119] C 75.

*"up to the amount of the commitment of Protocol No. 566 dated 14 October 1992…,"* the amount of which should, by assignment, pay off the debt of Commisimpex vis-à-vis Banque Saradar, is not extinguished, and the Republic of the Congo mustpay such debt.

**309.**     According to the Mazars report dated 7 January 2011[120] which Commisimpex relies on, the debt of 440,000,000 FRF as of 30 September 2011 totaled 360,515,125 Euros as of 7 January 2011.  In order to reach amount, Mazars carried out the following calculation, based on the various amounts in several foreign currencies that, according to the 2003 Protocol, total 440,000,000 FRF:  it added to the amounts specified in the 2003 Protocol compound interest at a rate of 10.5% per year from 23 August 2003 through 7 January 2011, the date of the report, then also added to those amounts compound interest at the rate of 10% per year from 30 September 1992 through 30 July 2003 and added up the figures.

**310.**     The Arbitral Tribunal believes that this calculation, which the Republic of the Congo challenges, is not compatible with the agreements between the parties and the text of the 2003 Protocol.  As it has already stated, the debt of 440,000,000 FRF of Commisimpex that the Republic of the Congo assumed responsibility for vis-à-vis Banque Saradar in virtue of the 2003 Protocol *"corresponded to the amount of Protocol No. 566 dated 14 October 1992 … "*.  The commitment of the Republic of the Congo based on the 1992 Protocol in August 2003, could only result from the 2000 Award, which, as the annulment proceeding related thereto had been  rejected on 23 May 2002, was final.  Commisimpex did not waive the benefit of this award upon signing the 2003 Protocol, as is confirmed by the fact that it deducts from the amounts that it claims in regards to the 2003 Protocol those that were awarded to it by the 2000 Award[121] which both parties acknowledge as having *res judicata* effect.   The Arbitral Tribunal therefore noted on the one hand that the total amount of the debt assumed by the Republic of the Congo up to the commitment specified in the 1992 Protocol is that specified by the 2000 Award and also that which Commisimpex requests be deducted from this total amount awarded by to it by the Arbitral Tribunal in this proceeding.  As a result, the ArbitralTribunal will note that the amounts owed by the Republic of the Congo under Article 1 of the 2003 Protocol are those that were allocated by the2000 Award, will acknowledge Commisimpex's petition that the Arbitral Tribunal should deduct these amounts from what the amounts awarded by the Arbitral Tribunal, and, after having deducted that amount, will order no amount to be paid under Article 1 of the 2003 Protocol.

### b.     The 520,000,000 FRF debt (Articles 3 and 4 of the 2003 Protocol)

**311.**     Furthermore, the Republic of the Congo must reimburse Commisimpex the amount of 520,000,000 FRF specified in Article 3 of the 2003 Protocol, plus interest of 941,141,586 FRF, i.e. 222,749,598.82 Euros,  for the period of 30 September 1992 through 30 July 2003 (applying a rate of 10% per year), as specified by Articles 3 and 5 of the 2003 Protocol.

**312.**     With regards to the calculation of interest for the period following the 2003 Protocol, Commisimpex based its argument on the Mazars report dated 7 January 2011 which uses a rate of 10.5%.  Mazars justifies this rate by the fact that the same rate was *" (…) also*

---

[120]     Mazars Report dated 7 January 2011, Page 11, No. 2.3.

[121]     Mazars Report dated 7 January 2011, Page 3.

