Exhibit 14





# Total SE, Elf Aquitaine et Total E&P Congo

## *vs.*

# Commissions Import Export

---

**Analyse du montant de la créance opposée aux sociétés Total SE, Elf Aquitaine et Total E&P Congo, sur le fondement de la garantie invoquée par la société Commissions Import Export en 1986**

---

*Rapport en date du 24 décembre 2020*



**TOTAL SE**
Direction Juridique et Accords de l'Exploration/Production
2 place Jean Millier – La Défense 6
92 078 Paris La Défense Cedex

Neuilly-sur-Seine, le 24 décembre 2020

Madame, Monsieur,

Par assignation en intervention forcée devant le Tribunal de commerce de Nanterre en date du 16 février 2018, la société Commissions Import Export (ci-après « COMMISIMPEX ») a demandé la condamnation de Total SE, Total E&P Congo et Total Holdings SAS à verser à COMMISIMPEX tous les paiements futurs dus à la République du Congo à concurrence de 1.052.007.205 euros, sur le fondement d'une garantie datée du 22 décembre 1986 pour répondre du paiement par la République du Congo à COMMISIMPEX de marchés et avenants de travaux publics et de fourniture de matériels qu'aurait réalisés COMMISIMPEX entre 1984 et 1986.

Le montant de 1 052 millions d'euros invoqué correspond en réalité aux montants de condamnations prononcées par deux sentences arbitrales datant de 2000 et de 2013 et des frais relatifs aux procédures d'arbitrage ayant opposé COMMISIMPEX à la République du Congo, tels que capitalisés au 31 juillet 2017 dans un rapport du cabinet Mazars en date du 23 octobre 2017. Le montant de la créance a ensuite été mis à jour par ledit cabinet dans un rapport en date du 28 mars 2019. Il ressort à 1 204 m€ à la date du 31 mars 2019.

Dans ce contexte, vous nous avez engagés afin de disposer d'un rapport qui présente une analyse de la pertinence du montant de la créance tel qu'allégué par COMMISIMPEX sur la base du rapport du cabinet Mazars en date du 28 mars 2019, notamment au regard des dispositions prévues par la garantie consentie par la République du Congo à COMMISIMPEX et des sentences arbitrales qui ont été émises dans le cadre du présent litige.

Ainsi, après un bref rappel du contexte en section I, vous trouverez en section II une présentation des principales informations disponibles au sein du rapport du cabinet Mazars en date du 31 mars 2019, au regard des dispositions de la garantie précitée.

*PricewaterhouseCoopers Advisory, SAS, 63, rue de Villiers, 92208 Neuilly-sur-Seine Cedex*
*Téléphone: +33 (0)1 56 57 12 57, Fax: +33 (0)1 56 57 65 85, www.pwc.fr*

Société par actions simplifiée au capital de 434 665,60 €. Siège social : 63, rue de Villiers 92200 Neuilly-sur-Seine.
RCS Nanterre 338 112 733. TVA n° FR 03 338 112 733. Siret 338 112 733 002 78. Code APE 7022 Z.
Bureaux : Bordeaux, Lille, Lyon, Marseille, Nantes, Neuilly-Sur-Seine, Strasbourg.



La section III portera sur la mise en perspective de la sentence arbitrale de 2000 avec la garantie de 1986.

Enfin, la section IV traitera de la pertinence du montant allégué de la créance, à hauteur de 1 204 m€, au regard de la garantie de 1986 et de la sentence arbitrale de 2013.

Ce rapport vous est destiné et pourra être utilisé dans le cadre de la procédure contentieuse pendante devant le Tribunal de commerce de Nanterre ou toute autre procédure à venir relative au litige objet du présent rapport. Toute autre utilisation de ce document n'est pas autorisée. Notre responsabilité ne saurait être engagée envers toute autre personne que le destinataire de ce rapport.

*    *

*

Nous restons à votre disposition pour vous communiquer toute information complémentaire que vous souhaiteriez obtenir et vous prions d'agréer, Madame, Monsieur, l'expression de nos sentiments distingués.

Jean-Louis Di Giovanni
Associé



## SOMMAIRE

1. **Présentation du contexte et de la nature des travaux**.....................**5**

   1.1   Contexte de notre intervention ....................................................................... 5

   1.2   Travaux mis en œuvre...................................................................................... 8

   1.3   Limitations et restrictions d'usage ................................................................. 8

   1.4   Plan du rapport ............................................................................................... 9

2. **Mise en perspective du Rapport Mazars avec la Garantie** .........................**10**

   2.1   Que la Garantie couvre le règlement de la Créance, soit 1 204 m€, n'est pour COMMISIMPEX qu'un postulat ..................................................................... 10

   2.2   La Garantie porte sur une liste précise de onze marchés et avenants ..................... 11

   2.3   Le cabinet Mazars calcule le montant de 1 204 m€ à partir des seules Sentences sans jamais faire référence aux marchés listés dans la Garantie................................ 11

   2.4   Les informations présentées dans le Rapport Mazars ne permettent pas d'établir un lien entre le montant de 1 204 m€ et la Garantie.............................................13

3. **Mise en perspective de la Sentence de 2000 avec la Garantie** ...................**14**

   3.1   Les principaux montants accordés par la Sentence de 2000 se rattachent aux montants des billets à ordre restitués par COMMISIMPEX .......................................14

   3.2   Les billets à ordre restitués retenus dans la Sentence de 2000 ont pour origine l'analyse menée dans le Rapport Ricol ...............................................................16

   3.3   Sur la base du Rapport Ricol, les principaux montants accordés par la Sentence de 2000 concernent sept des onze Marchés visés par la Garantie ..................................17

4. **Pertinence du montant allégué de la Créance de 1 204 m€ au regard de la Garantie et de la Sentence de 2013** ...............................................**21**

   4.1   Les montants accordés par la Sentence de 2000 correspondent aux « *soldes dus exécutables* » selon le Protocole de 1992....................................................21

   4.2   La créance sur laquelle se prononce la Sentence de 2013 est tout à fait distincte de celle visée par le Protocole de 1992 et étrangère à la Garantie................................ 22

   4.3   En définitive, seul un montant de 234 m€, soit 19% du montant allégué de 1 204 m€, pourrait être pris en compte au titre des marchés listés dans la Garantie .............. 24

5. **Conclusion générale** ..................................................................**26**



## 1. Présentation du contexte et de la nature des travaux

### 1.1 Contexte de notre intervention

*Présentation des parties*

1.  COMMISIMPEX, société anonyme de droit congolais, a conclu avec la République du Congo différents marchés et avenants de travaux publics et de fourniture de matériels au cours de la période allant de 1984 à 1986[1].

2.  Nous comprenons que lesdits marchés et avenants n'ont pas donné lieu à paiement et auraient dû être, *in fine*, payés par billets à ordre émis par la Caisse Congolaise d'Amortissement (ci-après la « CCA ») et avalisés par la République du Congo.

3.  Sur la base d'une fiche de calcul communiquée « *par la CCA et le Ministère des Finances au Procureur de la République, au Procureur Général et au Ministère de la Justice en septembre 1991* »[2], la « *Dette du Congo en 1987[3] due à COMMISIMPEX* [serait] *d'un montant de 29.949.284.818 francs CFA* ».

4.  Sur ce montant de près de 30 milliards de francs CFA (ci-après « MFCFA »), la République du Congo a réglé une somme de 15 millions de dollars (ci-après « mUSD ») en date du 28 avril 1987.

*Origine du litige*

5.  Le 14 octobre 1992, COMMISIMPEX et la République du Congo ont conclu un protocole d'accord (ci-après le « Protocole de 1992 » ou le « Protocole n°566 ») engageant cette dernière au paiement, échelonné sur une durée de dix ans, de montants exprimés en différentes devises pour l'équivalent de 22 MFCFA[4]. Ce protocole d'accord prévoyait l'application d'un taux d'intérêt de 10% (article 3 du protocole) et, en cas de retard dans le paiement des échéances, un intérêt de retard de 10,5% (article 4 du protocole).

