# Exhibit 15





Total SE, Elf Aquitaine, and Total E&P Congo

*vs.*

Commissions Import Export SA

Analysis of the amount of the claim against Total SE, Elf Aquitaine, and Total E&P Congo, based on the guarantee invoked by Commissions Import Export in 1986

*Report dated December 24, 2020*



**TOTAL SE**
Legal Department and Exploration/Production contracts 2
place Jean Millier — La Défense 6
 2 078 Paris La Défense Cedex

Neuilly-sur-Seine, December  2 4, 2020

Dear Sir or Madam,
By writ of compulsory intervention before the Nanterre Commercial Court dated February 16, 2018, Commissions Import Export (hereinafter "COMMISIMPEX") requested that Total SE, Total E&P Congo, and Total Holdings SAS be ordered to pay COMMISIMPEX all future payments due to the Republic of Congo up to €1,052,007,205, based on a guarantee dated December 22, 1986, to cover payment by the Republic of Congo to COMMISIMPEX for contracts and amendments for public works and the supply of equipment allegedly carried out by COMMISIMPEX between 1984 and 1986.

The amount of €1,052 million claimed actually corresponds to the amounts of awards handed down by two arbitral awards dating from 2000 and 2007. 2013 and costs relating to the arbitration proceedings between COMMISIMPEX and the Republic of Congo, as capitalized as of July 31, 2017, in a report by Mazars dated October 23, 2017. The amount of the claim was subsequently updated by the said firm in a report dated March 28, 2019. It stood at 1,204 million Congolese francs as of March 31, 2019.

In this context, you have engaged us to prepare a report presenting an analysis of the relevance of the amount of the claim as alleged by COMMISIMPEX based on the Mazars report dated March 28, 2019, in particular with regard to the provisions of the guarantee granted by the Republic of Congo to COMMISIMPEX and the arbitral awards issued in this dispute. Thus, after a brief reminder of the context in Section I, you will find in Section II a presentation of the main information available in the Mazars report dated March 31, 2019, with regard to the provisions of the aforementioned guarantee.

*PricewaterhouseCnopers Advisary, SAS, 63, rue de Villiers. 92208 Neuilly-sur-Seine Cedex Telephone. +33 (0)1 56 57 12 57, Fax. +33 (0)1 56 57 65 85. www.pwc.fr*
Simplified joint stock company with capital of €434,665.60. Registered office: 63, rue de Villiers, 92200 Neuilly-sur-Seine. RCS Nanterre 338 112 733 VAT No. FR 93 338 112 733. Siret 338 112 733 002/8. API Code 7022 Z



Section III will focus on the 2000 arbitration award in relation to the 1986 guarantee.

Finally, Section IV will address the relevance of the alleged amount of the claim, in the amount of 1 204 m€, in light of the 1 9 86 guarantee and the 201 3 arbitration award.

This report is intended for you and may be used in the context of the pending litigation before the Nanterre Commercial Court or any other future proceedings relating to the dispute that is the subject of this report. Any other use of this document is not authorized. We cannot be held liable to any person other than the recipient of this report.

We remain at your disposal to provide you with any additional information you may require. Yours faithfully,

Jean-Louis Di Giovanni Partner



## SUMMARY

1. **Presentation of the context and nature of the work**.................................................**5**

   1.2   Context of our intervention..... .............. ............. ............. ............ .............. .............. .............5

   1.2   Work carried out ..............................................................................................................8

   1.3   Limitations and restrictions on use ..................................................................................8

   1.4   Report outline ....................................................................................................................9

2.   **Putting the Mazars Report into perspective with the** Guarantee............................10

   2.1   The  fact that the Guarantee covers the settlement of the Debt, i.e. 1 204 mC,, is only an assumption for COMMISIMPEX. .............................................................................................................l0

   2.2 The Guarantee covers a specific list of eleven contracts and amendments ...................................

   2.3  Mazars calculates the amount of1 204 mC,based solely on the Awards without ever referring to the contracts listed in the Guarantee.............................................................................. 1

   2.4   The information presented in the Mazars Report does not allow a link to be established **between the** amount of 1 204 mC,and the Guarantee.......................................     3

3.    **Putting the 2000 Award** into **perspective with the Guarantee** ...........................................**14**

   3.1   The main amounts awarded by the 2000 Award relate to the amounts of promissory notes returned by COMMISIMPEX.......................................................................................14

   3.2   The promissory notes for the 2000 award are the origin of the analysis conducted in the Ricol Report.............................................................................................................. .1 6

   3.3   Based on the Ricol Report, the main amounts awarded by the 2000 Award relate to seven of the eleven Contracts covered by the Guarantee .............................     17

4    **Relevance of the alleged amount of the Claim of 1 204      in light of the Guarantee and the Award of 2013** ...................................................................................... 21

   4.1   The amounts awarded by the 2000 Award correspond to the "*amounts due* " according to the 1992 Protocol. ...................................................................................... 21

   4-2   The claim on which the 2013 Award is based is entirely separate from that referred to in the 1992 Protocol and unrelated to the Guarantee.........................................................................22

   4 3   Ultimately, only an amount of 234 m euros or 19% of the alleged amount of 120 4 m euros, could be taken into account in respect of the contracts listed in the Guarantee ........................................24

5.   General conclusion ........................................................................................................26


# 1. Presentation of the context and nature of the work

## 1.1 **Context of our** intervention

1. COMMISIMPEX, a public limited company under Congolese law, entered into various contracts and amendments with the Republic of Congo for public works and the supply of equipment during the period from 1984 to 1 9 8 6.[1]

2. We understand that these contracts and amendments have not been paid for and should ultimately have been paid by promissory notes issued by the Caisse Congolaise d'Amortissement (hereinafter the "CCA") and endorsed by the Republic of Congo.

3. Based on a calculation sheet provided "by *CCA and the Ministry of* Finance to *the* Public *Prosecutor,* **the** Attorney General*, and the* Ministry of Justice in September 199 "*, the "Congo's* **debt** *in 1987 owed to COMMISIMPEX [* would] amount *to 29.949.284.818* **CFA francs**".

4- Of this amount of nearly 30 billion CFA francs (hereinafter "MFCFA"), the Republic of Congo paid a sum of $15 million (hereinafter "USD") on April 28, 1987. "

*Origin of the litigation*

5. On October 4, 1992 COMMISIMPEX and the Republic of Congo entered into a memorandum of understanding (hereinafter the "1992 Protocol" or Protocol No. 566") committing the latter to pay, over a period of ten years, amounts expressed in various currencies equivalent to 22 mFCFA[4]. This memorandum of understanding provided for the application of an interest rate of 10% (Article 3 of the memorandum) and, in the event of late payment of installments, payment of installments, late payment interest of 10.5%. (Article 4 of the agreement).

---

*We understand that the work relates,* for *example, to sanitation, repair, and site development projects, and that* equipment is provided *in the context of, among other things, deforestation and* road *construction operations*.

