Exhibit 16

# Analyse du rapport du cabinet PWC dans le cadre du contentieux opposant la société Commissions Import Expert aux sociétés TotalEnergies SE, TotalEnergies E&P Congo et TotalEnergies Holding SAS

## septembre 2021

Cabinet Didier Kling Expertise & Conseil
28 Avenue Hoche
75008 Paris

# Sommaire

1. Liminaire .................................................................................................................. 2

1.1 Contexte ............................................................................................................... 2
1.2 Mission ................................................................................................................. 2
1.3 Présentation du cabinet Didier Kling Expertise & Conseil et des auteurs du présent rapport ........... 3
1.4 Diligences et réserves .............................................................................................. 3
1.5 Glossaire .............................................................................................................. 4
1.6 Plan ..................................................................................................................... 4

2. Rappel des faits ........................................................................................................ 5

2.1 Les marchés et avenants conclus entre COMMISIMPEX et la République du Congo ........... 5
2.2 La Garantie ........................................................................................................... 7
2.3 La Fiche de calcul détaillée ....................................................................................... 8
2.4 Le Protocole de 1992 .............................................................................................. 9
2.5 La Sentence de 2000 ............................................................................................. 10
2.5.2 *La sentence du 3 décembre 2000* ......................................................................... 13
2.6 L'expertise du cabinet Ernst & Young daté du 25 septembre 2001 ................................... 13
2.7 Le Protocole de 2003 ............................................................................................ 15
2.8 La Sentence de 2013 ............................................................................................. 16

3. Détermination du montant qui aurait été dû par la République du Congo à COMMISIMPEX au titre des marchés visés par la Garantie sur la base de la Fiche de calcul à la date du 31 mars 2019 ............................................................................................................... 17

3.1 Présentation des éléments de calcul retenus ............................................................... 17
3.2 Présentation des résultats des calcul ......................................................................... 18
3.3 Analyse des écarts avec les conclusions du Rapport Mazars 2019 .................................. 19

4. Analyse des conclusions du Rapport PWC .................................................................. 21

4.1 Sur la conclusion du Rapport PWC selon laquelle le Rapport RICOL aurait considéré que l'exécution de seulement 7 des 11 marchés visés par la Garantie était certaine. ................ 21
4.2 Sur la conclusion du Rapport PWC selon laquelle la Sentence de 2000 porte sur des Marchés visés par la Garantie seulement à hauteur des sommes accordées en FRF, GBP et USD ........... 22
4.3 Sur la conclusion selon laquelle la Sentence de 2013 porte exclusivement sur la seconde partie de la dette de la République du Congo à l'égard de COMMISIMPEX visée dans le Protocole de 2003 d'un montant de 520 millions FRF (ou 26 milliards FCFA) qui est étrangère aux marchés visés par la Garantie ................................................................................ 24

5. Analyse de l'analyse de l'indépendance du cabinet PWC à l'égard des partis au présent litige ..................................................................................................................... 27

Conclusion ................................................................................................................... 29

# 1. Liminaire

## 1.1 Contexte

La société Commissions Import Export (ci-après, « **COMMISIMPEX** ») a conclu avec la République du Congo différents marchés et avenants de travaux publics au cours de la période allant de 1984 à 1986.

Le 22 décembre 1986, la République du Congo, afin de permettre à COMMISIMPEX d'assurer le financement nécessaire à la réalisation et à l'exécution de ces marchés et avenants, a octroyé une garantie de paiement (ci-après, la « **Garantie** ») aux termes de laquelle elle nantissait différents revenus pétroliers portant sur des champs exploités, notamment, par des filiales du Groupe Total.

COMMISIMPEX et la République du Congo ont conclu des protocoles pour organiser le règlement de la dette de la République du Congo à l'égard de COMMISIMPEX respectivement le 14 octobre 1992 (ci-après, le « **Protocole n°566** » ou le « **Protocole de 1992** ») et le 23 août 2003 (ci-après, le « **Protocole n°706** » ou le « **Protocole 2003** »).

COMMISIMPEX a engagé des procédures d'arbitrage à la suite du non-respect par la République du Congo du Protocole de 1992 et du Protocole de 2003, qui ont conduit, chacune, à la condamnation de la République du Congo (ci-après, les « **Condamnations** ») respectivement en 2000 (ci-après, la « **Sentence de 2000** ») et en 2013 (ci-après, la « **Sentence de 2013** »).

N'obtenant pas le paiement par la République du Congo du montant des Condamnations, COMMISIMPEX a assigné les sociétés TotalEnergies SE (anciennement Total SE), TotalEnergies E&P Congo (anciennement TotalEnergies E&P Congo) et TotalEnergies Holding SAS (anciennement Total Holding SAS, ci-après conjointement, le « **Groupe Total** » ou « **Total** »)

Dans le cadre de cette procédure, le Groupe Total a produit un rapport du cabinet PWC (ci-après, le « **Rapport PWC** »).

## 1.2 Mission

Le présent rapport a pour objet de rendre compte des conclusions de la mission, qui nous a été confiée par COMMISIMPEX dans le cadre du litige l'opposant au Groupe Total, qui consiste à :

- Déterminer le montant qui aurait été dû par la République du Congo à COMMISIMPEX au titre des marchés visés par la Garantie sur la base de la fiche de calcul détaillées communiquée par la Caisse congolaise d'amortissement (ci-après, la « **CCA** ») et le Ministère des Finances au Procureur de la République, au Procureur Général et au Ministère de la Justice en septembre 1991 (ci-après, la « **Fiche de calcul** ») au 31 mars 2019 en tenant compte du fait que (i) cette fiche déterminait la dette de la République du Congo à la date du 31 décembre 1986 et (ii) le taux d'intérêt indiqué dans la Garantie s'élevait à 10,5% ;

- Fournir une explication de l'écart entre le montant ainsi calculé et le montant indiqué dans le rapport du cabinet Mazars de 2019 (ci-après, le « **Rapport Mazars 2019** ») ;

- Donner notre avis sur les conclusions du Rapport PWC ;

- Donner notre avis sur l'indépendance du cabinet PWC à l'égard des parties au présent litige ;

- Donner notre avis sur le défaut de référence à la Garantie dans les calculés réalisés dans le Rapport Mazars 2019.

## 1.3 Présentation du cabinet Didier Kling Expertise & Conseil et des auteurs du présent rapport

Le cabinet Didier Kling Expertise & Conseil (ci-après, le « Cabinet Kling ») met en œuvre des compétences multiples en matière économique, comptable et financière afin de répondre aux problèmes complexes de ses clients qui nécessitent l'émission d'un avis indépendant dans un contexte d'évaluation, de contentieux ou d'audit.

Didier Kling, président du cabinet Kling, est Président de la Chambre de Commerce de Paris Ile-de-France, ancien Président de la Compagnie Nationale des Commissaires aux Comptes, expert judiciaire (honoraire) inscrit près la Cour d'appel de Paris, agréé par la Cour de cassation.

Teddy Guerineau est associé du Cabinet Kling. Il est diplômé de l'Université Paris Dauphine et ancien chargé de cours du Master 225 Finance d'Entreprise et Ingénierie Financière. Il est membre du comité directeur de l'Association Professionnelle des Experts Indépendants (APEI). Il dispose d'une expérience de plus de vingt ans dans les métiers du conseil et de l'expertise financière.

## 1.4 Diligences et réserves

Pour accomplir notre mission, nous avons utilisé les documents et informations de nature économique, juridique, comptable et financière qui nous ont été communiqués par COMMISIMPEX et ses conseils :

- la Sentence de 2000, la Sentence de 2013 ainsi que la sentence partielle du 20 août 2010 ;
- le rapport de M. René RICOL du 14 avril 2000 (ci-après, le « **Rapport RICOL** ») ;
- le rapport du cabinet Ernst & Young du 25 septembre 2001 (ci-après, le « **Rapport EY** ») ;
- le Rapport PWC ;
- le Rapport Mazars 2019 et le rapport du cabinet Mazars du 2 août 2011 ;
- le courrier du cabinet Archipel Law du 16 avril 2021 relatif aux sommes recouvrées par COMMISIMPEX grâce à la mise en œuvre de mesures d'exécution forcées des sentences arbitrales ;
- la Fiche de calcul ;
- la Garantie ;
- le Protocole de 1992 et le Protocole de 2003 ;
- le Procès-verbal du 13 février 1988 de la Commission interministérielle chargée de faire le point de la situation avec la société COMMISIMPEX opérateur du projet Etoumbi-Kunda (ci-après, le « **Procès-verbal sur le projet Etoumbi-Kunda** »).

Les informations sur lesquelles ce rapport est fondé ont été obtenues auprès de sources réputées fiables. Il n'a donc été procédé à aucune vérification de ces informations.

Ce rapport ne saurait être utilisé dans un cadre autre que celui décrit au paragraphe 1.1.

## 1.5 Glossaire

AFT  : attestation de bonne fin de travaux

BAO  : billets à ordre

FCFA: franc CFA

FRF  : franc français

GBP  : livre sterling

USD  : dollar américain

## 1.6 Plan

Après avoir effectué un rappel des faits (**2.**), nous examinerons successivement les points suivants :

- le montant qui aurait été dû par la République du Congo à COMMISIMPEX au titre des marchés visés par la Garantie sur la base de la Fiche de calcul à la date du 31 mars 2019 (**3.1 et 3.2**) ;

- l'analyse des écarts entre le montant ainsi calculé et le montant indiqué dans le Rapport Mazars 2019 (**3.3**) ;

- l'analyse des conclusions du Rapport PWC (**4.**) ;

- l'analyse de l'indépendance du cabinet PWC à l'égard des parties au présent litige (**5.**).

Le rapport est complété d'une annexe unique correspond au calcul du montant qui aurait été dû par la République du Congo à COMMISIMPEX au titre des marchés visés par la Garantie sur la base de la Fiche de calcul à la date du 31 mars 2019.