*specified in the guarantee issued by the Republic of the Congo on 22 December 1986 and was also used by the CCA in its calculation of the debt owed by the Republic of the Congo to Commisimpex as of 31 December 1986".[122]*

**313.**     The Arbitral Tribunal believes this justification to be incompatible with the agreement reflected by the method selected in the Protocol, when computing the interest amount on 520 million FRF for the period of 30 September 1992 through 30 July 2003.[123]   This is explained by the Mazars report which uses this method for calculating the interest on the amount of 440,000,000 FRF incurred prior to the Protocol:

> *"Amount I2 of 941 million FRF of interest appearing in the 2003 Protocol is calculated as follows:*
>
> *- Base amount: 520 million FRF.*
> *        - Rate of 10% per year, compounded annually on September 30 (360-day year and 30-day months).*
> *- Period of 30 September 1992 through 30 July 2003."[124]*

**314.**     The Arbitral Tribunal sees no reason not to also use this contractual method to calculate the late interest subsequent to 2003, since the justification provided by Mazars and Commisimpex for using a rate of 10.5% is not satisfactory.

**315.**     In addition, Mazars calculated interest as of 23 August 2003, the date of execution of the 2003Protocol. However, since Article 6 of the Protocol anticipates more generally that the final Protocolwould be concluded on 31 December 2003, the Arbitral Tribunal believes that it was as of that date that all late interest should accrue, and not the date of execution of the Protocol.   It was at the end of 31 December 2003 that the non-performance of the Protocol became final.  Mazars so concluded in its calculation of interest regarding the 200 million FRF relating to the companies to be privatized, for which Mazars computed that the interest accrued as of 31 December 2003, due to the failure to into agreements providing for the attribution of companies to Commisimpex by that date, as was provided for by Article 6.  Such a restriction is unjustified because it was by 31 December that a final document had to be signed, to be applied to all the terms for performance of the commitments assumed by the Republic of the Congo.  The interest on the amount of 520 million FRF must therefore accrue as of 31 December 2003, and until the payment in full of the debt by the Republic of the Congo (the date of 7 January 2011 determined by Mazars is no longer applicable to the extent that the Arbitral Tribunal does not use themethod used by Mazars) at an interest rate of 10%, compounded annually as of 31 December of each year.

**316.**     The Republic of the Congo must therefore pay to Commisimpex, in performance of the 2003 Protocol, the amount of 520,000,000 FRF, i.e. 79,273,488.96 Euros[125] + 941,141,586 FRF i.e. 143,476,109.86 Euros = 222,749,598.82 Euros plus interest of 10% per year, compounded

---

[122]     Mazars Report dated 7 January 2011, Page 11, No. 2.2.3.

[123]     Exhibit C27, Article 3 of the 2003 Protocol.

[124]     Mazars Report dated 7 January 2011, Page 10.

[125]     Applicable exchange rate:  6.55957 FRF = 1 Euro.

annually on 31 December, from 31 December 2003 until payment in full;

D. Allocation of arbitration costs

**317.** Article 31 (3) of the ICC Arbitration Rules grants the Arbitral Tribunal the discretion to determine the allocation of arbitration costs.

**318.** The arbitration costs determined by the International Court of Arbitration in its session dated 9 January 2013 amount to USD 1,140,000. Commisimpex stated that its own costs (travel expenses, fees) totaled, as of 2 November 2012, 4,282,791 Euros (5,163,998 Euros – 881,207 Euros) while those of the Republic of the Congo totaled 2,674,300 Euros. Each of the parties has requested payment of their expenses in full from the opposing party.

**319.** The Arbitral Tribunal stated that although the Claimant was not successful on all its claims, based on the absence of a ruling relative to the 440,000,000 FRF share that is equivalent to the amounts owed under the 2000 Award, and the corresponding reduction of interest, the Republic of the Congo was primarily the unsuccessful party: its defense as to lack of jurisdiction was rejected by the Partial Award of 20 August 2010; its defense as to *res judicata* was rejected by this ruling, which also rejected its objections as to the validity of the 2003 Protocol and ordered it to perform the corresponding obligations.

**320.** For all these reasons, the Arbitral Tribunal holds that the Republic of the Congo must bear 75% of the arbitration costs, determined by the International Court of Arbitration to be US$ 1,140,000. Since Commisimpex advanced 100% of the funds , the Republic of the Congo therefore must pay Commisimpex US$ 855,000 as arbitration costs.