---

[1]  *Nous comprenons que les travaux se rapportent, à titre d'exemple, à des projets d'assainissement, de réfection, d'aménagement de sites, et que des matériels ont été fournis dans le cadre, entre autres, d'opérations de déforestation et d'aménagement de routes.*

[2]  *Cf. pièce Commisimpex n°4 intitulée « Fiche de calcul détaillée de la dette de la République du Congo ».*

[3]  *Estimation au début de l'année 1987, les calculs présentés étant effectués à la date du 31 décembre 1986.*

[4]  *Source : second protocole d'accord conclu entre les parties en date du 23 août 2003.*



6. Suite à la non-exécution de ce Protocole, COMMISIMPEX a initié une procédure d'arbitrage à l'encontre de la République du Congo, sous l'égide de la Cour internationale d'arbitrage de la Chambre de commerce internationale (ci-après la « CCI »).

7. Par sentence prononcée le 3 décembre 2000 (ci-après la « Sentence de 2000 »), le tribunal arbitral a condamné solidairement la République du Congo et la CCA au paiement de montants exprimés dans différentes devises dont le total était alors égal à 107 mUSD, hors i) intérêts de 10% générés par les billets à ordre sous-jacents jusqu'à leur échéance (article 3 du protocole de 1992) et ii) intérêts de retard de 10,5%, avec capitalisation annuelle à partir du 13 mars 1998 limités au seuil trimestriel de l'usure applicable en droit français (catégorie de prêts aux entreprises à plus de deux ans et à taux fixe) (article 4 du protocole de 1992).

8. Le 2 janvier 2001, la République du Congo a formé un recours en annulation de la Sentence de 2000, qui a été rejeté par la Cour d'appel de Paris par arrêt en date du 23 mai 2002.

9. Le 23 août 2003, la République du Congo et COMMISIMPEX ont signé un nouveau protocole d'accord (ci-après le « Protocole de 2003 » ou le « Protocole n°706 ») portant à la fois sur la dette initiale de 22 MFCFA, objet du Protocole de 1992, ainsi que sur une autre dette de 26 MFCFA, dont le fait générateur n'est pas explicité dans le Protocole de 2003.

10. Le 21 avril 2009, suite à la non-exécution de ce second Protocole, COMMISIMPEX a engagé une nouvelle procédure d'arbitrage auprès de la CCI.

11. Par sa sentence du 21 janvier 2013 (ci-après la « Sentence de 2013 »), le tribunal arbitral a condamné la République du Congo à payer à COMMISIMPEX la somme de 223 m€ plus intérêts de 10% l'an, avec capitalisation annuelle à compter du 31 décembre 2003.

12. La République du Congo a formé un recours en annulation de la Sentence de 2013, qui a été rejeté par la Cour d'appel de Paris par un arrêt du 14 octobre 2014 ; ce rejet ayant également été confirmé par la Cour de cassation le 25 mai 2016.

13. A titre illustratif, le schéma ci-dessous récapitule les principales dates énoncées précédemment :





Évolution du litige

14. Le 16 février 2018, COMMISIMPEX a assigné Total E&P Congo, Total Holdings SAS et la République du Congo, puis Total SE, devant le Tribunal de commerce de Nanterre (ci-après l'« Assignation »), dans le but d'« *obtenir de TOTAL SA en sa qualité de codébiteur le paiement de créances pétrolières que la République du Congo a nanti entre les mains de COMMISIMPEX à la faveur d'un acte signé le 22 décembre 1986 par les représentants de la Caisse Congolaise d'amortissement et du Ministère des Finances et du Budget de ce même Etat* ».

15. Nous comprenons que l'Assignation fait référence à une garantie de paiement consentie par la République du Congo à COMMISIMPEX et datée du 22 décembre 1986 (ci-après la « Garantie »).

16. L'Assignation fait état d'une créance qui serait payable par Total SE, Total E&P Congo et Total Holdings SAS à COMMISIMPEX (ci-après la « Créance »), correspondant à l'« actualisation »[5] au 31 juillet 2017 des sommes accordées par les Sentences de 2000 et de 2013 et des frais d'arbitrage afférents, telle que présentée dans un rapport du cabinet Mazars en date du 23 octobre 2017. Le montant de la Créance a été mis à jour par ledit cabinet dans un rapport en date du 28 mars 2019, faisant ressortir un montant de 1 204 m€ arrêté à la date du 31 mars 2019 (ci-après le « Rapport Mazars »).

---

[5] *Il convient de préciser que le terme financier d'actualisation est utilisé par le cabinet Mazars alors que les calculs réalisés correspondent à une capitalisation des montants issus des Sentences, qui tient compte des intérêts liés au passage du temps et des intérêts de retard. Il ne s'agit pas, à proprement parler, d'une actualisation qui correspondrait, en termes financiers, au calcul de la valeur présente de flux de trésorerie futurs. Néanmoins, dans un souci de simplification, nous emploierons le terme « actualisation » à l'instar du cabinet Mazars, dans la suite du présent rapport.*



17. A cet égard, COMMISIMPEX établit un lien entre la Garantie et le montant allégué de la Créance, en posant que « *les différentes condamnations prononcées par les deux sentences arbitrales, actualisées au 31 juillet 2017, s'élèvent à la somme de 1.052.007.205 euros* [6] [...] *Il en résulte que la Garantie a bien pour objet d'assurer le règlement de la dette dont COMMISIMPEX se prévaut aujourd'hui au titre de ces deux sentences* » (*caractère gras ajouté*).

## 1.2 Travaux mis en œuvre

18. Dans le contexte décrit ci-avant, nos travaux ont notamment consisté à :

- revoir l'ensemble de la documentation pertinente mise à notre disposition, qui se rapporte directement ou indirectement aux modalités de calcul et d'actualisation de la Créance et, en premier lieu, la Garantie ;
- analyser, de manière critique, les données chiffrées et la méthode de calcul présentées dans le Rapport Mazars et ses annexes ;
- revoir les modalités de calcul des sommes accordées par les Sentences de 2000 et de 2013 ;
- revoir l'analyse présentée dans le rapport du 14 avril 2000 de Monsieur René Ricol, expert mandaté dans le cadre de la première procédure arbitrale ayant opposé les parties.

19. Il convient de préciser que nous avons effectué nos travaux initialement sur la base du rapport du cabinet Mazars du 23 octobre 2017. Ces travaux ont ensuite été mis à jour de manière à tenir compte des calculs actualisés de la Créance présentés par le Rapport Mazars du 31 mars 2019.

## 1.3 Limitations et restrictions d'usage

20. Le présent rapport a pour objet principal d'analyser le montant de la Créance opposé à Total SE, Total E&P Congo et Total Holdings SAS, au regard des dispositions de la Garantie. Il n'appartient pas à PricewaterhouseCoopers Advisory d'émettre une opinion sur le fond de la Garantie ni sur sa validité juridique.

21. Plus généralement, les commentaires et les conclusions émis dans ce rapport ne constituent en aucune manière un avis légal ou juridique sur le présent litige et n'implique pas que la Garantie serait valide, exécutoire ou opposable.

---

[6] *Pour rappel, le montant allégué de la Créance est passé à 1 204 m€ dans le Rapport Mazars.*



22. De même, nous n'émettons pas d'opinion, attestation ou autre forme de certification concernant les informations comptables et/ou financières présentées dans ce rapport.

23. Il convient également de noter que les analyses présentées résultent de la documentation mise à notre disposition par Total SE ainsi que de nos propres recherches.

24. Les 27 pages de ce rapport constituent un tout indivisible, la lecture partielle dudit document pourrait entraîner des incompréhensions dont seul le lecteur serait responsable.

## 1.4 Plan du rapport

25. Notre rapport traitera plus précisément des points suivants :

    - en section II, de la mise en perspective du Rapport Mazars avec la Garantie ;

    - en section III, de la mise en perspective de la Sentence de 2000 avec la Garantie ;

    - en section IV, de la pertinence du montant allégué de la Créance de 1 204 m€ au regard de la Garantie et de la Sentence de 2013.