*See Commisimpex* document No. q entitled *"Detailed debt* statement *for the Republic of Congo.*"

[3] *Estimate at* the *beginning of 1998, with calculations* **made** *as of December 31,* **1986.**

[4] *Source: second memorandum of understanding concluded between the parties on* August *3, 2003.*



6.     Following the failure to implement this Memorandum, COMMISIMPEX initiated arbitration proceedings against the Republic of Congo under the auspices of the International Court of Arbitration of the International Chamber of Commerce (hereinafter the "ICC").

7-     In its award rendered on December 3, 2000 (hereinafter the "2000 Award"), the arbitral tribunal ordered the Republic of Congo and the CCA jointly and severally to pay amounts expressed in various currencies, the total of which was then equal to IRUSD 107, excluding i) interest at 10% generated by the underlying promissory notes until their maturity (Article 3 of the 1992 Protocol) and (ii) default interest of 10.5%, compounded annually from March 13, 1998, limited to the quarterly usury threshold applicable under French law (category of fixed-rate loans to businesses with a maturity of more than two years) (Article 4 of **the 1992** Protocol**).**

8-     On January 2, 2001, the Republic of Congo filed an appeal for annulment of the Award, which was dismissed by the Paris Court of Appeal in a ruling dated 23 May 2002.

9-     On August 3**, 2003,** the Republic of Congo and COMMISIMPEX signed a new memorandum of understanding (hereinafter the "2003 Protocol or Protocol No. 706") covering both the initial debt of 22 million CFA francs, which was the subject of the 1992 Protocol, and another debt of 26 million CFA francs, the basis for which is not specified in the Protocol of 2003

                .

10.    On April 21, 2009, following the breach of this second Protocol, COMMISIMPEX
.          initiated new arbitration proceedings before the **ICC.**

11.     In its award of January 21, 2013 (hereinafter the "Award of 2013"), the arbitral tribunal ordered the Republic of Congo to pay COMMISIMPEX the sum of 2013 plus interest at 10% per annum, with annual capitalization from December 31, 2003.

12.    The Republic of Congo filed an appeal for annulment of the 2013 Award, which was dismissed by the Paris Court of Appeal in a ruling dated October 14, 2014 (i),this dismissal also being confirmed by the Court of Cassation on May 2 , **2016.**

**13.    B**y way of illustration, the diagram below summarizes the key dates mentioned above:





14- On February 6, 2018, COMMISIMPEX summoned Total E&P Congo, Total Holdings SAS, and the Republic of Congo, then Total SE, before the Commercial Court of Nanterre (hereinafter the "Summons"), with the aim of "obtaining *from TOTAL SA, in its capacity as co-debtor,* payment *of oil claims that the Republic of Congo has* in *the hands of COMMIS!IMPEX* under an *agreement signed on December 22, 1986 by representatives of the Caisse Congolaise d'Amortissement and the Ministry of* Finance *and Budget of the same* state."

15. We understand that the Assignment refers to a payment guarantee granted by the Republic of Congo to COMMISIMPEX and dated December 22, 1986 (hereinafter the "Guarantee").

16. The Summons refers to a claim allegedly payable by Total SE, Total E&P Congo, and Total Holdings SAS to COMMISIMPEX (hereinafter the "Claim"), corresponding to the "discounting on July 31, 2017 of the sums awarded by the 2000 and 2003 Awards and the related arbitration costs, as presented in a report by Mazars dated October 23, 2 0 17. The amount of the Claim was updated by the said firm in a report dated March 28, 2019, showing an amount of 1 204 m€ of May 31, 2019 (hereinafter the "Mazars Report").

---

5 *It should be noted that the financial term "discounting" is used by Mazars, whereas the calculations performed correspond to* a capitalization *of the* amounts *resulting from* the Judgments, *which takes into account* interest *related to the passage of time and late payment* interest. *Strictly speaking, this is not a discounting process that would correspond,* in strict terms, to *a calculation of the present value of future cash flows. Nevertheless, for the sake of simplicity, we will use the term "discounting" to refer to the Mazars calculation in the remainder of* this *report.*



In this regard, COMMISIMPEX establishes a link between the Guarantee and the alleged amount of the Claim, stating that "*the various awards made by the two arbitral awards, updated as of July 31, 2017,* **amount to** *1.052.007.205* **euros** [6] [...] It *follows that* **the Guarantee** *is intended to ensure the settlement of the debt that COMMISIMPEX is claiming today under these* **two** *awards" (emphasis* added).

**1.2**

### Work Implemented

18.   In the context described above, our work consisted in particular of:

review all relevant documentation made available to us that relates directly or indirectly to the methods used to calculate and discount the Claim and, first and foremost, the Guarantee;

critically analyze the figures and calculation method presented in the Mazars Report and its appendices;

review the methods used to calculate the amounts awarded by the 2000 and 2013 Awards;

review the analysis presented in the April 4, 2013 report by Mr. René Ricol, the expert appointed in the first arbitration proceedings between the parties.

**19.**   It should be noted that we initially carried out our work on the basis of the Mazars report dated October 23, 2017. This work was then updated to take into account the updated calculations of the Claim presented in the Mazars Report dated March 31, 2019.

### 1.3   Limitations and restrictions on use

20.   The main purpose of this report is to analyze the amount of the Claim against Total SE, Total E&amp;P Congo, and Total Holdings SAS in light of the provisions of the Guarantee. It is not the role of PricewaterhouseCoopers Advisory to express an opinion on the substance of the Guarantee or its legal validity.

21.   More generally, the comments and conclusions contained in this report do not constitute legal or judicial advice on the present dispute and do not imply that the Guarantee is valid, enforceable, or opposable.

---

6 As *a reminder, the* alleged amount of the Claim *has been reduced to 1204 m euros* in *the Mazars Report.*


22. Similarly, we do not express any opinion, attestation or other form of certification regarding the accounting and/or financial information presented in this report.

23. It should also be noted that the analyses presented are based on documentation provided us by Total SE and our own research.

24. The 27 pages of this report constitute an indivisible whole, and partial reading of the document could lead to misunderstandings for which the reader alone would be responsible.

### 1.4 Outline of this report

25. Our report will address the following points in more detail:

- in section II, the Mazars Report in relation to the Guarantee;
- in section III, the comparison of the        Award with the Guarantee;
- in section IV, the relevance of the alleged amount of the Claim of 1,204 m euros light of the Guarantee and the 2003 Award.



## 2. Comparison of the Mazars Report with the Guarantee

2.1 That the Guaranteee covers the settlement of the Debt of 1 204 m euros, for COMMISIMPEX is only postulated

26. According to the terms of the Summons, on pages 23 and 24:

- *"The secured* debts *arise from* contracts not *settled by the Republic of Congo and* whose *enforceability has been definitively established by* the *judgments of December 3, 2000, and January 21, 2013."*

- *"It is the Republic of Congo's failure to pay these same* debts [arising from the contracts covered by the Guarantee] *that is at the origin of the two memoranda of understanding [...] the Republic of Congo's refusal to comply* with *its* commitments *under these two memoranda of understanding* led *to its* conviction *in two arbitration* awards *[...]. The various convictions handed down by the two* arbitration *awards*, *updated* as of *July 31, 2017, amount to the sum of 1,052,007,205 euros (Exhibit* No. 17 Report by Mazars dated October 23, 2017])· *It follows that t***he Guarantee is indeed intended to ensure the settlement of the debt which COMMISIMPEX is claiming today under these two awards**, p u r s u a n t to these two rulings (emphasis added)).