## 2.  Rappel des faits

### 2.1  Les marchés et avenants conclus entre COMMISIMPEX et la République du Congo

La dette de la République du Congo à l'égard de COMMISIMPEX résulte de la réalisation de marchés de travaux publics et de la fourniture de matériels dont la liste, établie dans le Rapport RICOL[1] et validée dans la Sentence de 2000[2] (ci-après, les « **Marchés** ») est présentée dans la figure suivante :

**Figure 1. Liste des marchés et avenants à l'origine de la dette de la République du Congo à l'égard de COMMISIMPEX**

| Désignation | Date du marché | Date AFT | Devise | Montant |
|---|---|---|---|---|
| Avenant n°1 n°107/84 du marché 353/83 | 05/04/84 | 02/07/88 | GBP | 5 638 000 |
| Avenant n°1 n°107/84/AV - solde | | | FCFA | 1 486 441 948 |
| Avenant n°3 n°127/84 du marché 353/83 | 05/05/84 | 02/07/88 | GBP | 8 457 000 |
| Marché n°83/85/AO | 24/06/85 | 25/09/86 | USD | 5 450 534 |
| Marché n°009/86/G | 12/02/86 | 30/09/86 | FRF | 14 812 000 |
| Marché n°015/86/G | 24/03/86 | 25/09/86 | FRF | 18 868 500 |
| Avenant n°4 n°54/86 du marché 353/83 | 08/07/86 | NA | GBP | 2 751 344 |
| Marché 53/86 | 01/07/86 | 02/10/86 | FCFA | 1 204 934 500 |
| Avenant n°1 n°55/86 du marché 15/86 | 08/07/86 | 25/09/86 | FCFA | 230 914 400 |
| Avenant n°5 n°57/86 du marché 353/83 | 08/07/86 | NA | GBP | 7 889 357 |
| Avenant n°1 n°56/86 du marché 83/85 | 08/07/86 | 25/09/86 | FCFA | 377 456 228 |
| Garantie n° corp 5166-85 | 27/06/87 | NA | GBP | 12 818 000 |
| Marché 185/84 | 25/06/04 | 01/07/87 | GBP | 8 653 000 |
| | | | | |
| Total | | | FRF | 33 680 500 |
| Total | | | GBP | 46 206 701 |
| Total | | | USD | 5 450 534 |
| Total | | | FCFA | 3 299 747 076 |

NB :
AFT : attestation de bonne fin de travaux
NA : non applicable

**Les Marchés représentaient un montant total de 572.205.082 FRF à la date de leur conclusion** – ce montant ne tient donc pas compte d'intérêts – sur la base des taux de change de la fin de l'année 1986[3].

---

[1]  Source : Rapport RICOL, pages 16, 18 et 26.
[2]  Source : Sentence de 2000, pages 37 et 38. Plus particulièrement, il est indiqué à la page 37 de la Sentence de 2000 que « *C'est donc à juste titre que l'expert [RICOL] a retenu les marchés suivants (page 26 du rapport) aux fins de déterminer les créances entre parties* ».
La liste de ces marchés et avenants est également citée à la note de bas de page n°1 de la Sentence de 2013.
[3]  Source : Sentence de 2000, page 38.

La République du Congo a financé ces marchés et avenants grâce à des crédits consentis par COMMISIMPEX matérialisés par des billets à ordre (ci-après, « **BAO** ») de deux types :

- les billets à ordre de série P correspondant au paiement du montant principal des Marchés ;

- les billets à ordre de série I correspondant au paiement des intérêts, entre la date de conclusion des Marchés et la date d'exigibilité des billets à ordre de série P.

La figure 2 détaille le montant des BAO émis en contrepartie des Marchés tel que déterminé dans le Rapport RICOL[4].

**Figure 2. BAO émis par la République du Congo en contrepartie des Marchés**

| Désignation | Date du marché | Devise | Montant BAO Type P | BAO Type I |
|---|---|---|---|---|
| Avenant n°1 n°107/84 du marché 353/83 Avenant n°1 n°107/84/AV - solde | 05/04/84 | GBP | 5 638 000 | 845 700 |
| Avenant n°3 n°127/84 du marché 353/83 | 05/05/84 | GBP | 8 457 000 | 1 735 970 |
| Marché n°83/85/AO | 24/06/85 | FRF | 51 780 076 | 6 472 510 |
| Marché n°009/86/G | 12/02/86 | FRF | 14 812 000 | 2 468 677 |
| Marché n°015/86/G | 24/03/86 | FRF | 18 868 500 | 3 900 890 |
| Avenant n°4 n°54/86 du marché 353/83 | 08/07/86 | USD | 4 182 043 | 470 480 |
| Marché 53/86 | 01/07/86 | USD | 3 492 564 | 427 838 |
| Avenant n°1 n°55/86 du marché 15/86 | 08/07/86 | USD | 669 317 | 19 447 |
| Avenant n°5 n°57/86 du marché 353/83 | 08/07/86 | USD | 11 991 826 | 1 678 856 |
| Avenant n°1 n°56/86 du marché 83/85 | 08/07/86 | USD | 1 094 076 | 87 526 |
| Garantie n° corp 5166-85 | 27/06/87 | GBP | 12 818 000 | 3 749 262 |
| Marché 185/84 | 25/06/04 | GBP | 8 652 000 | 1 816 920 |
| | | | | |
| Total | | FRF | 85 460 576 | 12 842 077 |
| Total | | GBP | 35 565 000 | 8 147 852 |
| Total | | USD | 21 429 826 | 2 684 147 |
| Total | | FCFA | | |

Plusieurs précisions peuvent être apportés sur les modalités de paiement des Marchés :

- Le solde de 1.486.441.948 FCFA relatif à l'avenant n°1 du marché n°107/84 correspond à la différence, au 31/12/1987, entre le montant total des travaux réalisés au titre de l'avenant n°1 du marché n°107/84 et le montant total des BAO émis au titre des avenants n°1 du marché n°107/84 et n°3 du marché n°127/84[5].

Ce solde n'a donc pas donné lieu à l'émission de BAO.

---

4   Source : Rapport RICOL, pages 28 à 43.
5   Sources :
    - Rapport RICOL, page 21, paragraphe 3.23
    - Sentence de 2000, page 36.
    - Procès-verbal sur le projet Etoumbi-Kunda, page 8.

- Les modalités de paiement de la garantie n° corp 5166-85 ont été définies dans le cadre du protocole 461, signé le 26 juin 1987[6].

- Les BAO relatifs au marché n°185/84 ont été escomptés par COMMISIMPEX auprès de l'Equator Bank[7].

## 2.2 La Garantie

La République du Congo a consenti, le 22 décembre 1986, une garantie de paiement à COMMISIMPEX, afin de lui permettre d'assurer le financement nécessaire à la réalisation et à l'exécution des Marchés.

L'article 1 de la Garantie expose la liste des marchés de travaux publics et de fournitures de matériels qu'elle couvre (ci-après, les « **Marché visés par la Garantie** ») ainsi que leur montant.

La figure 3 effectue un rapprochement entre la liste des Marchés (cf. figure 1) et la liste des Marchés visés par la Garantie, en précisant le montant et la devise pour lesquels ils sont mentionnés dans la Garantie.

**Figure 3. Comparaison de la liste des Marchés visés par la Garantie et de la liste des Marchés**

| Désignation | Date du marché | Visé par la Garantie | Devise[8] | Montant |
|---|---|---|---|---|
| Avenant n°1 n°107/84 du marché 353/83 | 05/04/84 | Oui | GBP | 5 638 000 |
| Avenant n°1 n°107/84/AV - solde | | Non | | |
| Avenant n°3 n°127/84 du marché 353/83 | 05/05/84 | Oui | GBP | 8 457 000 |
| Marché n°83/85/AO | 24/06/85 | Oui | FRF | 51 780 076 |
| Marché n°009/86/G | 12/02/86 | Oui | FRF | 14 812 000 |
| Marché n°015/86/G | 24/03/86 | Oui | FRF | 18 868 500 |
| Avenant n°4 n°54/86 du marché 353/83 | 08/07/86 | Oui | GBP | 2 751 344 |
| Marché 53/86 | 01/07/86 | Oui | USD | 3 492 564 |
| Avenant n°1 n°55/86 du marché 15/86 | 08/07/86 | Oui | FRF | 4 618 288 |
| Avenant n°5 n°57/86 du marché 353/83 | 08/07/86 | Oui | GBP | 7 889 357 |
| Avenant n°1 n°56/86 du marché 83/85 | 08/07/86 | Oui | FRF | 7 549 124 |
| Garantie n° corp 5166-85 | 20/03/85 | Oui | GBP | 12 818 000 |
| Marché 185/84 | | Non | | |
| | | | | |
| Total | | | FRF | 97 627 988 |
| Total | | | GBP | 37 553 701 |
| Total | | | USD | 3 492 564 |
| Total | | | FCFA | |

---

[6]  Source : Rapport RICOL, page 40.

[7]  Source : Rapport d'expertise du cabinet Ernst & Young en date du 25 septembre 2001.

[8]  On constate que la devise dans laquelle la Garantie est libellée est différente de la devise des BAO pour 4 marchés. La devise des BAO s'avère être le dollar (USD) dans ces 4 cas alors que la Garantie mentionne la livre sterling (GBP) dans 2 cas et le franc français (FRF) dans les deux autres cas.

**On observe que la Garantie portait sur l'ensemble des Marchés à l'exclusion** du marché 185/84 dont les billets à ordre avaient été escomptés auprès de l'Equator Bank.

Les articles B et C de la Garantie définissent la nature de la garantie de paiement accordée par la République du Congo dans les termes suivants :

> « *Les Garants[9] s'engagent par les présentes, sans conditions et irrévocablement, à garantir à COMMISIMPEX, le paiement des montants intégraux des marchés et avenants de travaux et fournitures attribuées à COMMISIMPEX, dont le détail figure ci-dessus* ».

> « *chaque garant ne sera libéré que par paiement de toutes les sommes dues à COMMISIMPEX au titre des marchés de travaux, avenants et fournitures y inclus intérêts, intérêts de retard, frais et accessoires rattachés aux contrats dont le détail figure ci-dessus* ».

L'article D stipule le taux d'intérêt applicable en cas de retard de paiement des Marchés :

> « *Les Garants s'engagent irrévocablement et en permanence à payer des intérêts de retard au taux de 10,5%, réévalués annuellement, qui commenceront à parcourir les délais stipulés dans les articles 'Imputations' concernant les intérêts et les intérêts de retard, se trouvant dans les divers marchés de travaux, avenants et fournitures dont le détail figure ci-dessus, et ceci jusqu'à leur entier paiement* ».

## 2.3  La Fiche de calcul détaillée

La Fiche de Calcul correspond à un document établi au mois de septembre 1991 qui a été communiqué par la CCA[10] et le Ministère des Finances de la République du Congo au Procureur de la République, au Procureur Général et au Ministère de la Justice de la République du Congo.