**321.** With regards to the legal fees incurred by the parties, the Arbitral Tribunal holds that the Republic of the Congo be ordered to reimburse 75% of the reasonable expenses of Commisimpex and that Commisimpex must be ordered to reimburse to the Republic of the Congo 25% of its reasonable expenses. The Arbitral Tribunal notes a significant disparity between the amount of legal fees incurred by Commisimpex (4,282,791 Euros) and those incurred by the Republic of the Congo (2,674,300 Euros). It is true that each party is free to dedicate to a proceeding the financial resources that seem necessary in its own opinion, however it is all the more true that this does not justify that the party that loses in whole or in part would be required to bear the consequences of the choices of the other party in this regard. In this case, the Arbitral Tribunal believes that given the characteristics of the dispute, the reasonable amount of the Commisimpex fees must be reduced to 3,500,000 Euros. Therefore the Republic of the Congo must be ordered to reimburse 75% of the reasonable amount of the Commisimpex fees, i.e. 3,500,000 Euros x 75% = 2,625,000 Euros, and Commisimpex must be ordered to reimburse the Republic of the Congo for 25% of its expenses, i.e. 2,674,300 Euros x 25% = 668,575 Euros. As a result, the Republic of the Congo shall be ordered to reimburse Commisimpex the amount of 2,625,000 Euros – 668,575 Euros = 1,956,425 Euros as legal fees.

**NOW THEREFORE, THE ARBITRAL TRIBUNAL:**

1)  Declares that the petitions of Commisimpex relative to the judgment of the court-ordered liquidation dated 30 October 2012 are admissible and that it has jurisdiction to hear them, inasmuch as they relate to the effects of that judgment on the arbitration proceeding;

2)  Declares that the requirements of international public policy prevent that the liquidation of Commisimpex should have any effects on this arbitration proceeding;

3)  Acknowledges the lack of standing of the liquidators appointed to represent Commisimpex in this arbitration proceeding;

4)  Rejects the petition of Commisimpex for reimbursement by the Republic of the Congo of the expenses incurred in this arbitration by the liquidation proceeding;

5)  Declares that it lacks jurisdiction to hear other petitions by Commisimpex relating  to its court-ordered liquidation or that they were rendered irrelevant by Procedural Orders Nos. 7 and 9;

6)  Rejects the arguments based on the *res judicata* effect of the arbitral award dated 3 December 2000 rendered in ICC Matter No. 9899, brought forward by the Republic of the Congo;

7)  Holds, in the majority, that the Protocol dated 23 August 2003 is valid and binding on the parties;

8)  Holds that the amounts owed by the Republic of the Congo pursuant to Article 1 of the Protocol dated 23 August 2003 are those that were granted by the arbitral Award dated 3 December 2000;

9)  Acknowledges and agrees with the petition by Commisimpex to deduct the same amounts from the amounts that the Arbitral Tribunal would order the Republic of the Congo to pay and, after having deducted such amounts, the Tribunal does not order any payment pursuant to Article 1 of the Protocol of 23 August 2003;

10) Orders the Republic of the Congo to pay to Commisimpex, pursuant to Articles 2 and 3 of the Protocol dated 23 August 2003, the amount of 222,749,598.82 Euros plus interest of 10% per year compounded annually on 31 December, from 31 December 2003 until such time as payment in full is made;

11) Holds that the Republic of the Congo must bear 75% of the arbitration costs determined by the International Court of Arbitration of the ICC in the amount of USD 1,140,000 and that Commisimpex must bear 25% of the same;

12) In consequence, orders the Republic of the Congo to pay USD 855,000;

13) Orders the Republic of the Congo to pay Commisimpex's legal fees in the amount of 1,965,425 Euros;

14) Rejects all the other petitions of the parties.


Place of the Arbitration: Paris (France)
Date: 01/21/2013
Signatures:


[signature]
Yves DERAINS
Chair


[signature]                                        [signature]
Bertrand HANOTIAU                          Carole MALINVAUD
Arbitrator                                           Arbitrator