## 2. Mise en perspective du Rapport Mazars avec la Garantie

### 2.1 Que la Garantie couvre le règlement de la Créance, soit 1 204 m€, n'est pour COMMISIMPEX qu'un postulat

26. Selon les termes de l'Assignation, en pages 23 et 24 :

   - « *Les créances garanties sont issues des marchés et avenants non réglés par la République du Congo et dont l'exigibilité a été définitivement établie par les sentences des 3 décembre 2000 et 21 janvier 2013* »

   - « *c'est l'absence de paiement par la République du Congo de ces mêmes créances* [nées des Marchés visés par la Garantie] *qui est à l'origine des deux protocoles d'accord* [...] *le refus de la République du Congo de respecter ses engagements au titre de ces deux protocoles d'accord a conduit à sa condamnation par deux sentences arbitrales* [...] *les différentes condamnations prononcées par les deux sentences arbitrales, actualisées au 31 juillet 2017, s'élèvent à la somme de 1.052.007.205 euros (Pièce n°17* [Rapport du cabinet Mazars en date du 23 octobre 2017]*). Il en résulte que la Garantie a bien pour objet d'assurer le règlement de la dette dont COMMISIMPEX se prévaut aujourd'hui au titre de ces deux sentences* » (caractère gras ajouté).

27. Dans ses écritures en date du 19 février 2019, COMMISIMPEX réitère, en page 73, que « ***Les deux sentences arbitrales*** *condamnant la République du Congo* ***incarnent donc bien la créance tirée des marchés visés par la Garantie de 1986*** » et que « *ces mêmes* ***sentences arbitrales délimitant le quantum de la créance de COMMISIMPEX tirée de la Garantie de 1986*** *bénéficient de l'autorité de la chose jugée* » (caractère gras ajouté).

28. Ainsi, et **sans jamais le démontrer, COMMISIMPEX pose que le montant allégué de la Créance, actualisée à 1 204 m€ au 31 mars 2019, dont le calcul est présenté dans le Rapport Mazars, est celui de sommes dues en rémunération des marchés et avenants visés par la Garantie.**

29. Dans ce contexte, nous examinerons successivement les informations clefs de la Garantie et celles du Rapport Mazars afin de savoir s'il existe, comme le soutient COMMISIMPEX, une identité ou un lien entre le montant de 1 204 m€ et les marchés et avenants couverts par la Garantie.



**2.2  La Garantie porte sur une liste précise de onze marchés et avenants**

30.  L'article 1 de la Garantie présente, ensuite, un tableau listant onze marchés et avenants, exprimés en Livres sterling (GBP), Francs français (FF) ou Dollars US (USD) (ci-après les « Marchés »), comme suit :

| Date | Désignation du Marché | Devise | Montant | Réf. PwC |
|------|----------------------|--------|---------|----------|
| 05/04/1984 | Avenant n°1 n°107/84/AV PR PCM DMCE | Livres Sterling | 5 638 000,00 | *Marché n°1* |
| 05/06/1984 | Avenant n°3 n°127/84/AV PR PCM DMCE | Livres Sterling | 8 457 000,00 | *Marché n°2* |
| 25/06/1985 | Marché n°83/85/AO PR PCM DMCE | Francs Français | 51 780 076,00 | *Marché n°3* |
| 12/02/1986 | Marché n°009/86/G PR PCM DMCE | Francs Français | 14 812 000,00 | *Marché n°4* |
| 24/03/1986 | Marché n°015/86/G PR PCM DMCE | Francs Français | 18 868 500,00 | *Marché n°5* |
| 08/07/1986 | Avenant n°4 n°54/86/AV / PR PCM DMCE | Livres Sterling | 2 751 344,00 | *Marché n°6* |
| 08/07/1986 | Marché n°53/86/AO/ PR RCM DMCE | Dollars US | 3 492 564,00 | *Marché n°7* |
| 08/07/1986 | Avenant n°1 n°55/86/AV/PR PCM DMCE | Francs Français | 4 618 288,00 | *Marché n°8* |
| 08/07/1986 | Avenant n°5 n°57/86/AV / PR PCM DMCE | Livres Sterling | 7 889 357,00 | *Marché n°9* |
| 08/07/1986 | Avenant n°1 n°56/86/AV PR PCM DMCE | Francs Français | 7 549 124,56 | *Marché n°10* |
| 20/03/1985 | Garantie n° CORP 5166-85 | Livres Sterling | 12 818 000,00 | *Marché n°11* |

*Source : article 1 de la Garantie, analyse PwC.*

31.  Ainsi, comme indiqué par COMMISIMPEX en page 7 de ses écritures en date du 19 février 2019, *« L'article 1er de cette Garantie énumère la liste des « marchés et avenants de travaux et fournitures » effectués par COMMISSIMPEX bénéficiant de ladite Garantie […] **Cette liste circonscrit la créance garantie** » (caractère gras ajouté).*

**2.3  Le cabinet Mazars calcule le montant de 1 204 m€ à partir des seules Sentences sans jamais faire référence aux marchés listés dans la Garantie**

32.  Pour mémoire et comme illustré ci-dessous, le Rapport Mazars présente une actualisation, au 31 mars 2019, des sommes accordées par les Sentences de 2000 et 2013 et des frais d'arbitrage afférents, et aboutit à un total de 1 204 m€.

33.  **Les travaux du cabinet Mazars se fondent donc uniquement sur les montants accordés par les Sentences, repris tels quels, sans qu'aucune référence aux marchés listés dans la Garantie ne soit faite dans son rapport.**

34.  Le schéma ci-dessous permet de s'en convaincre :





**Synthèse de la dette totale actualisée au 31 mars 2019**

| | Somme Accordées Actualisées Sentence de 2000 | Somme Accordées Actualisées Sentence de 2013 | Total Sommes Accordées Actualisées | BAO non échus à la date de la Sentence de 2000 + BAO dont la preuve de la restitution n'a pas été fournie Sentence de 2000 | Dette Totale Actualisée |
|---|---|---|---|---|---|
| FRF | 125 838 499 FRF | - | 125 838 499 FRF | 166 043 542 FRF | 291 882 041 FRF |
| GBP | 82 341 902 GBP | - | 82 341 902 GBP | 39 978 541 GBP | 122 320 443 GBP |
| USD | 135 534 688 USD | - | 135 534 688 USD | 63 629 789 USD | 199 164 477 USD |
| FCFA | 7 164 974 977 FCFA | - | 7 164 974 977 FCFA | 1 065 678 021 FCFA | 8 230 652 998 FCFA |
| EUR | - | 953 742 363 EUR | 953 742 363 EUR | - | 953 742 363 EUR |
| Contre-valeur EUR, à titre indicatif[5] | | | 1 198 656 682 EUR | 129 315 343 EUR | 1 327 972 025 EUR |

Table 2 : Synthèse des frais d'arbitrage actualisés au 31 mars 2019

**Frais d'arbitrage actualisés au 31 mars 2019**

| Description des frais | 31-mars-19 |
|---|---|
| Frais d'arbitrage suite à la Sentence de 2000 | 1 037 811 EUR |
| Frais d'arbitrage suite à la Sentence de 2013 | 4 472 709 EUR |
| Total | 5 510 520 EUR |

*Source : page 3 du Rapport Mazars*



## 2.4 Les informations présentées dans le Rapport Mazars ne permettent pas d'établir un lien entre le montant de 1 204 m€ et la Garantie

35. Il convient de souligner que la mission qui avait été confiée au cabinet Mazars consistait à « *calculer le montant actualisé au 31 mars 2019 de la dette de la République du Congo à Commisimpex **telle qu'établie par** [...] la '**Sentence de 2000**' et [...] la '**Sentence de 2013**'* » et ce, « *Dans le cadre du **litige entre** [...] '**Commisimpex**' [...] **et 'la République du Congo'*** », comme précisé dans la synthèse du Rapport Mazars (*caractère gras ajouté*).

36. Dans ce contexte, le cabinet Mazars retient, comme point de départ de ses travaux d'actualisation (i) les sommes accordées par la Sentence de 2000 et leur détail par billets à ordre tel que fourni en annexe de ladite Sentence, (ii) les sommes accordées par la Sentence de 2013 et (iii) les frais d'arbitrage afférents aux deux Sentences.

37. Comme déjà indiqué, le cabinet Mazars ne fait aucune référence à la Garantie ou aux marchés sous-jacents, ni dans son Rapport ni dans ses annexes.