27. In its submissions dated February 19, 2019, COMMISIMPEX reiterates on page 73 that "***The two arbitral awards therefore do indeed condemn*** the Republic of Congo **to pay the debt** *arising from the contracts* **used for the** *1986* **Guarantee***" and that "these same* **arbitral awards** *delimiting the quantum of COMñfISIMPEX's claim arising from the 1986 Guarantee* benefit *from* the authority *of res judicata" [emphasis added).*

28. Thus, **without ever demonstrating it, COMMISIMPEX asserts that the alleged amount of the Claim, discounted at** 1204 m euros **as of March 31**, 2019, **the calculation of which** is **presented in the Mazars Report, is that** of sums due in **remuneration for the contracts and amendments covered by the Guarantee.**

29. In this context, we will examine in turn the key information in the Guarantee and in the Mazars Report in order to determine whether, as COMMISIMPEX maintains, there is an identity or a link between the amount of 1204 m euros and the contracts and amendments covered by the Guarantee.



### 2.2 The Guarantee contains a specific list of *eleven* contracts and endorsements

30. Article I of the Guarantee then presents a table listing eleven contracts and amendments, expressed in pounds sterling (GBP), French francs (FF), or US dollars (USD) (hereinafter the "contracts"), as follows:

| Date | Agreement Designation | Currency | Amount | Rev. PwC |
|---|---|---|---|---|
| 04/05/1984 | Amendment No. 1 No. 107/84/AV PR PCM DMCE | Pounds Sterling | 5,638,000.00 | *ttorche y''1* |
| 06/05/1984 | Addendum No. 3 No. 127/84/AV PR PCM DMCE | Pounds Sterling | 8,457,000.00 | Morché No. z |
| 06/25/1985 | Contract No. 83/85/AO PR PCM DMCE | French francs | 51,780,076.00 | *Contract No. 3* |
| February 12, 1986 | Contract No. 009/86/G PR PCM DMCE | French francs | 14,812,000.00 | Lot No. 4 |
| 03/24/1986 | Contract No. 015/86/G PR PCM DMCE | French francs | 18,868,500.00 | *Warche tt'S* |
| 07/08/1986 | Addendum No. 4 No. 54/86/AV / PR PCM DMCE | Pounds Sterling | 2,751,344.00 | *Contract No. 6* |
| 07/08/1986 | Contract No. 53/86/AO/ PR RCM DMCE | US dollars | 3,492,564.00 | *Contract No. 7* |
| 07/08/1986 | Addendum No. 1 No. 55/86/AV/PR PCM DMCE | French francs | 4,618,288.00 | *Contract No. 8* |
| 07/08/1986 | Addendum No. 5 No. 57/86/AV / PR PCM DMCE | Pounds Sterling | 7,889,357.00 | *Contract No. 9* |
| 07/08/1986 | Addendum No. 1 No. 56/86/AV PR PCM DMCE | French francs | 7,549,124.56 | *Marchê No. 10* |
| 03/20/1985 | Guarantee No. CORP 5166-85 | Pounds Sterling | 12,818,000.00 | *Warche No. 11* |

*Source: Guarantee cuticle 1, PwC analysis.*

*31.* Thus, as indicated by COMMISIMPEX on page 7 of its entries dated February 19 2019 "*The front page of this* Guarantee lists the *'purchases and supplies' made by* Commisimpex as beneficiary of said guarantee*[...] This list is circumscribed to* the guarantee (bold added).

### 2.3 Mazars calculates the amount of 1204 m euros based solely on the Awards, without ever referring to the contracts listed in the Guarantee.

32. For the record, and as illustrated below, the Mazars Report presents an update, as of March 31, 2019, of the amounts awarded by the 2000 and 2013 Awards and the related arbitration costs, resulting in a total of 1,204 m euro.

33.

The **work of the Mazars firm** is **therefore based solely on the amounts awarded by the Awards, taken as they stand, without any reference to the contracts** listed in the Guarantee being made in its report.

34 The diagram below illustrates this point:





*Source : page 3 du Rapport Mazars*



**2.4** The information presented in **the** Mazars **Report** does not allow **establish a link** between the amount of 1204 m euros and the guarantee

35  It should be noted that the task entrusted to Mazars was to "calculate *the unconsolidated* amount *as of* March *31, 2019 of the Republic of Congo's debt to Commisimpex* **as established** by { ...*} the* **"2000 Award"***[* ...*] the* **'2013 Award"** a**nd this, "***In the context of the dispute between [*...*]* **Commisimpex [**...*] and the* **Republic *of Congo*,"** as specified in the summary of the Mazars Report (*bold added).*

36. In this context, Mazars takes as the starting point for its updating work (i) the sums awarded by the 2000 Award and their breakdown by promissory note as provided in the appendix to said Award, (ii) the sums awarded by the 2013 Award, and (iii) the arbitration costs relating to both Awards.

37- As already indicated, Mazars makes no reference to the Guarantee or the underlying contracts, either in its Report or in its appendices.

38. As it stands, **nothing in the Mazars Report therefore allows us to know whether the alleged amount of the Claim of** 1204 m euros **is likely to be linked to the contracts covered by the Guarantee.**

39. The appendices to the Mazars Report provide details of the Debt by promissory note, but without providing any indication of the contracts to which the notes may relate.

**4 In conclusion, it is not possible, on the basis of the Mazars Report alone, to establish a link** between **the amount of** 1204 m euros and the eleven **contracts covered by** the Guarantee.

41. We will therefore seek, in the remainder of this report, to analyze the consistency of the link established by COMMISIMPEX between the alleged amount of the Claim and the Guarantee, based directly on the details of the 2000 and 2013 Awards (the conclusions of which are simply repeated in the Mazars Report) and any other documents submitted for consideration in relation thereto.





# 3. Putting the 2000 Award into perspective with the Guarantee

## 3.1 The main amounts awarded by the 2000 Award **relate** to **the amounts of the** promissory **notes owed to Commisimpex**

42. As a reminder, following the breach of the 1992 Protocol, COMMISIMPEX initiated arbitration proceedings against the Republic of Congo under the auspices of the ICC.

43 This was followed by the 2000 Award condemning the Republic of Congo and the CCA jointly and severally to pay principal amounts, expressed in various currencies, corresponding to *the* "*balances due and payable* under *Protocol* No. 566 of 1992)" as illustrated in the following excerpt from the Award:



*Source: page 67 of the 2000 award, PwC analysis.*

### 3.1.1 Origin of the amount in FCFA

44- With regard to the amount of1427mFCFA approximately granted by the 2000 Award *(cf. previous diagram* B), and as illustrated below, it should be noted that this amount corresponds very precisely to that expressed in FCFA in Article I of the Protocol of 1992.