**Elle détermine que la dette de la République du Congo à l'égard de COMMISIMPEX s'élève à un montant global de 29.949.284.818 FCFA au 31 décembre 1986.**

Ce montant est calculé en tenant compte **exclusivement des Marchés visés par la Garantie** à partir de leur montant initial[11] et en tenant compte d'intérêts calculés au taux de 10,5% entre la date de leur conclusion et la date du 31 décembre 1986.

La figure 4 détaille le montant de la dette déterminée dans la Fiche de calcul.

---

[9]  C'est-à-dire le Ministère des Finances et du Budget de la République du Congo et la Caisse congolaise d'Amortissement.

[10]  La CCA est un etablissement public à caractère financier crée par Ordonnance n° 30/71 du 6/12/1971 qui, entre outres attributions, contracte des emprunts pour le compte de la République du Congo et gère la dette publique congolaise.

[11]  Ce montant correspond soit à celui indiqué dans la Garantie soit à celui indiqué dans la liste des Marchés établie dans le Rapport RICOL (cf. figure 1).

**Figure 4. Dette de la République du Congo à l'égard de COMMISIMPEX déterminée dans la Fiche de calcul**

| | Devise | Visé par la Garantie | Montant |
|---|---|---|---|
| Avenant n°1 n°107/84 du marché 353/83 | GBP | Oui | 5 638 000 |
| Avenant n°3 n°127/84 du marché 353/83 | GBP | Oui | 8 457 000 |
| Marché n°83/85/AO | FRF | Oui | 51 780 076 |
| Marché n°009/86/G | FRF | Oui | 14 812 000 |
| Marché n°015/86/G | FRF | Oui | 18 868 500 |
| Avenant n°4 n°54/86 du marché 353/83 | GBP | Oui | 2 751 344 |
| Marché 53/86 | FCFA | Oui | 1 204 934 500 |
| Avenant n°1 n°55/86 du marché 15/86 | FCFA | Oui | 230 914 400 |
| Avenant n°5 n°57/86 du marché 353/83 | GBP | Oui | 7 889 357 |
| Avenant n°1 n°56/86 du marché 83/85 | FCFA | Oui | 377 456 228 |
| Garantie n° corp 5166-85 | GBP | Oui | 12 818 000 |
| **Principal** | | | |
| Total | FRF | | 85 460 576 |
| Total | GBP | | 37 553 701 |
| Total | USD | | |
| Total | FCFA | | 1 813 305 128 |
| **Intérêts** | | | |
| Total | FRF | | 10 949 662 |
| Total | GBP | | 6 891 634 |
| Total | USD | | |
| Total | FCFA | | 79 233 629 |
| **Principal + intérêts** | | | |
| Total | FRF | | 96 410 238 |
| Total | GBP | | 44 445 335 |
| Total | USD | | |
| Total | FCFA | | 1 892 538 757[12] |

## 2.4  Le Protocole de 1992

Le protocole n°566 signé le 14 octobre 1992 par la République du Congo et COMMISIMPEX a pour objet d'organiser les modalités de règlement des dettes de la République du Congo à l'égard de COMMISIMPEX arrêtées aux montant suivants (cf. article 1) :

- 50.592.081,53 FRF ;
- 21.201.872,76 GBP,
- 34.521.293,24 USD ;
- 1.426.623.81 FCFA.

Le Protocole de 1992 prévoit notamment :

---

[12]   Il convient de noter qu'il existe un écart de 55.000 FCFA avec le détail donné dans la fiche.

- un règlement échelonné en 120 mensualités égales et successives, la première arrivant à échéance le 30 janvier 1993 (article 2) ;

- un taux d'intérêt de 10%, calculé sur le nombre exact des jours écoulés, sur la base de mois de 30 jours et d'une année de 360 jours (article 3) ;

- un taux d'intérêt de 10,5% applicable mensualités échues et non payées (article 4).

Les montants dus en application du Protocole de 1992 étaient matérialisés par des billets à ordre libellés dans leur monnaie d'origine (article 5).

Sa mise en œuvre prévoyait la remise par COMMISSIMPEX à la République du Congo des BAO souscrits par la CCA au titre des Marchés (article 7).

## 2.5  La Sentence de 2000

COMMISIMPEX a introduit le 13 mars 1998 un arbitrage contre la République du Congo car elle estimait que cette dernière n'avait pas respecté les engagements qu'elle avait souscrits dans le cadre du Protocole de 1992.

COMMISIMPEX a obtenu une sentence favorable le 3 décembre 2000 (*2.5.2*), le tribunal arbitral s'étant basé sur un rapport établi par M. René RICOL daté du 14 avril 2000 pour analyser certains aspects du litige (*2.5.1*).

### 2.5.1  Le Rapport RICOL du 14 avril 2000

#### a- La mission confiée à M. René RICOL

Le tribunal arbitral a décidé dans sa sentence intermédiaire du 28 juin 1999 de recourir à M. René RICOL notamment pour :

- « *donner son avis technique afin de permettre au Tribunal arbitral de déterminer, dans les devises appropriées, le montant exact, total et actualisé des créances entre, d'une part, COMMISIMPEX et, d'autre part, la REPUBLIQUE DU CONGO et la CAISSE CONGOLAISE D'AMORTISSEMENT au 31 octobre 1992, sans tenir compte du Protocole n°566 du 14 octobre 1992 et de la décote qu'il incorporait* » ;

- se prononcer sur les allégations suivantes de la République du Congo :

  - ✓ « *plusieurs des marchés et avenants à l'origine des créances de COMMISIMPEX visées dans le Protocole n°566 n'ont pas été exécutés, ou pas complètement exécutés, ou mal exécutés* » ;

  - ✓ « *certains de ces marchés seraient sans objets (travaux identiques »)* » ;

  - ✓ « *COMMISIMPEX aurait été payée plusieurs fois pour les mêmes marchés ou les mêmes créances par la REPUBLIQUE DU CONGO* ».

#### b- Les conclusions du Rapport RICOL

En premier lieu, le Rapport RICOL a procédé à un recensement des marchés à l'origine de la dette de la République du Congo à l'égard de COMMISIMPEX qui sont listés dans la figure 1.

**En deuxième lieu, le Rapport RICOL a analysé les allégations de la République du Congo concernant les Marchés <u>qu'il a rejetées dans leur intégralité</u>.**

Plus précisément :

- Concernant les allégations de non-exécution, d'exécution partielle ou de mauvaise exécution, les Marchés faisant l'objet d'un litige étaient au nombre de 5 (l'avenant n°5 du marché n°57/86, l'avenant n°1 du marché 107/84, l'avenant 3 du marché 127/84, la Garantie n° corp 5166-85 ayant donné lieu au Protocole n°461, et le marché n°185/84).

  Le Rapport RICOL conclut à leur propos que « ***Ils ont, cependant, été tous retenus par l'expert en l'absence de preuves suffisantes produites par les défenderesses*** *[la République du Congo et la CCA]* »[13] (gras ajouté par nous).

- Concernant les allégations de travaux identique, le Rapport RICOL indique que « ***les éléments versés au dossier ne permettent pas de vérifier les déclarations des défenderesses*** »[14] (gras ajouté par nous).

- Concernant les allégations de double règlement, le Rapport RICOL relève que « ***Les défenderesses n'ont pas apporté la preuve de leurs allégations portant sur les doubles règlements*** »[15] (gras ajouté par nous).

**La Sentence de 2000 a confirmé ces conclusions du Rapport RICOL** en écrivant que « ***aucune allégation relative aux marchés*** *eux-mêmes (exécution partielle ou défectueuse, doubles travaux, etc.)* ***ne peut être retenue****, non seulement aucune n'a été prouvée par les défenderesses, mais encore une analyse détaillée ne permet-elle pas de leur accorder vraisemblance* »[16] (gras ajouté par nous) et que « *c'est donc à juste raison* »[17] qu'il avait retenu l'ensemble des Marchés pour déterminer la dette de la République du Congo à l'égard de COMMISIMPEX.

En troisième lieu, le **Rapport RICOL a établi le montant des dettes qu'il qualifie de sûres et non discutables de la République du Congo à l'égard de COMMISIMPEX**, sur la base des BAO pour lesquels la preuve de la restitution a été apportée par un courrier de COMMISIMPEX du 24 novembre 1992[18].

Le montant de ces dettes se décomposaient entre 17.216.381 FRF, 15.521.332 GBP, 18.798.738 USD et 1.486.441.948 FCFA (cf. figure 5 de la page suivante) sur une base « non actualisée » selon l'expression retenu dans le rapport (c'est-à-dire avant prise en compte des intérêts liés aux retards de paiement).

**Elles concernent exclusivement des Marchés visés par la Garantie[19].**

---

[13] Cf. Rapport RICOL, page 5.

[14] Ibid.

[15] Ibid.

[16] Cf. Sentence de 2000, page 37.

[17] Ibid.

[18] Cf. Rapport RICOL, page 5.

[19] Pour mémoire, le montant de 1.486.441.948 FCFA correspond au solde dû à COMMISIMPEX, déterminé par différence entre le montant total des travaux réalisés au titre de l'avenant n°1 du marché n°107/84 et le montant total des BAO émis au titre des avenants n°1 du marché n°107/84 t n°3 du marché n°127/84 (cf. Rapport RICOL, page 21, paragraphe 3.23 et Sentence 2000, page 39, note de bas de page 14).

Il convient de souligner que si ces dettes sûres et non discutables ne portent pas sur l'intégralité des Marchés visés par la Garantie, c'est parce que COMMISIMPEX n'a pas rapporté la preuve d'avoir restitué les BAO correspondant et non parce que ces marchés n'auraient pas été exécutées.