38. En l'état, **rien dans le Rapport Mazars ne permet donc de savoir si le montant allégué de la Créance de 1 204 m€ est susceptible, ou non, de se rattacher aux Marchés visés par la Garantie.**

39. En effet, les annexes du Rapport Mazars présentent le détail de la Créance par billets à ordre, mais sans fournir d'indications sur les marchés auxquels lesdits billets sont susceptibles de se rattacher.

40. **En conclusion, il n'est pas possible, sur la seule base du Rapport Mazars, d'établir un lien entre le montant de 1 204 m€ et les onze Marchés visés par la Garantie.**

41. Nous chercherons donc, dans la suite du présent rapport, à analyser la consistance du lien établi par COMMISIMPEX entre le montant allégué de la Créance et la Garantie, en repartant directement du détail des Sentences de 2000 et de 2013 (dont le Rapport Mazars ne fait que reprendre les conclusions) et des éventuels autres documents versés aux débats qui s'y rattachent.



## 3. Mise en perspective de la Sentence de 2000 avec la Garantie

**3.1 Les principaux montants accordés par la Sentence de 2000 se rattachent aux montants des billets à ordre restitués par COMMISIMPEX**

42. Pour rappel, suite à la non-exécution du Protocole de 1992, COMMISIMPEX a initié une procédure d'arbitrage à l'encontre de la République du Congo, sous l'égide de la CCI.

43. S'en est suivie la Sentence de 2000 condamnant solidairement la République du Congo et la CCA au paiement de montants en principal, exprimés en différentes devises, qui correspondent aux « *soldes dus exécutables selon le Protocole n°566* [de 1992] » comme illustré dans l'extrait suivant de la Sentence :

> 1) Quant au principal
>
>   a) Disent pour droit que la REPUBLIQUE DU CONGO et la CAISSE CONGOLAISE D'AMORTISSEMENT sont solidairement débitrices envers la société anonyme COMMISIMPEX des sommes suivantes:
>
>   i)  les soldes dus exécutables selon le Protocole n° 566, à savoir
>
>   | | | |
>   |---|---|---|
>   | • FRF | 22.117.228 | A |
>   | • GBP | 14.204.829 | |
>   | • USD | 23.371.278 | |
>   | • XAF (FCFA) | 1.426.623.801. | B |
>
>   ii) augmentés des intérêts à 10% calculés sur ces sommes, conformément à l'article 2 dudit Protocole, à savoir
>
>   | | |
>   |---|---|
>   | • FRF | 4.741.134 |
>   | • GBP | 4.698.879 |
>   | • USD | 7.813.559 |
>   | • XAF (FCFA) | 707.367.634 |

*Source : page 67 de la Sentence de 2000, analyse PwC.*

**3.1.1 Origine du montant accordé en FCFA**

44. Pour ce qui concerne le montant de 1 427 mFCFA environ accordé par la Sentence de 2000 (*cf. schéma précédent [B]*), et comme illustré ci-après, il convient de noter que ce montant correspond très précisément à celui exprimé en FCFA dans l'article I du Protocole de 1992.



ARTICLE 1 : MONTANT DE LA DETTE

Le total des différentes dettes au 31 octobre 1992 est arrêté, en monnaie d'origine, aux montants ci-après :

A.  50.592.081,53 francs français ( cinquante millions cinq cent quatre-vingt douze mille quatre-vingt un francs et cinquante-trois centimes)

B.  21.201.872,76 livres sterling (vingt-et-un millions deux cent un mille huit cent soixante-douze livres soixante-seize pounds)

C.  34.521.293,24 dollars U.S.(trente-quatre millions cinq cent vingt-et-un mille deux cent quatre-vingt-treize dollars vingt-quatre cents)

D.  1.426.623.001 francs CFA (un milliard quatre cent vingt-six millions six cent vingt-trois mille huit cent un)

*Source : page 3 du Protocole de 1992, analyse PwC.*

45.  Cependant, le texte dudit Protocole (ni du reste la Sentence de 2000) ne fournit pas d'information permettant de comprendre la nature exacte de ce montant.

46.  En effet, la Sentence de 2000 indique seulement, en note de bas de page n°26, que ce montant « *n'avait pas donné lieu antérieurement à souscription de billets à ordre* [...] [et] *n'a apparemment pas fait l'objet d'une actualisation ou d'une décote* ».

47.  En conséquence, en l'absence d'autres informations à notre disposition, nous pouvons considérer que le **montant accordé en FCFA par la Sentence de 2000 n'est pas rattachable**, en l'état, **à la Garantie**, et ce d'autant plus, qu'aucun des onze Marchés listés dans la Garantie n'est exprimé, comme nous l'avons vu, en FCFA.

48.  Nous nous intéresserons donc, dans la suite du présent rapport, aux autres montants exprimés, dans la Sentence de 2000, en FRF, GBP et USD.

3.1.2   Origine des montants exprimés en FRF, GBP et USD

49.  Sur la base du détail présenté dans la Sentence de 2000, nous constatons que les **montants accordés en FRF, GBP et USD** (*i.e.* hors FCFA) **s'avèrent résulter de l'application d'une décote de 25% aux montants des billets à ordre** qui ont été, selon les termes de la Sentence, **restitués** par COMMISIMPEX à la République du Congo, comme l'illustre l'extrait suivant :





52. L'Expert récapitule ensuite ses conclusions dans le tableau repris ci-dessous (ci-après le « Tableau Récapitulatif »), en précisant que :

   • les créances considérées comme certaines par l'Expert sont celles figurant en colonnes (a) et (c) de son Tableau Récapitulatif, et que leur actualisation au 31 octobre 1992 donne lieu aux montants présentés en colonnes (b) et (d) ;

   • les créances présentées en colonne (e) et (f) sont soumises à l'appréciation du tribunal arbitral (respectivement sans et avec actualisation au 31 octobre 1992).

Tableau récapitulatif des hypothèses de calcul des créances entre les parties

| Devise | Billets restitués non actualisés | Billets restitués actualisés au 31/10/1992 | Supplément de prix non actualisé | Supplément de prix actualisé au 31/10/1992 | Billets ni réglés ni restitués non actualisés | Billets ni réglés ni restitués actualisés au 31/10/1992 |
|---|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | (e) | (f) |
| en FF | 17 216 381 | 29 489 637 | | | 61 397 336 | 120 655 472 |
| en USD | 18 798 738 | 31 161 701 | A° | | 1 181 602 | 2 143 899 |
| en GPB | 15 521 332 | 18 939 772 | | | 9 720 245 | 21 049 690 |
| en FCFA | | | 1 486 441 948 | 2 466 703 689 | | |

*Créances considérées comme certaines par l'Expert* — *Créances soumises à l'appréciation du Tribunal arbitral*

Source : page 52 du Rapport Ricol, analyse PwC.

53. En particulier, l'Expert retient, parmi les créances certaines, les montants des « *Billets restitués actualisés au 31/10/1992* » exprimés en FRF, GBP et USD (*cf. colonne (b) du Tableau Récapitulatif*), lesquels montants **correspondent précisément à ceux accordés, après application d'une décote de 25%, par la Sentence de 2000**.

3.3 Sur la base du Rapport Ricol, les principaux montants accordés par la Sentence de 2000 concernent sept des onze Marchés visés par la Garantie

54. A partir du détail de l'analyse présentée dans le Rapport Ricol, nous chercherons à savoir, dans la présente partie, quels marchés ou avenants sont implicitement compris dans les montants accordés par la Sentence en FRF, GBP et USD, et s'il y a un lien avec les Marchés visés par la Garantie.



### 3.3.1  Périmètre des marchés analysés dans le Rapport Ricol

55. En page 26, le Rapport Ricol présente un tableau listant « *les marchés retenus par l'expert pour déterminer les créances entre les parties* », qui correspondent aux marchés sur lesquels « *Les parties, lors de la réunion du 21 décembre 1999 (annexe 3), ont exprimé leur accord quant à l'existence, le numéro, la date de signature, l'objet et le montant [...]* »[7].

56. Cependant, il convient de noter que l'Expert ne fait **aucune référence à la Garantie** dans son Rapport ni dans son annexe 3.

57. Nous avons donc cherché à identifier si, parmi les marchés retenus par l'Expert pour les besoins de son analyse, figuraient certains des Marchés visés par la Garantie et avons procédé, à cette fin, au rapprochement entre le libellé indiqué par l'Expert et la désignation du Marché telle que figurant dans la Garantie.