ARTICLE 1 : MONTANT DE LA DETTE

Le total des différentes dettes au 31 octobre 1992 est arrêté, en monnaie d'origine, aux montants ci-après :

A.    50.592.081,53 francs français ( cinquante millions cinq cent quatre-vingt douze mille quatre-vingt un francs et cinquante-trois centimes)

B.    21.201.872,76 livres sterlings (vingt-et-un millions deux cent un mille huit cent soixante-douze livres soixante-seize pounds)

C.    34.521.293,24 dollars U.S.(trente-quatre millions cinq cent vingt-et-un mille deux cent quatre-vingt-treize dollars vingt-quatre cents)

B    1.426.623.801    francs CFA (un milliard quatre cent vingt-six millions six cent vingt-trois mille huit cent un)

*Source : page 3 du Protocole de 1992, analyse PwC.*

45    However, the text of the Protocol (nor, for that matter, the 2000 Award) does not provide any information enabling the exact nature of this amount to be understood.

46. In fact, the 2000 Award only indicates, in footnote 26, that this amount "*had not* been previously used to subscribe *for promissory notes* [...] [and] *did not appear to have been subject* to any *discount* or *haircut.*"

47    Consequently, in the absence of other information at our disposal, we can consider that the **amount granted in CFA francs by the 2000 Award is not,** as it stands, **related** to **the Guarantee,** especially since none of the eleven contracts
listed in the Guarantee is expressed, as we have seen, in CFA francs.

48. We will therefore focus in the remainder of this report on the other amounts expressed in the 2000 Award in FRF, GBP, and USD.

### 3.1.2    Origin of the amounts   in FRF, GBP, and USD

49.    Based on the details provided in the 2000 Award, we note that the **amounts awarded** in **FRF, GBP, and USD** (i.e., excluding FCFA) **result from the application of a discount of 25% to the amounts of the promissory notes** that were, according to the terms of the Award, **returned** by COMMISIMPEX to the Republic of Congo, as illustrated in the following excerpt:



**pwc**



Les conséquences de la restitution d'anciens billets à ordre pour des montants inférieurs à ceux prévus par le Protocole n° 566 doivent maintenant être dégagées (bien entendu, seulement en actualisé).

| Billets à restituer: | | Billets restitués: | | Manquants en anciens BO: | |
|---|---|---|---|---|---|
| FRF | 67.456.108 | 29.489.637 | | 37.966.471 | |
| GBP | 28.269.162 | 18.939.772 | A' | 9.329.390 | (FRF 76.253.769) |
| USD | 46.028.388 | 31.161.701 | | 14.866.687 | (FRF 77.529.772) |
| tot. FRF | 538.552.147 | 346.802.137 | | 191.750.012 | |

L'exécution du protocole ne doit donc se faire que partiellement (tant sur le plan extra-cambiaire que sur le plan cambiaire) en déduisant des montants équivalents aux manquants précités (réduits évidemment de la décote de 25%, pour assurer la cohérence de la déduction), ce qui donne les résultats suivants:

*Application d'une décote de 25%*

*Montants stipulés par le Protocole de 1992*

| Protocole, article 1: | | A déduire: | Soldes dus exécutables: | |
|---|---|---|---|---|
| FRF | 50.592.081 | 28.474.853 | 22.117.228 | A |
| GBP | 21.201.872 | 6.997.043 | 14.204.829 | |
| USD | 34.521.293 | 11.150.015 | 23.371.278 | |
| B | FCFA 1.426.623.801 | | 1.426.623.801 | B |
| tot. FRF | 432.446.601 | 143.812.523 | 288.634.078 | |

*Montants accordés par la Sentence de 2000*

## 3.2 The promissory notes returned in the 2000 Award originated from the analysis conducted in the Ricol Report

5- In the arbitration proceedings that led to the 2000 Award, the arbitral tribunal appointed Mr. René Ricol (hereinafter the "Expert") in particular to

"*Provide* his *technical opinion to enable the arbitral* tribunal *to* determine, *in the appropriate decisions, the exact, total and updated* amount *of the claims* between, on *the one hand, COMMISIMPEX and, on the other hand, the REPUBLIC OF CONGO and the CONGOLESE SOCIAL SECURITY FUND as at October 31, 1992* [... ]

51. Thus, in his report dated April 14, 2000 (hereinafter the "Ricol Report"), the Expert reviews the disputed contracts and amendments, based on the information in the file made available to him and the arguments of the parties, and then gives his opinion on the non-performance, total or partial performance of said contracts and amendments.



52.　The Expert then summarizes his conclusions in the table below (hereinafter the "Summary Table"), specifying that:

- the claims considered certain by the Expert are those listed in columns (a) and (c) of his Summary Table, and that their discounting as of October 31, 2002 gives rise to the amounts shown in columns (b) and (d);

- The claims presented in columns (e) and (f) are subject to the assessment of the arbitral tribunal (without and with discounting to October 31, 1992, respectively).

Summary table of assumptions used to calculate the claims of the parties

| Devise | Billets restitués non actualisés (a) | Billets restitués actualisés au 31/10/1992 (b) | Supplément de prix non actualisé (c) | Supplément de prix actualisé au 31/10/1992 (d) | Billets ni réglés ni restitués non actualisés (e) | Billets ni réglés ni restitués actualisés au 31/10/1992 (f) |
|---|---|---|---|---|---|---|
| en FF | 17 216 381 | 29 489 637 | | | 61 397 336 | 120 655 472 |
| en USD | 18 798 738 | 31 161 701 | A² | | 1 181 602 | 2 143 899 |
| en GPB | 15 521 332 | 18 939 772 | | | 9 720 245 | 21 049 690 |
| en FCFA | | | 1 486 441 948 | 2 466 703 689 | | |

Créances considérées comme certaines par l'Expert　　　Créances soumises à l'appréciation du Tribunal arbitral

Source: pages s• of the Ricol Report, *PwC analysis.*

53.　In particular, the Expert retains, among the certain claims, the amounts of the "*Discounted returned notes* 31 10 1992 expressed in FRF, GBP, and USD (see column *(b)* of *the Summary Table),* which amounts **correspond** precisely to those **awarded, after application of a discount of 25%, by the 2000 Award.**

## 3.3　Based on the Ricol Report, the main amounts awarded by the 2000 Award concern seven of the eleven contracts covered by the Guarantee.

54.　Based on the detailed analysis presented in the Ricol Report, in this section we will seek to determine which contracts or amendments are implicitly included in the amounts awarded by the Award in FRF, GBP, and USD, and whether there is a link with the Contracts covered by the Guarantee.



### 3.3.1    Scope of the contract analysis by the Ricol Report

55.    On page 26, the Ricol Report presents a table listing "*the contracts selected by the expert to* determine *the* claims *between the parties,"* which correspond to the contracts on which *"the parties, at the meeting of December 21, 1999 (annex 3) expressed their agreement* as *to the existence, number, date of signature,* purpose*, and* amount [...] "*7*

56.    However, it should be noted that the Expert makes **no reference to the Guarantee** in his Report or in its Annex 3.