**Figure 5. Dettes sûres et non discutables de la République du Congo à l'égard de COMMISIMPEX[20] selon le Rapport RICOL**

| Désignation | Mentionné Garantie | Devise | Principal | Montant Intérêts | Total |
|---|---|---|---|---|---|
| Avenant n°1 n°107/84 du marché 353/83 | Oui | | | | |
| Avenant n°1 n°107/84/AV - solde | Non | FCFA | 1 486 441 948 | | 1 486 441 948 |
| Avenant n°3 n°127/84 du marché 353/83 | Oui | | | | |
| Marché n°83/85/AO | Oui | | | | |
| Marché n°009/86/G | Oui | FRF | 7 405 998 | 1 382 453 | 8 788 451 |
| Marché n°015/86/G | Oui | FRF | 6 289 500 | 2 138 430 | 8 427 930 |
| Avenant n°4 n°54/86 du marché 353/83 | Oui | USD | 2 091 021 | 235 240 | 2 326 261 |
| Marché 53/86 | Oui | USD | 1 746 282 | 366 719 | 2 113 001 |
| Avenant n°1 n°55/86 du marché 15/86 | Oui | USD | 669 317 | 19 477 | 688 794 |
| Avenant n°5 n°57/86 du marché 353/83 | Oui | USD | 11 991 826 | 1 678 856 | 13 670 682 |
| Avenant n°1 n°56/86 du marché 83/85 | Oui | | | | |
| Garantie n° corp 5166-85 | Oui | GBP | 12 589 217 | 2 932 115 | 15 521 332 |
| Marché 185/84 | Non | | | | |
| | | | | | |
| Total | | FRF | | | 17 216 381 |
| Total | | GBP | | | 15 521 332 |
| Total | | USD | | | 18 798 738 |
| Total | | FCFA | | | 1 486 441 948 |

En dernier lieu, le Rapport RICOL a déterminé le montant « actualisé » des dettes sûres et non discutables au 30 octobre 1992 en appliquant « *le taux moyen annuel de base bancaire, référence Banque de France, augmenté d'un point* »[21], qui est présenté dans la figure suivante.

**Figure 6. Dettes sûres et non discutables « actualisées » au 31/10/1992[22]**

| Devise | Montants | |
|---|---|---|
| | Non actualisés | Actualisés au 31/10/1992 |
| FRF | 17 216 381 | 29 489 637 |
| GBP | 15 521 332 | 18 939 772 |
| USD | 18 798 738 | 31 161 701 |
| FCFA | 1 486 441 948 | 2 466 703 689 |

---

[20] Cf. Rapport RICOL, page 45.
[21] Cf. Rapport RICOL, pages 51 et 52.
[22] Cf. Rapport RICOL, page 8.

*2.5.2 La sentence du 3 décembre 2000*

La Sentence de 2000 a considéré que la République du Congo et la CCA étaient débitrices envers COMMISIMPEX tout d'abord des soldes dus exécutables composés :

- du montant des billets à ordre libellés en FRF, GBP et USD retournés dans la lettre du 24 novembre 1992, comme indiqué dans le Rapport RICOL, en y appliquant une décote de 25%[23] ;

- le solde libellé en FCFA en faveur de COMMISIMPEX, tout en notant qu'il n'a pas donné lieu à l'émission de billets à ordre, ni fait l'objet d'une actualisation ou d'une décote et qu'en tout état de cause le protocole n°566 limite son montant à 1.426.623.801[24].

Il en résulte que la Sentence de 2000 considère que les soldes dus à COMMISIMPEX en application du protocole n°566 sont les suivants :

**Figure 7 : Soldes dus exécutables selon le protocole n°566 en application de la Sentence de 2000[25]**

| Devise | Montant Rapport Ricol | Décote de 25% | Montant Sentence |
|--------|-----------------------|----------------|-------------------|
|        | (1)                   | (2) = 25% x (1) | (3) = (1) - (2)  |
| FRF    | 29 489 637            | 7 372 409      | 22 117 228        |
| GBP    | 18 939 772            | 4 734 943      | 14 204 829        |
| USD    | 31 161 701            | 7 790 425      | 23 371 278        |
| FCFA   | 2 466 703 689         | NA             | 1 426 623 801     |

Ces soldes son partiellement représentés par les BAO émis dans le cadre du Protocole n°566

Le montant accordé à COMMISIMPEX par la Sentence de 2000 tient également compte :

- d'intérêts calculés au taux de 10% sur les sommes récapitulés dans la figure 7[26] ;

- des intérêts de retard calculés au taux de 10,5%, réduits toutefois au seuil trimestriel de l'usure applicable en droit à la catégorie des prêts aux entreprises à plus de deux ans et à taux fixe, chaque fois que pour un trimestre considéré le taux de 10,5% est supérieur au taux de l'usure[27], avec une capitalisation annuelle à partir du 13 mars 1998.

## 2.6 L'expertise du cabinet Ernst & Young daté du 25 septembre 2001

A la requête de COMMISIMPEX, le Tribunal de commerce de Brazzaville a désigné, par une ordonnance en date du 3 septembre 2001, le cabinet Ernst & Young aux fins d'évaluer la créance exacte de COMMISIMPEX auprès de la République du Congo. Il a rendu ses conclusions dans le cadre d'un rapport daté du 25 septembre 2001.

---

[23] Cf. Sentence de 2000, pages 53 et 61.
[24] Cf. Sentence de 2000, page 50, note de bas de page 26, et page 61.
[25] Cf. Sentence de 2000, page 67, cf. § 1) a) i).
[26] Cf. Sentence de 2000, page 67, cf. § 1) a) ii).
[27] Cf. Sentence de 2000, page 68, cf. § 2).

Dans le cadre de ses travaux, le cabinet Ernst & Young a, tout d'abord, vérifié l'information indiquée dans la Fiche de calcul selon laquelle la dette de la République du Congo à l'égard de COMMISIMPEX s'élevait à 29.949.284.818 FCFA.

Il conclut à ce propos :

> *« On peut donc conclure qu'à la fin de 1986/début 1987 la République du Congo et la Caisse Congolaise d'Amortissement devaient bien à la société COMMISIMPEX une somme très voisine de 30 milliards de Francs cfa, comme la Caisse Congolaise d'Amortissement en avait informé les Autorités Judiciaires congolaises en 1991 dans le cadre du procès intenté à monsieur le Ministre LEKOUNDZOU en 1991 ».*

Il a procédé également à une **estimation de la dette de la République du Congo à l'égard de COMMISIMPEX au 30 septembre 1992**, dont le calcul est reproduit dans la figure 8.

**Figure 8 : calcul détaillé du Rapport EY concernant la dette de la République du Congo à l'égard de COMMISSIMPEX à la date du 30 septembre 1992[28]**

---

[28] Cf. Rapport EY, page 41.

**Le Rapport EY conclut que la dette de la République du Congo s'élève au 30 septembre 1992 à un montant de 48.532.681.474 FCFA, dont 22.000.000.000 FCFA couverts par le Protocole de 1992, ce qui laissait un solde de 26.532.681.474 FCFA** (cf. figure 8, montants encerclés en rouge).

Ce calcul du montant de la dette de la République du Congo au 30 septembre 1992 s'articule autour des éléments suivants :

- le montant de la dette déterminée dans la Fiche de calcul à 29.949.284.818 FCFA au 1er janvier 1987, sur la base des Marchés visés par la Garantie (cf. figure 8, montant encerclé en vert) ;

- une capitalisation au taux de 10,5% de ce montant au 27 avril 1987 d'où il est déduit un règlement partiel de 15 MUSD converti en 4.500.000.000 FCFA aboutissant à un montant de 26.457.303.897 FCFA (cf. figure 8, montants encerclés en bleu) ;

- une capitalisation au taux de 10,5% de ce montant au 30 septembre 1992 qui s'élève alors à 45.614.448.185 FCFA (cf. figure 8, montants encerclés en orange) ;

- une capitalisation au taux de 10,5% du solde de prix sur l'avenant n°1 du marché n°107/84 (1.426.623.801 FCFA) entre le 8 mars 1988 et le 30 septembre 1992 aboutissant à un montant de 2.918.233.289 FCFA (cf. figure 8, montants encerclés en jaune) ;

- la somme résultant de la capitalisation de la dette indiquée dans la Fiche de calcul et du solde de prix sur l'avenant n°1 du marché n°107/84 qui s'élève alors à 48.532.681.474 FCFA (cf. figure 8, montant encerclé en gris).

## 2.7  Le Protocole de 2003

Le protocole n°706 signé le 23 août 2003 par la République du Congo et COMMISIMPEX a pour objet d'organiser les modalités de règlement des dettes de la République du Congo à l'égard de COMMISIMPEX arrêtées à un **montant global de 96 milliards exprimé en FCFA, après la dévaluation intervenue en 1994, ou de 960 millions exprimé en FRF, au <u>30 septembre 1992</u>**.

A cet égard, le Protocole de 2003 indique notamment :

> *« **Le montant de la dette de l'Etat du Congo <u>arrêtée le 30 septembre 1992, s'élève en principal à la somme de 960.000.000 FRF</u>** (neuf cent soixante millions de Francs Français), qui représentait en 1992 la somme de 48 milliards de FCFA, **l'équivalent de <u>96.000.000.000 FCFA</u>** (quatre vingt seize milliards FCFA) »* (gras et souligné ajouté par nous).

Comme cela a été indiqué au paragraphe 2.6 précédent, ce montant de 96 mds FCFA correspond au montant de 48 mds FCFA indiqué dans le Rapport EY, après l'effet de la dévaluation intervenue en 1994, calculé à partir :

- du montant indiqué dans la Fiche de calcul au 1er janvier 1987 basée elle-même sur les Marchés visés par la Garantie ;

- des intérêts capitalisés sur ce montant au taux de 10,5% entre le 1er janvier 1987 et le 30 septembre 1992 ;

- du solde de prix sur l'avenant n°1 du marché n°107/84 y compris les intérêts capitalisés sur ce solde au taux de 10,5% entre le 8 mars 1988 et le 30 septembre 1992.

Les parties ont convenu que cette dette de 960 millions FRF se décomposait en deux parties :

- une première partie d'un montant de 440 millions FRF ayant fait l'objet du Protocole de 1992 ;

  Il est indiqué à cet égard dans le Protocole 2003 :

  > « *une première partie fixée à 440.000.000 FRF (Quatre cent quarante millions de Francs Français), soit l'équivalent de 22 Milliards de F CFA, objet du Protocole d'Accord n°566 du 14 octobre 1992* »

- une seconde partie d'un montant de 520 millions FRF dont les modalités de remboursement sont l'objet de l'article 4

Ce montant de 96 mds FCFA ou 960 millions FRF **ne tient pas compte des intérêts capitalisés cumulés au taux annuel de 10% entre le 30 septembre 1992 et le 30 juillet 2003** qui représentaient un **total de 941.141.586 FRF** comme le précise l'article 3 dans les termes suivants :

> « *l'Etat du Congo s'engage à rembourser à la société COMMISIMPEX, la somme en principal de 520 millions de FRF, **non compris les intérêts qui s'élèvent à 941.141.586 FRF, pour la période du 30 septembre 1992 au 30 juillet 2003 au taux de 10% l'an** »* (gras ajouté par nous).