58. La correspondance entre les dix premiers marchés cités dans la Garantie et les marchés retenus par l'Expert a pu être établie par l'exercice de réconciliation que nous avons mené. La seule exception à cet exercice concerne le Marché n°11 de la Garantie, qui nous semble correspondre au marché retenu par l'Expert sous l'intitulé « *Protocole n° 461* », bien que leurs libellés et dates respectifs diffèrent.

59. En effet, selon le Rapport Ricol (en page 22), le « *Protocole n°461* » « *porte sur les modalités de remboursement de la garantie de crédit mise en place par COMMISIMPEX, par l'intermédiaire de la [...] BCCI, pour permettre à APV Hall d'acquérir du matériel de déforestage et de défrichage dans le cadre du projet de réaménagement des palmeraies d'Etoumbi-Kunda* ».

60. Or, ces informations semblent concorder avec celles relatives à la « *Garantie n° CORP 5166-85* » (*i.e.* Marché n°11), telles qu'elles ressortent de la lecture du protocole n° 461 que COMMISIMPEX a communiqué après sommation dans le cadre de la procédure devant le Tribunal de commerce de Nanterre (*Pièce COMMISIMPEX n° 96*). De plus, le « *Protocole n°461* » et la « *Garantie n° CORP 5166-85* » sont présentés conjointement dans la « *Fiche de Calcul détaillée de la dette de la République du Congo* » (*cf. pièce COMMISIMPEX n°4 en page 2*).

---

[7]  *Cf. pages 16 du Rapport Ricol.*



61. Nous présentons ci-après le résultat de l'exercice de réconciliation mené en partant du Rapport Ricol[8] :

| Marché | Date | Nature | Devise | Montant | Correspondance avec la Garantie | Écarts avec la Garantie |
|---|---|---|---|---|---|---|
| Marché 209/86/G | 12/02/86 | assainissement Mpila (la congolaise) et Plateaux | FF | 14 812 000 | Marché n°4 | |
| Marché 015/86 | 24/03/86 | travaux anti-érosifs du Camp militaire du 15 août | FF | 18 868 500 | Marché n°5 | |
| Marché 55/86 | 01/07/86 | aménagement du Camp du 15 août | FCFA | 1 204 934 500 | Marché n°7 | Devise (USD) et date (08/07/86) |
| Avenant n°1 55/86 | 08/07/86 | marché 15/86/G/PR | FCFA | 230 914 400 | Marché n°8 | Devise (FRF) |
| Avenant n°4 54/86 | 08/07/86 | marché 353/83/CT révision des prix relatifs avenant-1 et 3 | £ | 2 751 344 | Marché n°6 | |
| Avenant n°5 57/86 | 08/07/86 | marché 353/83 CT portant révision des prix | £ | 7 889 359 | Marché n°9 | Montant (écart non significatif) |
| Avenant 1 n°107/84 | 05/01/84 | projet Palmiers à huile Etoumbi-Nkounda n°353/83/CT | | | Marché n°1 | |
| | | - Marché initial | £ | 5 638 000 | | |
| | | - Supplément de prix au 31/12/1987 | FCFA | 1 486 441 948 | | Ne figure pas dans la Garantie |
| Avenant 3 n°127/84 | 05/03/84 | projet Palmiers à huile Etoumbi-Nkounda n°353/83/CT | £ | 8 457 000 | Marché n°2 | Date (05/06/84) |
| Protocole n°461 | 27/06/87 | modalités de remboursement de la garantie de crédit mise en place par Commisimpex | £ | 12 818 000 | Marché n°11 | Libellé et date |
| Marché 185/841 | 25/06/84 | construction de 2 villages des travailleurs à Mokéko | £ | 8 653 000 | | Ne figure pas dans la Garantie |
| Marché 83/85/ | 24/06/85 | travaux de Kisoundi, Mpila et Makélékélé | USD | 5 450 534 | Marché n°3 | Devise (FRF) et date (25/06/85) |
| Avenant 5e/86 | 08/07/86 | marché 83/85/AO/PR, travaux de Makélékélé | FCFA | 377 456 228 | Marché n°10 | Devise (FRF) |

Source : page 26 du Rapport Ricol, analyse PwC.

62. Sur cette base, il apparaît que les onze Marchés visés par la Garantie sont bien compris dans le périmètre des marchés et avenants qui ont été analysés par l'Expert et « *qui [ont servi] de base au calcul des créances entre les parties* ».

63. En conséquence, nous nous attacherons, dans la suite de cette partie, à identifier les Marchés de la Garantie qui seront, *in fine*, retenus par l'Expert en tant que créances certaines entre les parties.

### 3.3.2 Marchés de la Garantie pris en compte par la Sentence de 2000

64. Le Rapport Ricol renvoie à l'annexe 45 pour le détail des montants de créances considérées certaines (colonne (b) de son Tableau Récapitulatif ci-dessous) et qui, pour rappel, sont à l'origine des montants accordés par la Sentence de 2000 en FRF, USD et GBP (*cf. partie 3.2*).

---

[8] Il convient de noter que le même rapprochement a été effectué par COMMISIMPEX en page 57 des conclusions n°5 de COMMISIMPEX, en date du 9 septembre 2020.



65. En nous reportant à l'annexe 45, nous constatons que lesdites créances se rattachent à sept Marchés de la Garantie, selon le détail suivant (*cf. détail en annexe du présent rapport*) :

Tableau récapitulatif des hypothèses de calcul des créances entre les parties



*Source : page 52 et annexe 45 du Rapport Ricol, analyse PwC.*

66. Il ressort donc de notre analyse du Rapport Ricol que les montants accordés par la Sentence de 2000 en FRF, USD et GBP[9] se rattachent à sept des onze Marchés visés par la Garantie.

67. **En conclusion, le Rapport Ricol analyse bien l'ensemble des onze Marchés de la Garantie et considère que l'exécution de sept des onze Marchés est certaine, et ce, à hauteur des montants figurant en colonne (b) du Tableau Récapitulatif établi par l'Expert.**

68. **C'est précisément ces montants-là qui seront *in fine* accordés, après décote, par la Sentence de 2000 en FRF, GBP et USD** (*i.e.* hors montant accordé en FCFA).

---

[9] *Nous ne tiendrons pas compte du montant en FCFA pour les motifs indiqués en section 3.1.1 du présent rapport.*



## 4. Pertinence du montant allégué de la Créance de 1 204 m€ au regard de la Garantie et de la Sentence de 2013

69. Pour mémoire, la Sentence de 2000 fait suite à la non-exécution du Protocole de 1992 et condamnait solidairement la République du Congo et la CCA au paiement des « *soldes dus exécutables selon le Protocole n°566 [dc 1992]* », exprimés en différentes devises, comme illustré ci-dessous :



> 1) Quant au principal
>
>     a) Disent pour droit que la REPUBLIQUE DU CONGO et la CAISSE CONGOLAISE D'AMORTISSEMENT sont solidairement débitrices envers la société anonyme COMMISIMPEX des sommes suivantes:
>
>         i) les soldes dus exécutables selon le Protocole n° 566 à savoir
>
>             • FRF        22.117.228 ⎤
>             • GBP       14.204.829 ⎥ A
>             • USD       23.371.278 ⎦
>             • XAF (FCFA) 1.426.623.801.  B

*Source : page 67 de la Sentence de 2000, analyse PwC.*

70. Plus précisément, la Sentence de 2000 accorde :

- en FCFA, un montant ([B]) correspondant à l'identique à celui stipulé par le Protocole de 1992, comme explicité précédemment (*cf. partie 3.1.1*) ;

- en FRF, GBP et USD, des montants ([A]) ayant pour origine ceux stipulés par le Protocole de 1992, comme l'illustre l'extrait suivant de la Sentence :