57.    We therefore sought to identify whether any of the contracts covered by the Guarantee included among the contracts selected by the Expert for the purposes of his analysis were and, to that end, we compared the wording used by the Expert with the designation of the Contract as it appears in the Guarantee.

58.    The correspondence between the first ten contracts cited in the Guarantee and the contracts selected by the Expert was established through the reconciliation exercise we conducted. The only exception to this exercise concerns Contract No. 11 in the Guarantee, which we believe corresponds to the contract selected by the Expert under the heading "*Protocol* No. *461,"* although their respective wording and dates differ.

59-    Indeed, according to the Ricol Report (on page 22), "Protocol No. 461" "relates to the repayment terms of the credit guarantee put in place by COMMISIMPEX, through the intermediary of [...] BCCI, to enable APV Hall to acquire deforestation and clearing equipment as part of the Etoumbi-Kunda palm grove redevelopment project."."

60.    This information appears to be consistent with that relating to "*Guarantee* No. 5166-85 *(* i.e. Contract No. 11), as can be seen from Protocol No. 461, which COMMISIMPEX provided after being summoned in the proceedings before the Nanterre Commercial Court (*Exhibit COMMISIMPEX •96* ) . Furthermore, *"Protocol 461"* and the "Guarantee No. *5166-85* are presented jointly in the "*Detailed* calculation *sheet on the debt of the Republic* of *Congo"* (see COMMISIMPEX document no. *4 on page 2).*

---

7    *Cf.* pages 16 of *the Ricol Report.*



61.  Below we present the results of the reconciliation exercise carried out on the basis of the Ricol Report:

| Marché | Date | Nature | Devise | Montant | Correspondance avec la Garantie | Ecarts avec la Garantie |
|---|---|---|---|---|---|---|
| Marché 009/86/G | 12/02/86 | assainissement Mpila (la congolaise) et Plateaux | FF | 14 812 000 | Marché n°4 | |
| Marché 015/86 | 24/03/86 | travaux anti-érosifs du Camp militaire du 15 août | FF | 18 868 500 | Marché n°5 | |
| Marché 53/86 | 01/07/86 | aménagement du Camp du 15 août | FCFA | 1 204 934 500 | Marché n°7 | Devise (USD) et date (08/07/86) |
| Avenant n°1 55/86 | 08/07/86 | marché 15/86/G/PR | FCFA | 230 914 400 | Marché n°8 | Devise (FRF) |
| Avenant n°4 54/86 | 08/07/86 | marché 353/83 CT révision des prix relatifs avenants 1 et 3 | £ | 2 751 344 | Marché n°6 | |
| Avenant n°5 57/86 | 08/07/86 | marché 353/83 CT portant révision des prix | £ | 7 889 390 | Marché n°9 | Montant (écart non significatif) |
| Avenant 1 n°107/84 | 05/04/84 | projet Palmiers à huile Etoumbi-Nkounda n°353/83/CT | | | Marché n°1 | |
| | | • Marché initial | £ | 5 638 000 | | |
| | | • Supplément de prix au 31/12/1987 | FCFA | 1 486 441 948 | | Ne figure pas dans la Garantie |
| Avenant 3 n°127/84 | 05/05/84 | projet Palmiers à huile Etoumbi-Nkounda n°353/83/CT | £ | 8 457 000 | Marché n°2 | Date (05/06/84) |
| Protocole n°461 | 27/06/87 | modalités de remboursement de la garantie de crédit mise en place par Commisimpex | £ | 12 818 000 | Marché n°11 | Libellé et date |
| Marché 185/841 | 25/06/84 | construction de 2 villages des travailleurs à Mokéko | £ | 8 653 000 | | Ne figure pas dans la Garantie |
| Marché 83/85/ | 24/06/85 | ravins de Kisoundi, Mpila et Makélékélé | USD | 5 450 534 | Marché n°3 | Devise (FRF) et date (25/06/85) |
| Avenant 56/86 | 08/07/86 | marché 83/85/AO/PR, travaux de Makélékélé | FCFA | 377 456 228 | Marché n°10 | Devise (FRF) |

*Source: page s6 of the Ricol report, PC analysis.*

62.  On this basis, it appears that the eleven contracts covered by the Guarantee are indeed included in the scope of the contracts and amendments that were analyzed by the Expert and *"used as a basis for calculating the claims between the parties."*

63.  Consequently, in the remainder of this section, we will focus on identifying the Guarantee contracts that will *ultimately* be retained by the Expert as certain claims between the

 . 3.3.2.   The Contracts of the Guarantee are accounted by the 2000 Award

64 The Ricol Report refers to Appendix 45 for details of the amounts of claims considered certain (column (b) of its Summary Table below) which, as a reminder, are the basis for the amounts awarded by the 2000 Award in FRF, USD, and GBP *(see section 3.2).*

---

※  *It should be noted that the same reconciliation was carried out by Commisimpex on page of the conclusions of COMMISIMIPEX, dated September 9, 2020.*



65. Referring to Appendix 45, we note that these claims relate to seven Guarantee Contracts, as detailed below *(see Appendix to this report):*



Summary table of assumptions used to calculate receivables from loans

| Devise | Billets restitués non actualisés | Billets restitués actualisés au 31/10/1992 | Supplément de prix non actualisé | Supplément de prix actualisé au 31/10/1992 | Billets ni réglés ni restitués non actualisés | Billets ni réglés ni restitués actualisés au 31/10/1992 |
|---|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | (e) | (f) |
| en FF | 17 216 381 | 29 489 637 | | | 61 397 336 | 120 655 472 |
| en USD | 18 798 738 | 31 161 701 | | | 1 181 602 | 2 143 899 |
| en GPB | 15 521 332 | 18 939 772 | | | 9 720 245 | 21 049 690 |
| en FCFA | | | 1 486 441 948 | 2 466 703 689 | | |

*Créances considérées comme certaines par l'Expert*

**Détail présenté en annexe 45 du Rapport Ricol**
*Marchés de la Garantie pris en compte*

Marchés n°4 et 5
Marchés n°6, 7, 8 et 9
Marché n°11

*Source: page 5• and Annex 45 of the Ricol Report, PwC Analysis.*

66. Our analysis of the Ricol Report therefore shows that the amounts awarded by the 2000 Award in FRF, USD, and GBP relate to seven of the eleven contracts covered by the Guarantee.

67. In conclusion, the Ricol Report provides a thorough analysis of all eleven Guarantee Contracts and considers that the performance of seven of the eleven Contracts is certain, up to the amounts shown in column (b) of the Summary Table drawn up by the Expert.

68. It is precisely these amounts that will be awarded, after discount, by the 2000 Award in FRF, GBP, and USD (i.e., excluding the amount awarded in FCFA).