## 2.8 La Sentence de 2013

COMMISIMPEX a introduit le 21 avril 2009 un nouvel arbitrage contre la République du Congo car elle estimait que cette dernière n'avait pas respecté les engagements qu'elle avait souscrits dans le cadre du Protocole de 2003.

COMMISIMPEX a obtenu une sentence favorable, le 21 janvier 2013.

Le tribunal lui a en effet accordé au titre de la seconde partie de sa dette visée dans le Protocole de 2003 d'un montant de 520 millions FRF et des intérêts capitalisés au taux annuel de 10% sur ce montant entre le 30 septembre 1992 et le 30 juillet 2003, « *la somme de 222.749.598,82 Euros plus intérêts de 10% l'an avec capitalisation annuelle au 31 décembre, sur la période entre le 31 décembre 2003 et jusqu'au parfait paiement* »[29].

---

[29] Cf. Sentence de 2013, page 79, point 10.
On peut lire également au paragraphe 316 des pages 77 et 78 de la Sentence de 2013 : « *La République du Congo doit donc payer à Commisimpex, en exécution du Protocole de 2003, un montant de 520.000.000 FRF soit l'équivalent de 79.273.488,96 euros + 941.141.586 FRF soit 143.476.109,86 euros = 222.749.598,82 euros plus intérêts de 10% l'an avec capitalisation annuelle au 31 décembre, sur la période entre le 31 décembre 2003 et jusqu'au parfait paiement* ».

## 3. Détermination du montant qui aurait été dû par la République du Congo à COMMISIMPEX au titre des marchés visés par la Garantie sur la base de la Fiche de calcul à la date du 31 mars 2019

### 3.1 Présentation des éléments de calcul retenus

La détermination du montant qui aurait été dû par la République du Congo à COMMISIMPEX, au titre des marchés visés par la Garantie, sur la base de la Fiche de calcul à la date du 31 mars 2019, nous a conduit à prendre en compte quatre éléments.

En premier lieu, nous avons retenu les montants totaux en devises indiqués dans la Fiche de calcul (voir figure 4 : 96.410.238 FRF, 44.445.335 GBP et 1.892.538.757 FCFA) car cette dernière est basée exclusivement sur les Marchés visés par la Garantie et les prend en compte de manière exhaustive.

En deuxième lieu, nous avons déduit les montants perçus par COMMISIMPEX depuis le 1er janvier 1987, soit la date de référence du calcul de la Fiche de calcul, qui sont de deux ordres selon les éléments qui nous ont été transmis.

D'une part, il s'agit d'un paiement partiel intervenu le 27 avril 1987 pour un montant d'environ 15 millions USD. Ce paiement a été effectué en contrepartie de la remise par COMMISIMPEX de billets à ordre émis au titre de différents marchés et libellés dans différentes devises comme cela est détaillé dans la figure suivante[30] :

**Figure 9. Détail du paiement partiel effectué par la République du Congo le 27 avril 1987**

| Désignation | Devise | Montant | | |
| --- | --- | --- | --- | --- |
| | | BAO Type P | BAO Type I | Total |
| Avenant n°1 n°107/84/AV | GBP | 1 409 500 | 338 280 | 1 747 780 |
| Avenant n°3 n°127/84/AV | GBP | 4 228 500 | 1 288 550 | 5 517 050 |
| Marché n°83/85/AO | FRF | | | |
| Marché n°009/86/G | FRF | 2 468 670 | 658 312 | 3 126 982 |
| Marché n°015/86/G | FRF | 3 144 750 | 964 390 | 4 109 140 |
| Avenant n°4 n°54/86/AV | USD | 1 045 511 | 188 192 | 1 233 703 |
| Marché n°53/86/AO | USD | | | |
| Avenant n°1 n°55/86/AV | FRF | | | |
| Avenant n°5 n°57/86/AV | GBP | | | |
| Avenant n°1 n°56/86/AV | FRF | | | |
| Garantie n° corp 5166-85 | GBP | | | |
| | | | | |
| Total | FRF | 5 613 420 | 1 622 702 | 7 236 122 |
| Total | GBP | 5 638 000 | 1 626 830 | 7 264 830 |
| Total | USD | 1 045 511 | 188 192 | 1 233 703 |

---

[30] Cf. Rapport Mazars du 2 août 2011, page 7.

Sur cette base, nous avons donc considéré que COMMISIMPEX avait obtenu le 27 avril 1987 un remboursement se décomposant en 7.236.122 FRF, 7.264.830 GBP et 1.233.703 USD.

Les montants en devises retenus dans la Fiche de calcul ne comprenant pas l'USD, nous avons converti le montant en USD en FRF au cours du 27 avril 1987, soit 5,966 FRF[31].

D'autre part, COMMISIMPEX a recouvré un certain nombre de sommes de la République du Congo suite à des mesures d'exécution forcée réalisées en exécution des sentences arbitrales.

Ces sommes libellées en euros ont été converties et déduites des montants exprimés en FRF dans la Fiche de calcul au cours officiel de 6,55957 FRF pour un euro.

La figure 10 détaille les sommes recouvrées par COMMISSIMPEX avant le 31 mars 2019.

**Figure 10. Détail des sommes recouvrées par COMMISIMPEX suite à des mesures d'exécution forcée avant le 31 mars 2019**

| Date | Montant EUR | Cumul EUR | Cumul FRF |
|---|---|---|---|
| 12/01/2016 | 1 197 273,30 | 1 197 273,30 | 7 853 598,02 |
| 21/03/2016 | 4 892 963,63 | 6 090 236,93 | 39 949 335,46 |
| 08/09/2016 | 43 947,90 | 6 134 184,83 | 40 237 614,79 |
| 23/06/2017 | 3 566 016,43 | 9 700 201,26 | 63 629 149,18 |
| 18/04/2018 | 450 000,00 | 10 150 201,26 | 66 580 955,68 |
| 25/07/2018 | 113 142,56 | 10 263 343,82 | 67 323 122,22 |
| 23/08/2018 | 42 626,40 | 10 305 970,22 | 67 602 733,08 |
| 15/02/2019 | 28 295,00 | 10 334 265,22 | 67 788 336,11 |

En troisième lieu, nous avons capitalisé les sommes retenues entre le 1er janvier 1987 et le 31 mars 2019 au taux de 10,5% indiqué dans la Garantie. La capitalisation est effectuée sur une base annuelle au 31 décembre.

En dernier lieu, nous avons converti les sommes en devises obtenues à la date du 31 mars 2019 en euro sur la base des taux de change indiquées dans la base de données Bloomberg soit : 1,162 EUR pour 1 GBP, 6,55957 FRF pour 1 EUR et 655,957 FCFA pour 1 EUR.

## 3.2 Présentation des résultats des calcul

La détermination du montant qui aurait été dû par la République du Congo à COMMISIMPEX, au titre des marchés visés par la Garantie, sur la base de la Fiche de calcul à la date du 31 mars 2019 s'élève à **1.461.421.086 EUR**, comme le détaille la figure 11 et l'annexe au présent rapport.

---

[31] Source : Bloomberg.

**Figure 11. Montant dû au titre des marchés visés par la Garantie sur la base de la Fiche de calcul à la date du 31 mars 2019**

| Devises | Montant | Tx change | Montant € |
|---------|---------|-----------|-----------|
| FRF | 1 972 824 818 | 0,1524 | 300 755 205 |
| GBP | 936 669 149 | 1,162 | 1 088 409 551 |
| FCFA | 47 397 045 455 | 0,0015 | 72 256 330 |
| **Total** | | | **1 461 421 086** |

## 3.3 Analyse des écarts avec les conclusions du Rapport Mazars 2019

Le Rapport Mazars 2019 détermine que le montant actualisé au 31 mars 2019 des sommes accordées par la Sentence 2000 et la Sentence 2013 s'élève globalement à 1.198.656.682 EUR[32], hors frais d'arbitrage actualisés.

Notre calcul du montant dû par la République du Congo à COMMISIMPEX au titre des marchés visés par la Garantie, sur la base de la Fiche de calcul, à la même date du 31 mars 2019, **s'avère plus élevé à 1.461.421.086 EUR**.

Fondamentalement, l'objet du Rapport Mazars 2019 consistait à actualiser à la date du 31 mars 2019 les sommes allouées dans le cadre des sentences arbitrales et ne visait donc pas à prendre en compte la Garantie ou les montants des marchés visés dans la Garantie tels qu'indiqué dans la Fiche de calcul.

La différence de résultat entre nos calculs et ceux du Rapport Mazars 2019 ne résulte donc non pas d'une différence de périmètre de calcul au sens où les sentences, comme nous le verrons dans la partie suivante, ont alloué des sommes à COMMISIMPEX sur la base des Marchés visés par la Garantie, qu'un ensemble de différences sur les paramètres de calcul pris en compte.

En premier lieu, il existe une différence sur le montant retenu au titre des Marchés visés par la Garantie car la Fiche de calcul retient le montant initial des marchés tandis que la Sentence 2000 retient un montant inférieur au montant initial en considérant, implicitement, que les BAO dont la preuve de la restitution n'avait pas pu être fourni avaient été payés[33].

En second lieu, il existe une différence sur la devise dans lesquels le montant des marchés est libellé dans les sentences arbitrales et dans la Fiche de calcul, ce qui conduit à retenir implicitement des parités de change différentes.

D'une part, la Sentence de 2000 est basée sur le montant des BAO matérialisant les crédits accordés par COMMISIMPEX qui sont libellés pour 5 marchés dans des devises différentes de celles prises en compte dans la Fiche de calcul[34].

---

[32] Cf. Rapport Mazars 2019, table 1, page 3, colonne « Total sommes accordées actualisées ».

[33] Tout en ajoutant le solde de l'avenant n°1 du marché n°107/84.

[34] Les BAO de ces cinq marchés sont libellés en USD tandis que leur montant dans la Fiche de calcul est libellé en GBP pour deux et en FCFA pour trois.

D'autre part, la Sentence de 2013 est basée sur une dette de la République du Congo libellée en FCFA et FRF (environ 30 milliards FCFA au 1er janvier 1987 et 48 milliards FCFA ou 960 millions FRF au 30 septembre 1992) qui revient à figer les parités entre le FRF, le FCFA et le GBP sur lesquelles sont calculées les sommes qu'elle alloue tandis que notre calcul est basé sur les devises qui apparaissent dans la Fiche de calcul et tient donc compte de l'évolution de ces parités jusqu'au 31 mars 2019.