> L'exécution du protocole ne doit donc se faire que partiellement (tant sur le plan extra-cambiaire que sur le plan cambiaire) en déduisant des montants équivalents aux manquants précités (réduits évidemment de la décote de 25%, pour assurer la cohérence de la déduction), ce qui donne les résultats suivants:

| Montants stipulés par le Protocole de 1992 | | A déduire : | Montants accordés par la Sentence de 2000 | |
|---|---|---|---|---|
| Protocole, article 1 | | | Soldes dus exécutables : | |
| FRF | 50.592.081 | 28.474.853 | 22.117.228 | A |
| GBP | 21.201.872 | 6.997.043 | 14.204.829 | A |
| USD | 34.521.293 | 11.150.015 | 23.371.278 | A |
| FCFA | 1.426.623.801  B | | 1.426.623.801 | B |
| tot. FRF | 432.446.601 | 143.812.523 | 288.634.078 | |

*Source : page 53 de la Sentence de 2000, analyse PwC.*



71. **Ainsi, les montants accordés par la Sentence de 2000 correspondent exhaustivement au solde dû, selon les arbitres, sur les marchés, tel qu'arrêté dans le Protocole de 1992.**

4.2 La créance sur laquelle se prononce la Sentence de 2013 est tout à fait distincte de celle visée par le Protocole de 1992 et étrangère à la Garantie

72. Aux paragraphes 5 et 6, la Sentence de 2013 :

- indique, en référence à la procédure d'arbitrage sur laquelle ladite Sentence se prononce, que *« **Le présent litige porte sur les effets du Protocole de 2003** »* ;

- rappelle que *« Le Protocole de 2003 fixait les modalités de remboursement de la **dette de la République du Congo, considérablement augmentée par rapport au Protocole de 1992** et évaluée à **48 milliards de FCFA** au 30 septembre 1992. Le Protocole de 2003 décrivait « la dette de l'Etat du Congo » comme étant composée d'une « **première partie** » de 22 milliards de FCFA, « objet du Protocole [dc 1992] », et d'une « **deuxième partie** » de 26 milliards de FCFA »* (caractère gras ajouté).

73. Dans ce contexte, la Sentence de 2013 précise que *« **Dans le Protocole de 2003, la République du Congo prend les engagements financiers** » tels que stipulés par les Articles 1 à 4 dudit Protocole, et précise que « Ces quatre articles **couvrent les deux composantes de la dette** de la République du Congo arrêtée au 30 septembre 1992, telle que confirmée dans le Préambule du Protocole : **440.000.000 FRF dits objets du Protocole de 1992** [et objets de l'article 1 du Protocole de 2003] **et 520.000.000 FRF** [objets des articles 3 et 4]»*[10], soit l'équivalent respectivement de 22 MFCFA et dc 26 MFCFA (caractère gras ajouté).

74. Cependant, s'agissant de *« a. la dette de 440.000.000 FRF (Article 1er du Protocole de 2003) »*, *« **Le Tribunal Arbitral constate** [...] d'une part **que le montant global de la dette prise en charge par la République du Congo à hauteur de l'engagement du Protocole de 1992 est celui fixé par la Sentence de 2000** et d'autre part que Commisimpex lui demande de déduire ce montant global des condamnations que le Tribunal Arbitral prononcerait en sa faveur dans la présente*

---

[10] *Cf. partie « C. Sur les montants dus par la République du Congo à Commisimpex » en pages 73 et 74 de la Sentence de 2013.*



procédure. Par conséquent, le Tribunal Arbitral constatera que les montants dus par la République du Congo au titre de l'article 1er du Protocole de 2003 sont ceux qui lui ont été alloués par la sentence de 2000, donnera acte à Commisimpex de sa demande de déduction de ces montants des condamnations que prononcerait le Tribunal Arbitral et, ayant effectué cette déduction, **ne prononcera aucune condamnation au titre de l'article 1er du Protocole de 2003** [portant sur le montant de 22 MFCFA] » (cf. paragraphe 310 de la Sentence de 2013) (caractère gras ajouté).

75. **Ainsi, la Sentence de 2013 ne se prononce aucunement sur le montant de 22 MFCFA, objet du Protocole de 1992, en considérant que le montant de la créance due au titre de ce Protocole a été définitivement fixé par la Sentence de 2000.**

76. S'agissant de « b. La dette de 520.000.000 FRF (Articles 3 et 4 du Protocole de 2003 », la Sentence de 2013 énonce que « **la République du Congo devra rembourser à Commisimpex le montant de 520.000.000 FRF** [...] **augmenté d'intérêts de** 941.141.586 FRF soit 222.749.598,82 euros » « **plus intérêts de 10%** l'an avec capitalisation annuelle au 31 décembre, sur la période entre le 31 décembre 2003 et jusqu'au parfait paiement » (cf. paragraphes 311 et 316 de la Sentence de 2013) (caractère gras ajouté).

77. C'est dans ce sens qu'en dernière page de la Sentence de 2013, « le tribunal arbitral [...] :
    [...]
    8) Constate que les montants dus par la République du Congo au titre de l'article 1er du Protocole du 23 août 2003 [22 MFCFA objets du Protocole de 1992] sont ceux qui lui ont été alloués par la Sentence arbitrale du 3 décembre 2000
    [...]
    10) Condamne la République du Congo à payer à Commisimpex, au titre des articles 2 et 3 du Protocole du 23 août 2003, la somme de 222.749.598,82 Euros plus intérêts de 10% l'an avec capitalisation annuelle au 31 décembre [...] ».

78. **Ainsi, la Sentence de 2013 porte exclusivement sur un montant de dette de 26 MFCFA qui est étrangère aux marchés visés par la Garantie.**

79. **En conclusion, les Sentences de 2000 et de 2013 portent sur deux montants de dette tout à fait distincts y compris dans leur origine**



**4.3   En définitive, seul un montant de 234 m€, soit 19% du montant allégué de 1 204 m€, pourrait être pris en compte au titre des marchés listés dans la Garantie**

80.   Pour rappel, le Rapport Mazars présente une actualisation, au 31 mars 2019, des sommes accordées par les Sentences de 2000 et 2013 et des frais d'arbitrage afférents, et aboutit à un total de 1 204 m€.

81.   Or, comme explicité précédemment :

     i.   la Sentence de 2000 repose implicitement sur l'analyse de la totalité des Marchés visés par la Garantie (via le Rapport Ricol)[11] (*cf. partie 3*) ;

     ii.   la Sentence de 2013 porte sur un montant de créance tout à fait distinct de celui sur lequel se prononce la Sentence de 2000 (*cf. partie 4*).

82.   Il s'ensuit que **la Créance opposée au titre de la Garantie ne saurait dépasser le montant actualisé des sommes accordées par la Sentence de 2000, tel qu'établi dans le Rapport Mazars,** puisque ledit montant résulte d'une analyse menée sur l'ensemble des Marchés de la Garantie.

83.   Nous considérons donc que **les sommes accordées par la Sentence de 2013 et les frais d'arbitrage afférents ne sauraient être inclus dans la Créance alléguée par COMMISIMPEX parce qu'elles sont étrangères à la Garantie.**

84.   Plus précisément, et comme illustré ci-après, **la Créance devrait être limitée au montant de 234 m€,** correspondant au montant actualisé des sommes accordées par la Sentence de 2000 et des frais d'arbitrage afférents, tel qu'il ressort du Rapport Mazars[12], soit 246 m€, diminué :

---

[11]   *A l'exception du montant de 1 427 mFCFA accordé par la Sentence de 2000 et qui n'a pas fait l'objet d'analyse dans le Rapport Ricol, selon notre compréhension et qui ne concerne pas les marchés visés par la Garantie.*

[12]   *Cf. somme des totaux présentés aux dernières cases des « Table 4 » et « Table 7 » respectivement en pages 11 et 15 du Rapport Mazars (Pièce COMMISIMPEX n°97).*



    i.   d'environ 11 m€[13] correspondant à l'actualisation par le cabinet Mazars du montant accordé en FCFA[14] dans la Sentence de 2000, que nous considérons non lié à la Garantie sur la base des informations dont nous disposons (*cf. partie 3.1.1*) ;

    ii.   d'environ 1 m€[15] correspondant à l'actualisation par le cabinet Mazars du montant des frais d'arbitrage relatifs à la Sentence de 2000 et ce, en partant du principe que la Garantie ne prévoit pas la prise en charge de tels frais.



85.   Par ailleurs, et en complément de ces travaux de réconciliation, s'agissant des calculs d'actualisation opérés par le cabinet Mazars, nous n'avons pas identifié d'anomalie susceptible d'avoir une incidence significative sur les résultats obtenus.