---

9 We will *not* take *into account the* amount in *CFA francs for the reasons indicated* in *section 3.1.1 of* this *report.*



## 4- Relevance of the alleged amount of the Claim of 1204 m Euros in light of the Guarantee and the Award of

### 4.1 The amounts awarded by the 2000 Award correspond to *"executable balances"* according to the 1992 Protocol the

69. For the record, the 2000 Award followed the breach of the 1992 Protocol and jointly ordered the Republic of Congo and the CCA to pay the "*balances due under Protocol No. 566*" expressed in various currencies, as illustrated below:



*Source : page 53 de la Sentence de 2000, analyse PwC.*

70. More specifically, the 2000 Award grants:

- in CFA francs, an amount ([B]) corresponding exactly to that stipulated in the 1992 Protocol, as explained above *(see section 3.1.1)*;

- in FRF, GBP, and USD, amounts ([A]) originating from those stipulated by the 1992 Protocol, as illustrated by the following excerpt from the Award:



*Source : page 53 de la Sentence de 2000, analyse PwC.*



71. Thus, the amounts awarded by the 2000Award correspond **exhaustively to the balance due, according to the arbitrators, on the contracts, as determined in the 1992 Protocol.**

**4.2** The claim on which the 2013 Award is based is entirely separate from that referred to in the 1992 Protocol and unrelated to the Guarantee.

72. In paragraphs 5 and 6, the 2013Award states:

• states, with reference to the arbitration proceedings on which the said Award rules, that "The present dispute concerns the effects of the 2003 Protocol";

• recalls that "The 2003 Protocol set out the terms for repayment of the debt of the Republic of Congo, which had increased considerably compared to the 1992 Protocol and was valued at 48 billion CFA francs as of September 30, 1992. The 2003 Protocol described "the debt of the State of Congo" as being composed of a "first part" of 22 billion CFA francs, "the subject of the [1992] Protocol," and a "second part" of 26 billion CFA francs" (emphasis added).

73 In this context, the 2013 Award specifies that "In the 2003 Protocol, the Republic of Congo makes the financial commitments" as stipulated by Articles 1 to 4 of the said Protocol, and specifies that "These four articles cover the two components of the debt of the Republic of Congo as of September 30, 1992, as confirmed in the Preamble to the Protocol: FRF 440,000,000 referred to as the objects of the 1992 Protocol [and objects of Article 1 of the 2003 Protocol] and FRF 520,000,000 [objects of Articles 3 and 4]" 10 , i.e., the equivalent of FCFA 22 million and FCFA 26 million respectively (emphasis added)

74 However, with regard to "a. the debt of 440,000,000 FRF (Article 1 of the 2003 Protocol)", "The Arbitral Tribunal notes [...] on the one hand that the total amount of the debt assumed by the Republic of Congo up to the commitment of the 1992 Protocol is that fixed by the 2000 Award and on the other hand that Commisimpex requests it to deduct this total amount from the condemnations that the Arbitral Tribunal would pronounce in its favor in the present case"

---



*procedure. Consequently, the Arbitral Tribunal will find that the amounts owed by the Republic of Congo under Article 1 of the 2003 Protocol are those awarded to it by the 2000 Award, will acknowledge Commisimpex's request to deduct these amounts from any awards made by the Arbitral Tribunal and, having made this deduction, **will not issue any award under Article 1 of the 2003 Protocol** [relating to the amount of 22 million FCFA]" (see paragraph 310 of the 2013 Award) (emphasis added).*

75        Thus, the Award of 213 does not rule in any way on the amount of 22 **MFCFA, which is the subject of the 1992 Protocol, considering that the** amount **of the debt owed under this Protocol was definitively set by the Award** of 2000.

76.    With regard to "b. *The debt of 520,000,000 FRF (Articles 3 and 4 of the Protocol of 2003,"* the 2013 Award states that "**the** Republic of ***Congo must pay*** Commisimpex the sum *of 520,000,000 FRF (...) plus interest of 941,141,586 FRF or 222.749,598.82 euros "plus* **interest** *at 10%* *per annum with annual capitalization* on *December 31, for the period between December 1, 2003 and* until *full payment" (see paragraphs 11 and 16 of the 2013 Award) (bold type* added).

77    It is in this sense that on the last page of the 2013 Award. "the arbitral tribunal [...]:

> *8) Notes that the amounts owed by the Republic of Congo under Article 1 of the Protocol of 23 August 2003 [22 MFCF A objects of the 1992 Protocol]*
>
> *10) Orders the Republic of Congo to pay Commisimpex, pursuant to Articles 2 and 3 of the Protocol of 23 August 2003, the sum of 222,749,598.82 Euros plus interest of 10% per year with annual capitalization as of 31 December*".

78.    Thus, the Award of 2013 relates exclusively to a debt amounting to **26 MFCFA, which is unrelated to the contracts covered by the Guarantee.**

79    In conclusion, the awards in 2000 and 2013 relate to two of debt that are entirely distinct, including in their origin



4-3  Ultimately, only an amount of 234 m euros, or 19% of the alleged amount of 1204 m euros, could be accounted to the contracts in the Guarantee

8o. For reference, the Mazars Report presents an update, as of March 31, 2019, of the amounts in the 2000 and 2013 Awards and the related arbitration costs, resulting in a total of 1 204 m€.

81. However, as explained above:

the 2000 Award is implicitly based on an analysis of all the Contracts covered by the Guarantee (via the Ricol Report) *(see* section 3);

the 2013 Award relates to a claim amount that is entirely separate from that on which the 2000 Award ruled *(see section* q).

82.   It follows that **the Claim** asserted **under the Guarantee cannot exceed the discounted amount of the sums awarded by** the 2000 Award, **as established** in the **Mazars Report,** since that amount is the result of an analysis conducted on all of the Guarantee                          .

83. We therefore conclude that the amounts awarded by the 2013 Award and the related arbitration costs cannot be included in the Claim alleged by COMMISIMPEX because they are unrelated to the Guarantee.

84- More specifically, and as illustrated below, the Claim should be limited to the amount of €234 million, corresponding to the updated amount of the sums awarded by the 2000 Award and the related arbitration costs, as shown in the Mazars Report12, i.e. €246 million, reduced by:

---

[11] With the exception of the amount of 1,427 million FCFA awarded by the 2000 Award, which was not analyzed in the Ricol Report, according to our understanding, and which does not concern the contracts covered by the Guarantee.
[12] This is the sum of the totals presented in the last boxes of "Table 4" and "Table 7" respectively on pages 11 and 15 of the Mazars Report (COMMTSIMPEX Exhibit No. 97).



i.  of approximately €11 million corresponding to the update by Mazars of the amount awarded in FCFA 14d in the 2000 Award, which we consider not related to the Guarantee based on the information available to us (see section 3.1.1);

ii. of approximately €1 million corresponding to the update by Mazars of the amount of arbitration costs relating to the 2000 Award, based on the



principle that the Guarantee does not provide for the coverage of such costs.

85.  Furthermore, and in addition to this reconciliation work, with regard to the discounting calculations performed by Mazars, we have not identified any anomalies that could have a significant impact on the results obtained.

86.  However, we were unable to corroborate the accuracy of all the usury rates used in calculating late payment interest, as listed in Appendix 3 of the Mazars Report, due to a lack of data from the Banque de France that would have been used for this purpose.