En troisième lieu, notre calcul basé sur la Fiche de calcul tient compte des remboursements intervenus aux termes des mesures d'exécution forcée des sentences arbitrales ce qui n'est pas le cas des montants déterminés dans le Rapport Mazars 2019.

En dernier lieu, il existe une différence sur le taux des intérêts retenu.

Notre calcul est basé sur un taux de 10,5% capitalisé annuellement tandis que :

- les sommes allouées dans la Sentence de 2000 tiennent compte d'intérêts simples, non capitalisés, jusqu'au 13 mars 1998 et d'un taux d'intérêt annuel de 10,5% toutefois limité au seuil d'usure ;

- les sommes allouées dans la Sentence de 2013 tiennent compte d'un taux d'intérêt annuel de 10% et non de 10,5%.

# 4. Analyse des conclusions du Rapport PWC

L'analyse du Rapport PWC nous conduit à effectuer des observations sur trois points :

- sa conclusion selon laquelle le Rapport RICOL aurait considéré que l'exécution de seulement 7 des 11 marchés visés par la Garantie était certaine (**4.1**) ;

- sa conclusion selon laquelle la Sentence de 2000 porte sur des Marchés visés par la Garantie seulement à hauteur des sommes accordées en FRF, GBP et USD (**4.2**) ;

- sa conclusion selon laquelle la Sentence de 2013 porte exclusivement sur la seconde partie de la dette de la République du Congo à l'égard de COMMISIMPEX visée dans le Protocole de 2003 d'un montant de 520 millions FRF (ou 26 milliards FCFA) qui serait étrangère aux marchés visés par la Garantie (**4.3**).

## 4.1 Sur la conclusion du Rapport PWC selon laquelle le Rapport RICOL aurait considéré que l'exécution de seulement 7 des 11 marchés visés par la Garantie était certaine

Le Rapport PWC exprime notamment cette conclusion dans les termes suivants[35] :

> « *le Rapport Ricol analyse bien l'ensemble des onze Marchés de la Garantie et considère que <u>l'exécution de sept des onze Marchés est certaine</u>, et ce, à hauteur des montants figurant en colonne (b) du Tableau Récapitulatif établi par l'Expert* » (soulignement ajouté par nous).

Cette conclusion appelle les observations suivantes de notre part :

1/ Pour être parfaitement précis, il convient de relever que le Rapport RICOL a analysé l'ensemble des Marchés à l'origine des dettes de la République de Congo à l'égard de COMMISIMPEX (cf. figure 1) qui comprend les onze Marchés visés par la Garantie (cf. figure 3) mais également le marché 185/84 dont les billets à ordre avaient été escomptés auprès de l'Equator Bank.

2/ **Le Rapport RICOL n'a relevé aucune incertitude concernant l'exécution des Marchés en général ou des Marchés visés par la Garantie en particulier** (cf. paragraphe 2.5.1).

Au contraire, il a relevé que la République du Congo et la CCA n'avaient pas produit de preuves suffisantes pour démontrer une absence d'exécution, une exécution partielle ou une mauvaise exécution[36].

3/ La Sentence de 2000 a confirmé cette conclusion du Rapport RICOL de la manière suivante (cf. paragraphe 2.5.1) :

> « *aucune allégation relative aux marchés eux-mêmes (exécution partielle ou défectueuse, doubles travaux, etc.) ne peut être retenue*, non seulement aucune n'a été

---

[35] Cf. Rapport PWC, page 20.
[36] Cf. Rapport RICOL, page 5.

> *prouvée par les défenderesses, mais encore une analyse détaillée ne permet-elle pas de leur accorder vraisemblance »*[37] (gras ajouté par nous).

4/ La rédaction retenue dans le Rapport PWC pourrait laisser supposer que les montants retenus par le Rapport RICOL l'auraient été à la hauteur de l'exécution avérée des Marchés.

Or, les montants retenus dans le Rapport RICOL le sont à la hauteur du montant des BAO pour lesquels COMMISIMPEX a pu prouver avoir procédé à leur restitution.

Il suffit pour s'en convaincre de se reporter à la page 5 du Rapport RICOL où il est écrit que :

> *« De mon point de vue, les dettes sûres et non discutables sont constituées par les billets à ordre pour lesquels la preuve de la restitution a été apportée par la lettre de Commisimpex du 24 novembre 1992 ».*

Par conséquent, le Rapport RICOL a confirmé que l'ensemble des Marchés, y compris les Marchés visés par la Garantie, avaient été parfaitement exécutés et retient pour chaque marché une dette de la République du Congo à l'égard de COMMISIMPEX à hauteur du montant des BAO pour laquelle une restitution a pu être prouvée, sans qu'il n'existe de lien entre ce montant et une quelconque incertitude sur l'exécution des marchés.

## 4.2 Sur la conclusion du Rapport PWC selon laquelle la Sentence de 2000 porte sur des Marchés visés par la Garantie seulement à hauteur des sommes accordées en FRF, GBP et USD

Le Rapport PWC exprime cette conclusion dans les termes suivants[38] :

> *« Ainsi, la Sentence de 2000 accorde des montants en différentes devises résultant de l'analyse de l'ensemble des Marchés visés par la Garantie.*
>
> *Il s'ensuit que la Créance opposée à la République du Congo, au titre de la Garantie, ne saurait dépasser, dans ces circonstances, le montant actualisé des sommes accordées par la Sentence de 2000 en FRF, GBP et USD, tel qu'établi dans le Rapport Mazars, puisque seul ledit montant résulte d'une analyse menée sur l'ensemble des marchés de la Garantie ».*

Le Rapport PWC suggère ainsi que la somme allouée par la Sentence de 2000 en FCFA, pour un montant de 1.426.623.801 FCFA, ne serait pas lié aux Marchés visés par la Garantie (voir figure 12 de la page suivante)[39].

**Figure 12 : soldes exécutables selon la page 67 de la Sentence de 2000**

---

[37]  Cf. Sentence de 2000, page 37.

[38]  Cf. Rapport PWC, pages 26 et 27.

[39]  Il en tire la conséquence que le montant actualisé des sommes allouées par la Sentence de 2000 déterminée dans le Rapport Mazars 2019 (soit 244.914.319 EUR, cf. page 11) doit être diminué du montant actualisé des sommes allouées en FCFA (soit 10.922.934 EUR, cf page 11) pour aboutir à un montant de 234 m€ (soit 244.914.319 – 10.922.934 = 233.991.385 EUR).

les soldes dus exécutables selon le Protocole n° 566, à savoir

- FRF          22 117 228
- GBP          14 204 829
- USD          23 371.278
- XAF (FCFA)    1 426 623 801

**Cette conclusion s'avère en contradiction avec la Sentence de 2000 car :**

1/ La note de bas de page n°14 de la page 39 de la Sentence de 2000 fait le lien entre ce montant de 1.426.623.801 FCFA et le montant de 1.486.441.998 FCFA indiqué dans le Procès-verbal sur le projet Etoumbi-Kunda du 13 février 1988 dans les termes suivants :

> « *Selon le rapport [RICOL] (pages 7 et 50), il faut ajouter comme une dette indiscutable le montant précité reconnu le 13 février 1988 [dans le Procès-verbal sur le projet Etoumbi-Kunda] de FCFA 1.486.441.998. Toutefois, le procès-verbal du 1er mars 1993 fait mention du montant légèrement inférieur de FCFA 1.426.623.801 figurant dans l'article 1 du Protocole n°566, apparemment sans faire l'objet ni d'une actualisation ni d'une décote, et que le Tribunal prendra seul en considération* » (gras ajouté par nous).

2/ Le Procès-verbal sur le projet Etoumbi-Kunda du 13 février 1988 a notamment établi que l'excution de l'avenant n°1 du marché 107/84 avait laissé un solde non payé à COMMISSIMPEX correspondant à ce montant de 1.486.441.998 FCFA.

Ce point est reconnu dans le Rapport RICOL dans les termes suivants :

> « *Dans le procès-verbal du 13/2/1988, la RPC reconnaît un solde en faveur de COMMISIMPEX, soit 1.486.441.948 FCFA (différence entre le montant total des travaux réalisés au titre de l'avenant A1 107/84 et la totalité des billets à ordre émis au titre des avenants A1 107/84 et A3 127/84) au 31/12/1987* » [40].

Ce constat est explicitement confirmé dans la Sentence de 2000 lorsqu'elle **écrit en page 36 à propos des avenants n°1 du marché n°107/84 et n°3 du marché n° 127/84** que :

> « *le procès-verbal reconnaît que COMMISIMPEX était à l'époque créancière d'un solde de 1.486.441.948 FCFA, correspondant à 'la différence entre travaux réalisés et paiements'* ».

3/ Les avenants n°1 du marché n°107/84 et n°3 du marché n°127/84 ayant donné naissance à un solde impayé en faveur de COMMISIMPEX de 1.486.441.948 FCFA sont visés dans la Garantie (voir figure 3).

Par conséquent, la somme allouée par la Sentence de 2000 pour un montant de 1.426.623.801 FCFA est liée aux Marchés visés par la Garantie, plus précisément les avenants n°1 du marché n°107/84 et n°3 du marché n°127/84, contrairement à ce que suggère le Rapport PWC.

---

[40] Source : Rapport RICOL, page 21, paragraphe 3.23.

### 4.3 Sur la conclusion selon laquelle la Sentence de 2013 porte exclusivement sur la seconde partie de la dette de la République du Congo à l'égard de COMMISIMPEX visée dans le Protocole de 2003 d'un montant de 520 millions FRF (ou 26 milliards FCFA) qui est étrangère aux marchés visés par la Garantie

Le Rapport PWC exprime cette conclusion dans les termes suivants :

> Page 23 : « *la sentence de 2013 porte exclusivement sur un montant de dette de 26 MFCFA qui est étrangère aux marchés visés par la Garantie* ».

> Page 26 : « *les sommes accordées par la Sentence de 2013 et les frais d'arbitrage afférents ne sauraient être inclus dans la Créance alléguée par COMMISIMPEX parce qu'elles sont étrangères à la Garantie* ».

**Cette conclusion s'avère en contradiction avec la Sentence de 2013.**

Dans sa section intitulée « Sur l'absence alléguée de cause du Protocole de 2003 »[41], le tribunal arbitral procède, en effet, à une analyse de l'origine de la seconde partie de la dette de la République du Congo d'un montant de 520 millions FRF à l'égard de COMMISIMPEX qui confirme qu'elle est liée aux Marchés visés par la Garantie de la manière suivante :

1/ La dette de la République du Congo à l'égard de COMMISIMPEX s'élevait à la date du 1er janvier 1987 à 29.949.284.818 FCFA, sur la base du montant de Marchés visés par la Garantie, comme le montre la Fiche de calcul (cf. paragraphe 2.3 et figure 4).