86.   Toutefois, nous n'avons pas été en mesure de corroborer la justesse de l'intégralité des taux d'usure entrant dans le calcul des intérêts de retard, tels que listés en annexe 3 du Rapport Mazars, faute de disposer des données de la Banque de France qui auraient été utilisées à cette occasion.

---

[13]  *Cf. dernière ligne de la « Table 4 » en page 11 du Rapport Mazars (Pièce COMMISIMPEX n°97).*

[14]  *Pour précision, le cabinet Mazars retient comme base de son calcul d'actualisation le montant de 1 070 mFCFA en principal, et non pas le montant de 1 427 mFCFA tel qu'accordé par la Sentence de 2000, en considérant que « la condamnation du Tribunal arbitral prononcée dans la Sentence de 2000 a uniquement porté sur les billets à ordre échus au 30 juin 2000 (échéance du 30 juin 2000 comprise), soit 1.069.967.851 FCFA » (cf. partie II.1 du Rapport Mazars - Pièce COMMISIMPEX n°17).*

[15]  *Cf. total présenté à la dernière colonne de la « Table 7 » en page 15 du Rapport Mazars (Pièce COMMISIMPEX n°97).*



## 5. Conclusion générale

87. Sans jamais le démontrer, COMMISIMPEX considère qu'il y aurait un lien entre la Garantie, et le montant de la Créance de 1 204 m€, résultat d'un calcul d'actualisation présenté dans le Rapport Mazars.

88. Or, ce calcul se fonde sur les montants accordés par les Sentences de 2000 et de 2013 sans qu'aucune référence ne soit faite à la Garantie ni à aucun des onze marchés qui y sont visés. **Il est donc impossible, sur la base du Rapport Mazars, d'établir une quelconque correspondance entre le montant allégué de la Créance et la Garantie.**

89. Dans ces circonstances, nous avons donc cherché à analyser de manière critique le postulat ainsi retenu par COMMISIMPEX, à partir des informations disponibles au sein des Sentences de 2000 et de 2013. Il en ressort les deux points suivants :

90. D'une part, la Sentence de 2000 accorde les « *soldes dus exécutables selon le Protocole n°566* [de 1992] », exprimés en différentes devises.

91. D'autre part, la Sentence de 2013 « *Constate que les montants dus par la République du Congo au titre de l'article 1er du Protocole du 23 août 2003* [objets du Protocole de 1992] *sont ceux qui lui ont été alloués par la Sentence arbitrale du 3 décembre 2000* » et ne prononce donc aucune condamnation au titre du Protocole de 1992.

92. **Ainsi, les Sentences de 2000 et de 2013 portent sur deux natures de créances tout à fait distinctes.**

93. Or, les montants accordés par la Sentence de 2000 en FRF, GBP et USD résultent de l'application d'une décote de 25% aux montants des billets à ordre considérés restitués par COMMISIMPEX, lesquels billets ont été déterminés par l'Expert mandaté par le tribunal arbitral, à savoir Monsieur René Ricol, sur la base de son analyse de la totalité des Marchés couverts par la Garantie.

94. **Ainsi, la Sentence de 2000 accorde des montants en différentes devises résultant de l'analyse de l'ensemble des Marchés visés par la Garantie.**



95. Il s'ensuit que **la Créance opposée à la République du Congo, au titre de la Garantie, ne saurait dépasser, dans ces circonstances, le montant actualisé des sommes accordées par la Sentence de 2000 en FRF, GBP et USD**, tel qu'établi dans le Rapport Mazars, puisque seul ledit montant résulte d'une analyse menée sur l'ensemble des Marchés de la Garantie.

96. *A contrario*, **les sommes accordées par la Sentence de 2013 et les frais d'arbitrage afférents ne sauraient être inclus dans la Créance alléguée par COMMISIMPEX, étant étrangères aux marchés couverts par la Garantie.**

97. Plus précisément, et comme illustré ci-après, **la Créance devrait être limitée au montant de 234 m€, correspondant au montant actualisé des sommes accordées par la Sentence de 2000 et des frais d'arbitrage afférents, tel que figurant dans le Rapport Mazars, soit 246 m€, diminué :**

   i. d'environ 11 m€ correspondant à l'actualisation par le cabinet Mazars du montant accordé en FCFA dans la Sentence de 2000, qui ne se rattache pas comme nous l'avons démontré à la Garantie ;

   ii. d'environ 1 m€ correspondant à l'actualisation par le cabinet Mazars du montant des frais d'arbitrage relatifs à la Sentence de 2000 et ce, en partant du principe que la Garantie ne prévoit pas la prise en charge de tels frais.



**Annexe**

———

Analyse PwC de l'annexe 45 du Rapport Ricol



**ANNEXE 45**

**Affaire Commisimpex d' République du Congo : état des créances actualisées au 31/10/1992**

| Marché | numéro | Billet à ordre échéance | devise | restitué | 31/12/87 | 31/12/88 | Actualisation 31/12/89 | 31/12/90 | 31/12/91 | 31/10/92 | Créance actualisée |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Marché n°4 de la Garantie | | | | | | | | | | | |
| M 009/86 | P 1007 | 01/01/87 | FF | 2 468 666 | 253 038 | 278 975 | 338 327 | 385 655 | 416 231 | 374 406 | 4 515 297 |
| | P 1008 | 01/07/87 | FF | 2 468 666 | 126 519 | 266 006 | 322 599 | 367 728 | 396 882 | 357 001 | 4 305 402 |
| | P 1009 | 01/01/88 | FF | 2 468 666 | | 253 038 | 306 872 | 349 801 | 377 534 | 339 597 | 4 095 508 |
| | | | | 7 405 998 | | | | | | | 12 916 207 A |
| | 1 627 | 01/01/87 | FF | 559 564 | 57 355 | 63 234 | 76 687 | 87 415 | 94 346 | 84 865 | 1 023 467 |
| | 1 628 | 01/07/87 | FF | 460 818 | 23 617 | 49 655 | 64 219 | 63 643 | 74 085 | 66 640 | 803 676 |
| | 1 629 | 01/01/88 | FF | 362 071 | | 37 112 | 45 808 | 51 304 | 55 372 | 49 808 | 600 674 |
| | | | | 1 382 453 | | | | | | | 2 427 817 B |
| Marché n°5 de la Garantie | | | | | | | | | | | |
| M 015/86 | P 1118 | 05/07/87 | FF | 3 144 750 | 156 692 | 338 398 | 410 392 | 467 802 | 504 890 | 454 156 | 5 477 079 |
| | P 1120 | 05/07/88 | FF | 3 144 750 | | 156 692 | 372 238 | 424 310 | 457 950 | 411 933 | 4 967 872 |
| | | | | 6 289 500 | | | | | | | 10 444 951 C |
| | 1 635 | 05/01/87 | FF | 838 600 | 84 763 | 94 645 | 114 780 | 130 837 | 141 210 | 127 020 | 1 531 855 |
| | 1 636 | 05/07/87 | FF | 712 810 | 35 517 | 76 703 | 93 022 | 106 035 | 114 442 | 102 942 | 1 241 471 |
| | 1 638 | 05/07/88 | FF | 587 020 | | 29 249 | 69 464 | 79 205 | 85 484 | 76 894 | 927 336 |
| | | | | 2 138 430 | | | | | | | 3 700 663 D |

$$A + B + C + D = 29\ 489\ 637\ FF$$

Soit le montant total des billets restitués actualisés au 31/10/1992 se rattachant aux Marchés n°4 et 5 de la Garantie