---

13 See last line of "Table 4" on page 11 of the Mazars Report (Exhibit Commisimpex n°97).

14 For clarification, Mazars uses the principal amount of 1,070 million FCFA as the basis for its discounting calculation, and not the amount of 1,427 million FCFA as awarded by the 2000 Award, considering that "the Arbitral Tribunal's award in the 2000 Award only applied to the promissory notes due on June 3, 2000 (including the June 3, 2000 maturity date), i.e., 1,069,967,851 FCFA" (see Part II.1 of the Mazars Report - Exhibit COMMISIMPEX No. 17)

15 S ee total shown in the last column of the "Table" on page 15 of the Mazars Report (Exhibit **COMMISIMPEX** No. 97



## 5. General conclusion

Without ever demonstrating it, COMMISIMPEX considers that there is a link between the Guarantee and the amount of the Claim of 1 204 m€,, which is the result of a discount calculation presented in the Mazars Report.

However, this calculation is based on the amounts awarded by the 2000 and 2013 Awards without any reference to the Guarantee or any of the eleven contracts referred to therein. **It is therefore impossible, on the basis of the Mazars Report, to establish any correspondence between the alleged amount of the Claim and the Guarantee.**

In these circumstances, we have therefore sought to critically analyze the assumption made by COMMISIMPEX, based on the information available in the 2000 and 2013 Awards. This leads to the following two points:

9O. On the one hand, the 2000 Award grants the "*balances due enforceable* under *the Protocol* [of 1992],*"* expressed in various currencies.

91. On the other hand, the 2013 Award "finds *that the amounts owed by the Republic* of *Congo* under *the main body of the Protocol of August 3, 2003* [subject matter of the 1992 Protocol] are *those that were awarded by the* 2000 Award *of December 3, 2000"* and therefore therefore does not impose any penalty under the Protocol of 1992.

**92. Thus, the 2000 and 2013 Awards concern two entirely distinct types of claims.**

**93.** However, the amounts awarded by the 2 0 0 0 Award in FRF, GBP, and USD result from the application of a 25% discount to the amounts of the promissory notes considered to have been returned by COMMISIMPEX, which notes were determined by the Expert appointed by the arbitration tribunal, namely Mr. René Ricol, based on his analysis of all the covered by the Guarantee.

94 **Thus, the 2 0 0 0 Award awards amounts in different currencies resulting from the analysis of all the Contracts covered by the Guarantee.**



95    It follows that **the Claim against the Republic of Congo** under the **Guarantee cannot, in these circumstances, exceed the discounted amount** of the sums **awarded** by the 20000 Award in **FRF, GBP, and USD,** as established in the Mazars Report, since only that amount results from an analysis conducted on all of the Guarantee Contracts.

96. *Conversely,* **the sums awarded** by **the 2013 Award and the** related arbitration **costs** cannot be included in the Claim alleged by **COMMISIMPEX, as they are unrelated to the** Contracts **covered by the Guarantee.**

97    More specifically, and as illustrated below, the Claim should be **limited to** the amount of 234 m Euros**, corresponding to** the **discounted** amount **of the sums awarded by the 2000** Award **and the related arbitration costs,** as set **out in the Mazars Report, i.e.,** 246 million francs, reduced:

> approximately 11 m€ corresponding to the discounting by Mazars of the amount awarded in FCFA in the 2000 Award, which, as we have demonstrated, is not related to the Guarantee;

> approximately 1 m€ corresponding to the discounting by Mazars of the amount of arbitration costs relating to the 2000 Award, on the assumption that the Guarantee does not provide for the payment of such costs.



<div style="border: 1px solid black; padding: 20px;">

Appendix


PwC analysis of Appendix 4    of the Ricol Report

</div>

# APPENDIX 45

| Marché | numéro | Billet à ordre échéance | devise | restitué | 31/12/87 | 31/12/88 | Actualisation 31/12/89 | 31/12/90 | 31/12/91 | 31/10/92 | Créance actualisée |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Marché n°4 de la Garantie** — M 009/86 | P 1007 | 01/01/87 | FF | 2 468 666 | 253 038 | 278 975 | 338 327 | 385 655 | 416 231 | 374 406 | 4 515 297 |
| | P 1008 | 01/07/87 | FF | 2 468 666 | 126 519 | 266 006 | 322 599 | 367 728 | 396 882 | 357 001 | 4 305 402 |
| | P 1009 | 01/01/88 | FF | 2 468 666 | | 253 038 | 306 872 | 349 801 | 377 534 | 339 597 | 4 095 508 |
| | | | | 7 405 998 | | | | | | | 12 916 207 A |
| | I 627 | 01/01/87 | FF | 559 564 | 57 355 | 63 234 | 76 687 | 87 415 | 94 346 | 84 865 | 1 023 467 |
| | I 628 | 01/07/87 | FF | 460 818 | 23 617 | 49 655 | 60 219 | 68 643 | 74 085 | 66 640 | 803 676 |
| | I 629 | 01/01/88 | FF | 362 071 | | 37 112 | 45 008 | 51 304 | 55 372 | 49 808 | 600 674 |
| | | | | 1 382 453 | | | | | | | 2 427 817 B |
| **Marché n°5 de la Garantie** — M 015/86 | P 1118 | 05/07/87 | FF | 3 144 750 | 156 692 | 338 398 | 410 392 | 467 802 | 504 890 | 454 156 | 5 477 079 |
| | P 1120 | 05/07/88 | FF | 3 144 750 | | 156 692 | 372 238 | 424 310 | 457 950 | 411 933 | 4 967 872 |
| | | | | 6 289 500 | | | | | | | 10 444 951 C |
| | I 635 | 05/01/87 | FF | 838 600 | 84 763 | 94 645 | 114 780 | 130 837 | 141 210 | 127 020 | 1 531 855 |
| | I 636 | 05/07/87 | FF | 712 810 | 35 517 | 76 703 | 93 022 | 106 035 | 114 442 | 102 942 | 1 241 471 |
| | I 638 | 05/07/88 | FF | 587 020 | | 29 249 | 69 484 | 79 205 | 85 484 | 76 894 | 927 336 |
| | | | | 2 138 430 | | | | | | | 3 700 663 D |

A + B + C + D =     FF

The total amount of bills returned,
discounted as of 10/31/1992, relating to
No. 4 and 5 of the Guarantee