2/ Cette dette avait progressé à un montant d'environ 48 milliards FCFA (soit 960 millions FRF) au 30 septembre 1992, en tenant compte des intérêts calculés au taux annuel de 10,5% entre le 1er janvier 1987 et le 30 septembre 1992.

Ce point est notamment développé dans le Rapport EY (cf. paragraphe 2.6 et figure 8) qui :

- confirme le montant de la dette de la République du Congo indiquée dans la Fiche de calcul ;

- montre que cette dernière avait augmenté à 48.532.681.474 FCFA au 30 septembre 1992.

3/ Le Protocole de 1992 ne réglait que partiellement la dette de la République du Congo à l'égard de COMMISIMPEX.

Ce point est souligné dans le Rapport EY (cf. paragraphe 2.6 et figure 8) qui indique que la dette au 30 septembre 1992 avait été réglée partiellement à hauteur de 22 milliards FCFA (soit 440 millions FRF) au travers du Protocole de 1992, ce qui laissait une dette résiduelle d'un montant de 26.532.681.474 FCFA (soit environ 520 millions FRF).

---

[41] Cf. Sentence de 2013, pages 65 et suivantes.

4/ Les articles 3 et 4 du Protocole de 2003 visaient précisément à organiser le règlement de cette dette résiduelle d'un montant de 520 millions FRF au 30 septembre 1992 (cf. paragraphe 2.7).

Plus précisément, on peut lire les éléments suivants dans la Sentence de 2013 :

> Paragraphe 288 : « *Le Tribunal Arbitral considère à la majorité **que la République du Congo n'a fourni aucun élément convaincant établissant qu'en octobre 2003 sa dette vis-à-vis de Commisimpex était d'un montant autre que les 48 milliards FCFA [ou 960 millions FRF] visés au Protocole de 2003,** alors que Commisimpex a expliqué de façon plausible **l'origine de ce montant** : une évaluation de la créance de Commisimpex au titre des marchés à 29.949.284.818 FCFA fin 1986. Par application d'un taux d'intérêt de 10,5% avec capitalisation annuelle et sur la base d'une conversion des montants en devises étrangères aux taux envisagés à la date de la signature des marchés, on obtient un montant d'environ FRF 960.000.000, soit les 48 milliards FCFA du Protocole de 2003* ».

> Paragraphe 292 : « ***La Fiche de Calcul Détaillée de la CCA de 1991, qui constate l'existence d'une créance de 20.949.284.818 FCFA fin 1986,** est également reprise par la Cour d'appel dans sa décision du 12 juillet 2002 qui fait aussi état de l'évaluation à 48 milliards FCFA de la créance au 30 septembre 1992 par Ernst & Young* ».

> Paragraphe 293 : « *l'ensemble des documents qui viennent d'être évoqués **permettent au Tribunal Arbitral de constater deux points essentiels : 1) l'évaluation de la dette du Congo vis-à-vis de Commisimpex fin 1986 à 29.949.184.818 FCFA** semblait largement admise tant en 1991 qu'en 2002-2003 ; 2) son actualisation à 48 milliards FCFA en octobre 1992 prête peu à discussion puisqu'il s'agit d'un calcul mathématique effectué par Ernst & Young et contrôlé par le cabinet Mazars au cours de la précédente procédure arbitrale (...) **Le montant de 48 milliards FCFA repose sur une évaluation des sommes dues à Commisimpex articulée dès 1991 et actualisée à fin septembre 1992. Il ne s'agit aucune d'un montant sorti d'un chapeau par des négociateurs pour des raisons obscures et sans aucun fondement factuel* ».

> Paragraphe 297 : « *Il faudrait aussi que la fraude se fut étalée sur une longue période, puisqu'elle remonterait au moins à **l'évaluation de la dette à 29.949.184.818 FCFA fin 1986, en 1991, fondement de l'évaluation à 48 milliards en septembre 1992** ».

Par conséquent, les Marchés visés par la Garantie étaient à l'origine de la dette de 29.949.184.818 FCFA déterminée à la date du 1er janvier 1987, dont le montant avait augmenté à environ 48 milliards FCFA au 30 septembre 1992 (ou 960 millions FRF), du fait de la capitalisation des intérêts.

Le Protocole de 1992, jamais exécuté par la République du Congo, ne traitait la dette de la République du Congo à la date du 30 septembre 1992 qu'à hauteur de 22 milliards FCFA (ou 440 millions FRF) laissant une dette résiduelle d'environ 26 milliards FCFA (ou 520 millions FRF), objet de la seconde partie de la dette de la République du Congo traitée aux articles 3 et 4 du Protocole de 2003.

**Les sommes allouées à COMMISIMPEX par la Sentence de 2013 portant sur la seconde partie de la dette de la République du Congo d'un montant 520 millions FRF arrêtée au 30 septembre 1992 et sur les intérêts capitalisés sur ce montant jusqu'au**

**30 juillet 2003, il existe un lien direct entre les sommes allouées par la Sentence de 2013 et les Marchés visés par la Garantie.**

## 5. Analyse de l'indépendance du cabinet PWC à l'égard des partis au présent litige

Dans le cadre de la procédure en cours, la société TOTAL Enegrie E&P Congo a produit un rapport rédigé, le 24 décembre 2020, par le cabinet PWC

Pour etre valablement retenu dans les débats, ce rapport ne mérité considération que s'il émane d'un professionnel qui, indépendamment de ses qualités techniques, est indépendant des parties en cause.

A cet égard, deux constatations méritent d'etre relatées :

1/ Les relations du cabinet PWC avec la République du Congo :

Le 20 mars 2017, le gouvernement du Congo a annoncé avoir confié une mission importante aux experts du cabinet PWC à Brazzaville.

L'objectif est de développer une méthodologie en vue d'une diversification de l'économie congolaise.

Cette mission s'inscrit dans le projet d'appui à la diversification de l'économie et le programme national de développement 2012-2016.

Cette relation d'affaires, inscrite dans la durée, implique une grande proximité avec les pouvoirs publics congolais.

Or, dans le présent litige, les intérets de la République du Congo ne sont pas nécessairement convergents avec ceux du groupe TOTAL.

Dès lors, il est difficile d'intervenir simultanément pour deux parties intéressées aux résultats du même procès.

2/ Les relations du cabinet PWC avec le Groupe TOTAL.

Selon un communiqué publié par le Groupe TOTAL, un conseil d'administration s'est réuni, le 29 octobre 2020, et a décidé de soumettre à l'assemblée générale des actionnaires, qui se réunira le 25 mai 2022, pour approuver les comptes de l'exercice 2021, la nomination du cabinet PWC en qualité de commissaire aux comptes, pour un mandat de 6 ans.

C'est dire qu'à la date à laquelle le cabinet PWC a rédigé son rapport, soit le 24 décembre 2020, il avait accepté d'etre désigné en qualité de commissaire aux comptes.

Or, le Code déontologie de la profession de commissaire aux comptes, inséré en annexe du Livre VIII du Code de commerce, dans sa partie réglementaire, en vigueur à compter du 25 Mars 2020, prévoit, en son article 22, que :

> « *Le commissaire aux comptes ne peut accepter une mission de certification auprès d'une entité d'intérêt public lorsque, au cours de l'exercice précédent celui dont les comptes doivent être certifiés ; lui ou tout membre de son réseau a fourni, directement ou indirectement à l'entité d'intérêt public, aux personnes ou entités qui la controlent ou qui sont controlées par elle dans l'Union européenne, au sens des I et II de l'article L. 233 du Code de commerce, les services qui sont mentionnées au e du 1 de l'article 5 du Règlement UE n° 537/2014* ».

Au surplus, le paragraphe I de l'article 22 fait obligation au commissaire aux comptes d'identifier et d'analyser toutes les missions réalisées antérieurement à sa désignation, pour apprécier les risques d'autorévision et définir les mesures de sauvegarde appropriés.

Enfin, l'article 18 dudit Code énonce les services interdits à un commissaire intervenant auprès d'une entité d'intérêt public.

Ces services sont énumérés au II de l'article L.822-11 du Code de commerce et comprennent, notamment : g-iii- l'exercice d'un role de défenseur dans le cadre de la résolution d'un litige.

Dès lors que son nom avait été proposé par un conseil d'administration et qu'il avait accepté d'etre désigné à une prochaine assemblée, on peut considérer que le cabinet PWC était tenu de se soumettre à cette exigence et de s'abstenir de toute mission qui pourrait le placer dans une situation d'incompatibilité par rapport à la fonction à laquelle il avait accepté d'etre désigné.

En rédigeant un rapport en défense du Groupe TOTAL, le 24 décembre 2020, le cabinet PWC parait avoir ignoré cette prescription.

Dès lors, ce rapport, produit en contravention avec des dispositions légales et règlementaires, doit etre écarté du présent débat.

## Conclusion

En conclusion, il ressort des constatations décrites dans le présent rapport que les conclusions suivantes peuvent, à notre avis, être retenues :

1. Le montant qui aurait été dû par la République du Congo à COMMISIMPEX, au titre des marchés visés par la Garantie, sur la base de la Fiche de calcul, à la date du 31 mars 2019, s'élève à 1.461.421.086 EUR.

2. Ce montant s'avère supérieur à celui déterminé dans le Rapport Mazars 2019, qui se monte à 1.198.656.682EUR, hors frais d'arbitrage actualisés.

3. La différence entre ces deux montants ne s'explique pas par des différences de périmètre, au sens où les sentences prises en compte dans le Rapport Mazars 2019 ont alloué des sommes à COMMISIMPEX exclusivement sur la base des Marchés visés par la Garantie. Cette différence trouve son origine par la prise en compte de paramètres de calcul différents.

4. Les conclusions du Rapport PWC ne peuvent pas être considérées comme exactes sur trois points.

   En premier lieu, il est inexact d'écrire, comme le fait le Rapport PWC, que le Rapport RICOL aurait considéré que l'exécution de seulement sept des onze Marchés visés dans la Garantie serait certaine.

   Le Rapport RICOL considère, en effet, que l'ensemble des Marchés, en ce compris l'ensemble des Marchés visés dans la Garantie, avaient été parfaitement exécutés. Il ne retient, ainsi, aucune des allégations de la République du Congo concernant une éventuelle inexécution, exécution partielle ou mauvaise exécution d'un marché.