1

Affaire Commsisinpex d' République du Congo : état des créances actualisées au 31/10/1992

| Marché | numéro | Billet à ordre échéance | devise | restitué | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M 53/86 | P 1173 | 01/01/87 | USD | 582 094 | 59 665 | 65 780 | 79 775 | 90 935 | 98 144 | 88 282 | 1 064 675 | E |
| | P 1174 | 01/07/87 | USD | 582 094 | 29 832 | 62 722 | 76 067 | 86 708 | 93 582 | 84 178 | 1 015 183 | |
| | P 1175 | 01/01/88 | USD | 582 094 | | 59 665 | 72 358 | 82 481 | 89 020 | 80 075 | 965 692 | |
| | | | | 1 746 282 | | | | | | | 3 045 550 | E |
| | I 684 | 01/01/87 | USD | 122 240 | 12 530 | 13 814 | 16 753 | 19 096 | 20 610 | 18 539 | 223 582 | |
| | I 685 | 01/07/87 | USD | 101 866 | 5 221 | 10 976 | 13 312 | 15 174 | 16 377 | 14 731 | 177 657 | |
| | I 686 | 01/01/88 | USD | 81 493 | | 8 353 | 10 130 | 11 547 | 12 463 | 11 210 | 135 197 | |
| | I 687 | 01/07/88 | USD | 61 120 | | 3 132 | 7 244 | 8 258 | 8 913 | 8 017 | 96 684 | |
| | | | | 366 719 | | | | | | | 633 120 | F |
| A 55/86 | P 1172 | 08/01/87 | USD | 669 317 | 67 080 | 75 481 | 91 539 | 104 345 | 112 617 | 101 301 | 1 221 681 | G |
| | I 683 | 08/01/87 | USD | 19 477 | 1 952 | 2 196 | 2 664 | 3 036 | 3 277 | 2 948 | 35 551 | H |
| A4 54/86 | P 1168 | 06/07/87 | USD | 1 045 510,70 | 51 796 | 112 474 | 136 403 | 155 484 | 167 811 | 150 949 | 1 820 428 | I |
| | P 1169 | 06/01/88 | USD | 1 045 510,70 | | 105 379 | 129 763 | 147 915 | 159 642 | 143 601 | 1 731 811 | |
| | | | | 2 091 021 | | | | | | | 3 552 239 | I |
| | 1 685/679 | 06/07/87 | USD | 141 143,94 | 6 993 | 15 184 | 18 414 | 20 990 | 22 655 | 20 378 | 245 758 | |
| | 1 686/680 | 06/01/88 | USD | 94 095,96 | | 9 484 | 11 679 | 13 312 | 14 368 | 12 924 | 155 863 | |
| | | | | 235 240 | | | | | | | 401 621 | J |

Marché n°7 de la Garantie

Marché n°8 de la Garantie

Marché n°6 de la Garantie

Affaire Commisimpex c/ République du Congo : état des créances actualisées au 31/10/1992

| Marché | numéro | Billet à ordre échéance | devise | restitué | | | | | | | | |
|--------|--------|-------------------------|--------|----------|---|---|---|---|---|---|---|---|
| A5 57/86 | P 1161 | 08/01/87 | USD | 1 998 637,61 | | 200 308 | 273 344 | 311 582 | 336 285 | 302 493 | 3 648 042 | |
| | P 1162 | 08/07/87 | USD | 1 998 637,61 | | 97 878 | 260 611 | 297 068 | 320 621 | 288 403 | 3 478 111 | |
| | P 1163 | 08/01/88 | USD | 1 998 637,61 | | 200 308 | 247 931 | 282 614 | 305 021 | 274 370 | 3 308 882 | |
| | P 1164 | 08/07/88 | USD | 1 998 637,61 | | | 236 382 | 269 450 | 290 812 | 261 590 | 3 154 749 | |
| | P 1165 | 08/01/89 | USD | 1 998 637,61 | | | 220 339 | 256 292 | 276 611 | 248 816 | 3 000 695 | |
| | P 1166 | 08/07/89 | USD | 1 998 637,61 | | 97 878 | 107 665 | 243 278 | 262 566 | 236 182 | 2 848 328 | |
| | | | | 11 991 826 | | | | | | | 19 438 808 | K |
| | 1672 | 08/01/87 | USD | 479 673 | 48 074 | 54 094 | 65 603 | 74 780 | 80 708 | 72 598 | 875 530 | |
| | 1673 | 08/07/87 | USD | 399 728 | 19 576 | 42 979 | 52 122 | 59 414 | 64 124 | 57 681 | 695 622 | |
| | 1674 | 08/01/88 | USD | 319 782 | | 32 049 | 39 669 | 45 218 | 48 803 | 43 899 | 529 421 | |
| | 1675 | 08/07/88 | USD | 239 837 | | 11 745 | 28 366 | 32 334 | 34 897 | 31 391 | 378 570 | |
| | 1676 | 08/01/89 | USD | 159 891 | | | 17 627 | 20 503 | 22 129 | 19 905 | 240 056 | |
| | 1677 | 08/07/89 | USD | 79 946 | | | 4 307 | 9 731 | 10 503 | 9 447 | 113 933 | |
| | | | | 1 678 856 | | | | | | | 2 833 132 | L |

Marché n°9 de la Garantie

E + F + G + H + I + J + K + L = 31 161 701 USD

Soit le montant total des billets restitués
actualisés au 31/10/1992 se rattachant
aux Marchés n°6, 7, 8 et 9 de la Garantie

3

# Affaire Commisimpex c/ République du Congo : état des créances actualisées au 31/10/1992

**Marché n°11 de la Garantie**

| Marché | numéro | échéance | devise | restitué | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Protocole 461 | P1278 | 30/06/88 | £ | 1 068 163 | | 55 047 | 126 642 | 144 358 | 155 803 | 140 147 | 1 690 160 |
| | P1280 | 30/06/89 | £ | 1 068 167 | | | 60 552 | 130 367 | 140 703 | 126 564 | 1 526 354 |
| | P1281 | 30/12/89 | £ | 1 068 167 | | | 335 | 123 412 | 133 196 | 119 812 | 1 444 922 |
| | P1282 | 30/06/90 | £ | 1 068 167 | | | | 62 029 | 126 299 | 113 608 | 1 370 104 |
| | P1283 | 30/12/90 | £ | 1 068 167 | | | | 343 | 119 406 | 107 407 | 1 295 323 |
| | P1284 | 30/06/91 | £ | 1 068 167 | | | | | 60 015 | 102 006 | 1 230 189 |
| | P1285 | 30/12/91 | £ | 1 068 167 | | | | | 332 | 96 610 | 1 165 109 |
| | P1286 | 30/06/92 | £ | 1 068 167 | | | | | | 58 270 | 1 126 437 |
| | P1287 | 30/12/92 | £ | 1 068 167 | | | | | | | 1 068 167 |
| | P1288 | 30/06/93 | £ | 1 068 167 | | | | | | | 1 068 167 |
| | P1289 | 30/12/93 | £ | 1 068 167 | | | | | | | 1 068 167 |
| | | | | **11 749 833** | | | | | | | **14 053 099 M** |
| | 1807 | 30/06/88 | £ | 576 810 | | 29 726 | 68 387 | 77 954 | 84 134 | 75 680 | 912 690 |
| | 1809 | 30/06/89 | £ | 480 675 | | | 27 249 | 58 665 | 63 316 | 56 954 | 686 859 |
| | 1810 | 30/12/89 | £ | 432 607 | | | 135 | 49 982 | 53 944 | 48 524 | 585 192 |
| | 1811 | 30/06/90 | £ | 384 540 | | | | 22 331 | 45 468 | 40 899 | 493 237 |
| | 1812 | 30/12/90 | £ | 336 472 | | | | 108 | 37 613 | 33 833 | 408 026 |
| | 1814 | 30/12/91 | £ | 240 337 | | | | | 13 503 | 22 951 | 276 792 |
| | 1815 | 30/06/92 | £ | 192 270 | | | | | 60 | 17 390 | 209 719 |
| | 1816 | 30/12/92 | £ | 144 202 | | | | | | 7 866 | 152 068 |
| | 1817 | 30/06/93 | £ | 96 135 | | | | | | | 96 135 |
| | 1818 | 30/12/93 | £ | 48 067 | | | | | | | 48 067 |
| | | | | **2 932 115** | | | | | | | **3 868 786 N** |
| art 3 du protocole | 1819 | 30/12/90 | £ | 839 384 | | | | 269 | 93 831 | 84 403 | 1 017 887 O |
| Avenants 1 et 3 | solde | 31/12/87 | FCFA | 1 486 441 948 | 423 223 | 152 403 680 | 184 827 563 | 210 683 136 | 227 386 615 | 204 537 524 | 2 466 703 699 |

M + N + O = 18 939 772 GBP

Soit le montant total des billets restitués
actualisés au 31/10/1992 se rattachant
au Marché n°11 de la Garantie