| | Marchi! numero | Billet ◆ ordre echeance | devise | restitue | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Marche n°7 de la Garantie** M 53/86 | P 1173 | 01/01/87 | USD | 582 094 | 59665 | 65 780 | 79775 | 90935 | 98144 | 88282 | 1064675 | |
| | P1174 | 01/07/87 | USD | 582 094 | 29832 | 62 *721* | 76067 | 86708 | 93582 | 84178 | 1015181 | |
| | P1175 | 01/01/88 | USO | 582 094 | | 59 665 | 72358 | 82481 | 89020 | 80075 | 965692 | |
| | | | | 1746282 | | | | | | | 3045550 | E |
| | **1684** | 01/01/87 | USD | 122 240 | 12 530 | 13 814 | 16753 | 19096 | 20610 | 18 539 | 223 582 | |
| | 1685 | 01/07/87 | USD | 101 866 | 5221 | 10 976 | 13312 | 15174 | 16 377 | 14 731 | 1776◆ | |
| | 1686 | 01/01/88 | USO | 81493 | | 8353 | 10130 | 11547 | 12463 | 11210 | 135197 | |
| | 1687 | 01/07/88 | USD | 61120 | | 3132 | 7244 | **8258** | 8 913 | 8 017 | **96684** | |
| | | | | 366 719 | | | | | | | 633120 | F |
| **Marchen"8 de la Garantie** 55/86 | Pll72 | 08/01/87 | USD | 669 317 | 67080 | 75 481 | 91 539 | 104345 | 112 617 | 101 301 | 1 221 681 | |
| | I 683 | 08/01/87 | USD | 19 477 | 1952 | 2 196 | 2664 | 3036 | 3277 | 2948 | 35 551 | |
| **Marche n°6 de la Garantie** A4 **54/86** | P1168 | 06/(11/87 | USD | 1045 510,70 | 51 796 | 112474 | 136 403 | 155 484 | 167 811 | 150 9,9 | **1820428** | |
| | P1169 | 06/01/88 | USD | 1045510,70 | | 105379 | 129 763 | 147915 | 159642 | 143 601 | 1731811 | |
| | | | | 21191 021 | | | | | | | 3552 239 | I |
| | I 685/679 | 06/07/87 | USD | 141143,94 | 6 993 | 15184 | 18 414 | 20990 | 22655 | 20378 | 245758 | |
| | J 686/680 | 06/01/88 | USO | 94095,96 | | 9484 | 11679 | 13312 | 14368 | 12 924 | 155863 | |
| | | | | 235240 | | | | | | | 401621 | J |

| MarcM | | numEro | Billet ii ordre EchEance | devise | restituE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Marche n°9 dela Garantie | 5 57/86 | P 1161 | 08/01/87 | USO | 1998 637,61 | 200 308 | 225 392 | 273 344 | 311 582 | 336 285 | 302 493 | 3648 042 | |
| | | P 1162 | 08/07/87 | USO | 1998637,61 | 97'878 | 214 893 | 260 611 | 297068 | 320621 | 288403 | 3478111 | |
| | | P1163 | 08/01/88 | USO | 1998 637,61 | | 200308 | 247931 | 282614 | 305021 | 274 370 | **3308882** | |
| | | P1164 | 08/07/88 | USO | **1998** 637,61 | | 97 878 | 236 382 | 269 450 | 290 812 | 261590 | 3154 749 | |
| | | P 1165 | 08/01/89 | USD | 1998637,61 | | | 220339 | 256292 | 276611 | 248 816 | 3 000695 | |
| | | P 1166 | 08/07/89 | USO | 1998 637,61 | | | 107 665 | 243 278 | 262 566 | 236182 | **2848 328** | |
| | | | | | 11991826 | | | | | | | 19 438808 | K |
| | | 1672 | 08/01/87 | USD | 479 673 | 48 074 | 54 094 | 65603 | 74 780 | 80708 | 72 598 | 875 530 | |
| | | 1673 | 08/07/87 | USO | 399 728 | 19 576 | 42979 | 52122 | 59414 | 64124 | 57681 | 695 622 | |
| | | 1674 | 08/01/88 | USO | 319 782 | | 32049 | 39 669 | 45 218 | 48803 | 43 899 | 529 421 | |
| | | I 675 | 08/07/88 | USO | 239 837 | | 11 745 | 28366 | 32334 | 34 897 | 31 391 | 378570 | |
| | | 1676 | 08/01/89 | USO | 159 891 | | | 17 627 | 20503 | 22129 | 19905 | 240056 | |
| | | 1677 | 08/07/89 | USO | 79946 | | | 4 307 | 9 731 | 10503 | **9 447** | 113933 | |
| | | | | | 1678 856 | | | | | | | 2833132 | L |

E + F + G + H + I + J + K + L = 31 161 701 USD

Soit le montant total des billets restitues
actualises au 31/10/1992 serattachant
aux Marches n°6, 7, 8 et 9 de la Garantie

Marche 11°11

| Marche de la Garantie | numero | Billet A ordre ecMance | devise | restitue | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Proiocole 461 | P1278 | 30/06/88 | £ | 1 068163 | 55 047 | 126 642 | 144 358 | 155 803 | 140 147 | 1690160 |
| | PI280 | 30/06/89 | £ | 1068167 | | 60552 | 130 367 | 140 703 | 126 564 | 1526 354 |
| | PI281 | 30/12/89 | £ | 1 068167 | | 335 | 123 412 | 133 196 | 119 812 | 1444922 |
| | P 1282 | 30/06/90 | £ | 1 068167 | | | 62029 | 126 299 | 113 608 | 1370104 |
| | P 1283 | 30/12/90 | £ | 1 068167 | | | 343 | 119 406 | 107 407 | 1295 323 |
| | P1284 | 30/06/91 | £ | 1 068167 | | | | 60 015 | 102 006 | 1230189 |
| | P1285 | 30/12/91 | £ | 1 068167 | | | | 332 | 96 610 | 1165109 |
| | P1286 | 30/06/92 | £ | 1068167 | | | | | 58 270 | 1126 437 |
| | P1287 | 30/12/92 | £ | 1068167 | | | | | | 1 068167 |
| | P 1288 | 30/06/93 | £ | 1068167 | | | | | | 1068167 |
| | P 1289 | 30/12/93 | £ | 1068167 | | | | | | 1068167 |
| | | | | 11 749833 | | | | | | 14053099  M |
| | 1807 | 30/06/88 | £ | 576 810 | 29 726 | 68387 | 77954 | 84134 | 75680 | 912690 |
| | 1809 | 30/06/89 | £ | 480675 | | 27 249 | 58665 | 63316 | 56954 | 686859 |
| | 1810 | 30/12/89 | £ | 432 607 | | 135 | 49982 | 53944 | 48524 | 585192 |
| | 1811 | 30/06/90 | £ | 384 540 | | | 22331 | 45468 | 40899 | 493 237 |
| | 1812 | 30/12/90 | £ | 336 472 | | | 108 | 37613 | 33833 | 408 026 |
| | 1814 | 30/12/91 | £ | 240 337 | | | | 13503 | 22 951 | 276 792 |
| | 1815 | 30/06/92 | £ | 192 270 | | | | 60 | 17 390 | 209 719 |
| | 1816 | 30/12/92 | £ | 144 202 | | | | | 7866 | 152 068 |
| | 1817 | 30/06/93 | £ | 96135 | | | | | | 96135 |
| | 1818 | 30/12/93 | £ | 48 067 | | | | | | 48067 |
| | | | | 2932 115 | | | | | | 3868786  N |
| art 3 du protocole | I819 | 30/12/90 | £ | 839 384 | | | 269 | 93831 | 84403 | 1017 887  O |
| Avenants 1 et 3 | solde | 31/12/87 | FCFA | 1486 441948 | 423 223 | 152403680 | 184 827 563 | 210683136 | 227 386 615 | 204537 524 |

M+N+O  =  18 939 772 GBP

Soit le montant total des billets restitues actualises au 31/10/1992 se rattachant au Marche n°u de la Garantie