   En deuxième lieu, il est incorrect de considérer que les sommes allouées à COMMISIMPEX par la Sentence de 2000 ne devrait être retenues que pour les montants libellés en FRF, GBP et USD.

   La somme allouée à COMMISIMPEX par la Sentence de 2000 libellée en FCFA est, en effet, également liée aux Marchés visés par la Garantie, précisément les avenants n°1 du marché n°107/84 et n°3 du marché n°127/84.

   Par conséquent, la totalité de la somme allouée à COMMISIMPEX par la Sentence de 2000 actualisée dans le Rapport Mazars 2019 (soit 244,9 millions EUR) est liée aux Marchés visés par la Garantie, et non juste un montant de 234 millions comme le suggère le Rapport PWC.

   En dernier lieu, il est erroné d'affirmer que les sommes allouées par la Sentence de 2013 à COMMISIMPEX seraient étrangères aux Marchés visés dans la Garantie.

   Les sommes allouées par la Sentence de 2013 sont, en effet, basées sur la seconde partie de la dette de la République du Congo d'un montant de 520 millions FRF arrêtée au 30 septembre 1992 et sur les intérêts capitalisés sur ce montant jusqu'au 30 juillet 2003.

   Or :

   - Ce montant de 520 millions FRF constitue le solde de la dette de la République du Congo calculée sur la base du montant arrêté dans la Fiche de calcul (48 milliards FCFA ou 960 millions FRF après capitalisation des montants du 1er janvier 1987 au 30 septembre 1992) après déduction du montant de 440 millions FRF objet du Protocole de 1992.

- la Fiche de calcul est basée exclusivement et prend en compte de manière exhaustive les Marchés visés par la Garantie.

Il en résulte que les sommes allouées par la Sentence de 2013 sont basées exclusivement sur les Marchés visés dans la Garantie.

5. Le Rapport PWC devrait être écarté du présent débat car il apparaît en contradiction avec des dispositions légales et règlementaires à raison de :

- ses relations avec la République du Congo ;

- l'annonce le 29 octobre 2020 par TotalEnergies, soit précédemment à la date de son rapport, de la proposition de le nommer au mandat de commisssaire aux comptes lors de son assemblée générale appelée à se prononcer sur les comptes de son exercice 2021.

Fait à Paris, le 27 septembre 2021

Cabinet Didier Kling Expertise & Conseil

Didier Kling
Expert (honoraire) près la cour d'appel de Paris
Agréé par la Cour de cassation

Teddy Guerineau
Associé

Marché n°015/86/G ............ FRF 20 355 751
Avenant n°4 n°54/86/AV ...... GBP 2 871 649
Marché 53/86 ................. FCFA 1 257 621 499
Avenant n°1 n°55/86/AV ...... FCFA 241 011 369
Avenant n°5 n°57/86/AV ...... GBP 8 234 327
Avenant 56/86 ............... FCFA 393 960 889
Garantie n° corp 5166-85 .... GBP 15 174 229

Total   FRF   96 410 238
Total   GBP   44 445 335
Total   USD    1 233 703
Total   CFA  1 892 593 757

| Date | FRF | USD | | | | |
|---|---|---|---|---|---|---|
| 18/04/2018 | FRF | 4 109 140 | 450 000,00 | 10 150 201,26 | 66 580 955,68 | |
| 25/07/2018 | USD | 1 233 703 | 113 142,56 | 10 263 343,82 | 67 323 122,22 | |
| 23/08/2018 | | | 42 626,40 | 10 305 970,22 | 67 602 733,08 | |
| 15/02/2019 | | | 28 295,00 | 10 334 265,22 | 67 788 336,11 | |
| 10/04/2019 | | | 2 208 981,90 | 12 543 247,12 | 82 278 307,51 | |
| 23/02/2021 | | | 26 233 973,54 | 38 777 220,66 | 254 361 893,32 | |

| | | |
|---|---|---|
| FRF | 7 236 122 | |
| GBP | 7 264 830 | |
| USD | 1 233 703 | |
| CFA | 1 892 593 757 | |

### Tableau principal

| Date | FRF Principal | FRF Intérêts à 10,5% | FRF Rbt | FRF Montant fin période | GBP Principal | GBP Intérêts à 10,5% | GBP Rbt | GBP Montant fin période | FCFA Principal | FCFA Intérêts à 10,5% | FCFA Rbt | FCFA Mont fin p. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31/12/86 | 96 410 238 | 3 244 931 | -14 596 394 | | 44 445 335 | 1 495 920 | -7 264 830 | | 1 892 593 757 | 63 700 039 | | 2 091 |
| 27/04/87 | | 5 836 801 | | 90 895 576 | | 2 652 549 | | 41 328 974 | | 135 022 305 | | 2 310 |
| 31/12/87 | | 9 944 035 | | 100 439 612 | | 4 339 542 | | 45 668 517 | | 219 588 191 | | 2 553 |
| 31/12/88 | | 10 546 159 | | 110 985 771 | | 4 795 194 | | 50 463 711 | | 242 644 951 | | 2 821 |
| 31/12/89 | | 11 653 506 | | 122 639 277 | | 5 298 690 | | 55 762 400 | | 268 122 670 | | 3 179 |
| 31/12/90 | | 12 877 124 | | 135 516 401 | | 5 855 052 | | 61 617 453 | | 296 275 551 | | 3 445 |
| 31/12/91 | | 14 229 222 | | 149 745 623 | | 6 469 833 | | 68 087 285 | | 327 384 484 | | 3 807 |
| 31/12/92 | | 15 723 290 | | 165 468 913 | | 7 149 165 | | 75 236 450 | | 361 759 855 | | 4 206 |
| 31/12/93 | | 17 374 236 | | 182 843 149 | | 7 899 827 | | 83 136 277 | | 399 744 639 | | 4 648 |
| 31/12/94 | | 19 198 531 | | 202 041 680 | | 8 729 309 | | 91 865 586 | | 441 717 826 | | 5 136 |
| 31/12/95 | | 21 214 376 | | 223 256 056 | | 9 645 887 | | 101 511 473 | | 488 098 198 | | 5 676 |
| 31/12/96 | | 23 441 886 | | 246 697 942 | | 10 658 705 | | 112 170 178 | | 539 348 509 | | 6 271 |
| 31/12/97 | | 25 903 284 | | 272 601 226 | | 11 777 869 | | 123 948 046 | | 595 980 102 | | 6 930 |
| 31/12/98 | | 28 623 129 | | 301 224 355 | | 13 014 545 | | 136 962 591 | | 658 558 013 | | 7 658 |
| 31/12/99 | | 31 628 557 | | 332 852 912 | | 14 381 072 | | 151 343 663 | | 727 706 605 | | 8 462 |
| 31/12/00 | | 34 949 556 | | 367 802 468 | | 15 891 085 | | 167 234 748 | | 804 115 798 | | 9 350 |
| 31/12/01 | | 38 619 259 | | 406 421 727 | | 17 559 649 | | 184 794 396 | | 888 547 957 | | 10 332 |
| 31/12/02 | | 42 674 281 | | 449 096 008 | | 19 403 412 | | 204 197 808 | | 981 845 492 | | 11 417 |
| 31/12/03 | | 47 155 081 | | 496 251 089 | | 21 440 770 | | 225 638 578 | | 1 084 939 269 | | 12 616 |
| 31/12/04 | | 52 106 364 | | 548 357 454 | | 23 692 051 | | 249 330 628 | | 1 198 857 892 | | 13 941 |
| 31/12/05 | | 57 577 533 | | 605 934 986 | | 26 179 716 | | 275 510 344 | | 1 324 737 971 | | 15 405 |
| 31/12/06 | | 63 623 174 | | 669 558 160 | | 28 928 586 | | 304 438 930 | | 1 463 835 458 | | 17 022 |
| 31/12/07 | | 70 303 607 | | 739 861 767 | | 31 966 088 | | 336 405 018 | | 1 617 538 181 | | 18 810 |
| 31/12/08 | | 77 685 486 | | 817 547 252 | | 35 322 527 | | 371 727 545 | | 1 787 379 690 | | 20 785 |
| 31/12/09 | | 85 842 461 | | 903 389 714 | | 39 031 392 | | 410 758 937 | | 1 975 054 557 | | 22 967 |
| 31/12/10 | | 94 855 920 | | 998 245 634 | | 43 129 688 | | 453 888 626 | | 2 182 415 286 | | 25 379 |
| 31/12/11 | | 104 815 792 | | 1 103 061 425 | | 47 658 306 | | 501 546 931 | | 2 411 590 991 | | 28 043 |
| 31/12/12 | | 115 821 450 | | 1 218 882 875 | | 52 662 428 | | 554 209 359 | | 2 664 808 045 | | 30 988 |
| 31/12/13 | | 127 982 702 | | 1 346 865 577 | | 58 191 983 | | 612 401 342 | | 2 944 612 890 | | 34 242 |
| 31/12/14 | | 141 420 886 | | 1 488 286 462 | | 64 302 141 | | 676 703 483 | | 3 253 797 243 | | |
| 31/12/15 | | 5 123 609 | -7 853 598 | | | | | | | 3 595 445 954 | | 37 837 |
| 12/01/16 | | 29 305 290 | -32 095 737 | | | 71 053 866 | | 747 757 348 | | 3 972 967 779 | | 41 810 |
| 21/03/16 | | | -288 279 | | | | | | | | | |
| 08/09/16 | | 47 358 319 | | 1 600 887 686 | | 78 514 522 | | 826 271 870 | | 4 390 129 395 | | 46 200 |
| 31/12/16 | | 80 132 104 | -23 391 534 | | | | | | | 1 196 159 913 | | 47 397 |
| 23/06/17 | | 86 675 850 | | 1 744 304 106 | | 86 758 546 | | 913 030 416 | | | | |
| 31/12/17 | | 54 192 900 | -2 951 807 | | | 23 638 733 | | 936 669 149 | | | | |
| 18/04/18 | | 49 091 822 | -742 167 | | | | | | | | | |
| 25/07/18 | | 14 520 980 | -279 611 | | | | | | | | | |
| 31/12/18 | | 65 083 593 | | 1 923 219 819 | | | | | | | | |
| 15/02/19 | | 25 449 731 | | | | | | | | | | |
| 31/03/19 | | 24 340 871 | -185 603 | 1 972 824 818 | | | | | | | | |